1  Ronald N. Richards (SBN 176246)
   LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.
2  Email:  ron@ronaldrichards.com
   P.O.  Box 11480
3  Beverly Hills, California 90213
   Telephone:   (310) 556-1001
4  Facsimile:   (310) 277-3325

5  Geoffrey S. Long (Cal. State Bar No. 187429)
   LAW OFFICES OF GEOFFREY LONG, A.P.C.
6  Email:  glong0607@gmail.com
   1601 N. Sepulveda Blvd., No. 729
7  Manhattan Beach, California 90266
   Telephone:   (310) 480-5946
8  Facsimile:   (310) 796-5663

9  Attorneys for Plaintiff LDR INTERNATIONAL LIMITED, a British Virgin Island
   corporation

10              UNITED STATES DISTRICT COURT

11       CENTRAL DISTRICT OF CALIFORNIA—SOUTHERN DIVISION

12

13  LDR INTERNATIONAL LIMITED, a          )  Case No. 8:23−cv−00257−DOC (JDEx)
    British Virgin Island corporation;    )
14                                         )  **PLAINTIFF'S APPENDIX OF**
              Plaintiff,                   )  **EVIDENCE IN SUPPORT OF**
15                                         )  **MOTION FOR SUMMARY**
         v.                               )  **JUDGMENT AGAINST**
16                                         )  **DEFENDANTS SARA JACQUELINE**
    SARA JACQUELINE KING, an              )  **KING AND KING FAMILY**
17  individual, and KING FAMILY           )  **LENDING LLC**
    LENDING LLC, a California limited     )
18  liability company;                    )  **(FED. R. CIV. P. 56; CENTRAL DISTRICT**
                                           )  **LOCAL RULE 56-1)**
19            Defendants.                  )
                                           )  (Filed concurrently with: 1) Notice of
20                                         )  Motion and Motion for Summary
                                           )  Judgment; 2) Memorandum of Points and
21                                         )  Authorities; 3) Statement of
                                           )  Uncontroverted Facts and Conclusions of
22                                         )  Law; and 4) Notice of Lodging Proposed
                                           )  Judgment)
23                                         )
                                           )  Date:        October 16, 2023
24                                         )  Time:        8:30 a.m.
                                           )  Courtroom:   10A
25                                         )  Judge:       Judge David O. Carter
                                           )
26                                         )  Trial Date:  January 30, 2024
                                           )
27                                         )
                                           )
28  ─────────────────────────────────────)

─────────────────────────────────────────────────────────────

Pursuant to Rule 56-1 of the United States District Court, Central District of California, Local Rules, Plaintiff LDR INTERNATIONAL LIMITED ("Plaintiff" or "LDR") hereby submits this Appendix of Evidence in support of its Motion for Summary Judgment against Defendants SARA JACQUELINE KING ("Sara King") and KING FAMILY LENDING LLC ("King Lending," collectively "Defendants").

- Declaration of Laurent Reiss
- Declaration of Ronald Richards
- Exhibit "A"— Complaint filed February 11, 2023
- Exhibit "B"— Default by Clerk F.R.Civ.P. 55(a) against King Lending issued April 4, 2023
- Exhibit "C"— Answer by Sara King filed March 28, 2023
- Exhibit "D"— Information filed against Sara King in the action entitled *United States of America v. Sara Jacqueline King*, United States District Court, Central District of California, Southern Div., Case No. 8:23-cr-00079-DOC ("Criminal Action")
- Exhibit "E"— Plea Agreement by Sara King in the Criminal Action filed June 12, 2023 ("Plea Agreement")
- Exhibit "F"— Reporter's Transcript of Proceedings in the Criminal Action, July 24, 2023
- Exhibit "G"— King Lending Promissory Note to Plaintiff dated January 14, 2022, in the amount of $195,000
- Exhibit "H" — King Lending Promissory Note to Plaintiff dated April 27, 2022, in the amount of $200,000
- Exhibit "I" — King Lending Promissory Note to Plaintiff dated May 16, 2022, in the amount of $500,000
- Exhibit "J" — King Lending Promissory Note to Plaintiff dated June 20, 2022, in the amount of $150,000

- Exhibit "K" — King Lending Promissory Note to Plaintiff dated August 18, 2022, in the amount of $300,000
- Exhibit "L"— spreadsheet itemizing 97 loans from Plaintiff to King Lending
- Exhibit "M"— fraudulent/fabricated loan documents between King Lending and purported third-party borrower for King Lending Promissory Note to Plaintiff dated January 14, 2022, in the amount of $195,000
- Exhibit "N"— fraudulent/fabricated loan documents between King Lending and purported third-party borrower for King Lending Promissory Note to Plaintiff dated April 27, 2022, in the amount of $200,000
- Exhibit "O"— fraudulent/fabricated loan documents between King Lending and purported third-party borrower for King Lending Promissory Note to Plaintiff dated June 20, 2022, in the amount of $150,000
- Exhibit "P" — fraudulent/fabricated loan documents between King Lending and purported third-party borrower for King Lending Promissory Note to Plaintiff dated July 7, 2022, in the amount of $400,000
- Exhibit "Q" — fraudulent/fabricated loan documents between King Lending and purported third-party borrower for King Lending Promissory Note to Plaintiff dated August 23, 2022, in the amount of $175,000
- Exhibit "R" — fraudulent/fabricated collateral documents in connection with January 14, 2022 loan in the amount of $195,000
- Exhibit "S"— fraudulent/fabricated collateral documents in connection with April 1, 2022 loan in the amount of $150,000
- Exhibit "T" — fraudulent/fabricated collateral documents in connection with April 5, 2022 loan in the amount of $95,000
- Exhibit "U"— fraudulent/fabricated collateral documents in connection with January 28, 2022 loan in the amount of $175,000

3

- Exhibit "V" —  fraudulent/fabricated collateral documents in connection with March 4, 2022 loan in the amount of $150,000
- Exhibit "W"— fraudulent/fabricated NFL Player Contract
- Exhibit "X"—  Cashier's Check dated 1/14/2022 for $193,000 as purported proof of funding document in connection with January 14, 2022 loan in the amount of $195,000
- Exhibit "Y"—  Cashier's Check dated 3/28/2022 for $120,000 as purported proof of funding document in connection with March 28, 2022 loan in the amount of $120,000
- Exhibit "Z"—  Cashier's Check dated 7/22/2022 for $150,000 as purported proof of funding document in connection with July 28, 2022 loan in the amount of $150,000
- Exhibit "AA"— email sent to Plaintiff by Sara King on March 27, 2022, in connection with Loan 10
- Exhibit "BB"— email sent to Plaintiff by Sara King on March 30, 2022, in connection with Loan 11
- Exhibit "CC"— email sent to Plaintiff by Sara King on January 27, 2022, in connection with Loan 03
- Exhibit "DD"— email sent to Plaintiff by Sara King on May 25, 2022, in connection with Loan 28
- Exhibit "EE"— email sent to Plaintiff by Sara King on January 14, 2022, in connection with Loan 01
- Exhibit "FF"— Ocrolus premier document fraud analysis of Chase Bank statements February through June 2022
- Exhibit "GG"— JPMorgan Chase Bank, N.A. document production for King Lending account and custodian of records declaration
- Exhibit "HH"— JPMorgan Chase Bank, N.A. document production for Sara King account and custodian of records declaration

4

1  DATED: September 11, 2023          LAW OFFICES OF RONALD RICHARDS &
2                                     ASSOCIATES, A.P.C.

3
                                      By: ____/ s /  Ronald N. Richards_____
4                                          Ronald N. Richards
                                      Attorneys for Plaintiff LDR
5                                     INTERNATIONAL LIMITED

6
   DATED: September 11, 2023          LAW OFFICES OF GEOFFREY LONG,
7                                     A.P.C.

8
9                                     By: ____/ s /  Geoffrey S. Long_____
                                           Geoffrey S. Long
10                                    Attorneys for Plaintiff LDR
                                      INTERNATIONAL LIMITED
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Appendix of Evidence in Support of Motion for Summary Judgment Against Defendants

## DECLARATION OF LAURENT REISS

I, Laurent Reiss, declare and state as follows:

1)     At all times relevant hereto, I have been the President/CEO of Plaintiff LDR International Limited ("Plaintiff" or "LDR").  In this capacity, I have personal knowledge of the facts set forth in this declaration, and if called as a witness for this purpose, I could and would testify competently under oath to them.

2)     I make this declaration in support of Plaintiff's Motion for Summary Judgment ("Motion") against Defendants Sara Jacqueline King ("Sara King") and King Family Lending LLC ("King Lending," collectively "Defendants").

3)     I was personally involved with each of the loan transactions between Plaintiff and King Lending that are the subject matter of this lawsuit and all of the related communications with and misrepresentations by Sara King.  I was a party to and the representative for Plaintiff with respect to all of the communications, written and verbal, between King Lending and Sara King, on the one hand, and Plaintiff, on the other hand, regarding the loans that are the subject matter of this lawsuit.

4)     Beginning in January 2022 through October 2022, Plaintiff began extending a series of loans to King Lending.  In total there were ninety-seven (97) loans from Plaintiff to King Lending.  All of the loans from Plaintiff to King Lending were for a similar purpose and took a similar form, specifically Plaintiff would loan King Lending moneys which King Lending and Sara King represented to me, both in writing and verbally, that King Lending was using to loan the same funds to third-party borrowers.  Sara King and King Lending represented to me, in writing and verbally, that the purported loans from King Lending to the third-party borrowers were secured by various forms of valuable collateral, including but not limited to luxury automobiles, boats, yachts, jewelry, watches, precious metal coins, and the earnings from guaranteed professional sports contracts.  The loans from Plaintiff to King Lending would in turn be secured by the same collateral

which purportedly secured the loans from King Lending to the third-party

borrowers.

5)     Each of the ninety-seven loans from Plaintiff to King Lending was

evidenced by a Promissory Note, prepared by Sara King, payable by King

Lending, as maker, to Plaintiff, as payee.  In each of said Promissory Notes, Sara

King and King Lending expressly represented that the loan from Plaintiff to King

Lending was for purpose of making the third-party loan as follows: "Maker is a

California Finance Lender and is using all monies to fund a loan. Collateral for

said loan is: [collateral identified]."  Attached hereto as Exhibits "G" through "K"

are five promissory notes, out of the ninety-seven, including the Promissory Note

dated January 14, 2022, for $195,000 which was the first loan and promissory note

from Plaintiff to King Lending, and four others which are all identical other than

the date, dollar amount, and collateral identified in paragraph 7.  The attached

promissory notes were selected from the ninety-seven promissory notes because

they show the various forms of collateral promised by King Lending to Plaintiff to

secure each of the loans.  I have in my possession, custody, and control all ninety-

seven promissory notes that are signed by Sara King as the manager for King

Lending and payable to Plaintiff.

6)     Each of the Promissory Notes from King Lending as maker to

Plaintiff as payee contains an attorneys' fee clause, at paragraph 11, in the event

collection on the note is required, governing law provision applying California law,

and default provisions.  See Exhibits "G" through "K" at ¶ 11.

7)     In total, Plaintiff extended ninety-seven (97) loans to King Lending in

the total principal amount of $10,258,500 which were purportedly secured by

luxury cars, jewelry, watches, antique precious metal coins, designer handbags,

boats, yachts, and earnings from guaranteed sports contracts with representations

regarding salary and bonus amounts of those sports contracts.  In connection with

each of the 97 loans from Plaintiff to King Lending, Sara King made numerous

intentionally false written representations regarding the third-party loans, collateral for the third-party loans, and funding of the third-party loans.  Attached hereto as Exhibit "L" is a true, correct, and accurate copy of a spreadsheet that accurately itemizes and contains all material information for each of the 97 loans, including but not limited to the loan number, amount, collateral, date funded, duration, and maturity/due date.  Exhibit "L" was prepared by me and at my direction in the regular course of business and was continually updated for each new loan at or near the time of the loan funding based on the information contained in each promissory note and in Plaintiff's bank records.  For each of the 97 loans identified in Exhibit "L" there is a corresponding promissory note from King Lending as maker to Plaintiff as payee and there is corresponding third-party loan documents that were provided to me by Sara King and King Lending, as discussed below.

8)      In connection with the purported third-party loans which the moneys loaned by Plaintiff to King Lending were purportedly being used to fund, Sara King and King Lending provided me and Plaintiff with false and fabricated loan documents between King Lending and the purported third-party borrowers, which typically included a Secured Promissory Note and Security Agreement with the name and other identifying information of the third-party borrower redacted by Defendants.  Sara King and King Lending represented to me when these purported third-party loan documents were provided to me by Defendants that these were the actual loan documents between King Lending and its third-party borrowers. Attached hereto as Exhibits "M" through "Q" are five such purported third-party loan documents that were provided to me by King Lending and Sara King at or about the time that the corresponding loan was made by Plaintiff to King Lending. There are similar loan documents that were provided to me by Sara King and King Lending for all of the other loans that are in my custody, control, and possession. These purported third-party loan documents that were provided to me by

Defendants are false and fabricated because there were no such third-party loans by King Lending to any third-party.

9)     In connection with many of the purported third-party loans which the moneys loaned by Plaintiff to King Lending were purportedly being used to fund, Sara King and King Lending provided me with false and fabricated documents regarding the collateral purportedly securing said loans, including but not limited to title documents for automobiles and boats, appraisals, and photographs, with name and other identifying information of the third-party borrower redacted by Sara King which Defendants represented to me was the collateral securing the third-party loans.  Attached hereto as Exhibits "R" through "V" are five such purported third-party collateral documents that were provided to me by King Lending and Sara King at or about the time that the corresponding loan was made by Plaintiff to King Lending.  Additional similar documents are in my custody, control, and possession.

10)     In connection with the purported third-party loans which the moneys loaned by Plaintiff to King Lending were purportedly being used to fund and which were secured by guaranteed professional sports contracts, Sara King and King Lending provided me with information regarding the alleged guaranteed sports contracts, including salary and bonus information and an NFL Player Contract, with name and other identifying information of the third-party borrower and financial information redacted, which Sara King represented to me was one of the guaranteed contracts that secured one of King Lending's third-party loans.  A true and correct copy of said NFL Player Contract is attached hereto as Exhibit "W."

11)     In connection with many of the purported third-party loans which the moneys loaned by Plaintiff to King Lending were purportedly being used to fund, Sara King and King Lending provided me with purported proof of funding documents which typically consisted of a cashier's check from King Lending with

the purported third-party borrower's name redacted which Sara King and King Lending represented to me were proof of the funding of the third-party loans by King Lending.  Because the payee names were redacted, I could never verify that the funds were actually loaned to the third-party borrowers.  These "proof of funds" documents do not evidence payment to any third-party borrowers and Sara King and King Lending intentionally provided me with these false and mispresented documents.  True and correct copies of three of the Cashier's Checks provided to me by Sara King and King Lending as purported proof of funding of the third-party loans are attached here as Exhibit "X" through "Z," and there are more.

12)     Sara King and King Lending also falsely represented to me, in writing and verbally, that the amount of $6,331,580 received by King Lending in loan repayments from third-party borrowers had been "redeployed" to fund purported additional loans between King Lending and third-party borrowers, instead of being repaid to Plaintiff.  In fact, there were no payments made by the any third-party borrowers because there were no third-party borrowers or loans to third-party borrowers.

13)     Sara King and King Lending engaged in a massive fraud on Plaintiff.  There were no third-party loans from King Lending to any third-party borrowers.

14)     Sara King and King Lending falsified and fabricated each of the purported third-party loans and all of the documents regarding those loans, funding of the third-party loans, and collateral for those loans, including but not limited to Exhibits "M" through "Z."

15)     Attached hereto as Exhibit "AA" is a true and correct copy of an email sent to me by Sara King on March 27, 2022, regarding Loan 10 on Exhibit "L" and attaching to it purported third-party borrower documents between King Lending and the purported third-party borrower.

16)     Attached hereto as Exhibit "BB" is a true and correct copy of an email sent to me by Sara King on March 30, 2022, regarding Loan 11 on Exhibit "L" and attaching to it purported third-party borrower documents between King Lending and the purported third-party borrower.

17)     Attached hereto as Exhibit "CC" is a true and correct copy of an email sent to me by Sara King on January 27, 2022, regarding Loan 03 on Exhibit "L" and attaching to it purported third-party borrower documents between King Lending and the purported third-party borrower.

18)     Attached hereto as Exhibit "DD" is a true and correct copy of an email sent to me by Sara King on May 25, 2022, regarding Loan 28 on Exhibit "L" and attaching to it purported third-party borrower documents between King Lending and the purported third-party borrower.

19)     Attached hereto as Exhibit "EE" is a true and correct copy of an email sent to me by Sara King on January 14, 2022, regarding Loan 01 on Exhibit "L" and attaching to it purported third-party borrower documents between King Lending and the purported third-party borrower.

20)     I utilized Ocrolus premier document fraud detection solution and analysis on some of the bank statements that were provided to me by Sara King regarding the loans from LDR and the purported loans by King Lending.  Ocrolus is an online software service that analyzes bank statements and other documents to detect fraud and alterations of original bank documents.  The Court can learn more about the Ocrolus at its website https://www.ocrolus.com/product/detect.  The following is a description of the Ocrolus premier document detection solution service/software from its website:

> "Ocrolus' premier document fraud detection solution helps you uncover more fraud than ever before. Our algorithms have been trained on more than 100 million pages of documents from thousands of financial institutions, providing you with only the highest quality data for decision making."

> "Detect evaluates a document's origin and inspects it for signs of tampering after creation. Detailed signals outline

exactly what has been changed on the document allowing you to make more informed decisions, avoid costly losses and streamline application review."

"Clear visualizations illustrate exactly where document tampering has occurred on a file, bringing over 4x more fraud to your attention than other solutions. Effortlessly uncover what fraudsters have tried to conceal and save your teams countless hours of manual inspection."

21)     Attached hereto as Exhibit "FF" is a true and correct copy of the Ocrolus report for the February 2022, March 2022, April 2022, May 2022, and June 2022 Chase Bank statements provided to me by Sara King regarding the funds loaned to King Lending by LDR and the purported third-party loans from King Lending which have been analyzed by the Ocrolus premier fraud detection software.  The red highlights are from Ocrolus and show entries on the bank statements that have been altered from the original bank statements.  At the end of each monthly statement there is a summary provided by Ocrolus of the number of types of entries that have been altered by Sara King and King Lending.

22)     Plaintiff only made the loans to King Lending because of the representations made by Sara King and third-party loan documents that I was provided by King Lending and Sara King.  Plaintiff would not have made any loans to King Lending but for the representations by Sara King and third-party loan documents which ended up being fabricated, including but not limited to the third-party promissory notes, documents regarding collateral, and proof of fundings documents, that I was provided by King Lending and Sara King.

23)     In reliance on the representations made by Sara King and King Lending to me and Plaintiff, including the false and fabricated documents provided to me, emails from Sara King, and phone calls with Sara King, Plaintiff did fund ninety-seven (97) loan to King Lending.  Those loans are itemized and accounted for on Exhibit "L" hereto.  The total amount of principal loaned by Plaintiff to King Lending is $10,258,500.

24) All of the ninety-seven (97) loans from Plaintiff to King Lending have matured, are unpaid by King Lending, and are in default. Total unpaid principal owed by King Lending to Plaintiff in connection with the loans is $10,258,500.

25) In connection with Plaintiff's demands for payment prior to filing this action, King Lending paid Plaintiff $2,000,000 against the interest owed to Plaintiff on the loans.

26) Unpaid prejudgment interest pursuant to the Promissory Notes on the ninety-seven (97) loans, from the dates of funding through September 30, 2023, in the amount of $1,900,000 is owed by King Lending to Plaintiff.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed September 10, 2023

_____
Laurent Reiss

## <u>DECLARATION OF RONALD RICHARDS</u>

I, Ronald Richards, declare and state as follows:

1)      I am an attorney at law duly licensed to practice before all courts of the State of California and the United States District Courts in California, including the Central District of California.  I am the principal of the Law Offices of Ronald Richards & Associates, A.P.C., one of the counsel of record for Plaintiff LDR International Limited ("Plaintiff" or "LDR") in the above-captioned action.  The following facts are personally known to me, and if called as a witness, I could and would competently testify thereto.

2)      I make this declaration in support of Plaintiff's Motion for Summary Judgment ("Motion") against Defendants Sara Jacqueline King ("Sara King") and King Family Lending LLC ("King Lending," collectively "Defendants").

3)      I subpoenaed documents (bank records and account statements) from JPMorgan Chase Bank, N.A. ("Chase Bank") for both Sara King and King Lending during the relevant time period during which LDR was making loans to King Lending—January 2022 through November 2022.

4)      Attached hereto as Exhibit "GG" is a true and correct copy of a portion of the document production made by Chase Bank for the document subpoena requesting bank records and account statements for King Lending's accounts.  Exhibit "GG" includes the Chase Bank custodian of records declaration and bank statements for January through April 2022.

5)      Exhibit "GG" shows extensive ATM and debit card withdrawals at the Pechanga, Aria Resort, and Wynn casinos from the King Lending bank account for hundreds of thousands dollars.  Some of these transactions have been highlighted for the Court's convenience.

6)      Attached hereto as Exhibit "HH" is a true and correct copy of a portion of the document production made by Chase Bank for the document subpoena requesting bank records and account statements for Sara King's

accounts.  Exhibit "HH" includes the Chase Bank custodian of records declaration and bank statements for January through May 9, 2022.

7) Exhibit "HH" shows extensive ATM and debit card withdrawals at the Pechanga, Aria Resort, and Wynn casinos from Sara King's personal account for hundreds of thousands dollars.  Some of these transactions have been highlighted for the Court's convenience.

8) Exhibit "HH" also shows numerous transfers from King Lending's Chase Bank account into Sara King's Chase Bank account for hundreds of thousands of dollars.  Some of these transactions have been highlighted for the Court's convenience.

9) On page 3 of Exhibit "GG" there is a $230,000 withdrawal from King Lending's account on January 18, 2023.  That withdrawal matches the $230,000 deposit into Sara King's Chase Bank account on that same date shown on pages 10 and 19 of Exhibit "HH."  These transactions have been highlighted for the convenience of the Court.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed September 10, 2023.

_____
Ronald Richards, Esq.

**EXHIBIT "A"**

Ronald N. Richards (Cal. State Bar No. 176246)
LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.
Email:  ron@ronaldrichards.com
P.O.  Box 11480
Beverly Hills, California 90213
Telephone:   (310) 556-1001
Facsimile:    (310) 277-3325

Geoffrey S. Long (Cal. State Bar No. 187429)
LAW OFFICES OF GEOFFREY LONG, A.P.C.
Email:  glong0607@gmail.com
1601 N. Sepulveda Blvd., No. 729
Manhattan Beach, California 90266
Telephone:   (310) 480-5946
Facsimile:    (310) 796-5663

Attorneys for Plaintiff LDR INTERNATIONAL LIMITED, a British Virgin Island corporation

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA—SOUTHERN DIVISION

| | |
|---|---|
| LDR INTERNATIONAL LIMITED, a British Virgin Island corporation;<br><br>        Plaintiff,<br><br>    v.<br><br>SARA JACQUELINE KING, an individual, and KING FAMILY LENDING LLC, a California limited liability company;<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR:**<br>    **(1)** BREACH OF WRITTEN CONTRACTS<br>    **(2)** FRAUD<br>    **(3)** CIVIL THEFT (CAL. PENAL CODE § 496)<br>    **(4)** ACCOUNT STATED<br><br>**DEMAND FOR JURY** |

Plaintiff LDR INTERNATIONAL LIMITED ("Plaintiff") alleges as follows:

### THE PARTIES

1.    Plaintiff is a business entity incorporated in the British Virgin Islands with its principal place of business in the British Virgin Islands.

2.    Defendant Sara Jacqueline King ("King") is an individual residing in

Orange County, California. King is an attorney licensed to practice law in the State of California, State Bar Number 299115, and is a partner at the law firm King Reuben, P.C., 220 Newport Center Dr., 11-240, Newport Beach, CA 92660.

3. Defendant King Family Lending LLC ("King Lending") is a California limited liability company formed on February 7, 2020, with its principal place of business in Orange County, California. King is the manager, president, and, upon information and belief, the sole member of King Lending. King Lending's agent for service of process, Attorneys Corporation Service, Inc., filed a Resignation of Agent for Service of Process with the California Secretary of State on July 25, 2022, and King Lending has no agent for service of process.

4. King Lending was previously licensed as a finance lender by the California Department of Financial Protection & Innovation ("DFPI") under license number 60DBO-126664, but its license status became inactive under that license number on November 17, 2020. King Lending then became licensed as a finance lender by the DFPI under license number 60DBO-111951 effective November 17, 2020, and its license status became inactive under that license number on April 19, 2022.

5. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned in this Complaint, Defendants, and each of them, were the partners, joint venturers, agents, employees, alter egos, and representatives of each other in doing the things herein alleged and, in doing so, were acting within the scope of their respective authorities as agents, employees and representatives, and are jointly and severally liable to Plaintiff. Plaintiff is informed and believes, and thereon allege, that King and King Lending are alter egos of each other and that King Lending is so organized and controlled by King and its affairs and business are so conducted as to make it a mere instrumentality and alter ego of King. Plaintiff is informed and believe that King Lending:

      a. has commingled funds and other assets with King,

      b. has failed to segregate funds,

c. that there have been unauthorized diversion of corporate/business funds and assets to other than corporate/business uses,

d. that King has treated the assets of King Lending as her own,

e. that there has been a failure to maintain minutes and adequate corporate records,

f. that King Lending has been used as a mere shell, instrumentality or conduit for King,

g. there has been a disregard of legal formalities and the failure to maintain arm's length relationship between King Lending and King,

h. there has been a use of the corporate entity as a shield against personal liability of King, and

i. there has been the use of the corporate entity as a subterfuge for illegal transactions, including those at issue in this action.

## JURISDICTION AND VENUE

6.     This Court has original subject matter jurisdiction over this action pursuant to 18 U.S.C. Section 1332 in that the amount in controversy exceeds $75,000, exclusive of interest, Plaintiff is a citizen of the British Virgin Islands, and Defendants are citizens/residents of the State of California.

7.     Venue is proper in this Court on the ground that Defendants reside in this judicial district.

## GENERAL FACTUAL ALLEGATIONS

8.     Beginning in January 2022 and through October 2022, Plaintiff began extending a series of loans to King Lending.  All of the loans from Plaintiff to King Lending were for a similar purpose and took a similar form:  Plaintiff would loan King Lending funds which King Lending and King represented to Plaintiff that King Lending was using to loan the same funds to third-party borrowers.  The purported loans from King Lending to the third-party borrowers were purportedly secured by various forms of collateral, including but not limited to luxury automobiles, boats, yachts, jewelry,

1  watches, precious metal coins, and the earnings from guaranteed professional sports

2  contracts.  The loans from Plaintiff to King Lending would in turn be secured by the

3  same collateral which purportedly secured the loans from King Lending to the third-

4  party borrowers.

5       9.     Each of the loans from Plaintiff to King Lending was evidenced by a

6  Promissory Note payable by King Lending, as maker, to Plaintiff, as payee.  In each of

7  said Promissory Notes, King and King Lending expressly represented that the purpose

8  of the loan from Plaintiff to King Lending was for purposes of making the third-party

9  loan as follows: "Maker is a California Finance Lender and is using all monies to fund a

10  loan. Collateral for said loan is: [collateral identified]."

11      10.    In fact, King Lending's finance lender license status was ineffective as of

12  April 19, 2022.

13      11.    Each of the Promissory Notes from King Lending as maker to Plaintiff as

14  payee contains an attorneys' fee clause in the event collection on the note is required,

15  governing law provision applying California law, and default provisions.

16      12.    In total, Plaintiff extended ninety-seven (97) loans to King Lending in the

17  total principal amount of $10,258,500 which were purportedly secured by luxury cars,

18  jewelry, watches, antique precious metal coins, designer handbags, boats, yachts, and

19  earnings from guaranteed sports contracts with representations regarding salary and

20  bonus amounts.  In connection with each of the 97 loans from Plaintiff to King Lending,

21  King made various intentionally false written representations regarding the third-party

22  loans, collateral for the third-party loans, and funding of the third-party loans, as

23  detailed herein.

24      13.    Attached hereto as Exhibit "A" is a list of all 97 loans from Plaintiff to

25  King Lending which is incorporated by reference here in full.  Each of the 97 loans from

26  Plaintiff to King Lending is identified in this Complaint by reference to the loan number

27  in the first column of the attached Exhibit "A."  For example, "Loan 01" refers to the

28  loan from Plaintiff to King Lending in the amount of $195,000 funded on January 14,

2022, that matured on May 31, 2022, which was purportedly secured by three watches—Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with black dial with rose gold band; Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with white dial with rose gold band; and Richard Mille RM 030 titanium watch, with light blue rubber band.

14.     In connection with each of the purported third-party loans which the funds loaned by Plaintiff to King Lending were purportedly being used to fund, King and King Lending provided Plaintiff and its agent and representative, Laurent R.[1] ("L.R."), with false and fabricated loan documents between King Lending and the purported third-party borrowers, including "Secured Promissory Note," with name and other identifying information of the third-party borrower redacted.

15.     In connection with most of the purported third-party loans which the funds loaned by Plaintiff to King Lending were purportedly being used to fund, King and King Lending provided Plaintiff and L.R. with false and fabricated documents regarding the collateral purportedly securing said loans, including but not limited to title documents, appraisals, and photographs, with name and other identifying information of the third-party borrower redacted.

16.     In connection with the purported third-party loans which the funds loaned by Plaintiff to King Lending were purportedly being used to fund and which were secured by guaranteed professional sports contracts, King and King Lending provided Plaintiff and L.R. with false and fabricated copies of the guaranteed professional sports contracts of the third-party borrowers, with name and other identifying information of the third-party borrower and financial information redacted.

17.     In connection with many of the purported third-party loans which the funds loaned by Plaintiff to King Lending were purportedly being used to fund, King and King Lending provided Plaintiff and L.R. with purported proof of funding documents which typically consisted of a cashier's check from King Lending with the purported

---

[1] The full last name of Laurent R. is not included to protect financial and other privacy rights.

third-party borrower's name redacted.  Because the payee name was redacted, Plaintiff could never verify that the funds were actually loaned to the third-party borrower.  Plaintiff is informed and believes that these "proof of funds" do not evidence payment to any third-party borrowers and that King and King Lending intentionally provided Plaintiff with these false and mispresented documents.

18.    Because King Lending's finance lender license with the DFPI became inactive April 19, 2022, it was not licensed during the majority of the time that it was a borrower from Plaintiff and purportedly engaging in the third-party loans it falsely represented to Plaintiff.

19.    King falsely represented to Plaintiff that King Lending's finance lender license with the DFPI was only inactive because of an "administrative problem," however, Plaintiff is informed and believes that it was rendered inactive for other reasons and that King's statement was an intentional misrepresentation.

20.    In total, Plaintiff loaned King Lending the principal amount of $10,258,500.

21.    King and King Lending also falsely represented to Plaintiff that the amount of $6,331,580 received by King Lending in loan repayments from third-party borrowers had been "redeployed" to fund purported additional loans between King Lending and third-party borrowers, instead of being repaid to Plaintiff.  In fact, as alleged herein, there were no payments made by the any third-party borrowers because there were no third-party borrowers or loans to third-party borrowers.

22.    Plaintiff is informed and believes that King and King Lending engaged in a massive fraud on Plaintiff.  Plaintiff is informed and believes, and thereon alleges, that there were no third-party loans from King Lending to any third-party borrowers.

23.    Plaintiff is informed and believes, and thereon alleges, that King and King Lending fabricated each of the purported third-party loans and all of the documents regarding those loans, funding of the third-party loans, and collateral for those loans.

24.    Plaintiff is informed and believes, and thereon alleges, that King spent the

Complaint; Jury Demand

majority of the funds loaned by Plaintiff to King Lending to gamble in Las Vegas, fund an extravagant lifestyle, and for other personal uses by King. Plaintiff is informed and believes that King moved into the Wynn Las Vegas resort and hotel, lived there for six months, and gambled 24/7.

25.     King's ex-husband, Kamran Pahlavi ("Pahlavi"), who has since fled to Morocco, has substantiated Plaintiff's belief that King engaged in a massive fraud against Plaintiff as alleged herein.

26.     The following photographs were sent by King to L.R. and Plaintiff as part of an effort by King to increase Plaintiff's trust and confidence in King in terms of her connections, lifestyle, and connections to high-profile athletes as part of her fraud and scheme. They are on various pages that are inserted into this Complaint. They show the lavish lifestyle she was living, jewelry, cars, and image she was trying to portray, as well as been a successful California licensed attorney. The photos are four different pictures of King. Moreover, King has recently provided evidence she only has $11.98 to her name. She provided a bank screen shot which is also included in these serious of photographs. King in an email sent on February 9, 2023, is still asking Plaintiff and its principal for more money so she can try and make back the money she has stolen. As of February 9, 2023, King also is still sending fake deals to the Plaintiff and or its agents. King claims she has spent all of the funds and has no money left to her name. King also is crossing state lines to engage in further frauds.



11:41  5G E

◀ Search

≡
Menu

✉
Inbox

🛒
Products

→]
Log Out

**Accounts**               Dashboard

⚠ **BankAmericard Platinum Plus Mastercard -
8320 account is closed and past due**                    ✕

Make a payment or contact Bank of America at
866-674-7511 for assistance.

View more details

Make Payment

🔍 How can we help?

**Hello, Sara**                                                  ›
Preferred Client

◉  **Bank of America Life Plan®**                                ›
   Your next steps are ready.  Let's go!

My Rewards                                                        ›

# Bank of America

Adv Plus Banking - 9881                                    **VIEW**
## $11.98

Adv Relationship Banking - 7415                            **VIEW**
## $0.00

Advantage Savings - 7428                                   **VIEW**
## $0.01

Ⓢ                    $⇄$                $                    ▭               ◔
Accounts      Transfer | Zelle®   Bill Pay        Deposit Checks      Invest







## FIRST CAUSE OF ACTION

### (Breach of Contracts Against All Defendants)

27. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 26, inclusive, of this Complaint as though fully set forth at length.

28. Except as prevented or excused by the acts or omissions of King and King Lending, Plaintiff has performed all obligations required of it in connection with each of the ninety-seven (97) loans from Plaintiff to King Lending, as identified in Exhibit "A" hereto, and evidenced by the promissory notes from King Lending as maker to Plaintiff as payee.

29. All of the ninety-seven (97) loans from Plaintiff to King Lending have matured, are unpaid by King Lending, and are in default.

30. In total, Plaintiff loaned King Lending the principal amount of $10,258,500 as evidenced by the Promissory Notes from King Lending to Plaintiff.

31. King and King Lending falsely represented to Plaintiff that $6,331,580 in loans had been repaid by the third-party borrowers and that money had been "redeployed" to fund additional loans. In fact, there were no loans to any third-party and, therefore, no repayment of any loans to third-parties. King falsely represented to Plaintiff that a total of $19,370,000 had been loaned to third-party borrowers.

32. In connection with Plaintiff's demands for payment prior to filing this action, King Lending paid Plaintiff $2,000,000 against the interest owed to Plaintiff on the loans.

33. Defendants are in breach of all ninety-seven (97) of their Promissory Notes to Plaintiff by failing to pay all principal and interest due thereon to Plaintiff by the maturity dates and by failing to pay default interest, costs and attorneys' fees thereafter.

34. As a direct and proximate result of the acts, omissions, and breaches of the

promissory notes by Defendants, as alleged herein, Plaintiff has suffered damages in a specific amount to be determined at trial, but in the amount of at least $10,258,500, plus prejudgment interest at the legal or contract rate.

35.     Plaintiff is also entitled to recover attorneys' fees pursuant to contract.

## SECOND CAUSE OF ACTION

### (Fraud Against All Defendants)

36.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 26, inclusive, of this Complaint as though fully set forth at length.

37.     Prior to most of the ninety-seven (97) loans identified in Exhibit "A" hereto, King would send an email to L.R. requesting the loan and regarding the purported details of the loan from King Lending to the third-party borrower and from Plaintiff to King Lending.  Those emails would include information, and frequently would include false and fabricated documentation, regarding the purported third-party borrower and the purported collateral.  The following are some, but not all, of the email communications from King to L.R. regarding the purported loans:

        A. Email sent by King to L.R. on January 13, 2022, regarding Loan 01 stating: "Please see attached:

-Security Agreement

-Secured Promissory Note

-Confession of Judgment

-PG

These are the agreements between the lending company and borrower. Because the borrower is an individual who signed a Confession of Judgment and the loan is collateralized on the assets, I don't see the need for a personal guarantee, but will prepare one to be signed just to be safe. The PG attached is a sample document I'm preparing for signature tomorrow."

13
Complaint; Jury Demand

B. Email sent by King to L.R. on January 18, 2022, regarding Loan 02 stating: "Hi Laurent,

Attached please find the funding confirmation form and copy of the check remitted to the borrower.  We held $5,000 in fees and costs and upon maturity of your loan, will be settled out 60/40.

I am working on the master agreement and should have the draft sent to you by tomorrow.

Again, thank you for funding this loan, and will send you an email tomorrow with the draft agreement."

C. Email sent by King to L.R. on January 28, 2022, regarding Loan 03 stating: "Attached please find:

1. Borrower Docs: Secured Promissory Note, Security Agreement, and COJ.

2. Appraisals: vehicle appraisal and purchase agreement.  The watch appraisal and boat appraisal are in hard copy received at my office yesterday; I will be there later this morning and will send you a copy.

3. Titles. The only missing title is the Maybach62 (I supplemented it with a photo taken by me) - however, the title was dropped off to my office yesterday – so I will send you a copy when I get there later this morning.

This morning I will resend a complete packet to you after meeting with the borrower for final signatures and funding.

Solomon is interested in scaling this business, first in New York followed by Florida. We had a great conversation and were able to identify some key hurdles to scaling, however not insurmountable. Will take some planning, but I do think we can take this nationwide.

Between Kamran and I, you, and Solomon, we may be able to really

Complaint; Jury Demand

take over the industry. Exciting stuff!"

D. Email sent by King to L.R. on February 21, 2022, regarding Loan 04 and Loan 05 stating: "Hi Laurent, [¶] Attached please find the Funding Confirmations and the Proof of Funding for the two loans funded."

E. Email sent by King to L.R. on March 14, 2022, regarding Loan 08 stating: "It was such a pleasure meeting you this past week. When you have a chance, please send over the spreadsheet you created - I'd love to tinker around with it a bit to learn more.

If you recall when we met, I got a loan request on a Tiffany stamped Patek. I got the details including confirmation of authenticity, along with the current market value estimate and appraisal from my appraiser. Being that it has the Tiffany stamp, I was told the value can increase 4x. I requested a very conservative value.

The guy is looking to borrow $350k by Tuesday, March 15 (I'm assuming it has something to do with tax season!). I have him locked in for $250k (less than requested) at 8% but it's contingent on funding by Tuesday. Oftentimes I will come back at the amount they originally requested and add more interest. ;) But in this case, he is okay with $250k.

Attached is the request along with a photo and a video of the watch so that you can also confirm the value."

F. Email sent by King to L.R. on March 20, 2022, regarding Loan 11 stating: "I have one last loan for the month – it's one I first sent to you in the very beginning, a coin collection. The borrower paid back the funds, and now needs them again.  History on this guy is that he makes a lot of money, owns a drywall company, and uses cash for

'extracurricular' activities that he doesn't want his company books to show (ha). I have known him for a few years and he was a law client of mine - borrowers often, and has always paid. [¶] He needs the money tomorrow (3/31) and he agreed to 10% (which is more than the last loan funded) for a period of 3 months. LTV is =8%. If you're interested, we would need to fund him by tomorrow, which means you would have to fund today. If this is too quick for you - no problem! [¶] I likely will not be looking at any deals next week due to a law conference I am speaking at, so thought you may like this one. :)"

G. Email sent by King to L.R. on April 7, 2022, regarding Loan 13 stating: "Hi Laurent,

There's one that cleared due diligence today. It's small, but pretty good. Collateral is a G wagon (photos attached) my guys cleared it this morning. I don't know why someone would pick this color, haha.

Collateral Value: $300k

Fire Sale: $220k

Amount: $65k

Term: 2 months

Rate: 15% (so you make 9% on the deal)

It's a higher rate because the term is shorter. The borrower is actually a friend of mine who is waiting on purchase orders and needs to fund payroll. So, he's not looking to take full equity out, just enough to get him by. He has payroll due tomorrow (Friday). So we would need to fund immediately. I am gathering the docs, and can send them to you by this evening so we can fund in the morning- it's a good one especially if he defaults! The LTV is 30%!"

H. Email sent by King to L.R. on April 18, 2022, regarding Loan 17 and

Complaint; Jury Demand

Loan 18 stating: "These two cleared with appraisers - they are smaller than normal, but still good for the portfolio. Funding requested for today, but I have already prepared them for Tuesday funding.  I do not have a back story on the borrowers, these are referral from my mentor. [¶] 1. 1902 37.5 Ruble Gold Coin Sev-578 PCGS AU Condition, Market Value: $65k; Firesale: $35k; Loan Request: $30k… [¶] 2. The Avengers #1 (Marvel, 1963) CGC NM-9.2 Off-white to white pages, Comic Book, Market Value: $50k; Firesale: $27k; Loan Request: $25k…"

I. Email sent by King to L.R. on May 14, 2022, regarding Loan 25 stating: "Finally, my favorite and the most secure type of loan deal has finally arrived! Lending against guaranteed sports contracts.  There is a professional hockey player (NHL) who has a guaranteed contract for $3m a year. He wants to borrow $500k for 6 months. Because it's a major sports contract our maximum rate we can charge is 6%. Happy to offer you 4% (as opposed to 3.6%) of the money so it's lucrative for you.

How it works is the sports team pays an escrow account monthly and we get payment before the player does; thus, because it's a guaranteed contract (doesn't matter if player gets injured), and because we get paid first by the league, it is very secure collateral and no chance for default. These are the loans I have been waiting for from mentor.

Amount: $500k

Term: 6 months

Rate: 6%

Collateral: guaranteed sports contract

Funding date: Monday, May 16

Complaint; Jury Demand

Because you have money with KFL for lending you would need to send only $255k to fund this one. It's really my goal type of loan because we eliminate security issues and resale issues. So if we get this one done, the league will have us approved to lend to other players. So, it's a big deal. And, professional sports lending is really easy to scale! I'm not allowed to send the actual contract to anyone - but I can send the agreement that is to be signed by player and the league.

This one makes me very happy and excited. Been working hard to get to these loans - and finally it's paying off!"

J. Email sent by King to L.R. on May 23, 2022, regarding Loan 30 stating: "I have a request for another one - The borrower is requesting $300k. This deal is a different league (MLB). I'm simply notifying you because I promised I would. [¶] Please make it clear whether you want to do any deals today/tomorrow or hold off until you receive all photos. I cannot lose the sports contract deals - they have been my goal for a long time, so if you are not funding at this time, need to know asap to make sure I can get the deals done with other people."

K. Email sent by King to L.R. on May 26, 2022, regarding Loan 28 stating: "Hi Laurent,

Both checked out. Ideally, she would like funding by tomorrow, as you'll see below, if by tomorrow she's willing to pay a higher interest rate.

Attached are photos as you requested- up close for inspection! Watch value at $50k. Box included, she has the Rolex card she's trying to find but value contemplates no card.

The Rolls Ghost is at the shop and valued at $230k.

Loan amount: $150k

Complaint; Jury Demand

Term: 4 months

Rate: 10% if funded tomorrow (Thursday); 8% if Friday.

LTV: 53%

She is a friend of mine and a famous hair extension person for the stars. Her biggest clients are the Kardashians. She wants to expand the business and didn't like the potential investors. She makes good money; I was her lawyer for a period of time and had access to her books. Tomorrow we receive $10,500 in interest payments so the amount to fund is $139,500.00. Sending promissory note in a separate email if you are able to fund tomorrow morning!"

L.  Email sent by King to L.R. on February 17, 2022, regarding Loan 07 requesting a loan in the amount of $200,000 to be secured by a Chevrolet Truck valued at $300,000, Chevrolet Cheville valued at $295,000, and Ford Roadster valued at $75,000.

M. Email sent by King to L.R. on February 17, 2022, regarding Loan 04 requesting a loan in the amount of $400,000 to be secured by a Tiara F44 boat valued at $900,000.

N.  Email sent by King to L.R. on March 27, 2022, regarding Loan 09 stating: "Attached are the unsigned borrower docs for the $75,000.00 loan. On Monday, the borrower will sign prior to funding. I will send you proof of funding on Monday once completed."

O.  Email sent by King to L.R. on March 27, 2022, regarding Loan 10 stating: "Attached are the unsigned borrower docs for the $120,000.00 loan. On Monday, the borrower will sign prior to funding. I will send you proof of funding on Monday."

Complaint; Jury Demand

P. Email sent by King to L.R. on June 14, 2022, regarding Loan 36 stating: "Attached are photos of collateral for a deal that needs funding by tomorrow morning. (Wednesday)

Amount: $100,000

Term: 2 months

Rate: 10%

Collateral: AP watch, Rolex watch

The guy is one of my mentor's referrals- he needs money by tomorrow. I have the watches and they have been verified.

Funding to send this morning: $87,700

Currently, we have $12,300 in account. We have loan payoffs that are incoming, but funds won't be available until Friday. The good news is that I've pushed the other deals I will be sending until Monday/Tuesday, so you won't need to send any to fund the next set of deals."

Q. Email sent by King to L.R. on May 11, 2022, regarding Loan 23 stating: "This one checked out. With papers; no box. Guy looking for $65k for 3 months at 8% (I'll still give you 6%). He's looking for funding by tomorrow. If you like it, I can send you total for tomorrow. Let me know what you think."

R. Email sent by King to L.R. on June 27, 2022, regarding Loan 35, Loan 41, and Loan 46 stating: "All docs will be there by evening tomorrow for you! Finally got things handled - including the sports contract. Finally got approval on the redacted version. I'll be on my computer later to finish and share the drive with you. No sense in sending you the link partially done, you will just get constant emails about updates. We have 3 loans on deck that requested funding this past Friday, but I held them off to tomorrow/today (Monday) because you'll have funds

20

Complaint; Jury Demand

1          in!

2          Deals:

3          1. Loan 35 requested another loan.

4          Amount: $150k

5          Term: 7 days

6          Rate: 15%

7          Collateral: AP white ceramic

8          Funding: today.

9          2. NHL contract

10         Amount: $250k

11         Term: 5 months

12         Rate: 7%

13         Player newly drafted, first year, 21 years old, guaranteed contract 2

14         year; bonus is in November for $500k Funding immediately (Monday)

15         3. AP Royal Oak Chronograph, gold with blue face. (See photos

16         attached)

17         …

18         I will fund them this morning."

19

20     S.   Email sent by King to L.R. on July 10, 2022, regarding Loan 44, Loan

21         54, and Loan 59 A stating: "Current Deals

22         Deal 1:

23         Loan 44 (the short-term watch) want to renew again - love this one!

24         Amount: $150,000

25         Deal 2:

26         Loan 1 wants to do another loan; however, with the following terms:

27         Amount: $195,000

28         Term: 3 months

Complaint; Jury Demand

Rate: 10%

Deal 3:

Amount: $25,000

Term: 6 months

Rate: 7%

Collateral: NBA Contract guaranteed 4.5m for 3 years, 21 years old, Toronto Raptors player. I happened to be at the NBA summer league games and got this one! Bonus is in January for $500k.

We have a few more I need to review - but these two need funding by today (Monday). I have about 6 for review for Tuesday funding! Five of which come from my mentor.

As of tomorrow morning we will have $149,200.00 to use for funding. Spreadsheet to follow. Deals 1 & 3 are the most urgent for Monday morning funding as I am still at the NBA summer league games and I'd like to be able to complete the loan in front of other players ;).  Deal 2 is urgent, but if you'd like me to push it off until we collect more funds, I am happy to do so.

Let me know if you are interested and I'll send the amount to fund for today (Monday) funding.

AMOUNT TO FUND:

Deal 2 & 3 TOTAL TO FUND: $250,800.00

Deal 1, 2 and 3 TOTAL TO FUND: $445,800.00"

T. Email sent by King to L.R. on June 3, 2022, regarding Loan 32 stating: "This borrower has an urgent need to be funded tomorrow (today), Friday.

Collateral:

2019 Porsche Panamera GTS (Firesale: $90k) AP Chrono (pics

attached) (Firesale: $45k)

Amount: $65,000

Term: 2 months

Rate: 12%

Borrower is waiting for a purchase order to be paid and has payroll due today.

If you're able to fund this would be great. He needs it today to pay employees. All items checked out. Watch has no box, but papers."

38.  The information contained in the emails from King to Plaintiff, identified and quoted in paragraph 37, above, among others, was false. The representations by King to Plaintiff contained in the emails identified and quoted in paragraph 37, above, regarding the existence of the third-party loans, collateral for the loans, funding of the third-party loans, and descriptions of the third-party borrowers were false.

39.  King made the representations to Plaintiff contained in the emails identified and quoted in paragraph 37, above, among others, with knowledge of their falsity.

40.  King made the representations to Plaintiff contained in the emails identified and quoted in paragraph 37, above, among others, with the intent to deceive and defraud Plaintiff and to cause Plaintiff to loan King Lending and King over $10,000,000 in principal.

41.  Plaintiff justifiably relied on the representations made by King to Plaintiff contained in the emails identified and quoted in paragraph 37, above, among others, by loaning Defendants $10,258,500 in principal.

42.  King intentionally misrepresented to Plaintiff that $6,331,580 in loans had been repaid by the third-party borrowers and that money had been "redeployed" to fund additional loans. King made this false and fraudulent representation knowing it was false and with intent to induce reliance by Plaintiff and to cause Plaintiff to continue funding additional loans and refrain from pursuing legal action. Plaintiff justifiably relied on this false representation by continuing to fund additional loans.

Complaint; Jury Demand

43.     In addition, on or about the following dates, in addition to at other times, King intentionally misrepresented to Plaintiff that payments had been made by third-party borrowers on the purported third-party loans by providing Plaintiff and LR with fraudulent, falsified, and altered King Lending bank statements: on July 2, 2022, with the April 2022 bank statement; on July 6, 2022 with June 2022 bank statement; and on September 8, 2022 with August 2022 bank statements.  King uploaded fraudulent and falsified bank statements where she altered the bank statements to show deposits/payments by third-party borrowers that were in fact never made.  King would upload these fraudulent, falsified, and altered bank statements into a Google drive shared with Plaintiff and LR and notify Plaintiff and LR that she had loaded the bank statements to show purported payments by third-party borrowers.

44.     King and King Lending made the misrepresentations to Plaintiff identified in paragraph 43, above, with knowledge of their falsity and with intent to induce reliance by Plaintiff and to cause Plaintiff to continue funding additional loans and refrain from pursuing legal action.  Plaintiff justifiably relied on this false representation by continuing to fund additional loans.

45.     As a direct and proximate result of Defendants' fraud and tortious conduct, Plaintiff has been damaged in an amount to be proven at trial, but in the amount of at least $10,258,500.

46.     In doing the things herein alleged, Defendants acted willfully, maliciously, and with the intent to cause injury and harm to Plaintiff.  Defendants are therefore guilty of malice and/or fraud in conscious disregard of Plaintiff's rights, thereby warranting an assessment of punitive and exemplary damages in an amount appropriate to punish Defendants, and each of them, and deter them and others from engaging in similar misconduct.

### THIRD CAUSE OF ACTION

### (Civil Theft, Cal. *Penal Code* Section 496 Against All Defendants)

47.     Plaintiff realleges and incorporates by reference the allegations

contained in paragraphs 1 through 46, inclusive, of this Complaint as though fully set forth at length.

48.    As a result of King and King Lending's conduct as alleged herein, they have violated California *Penal Code*, section 496 ("Section 496").

49.    Section 496, provides, "(a) [e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.... [¶] (c) Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

50.    King and King Lending have obtained and received property from Plaintiff, the $10,258,500, in a manner constituting "theft," as that term is defined in California *Penal Code*, section 484(a), and case law interpreting same.  California *Penal Code*, section 484(a), provides: "[e]very person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulently representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulentlyly gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

51.    As a direct and proximate result of Defendants' civil theft, Plaintiff has been damaged in an amount to be proven at trial, but at least $10,258,500.

52.    Pursuant to California *Penal Code*, section 496(c), Plaintiff is also entitled to recover treble damages from Defendants.

Complaint; Jury Demand

53.     Pursuant to California *Penal Code*, section 496(c), Plaintiff is also entitled to recover attorneys' fees from Defendants.

54.     In doing the things herein alleged, Defendants acted willfully, maliciously, and with the intent to cause injury and harm to Plaintiff. Defendants are therefore guilty of malice and/or fraud in conscious disregard of Plaintiff's rights, thereby warranting an assessment of punitive and exemplary damages in an amount appropriate to punish Defendants, and each of them, and deter them and others from engaging in similar misconduct.

## FOURTH CAUSE OF ACTION

### (Account Stated Against All Defendants)

55.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 26, inclusive, of this Complaint as though fully set forth at length.

56.     King and King Lending owe Plaintiff at least $10,258,500 from the ninety-seven (97) loans made by Plaintiff to King Lending.

57.     Plaintiff and Defendants, by both words and conduct, have agreed that the amount that Plaintiff alleges to be due from Defendants to Plaintiff, $10,258,500 plus interest, is the correct amount owed.

58.     Defendants, by words and conduct, have promised to pay $10,258,500, plus interest and other amounts due, to Plaintiff.

59.     Defendants have not paid Plaintiff the $10,258,500, plus interest and other amounts, owed under this account.

60.     Defendants owe Plaintiff the amount of $10,258,500, plus interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.     For damages in the amount to be proven at trial, but in the amount of at least $10,258,500;

Complaint; Jury Demand

2.    For pre-judgment interest at the legal rate or the rate set forth in the contracts;

3.    For post-judgment interest at the legal rate;

4.    For treble damages pursuant to California *Penal Code,* section 496(c);

5.    For attorneys' fees pursuant to contract;

6.    For attorneys' fees pursuant to California *Penal Code,* section 496(c);

7.    For punitive damages;

8.    For court costs; and

9.    For such other and further relief as the Court deems just and proper.

DATED: February 10, 2023          LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.


By: ___/ s / Ronald N. Richards___
Ronald N. Richards
Attorneys for Plaintiff LDR
INTERNATIONAL LIMITED

DATED: February 10, 2023          LAW OFFICES OF GEOFFREY LONG, A.P.C.


By: ___/ s / Geoffrey S. Long___
Geoffrey S. Long
Attorneys for Plaintiff LDR
INTERNATIONAL LIMITED

Complaint; Jury Demand

## JURY DEMAND

Plaintiff LDR INTERNATIONAL LIMITED hereby demands trial by jury on all causes of action as to which it is entitled to jury.

DATED: February 10, 2023      LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, A.P.C.


By: _____/ s / Ronald N. Richards_____
         Ronald N. Richards
Attorneys for Plaintiff LDR
INTERNATIONAL LIMITED

DATED: February 10, 2023      LAW OFFICES OF GEOFFREY LONG, A.P.C.


By: _____/ s / Geoffrey S. Long_____
         Geoffrey S. Long
Attorneys for Plaintiff LDR
INTERNATIONAL LIMITED

**EXHIBIT "A"**

| Loan No. | Purported Collateral | AMOUNT | DURATION (MONTHS) | DATE FUNDED | MATURITY DATE |
|---|---|---|---|---|---|
| Loan 01 | AP Royal Oak Watch Gold /Black Index<br>AP Royal Oak Chronograph Rose Gold White Index<br>Richard Mille RM 030 | $ 195,000 | 4 | 01/14/2022 | 05/31/2022 |
| Loan 02 | 1979 Ferrari 308 GTS<br>1896 Ferrari 328 GTB<br>2003 Chevrolet Corvette<br>2010 Rolls Royce Ghost<br>2014 Aston Martin Vanquish<br>2020 Porsche Taycan 4S | $ 235,000 | 6 | 01/18/2022 | 07/18/2022 |
| Loan 03 | 2006 SeaRay<br>Two-Tone Date Just<br>2007 Maybach | $ 175,000 | 4 | 01/31/2022 | 05/31/2022 |
| Loan 04 | 2017 Tiara F44 | $ 400,000 | 4 | 02/18/2022 | 06/18/2022 |
| Loan 05 | Cartier Jewelry Lot | $ 150,000 | 3 | 02/18/2022 | 05/18/2022 |
| Loan 06 | Hermès Birkin Bag 35; White Himalayan<br>Rolex Daytona Rose Gold | $ 100,000 | 4 | 03/04/2022 | 07/04/2022 |
| Loan 07 | 1956 Chevrolet Truck<br>1971 Chevrolet Cheville | $ 150,000 | 3 | 03/04/2022 | 06/04/2022 |
| Loan 08 | Patek Phillipe Nautilus, Rose Gold, Tiffany Stamp | $ 350,000 | 3 | 03/15/2022 | 06/14/2022 |
| Loan 09 | 2021 MBZ S580<br>Rolex Yacht Master Yellow Gold | $ 75,000 | 3 | 03/28/2022 | 06/29/2022 |
| Loan 10 | Rolex Oyster Perp, Stainless Steel<br>Diamond Ring, Pear, 5.02k<br>Diamond Ring, Yellow Diamond, 8.74k | $ 120,000 | 4 | 03/28/2022 | 07/28/2022 |
| Loan 11 | Coins | $ 150,000 | 3 | 04/01/2022 | 07/01/2022 |
| Loan 12 | Chanel Classic Bag (Beige)<br>Chanel Classic Bag (Black)<br>Chanel Rocket Bag<br>Cartier Monsieur Watch, Rose Gold, Cartier Tank Francaise, Rose Gold, Cartier Juste Un Clous Bracelet, Rose Gold w/ Diamonds, Cartier Love Bracelet, Rose Gold w/ Diamonds, Cartier Love Ring, White Gold w/ Diamonds<br>Cartier Trinity Ring, w/ Diamonds, Cartier Trinity Bracelet, w/Diamonds | $ 95,000 | 4 | 04/06/2022 | 08/06/2022 |
| Loan 13 | Mercedes Benz G Class, 63 AMG | $ 65,000 | 2 | 04/08/2022 | 06/08/2022 |
| Loan 14 | 2019 Rolls Royce Dawn | $ 100,000 | 3 | 04/11/2022 | 07/11/2022 |
| Loan 15 | Patek Phillipe Nautilus Watch, Platinum and Ruby | $ 150,000 | 4 | 04/11/2022 | 08/11/2022 |
| Loan 16 | Ruby Ring w/ Diamonds, 10.04k | $ 80,000 | 2 | 04/15/2022 | 06/15/2022 |
| Loan 17 | Avengers Comic Book | $ 25,000 | 3 | 04/19/2022 | 07/19/2022 |
| Loan 18 | 1902 Ruble Gold Coin | $ 30,000 | 3 | 04/19/2022 | 07/19/2022 |
| Loan 19 | Van Cleef & Arpels Ruby/Diamond Bracelet | $ 75,000 | 3 | 04/26/2022 | 07/26/2022 |
| Loan 20 | Rolex Daytona, Platinum Ice Blue Face | $ 100,000 | 4 | 04/26/2022 | 08/26/2022 |
| Loan 21 | Lamborghini Aventador | $ 200,000 | 3 | 04/27/2022 | 07/27/2022 |
| Loan 22 | Audemars Piguet Royal Oak, Extra Thin, Black Ceramic | $ 150,000 | 3 | 05/04/2022 | 08/05/2022 |
| Loan 23 | Rolex Rainbow Watch | $ 55,000 | 3 | 05/12/2022 | 08/12/2022 |
| Loan 24 | Audemars Piguet Royal Oak Offshore Chronograph Titanium<br>Audemars Piguet Royal Oak Offshore Ghost | $ 40,000 | 3 | 05/12/2022 | 08/12/2022 |
| Loan 25 | NHL Sports Contract | $ 500,000 | 6 | 05/16/2022 | 10/17/2022 |
| Loan 26 | NHL Sports Contract | $ 200,000 | 4 | 05/24/2022 | 09/25/2022 |
| Loan 27 | MLB Sports Contract | $ 250,000 | 6 | 05/24/2022 | 10/25/2022 |
| Loan 28 | Rolex Day Date II Rose Gold 41mm, Diamond Dial<br>2018 Rolls Royce Ghost | $ 150,000 | 4 | 05/26/2022 | 09/25/2022 |
| Loan 29 | 2016 Aston Martin Vanquish (Silver)<br>AP Rose Gold Chronograph Watch | $ 100,000 | 5 | 05/31/2022 | 10/31/2022 |
| Loan 30 | MLB Sports Contract | $ 300,000 | 3 | 05/31/2022 | 08/31/2022 |
| Loan 31 | NHL Contract | $ 100,000 | 4 | 06/01/2022 | 10/01/2022 |

| Loan 32 | AP Steel Royal Oak Chronograph Watch 2020 Porsche Panamera GTS | $ | 65,000 | 2 | 06/03/2022 | 08/03/2022 |
|---|---|---|---|---|---|---|
| Loan 33 | NHL Contract | $ | 500,000 | 4 | 06/10/2022 | 10/10/2022 |
| Loan 34 | 2022 Porsche Taycan 4s | $ | 75,000 | 6 | 06/10/2022 | 12/10/2022 |
| Loan 35 | AP Royal Oak White Ceramic 1st | $ | 150,000 | 0 (7 days) | 06/13/2022 | 06/21/2022 |
| Loan 36 | Rolex Rose Gold Day Date II | $ | 100,000 | 2 | 06/15/2022 | 08/16/2022 |
| Loan 37 | MBZ G 63 (Matte Black) 2021 | $ | 100,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 38 | Hermes Birkin, So Matte, Alligator Piaget Limelight Diamond Watch | $ | 150,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 39 | MBZ G 63 (Red) | $ | 100,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 40 | NHL Sports Contract | $ | 200,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 41 | MLSoccer Sports Contract | $ | 500,000 | 6 | 06/22/2022 | 12/21/2022 |
| Loan 42 | Patek 5711 Jumbo Rose Gold/Brown dial | $ | 100,000 | 3 | 06/24/2022 | 09/24/2022 |
| Loan 43 | AP Royal Oak White Gold Frosted/Purple Dial | $ | 75,000 | 2 | 06/24/2022 | 08/24/2022 |
| Loan 44 | AP Royal Oak White Ceramic 2nd | $ | 150,000 | 0 (7 days) | 06/27/2022 | 07/05/2022 |
| Loan 45 | NFL Contract | $ | 250,000 | 5 | 06/27/2022 | 11/27/2022 |
| Loan 46 | AP Royal Oak Chronograph Gold, with Blue dial | $ | 75,000 | 3 | 06/27/2022 | 09/27/2022 |
| Loan 47 | 2017 Tiara F44 | $ | 400,000 | 4 | 07/07/2022 | 11/07/2022 |
| Loan 48 | 2021 MBZ S580 Rolex Yacht Master Yellow Gold | $ | 75,000 | 3 | 07/07/2022 | 10/06/2022 |
| Loan 49 | Richard Mille Watch | $ | 100,000 | 2 | 07/07/2022 | 09/07/2022 |
| Loan 50 | NBA Sports Contract | $ | 350,000 | 5 | 07/08/2022 | 12/08/2022 |
| Loan 51 | 2005 Ford GT | $ | 200,000 | 3 | 07/08/2022 | 10/08/2022 |
| Loan 52 | AP Royal Oak White Ceramic 3rd | $ | 150,000 | 0 (7 days) | 07/11/2022 | 07/19/2022 |
| Laon 53 | NBA Contract | $ | 250,000 | 6 | 07/13/2022 | 01/13/2023 |
| Loan 54 | AP Royal Oak Watch Gold /Black Index AP Royal Oak Chronograph Rose Gold White Index Richard Mille RM 030 | $ | 195,000 | 3 | 07/16/2022 | 10/16/2022 |
| Loan 55 | NBA Sports Contract 45901 | $ | 200,000 | 6 | 07/16/2022 | 01/16/2023 |
| Loan 56 | Hermès Birkin Bag 35; White Himalayan Rolex Daytona Rose Gold | $ | 100,000 | 4 | 07/22/2022 | 11/22/2022 |
| Loan 57 | 2019 Rolls Royce Dawn | $ | 100,000 | 3 | 07/22/2022 | 10/22/2022 |
| Loan 58 | 2019 Ferrari 488 Spider | $ | 150,000 | 3 | 07/22/2022 | 10/22/2022 |
| Loan 59 A | NBA Contract: 45992 | $ | 250,000 | 6 | 07/22/2022 | 01/22/2023 |
| Loan 59 B | NBA Contract 45919(b) | $ | 200,000 | 6 | 07/22/2022 | 01/22/2023 |
| Loan 60 | NFL Contract 900173 | $ | 350,000 | 5 | 07/22/2022 | 12/22/2022 |
| Loan 61 | NBA Contract 647007 | $ | 250,000 | 5 | 07/25/2022 | 12/28/2022 |
| Loan 62 | NFL Contract: 900173 | $ | 350,000 | 5 | 07/28/2022 | 12/28/2022 |
| Loan 63 | NBA Contract: 647007 | $ | 200,000 | 5 | 07/28/2022 | 12/28/2022 |
| Loan 64 | AP Royal Oak White Ceramic 4rth | $ | 150,000 | 10 days | 07/28/2022 | 08/05/2022 |
| Loan 65 | Lamborghini Aventador | $ | 200,000 | 3 | 07/28/2022 | 10/28/2022 |
| Loan 66 | NBA Contract: 647972 | $ | 250,000 | 5 | 08/03/2022 | 01/03/2023 |
| Loan 67 | Rolls Royce Cullinan | $ | 150,000 | 3 | 08/03/2022 | 11/03/2022 |
| Loan 68 | Rolex Daytona [White Dial/Black Chronograph] | $ | 50,000 | 3 | 08/04/2022 | 11/04/2022 |
| Loan 69 | AP Royal Oak [Gold Frosted] | $ | 50,000 | 14 days | 08/10/2022 | 08/24/2022 |
| Loan 70 | NBA Contract | $ | 300,000 | 5 | 08/10/2022 | 01/10/2023 |
| Loan 71 | NBA Contract | $ | 250,000 | 5 | 08/12/2022 | 01/10/2023 |
| Loan 72 | Audemars Piguet Royal Oak Tourbillon [Extra Thin, Black Ceramic] | $ | 150,000 | 2 | 08/16/2022 | 10/16/2022 |
| Loan 73 | Audemars Piguet Royal Oak Tourbillon [White Ceramic] | $ | 150,000 | 10 days | 08/16/2022 | 08/23/2022 |
| Loan 74 | MLB Contract 7NN1C3 | $ | 300,000 | 4 | 08/16/2022 | 12/16/2022 |
| Loan 75 | NFL Contract: 944301 | $ | 250,000 | 5 | 08/16/2022 | 01/16/2023 |
| Loan 76 | Tiffany's Diamond Engagement Ring [8.4 carats, D Color, Flawless] | $ | 300,000 | 3 | 08/18/2022 | 11/18/2022 |
| Loan 77 | 2018 Rolls Royce Phantom | $ | 175,000 | 3 | 08/23/2022 | 11/23/2022 |
| Loan 78 | NBA Contract 788634 | $ | 250,000 | 4 | 08/23/2022 | 12/23/2022 |

| | | | | | |
|---|---|---|---|---|---|
| Loan 79 | MLS Contract LA GALAXY 629 | $ 250,000 | 5 | 08/23/2022 | 01/23/2023 |
| Loan 80 | 1979 Ferrari 308 GTS | $ 110,000 | 3 | 08/29/2022 | 11/29/2022 |
| Loan 81 | 2021 BMW M6 Convertible | $ 50,000 | 3 | 08/29/2022 | 11/29/2022 |
| Loan 82 | NBA Contract | $ 250,000 | 4 | 08/29/2022 | 12/29/2022 |
| Loan 83 | Patek Philippe Nautilus (Blue Dial) Rolex Rose Gold Day Date II | $ 100,000 | 2 | 08/29/2022 | 10/29/2022 |
| Loan 84 | NFL Sports Contract | $ 350,000 | 4 | 09/09/2022 | 01/09/2023 |
| Loan 85 | Aston Martin DBS | $ 150,000 | 4 | 09/09/2022 | 01/09/2023 |
| Loan 86 | Patek Philipe Nautilus Watch, Platinum Ruby (2nd) | $ 200,000 | 3 | 09/12/2022 | 12/12/2022 |
| Loan 87 | Audemars Piguet Royal Oak Tourbillon | $ 150,000 | 0 (14 days) | 09/15/2022 | 09/30/2022 |
| Loan 88 | MLS Sports Contract ID: 607 | $ 250,000 | 5 | 09/19/2022 | 02/19/2023 |
| Loan 89 | Bentley Batayaga | $ 150,000 | 3 | 09/20/2022 | 12/20/2022 |
| Loan 90 | NBA Clippers Contract | $ 500,000 | 4 | 10/05/2022 | 02/05/2023 |
| Loan 91 | Commercial Building | $ 350,000 | 3 | 10/05/2022 | 01/05/2023 |
| Loan 92 | Aston Martin DB4 1961 | $ 450,000 | 3 | 10/05/2022 | 01/05/2023 |
| Loan 93 | Audemars Piguet Royal Oak Double Balance Gold | $ 80,000 | 3 | 10/07/2022 | 01/07/2023 |
| Loan 94 | Patek 5711 Jumbo Rose Gold/Brown dial | $ 80,000 | 3 | 10/07/2022 | 01/07/2023 |
| Loan 95 | NFL Sport Contract | $ 500,000 | 4 | 10/12/2022 | 2/12/2023 |
| Loan 96 | NBA Sport Contract | $ 350,000 | 4 | 10/12/2022 | 2/12/2023 |
| Loan 97 | MLB Sport Contract | $ 750,000 | 4 | 10/12/2022 | 2/12/2023 |

**EXHIBIT "B"**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER: |
|---|---|
| LDR INTERNATIONAL LIMITED<br><br>PLAINTIFF(S)<br><br>v.<br><br>SARA JACQUELINE KING, et al.<br><br>DEFENDANT(S). | 8:23–cv–00257–DOC–JDE<br><br>**DEFAULT BY CLERK**<br>**F.R.Civ.P. 55(a)** |

It appearing from the records in the above–entitled action that summons has been served upon the defendant(s) named below, and it further appearing from the affidavit of counsel for Plaintiff, and other evidence as required by F.R.Civ.P. 55(a), that each of the below defendants have failed to plead or otherwise defend in said action as directed in said Summons and as provided in the Federal Rules of Civil Procedure:

Now, therefore, on request of counsel, the DEFAULT of each of the following named defendant(s) is hereby entered:

KING FAMILY LENDING LLC, a California limited liability company

Clerk, U.S. District Court

_April 4, 2023_
Date

By _/s/ Trina DeBose_
Deputy Clerk

DEFAULT BY CLERK F.R.Civ.P. 55(a)

**EXHIBIT "C"**

1   SARA J. KING (Cal. State Bar No. 299115)
    PRO PER
2   Email: sarakingproper@gmail.com
3   P.O. Box 8114
    Rancho Santa Fe, California 92067
4   Tel:    (949) 220-3666

5

6   In Pro Per for Defendant SARA J. KING,

7

8                   **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

10

11  LDR INTERNATIONAL LIMITED, a          Case No.:  **8:23-CV-00257-DOC-JD(Ex)**
    British Virgin Island corporation;
12                                         **DEFENDANT SARA JACQUELINE KING'S ANSWER**
                  Plaintiff,               **AND DEFENSES TO PLAINTIFF'S COMPLAINT**
13
            v.                             **[FILED CONCURRENTLY WITH:**
14
    SARA JACQUELINE KING, an               **1)  KING FAMILY LENDING LLC'S ANSWER TO**
15  individual, and KING FAMILY LENDING        **COMPLAINT; AND**
    LLC, a California limited liability    **2)  CROSSCLAIM AGAINST KAMRAN ABBAS-**
16  company;                                   **VAHID**

17                Defendants.

18                                         Assigned For All Purposes:
                                           Hon. David O. Carter
19  SARA JACQUELINE KING, an
    individual, and KING FAMILY LENDING
20  LLC;

21                Cross-Claimant,

22          v.

23  KAMRAN ABBAS-VAHID, an
    individual; and DOES 1 to 20, inclusive.
24
                  Cross-Defendants.
25
          Defendant Sara Jacqueline King ("KING"), in pro per hereby files her Answer and
26
    Defenses to the Complaint filed by LDR International LDR ("Plaintiff") as follows:
27

28

                                        1

**PRELIMINARY STATEMENT**

In answering the Complaint, KING states that she is responding to allegations on behalf of herself only, even where the allegations pertain to alleged conduct by all Defendants.  KING denies any and all allegations in the headings and/or unnumbered paragraphs in the Complaint.

**DEFENDANT SARA JACQUELINE KING'S ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT**

**THE PARTIES**

In response to the specific allegations in the enumerated paragraphs in the Complaint, KING responds as follows:

1. KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1.

2. KING admits that she is an attorney licensed to practice law in the State of California, State Bar Number 299115. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2

3. KING admits that she filed for a California limited liability company called King Family Lending LLC on or about February 7, 2020, with its principal place of business in Orange County, California. KING admits that she is the manager of King Family Lending LLC. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3.

4. KING admits that she obtained a finance lender's license by the DFPI under license number 60-DBO-111951 effective November 17, 2020. KING is without knowledge or sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 4.

5. KING denies the allegations in Paragraph 5 and Paragraph 5 subsections a, b, c, d, e, f, g, h, and i.

## JURISDICTION AND VENUE

6.      To the extent Plaintiff has properly alleged the claims, KING admits that this Court has jurisdiction as to KING. KING denies Plaintiff's entitlement to any relief. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6.

7.      To the extent Plaintiff has properly alleged the claims, KING admits that this venue is proper as to KING. KING denies Plaintiff's entitlement to any relief.

## GENERAL FACTUAL ALLEGATIONS

8.      KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9.      KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.

10.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12.

13.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13.

14.     KING admits that any borrower documents sent to Plaintiff had borrower's identity redacted to protect identities of borrowers. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14.

15.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.     KING is without knowledge or information sufficient to form a belief as to the

ANSWER TO COMPLAINT                                3

truth of the allegations in Paragraph 16.

17.    KING admits that she redacted borrowers' identities to protect identities of borrowers. KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in remaining allegations in Paragraph 17.

18.    KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18.

19.    KING denies misrepresentation to Plaintiff regarding the status of her lending license. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 19.

20.    KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20.

21.    KING denies that there were no third-party borrowers or loans to third-parties. KING is without knowledge or information sufficient form a belief as to the truth of the remaining allegations in Paragraph 21.

22.    KING denies the allegations in Paragraph 22.

23.    KING denies the allegations in Paragraph 23.

24.    KING denies the allegations in Paragraph 24.

25.    KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26.    KING denies the allegations in allegations in Paragraph 26.

## **FIRST CAUSE OF ACTION**
**(Breach of Contract)**

27.    KING reasserts and re-alleges her responses and defenses as set forth above in Paragraphs 1 through 26.

28.    KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

29.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

30.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

31.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

32.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

33.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

34.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

35.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34.

36.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35.

## SECOND CAUSE OF ACTION
### (Fraud)

37.     KING reasserts and re-alleges her responses and defenses as set forth above in Paragraphs 1-36.

38.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36.

39.     KING denies making false representations to Plaintiff. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37, and including Paragraph 37 subparagraphs A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, and T.

40.     KING is without knowledge or information sufficient to form a belief as to the

ANSWER TO COMPLAINT                                    5

truth of the allegations in Paragraph 38.

41.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39.

42.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

43.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41.

44.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42.

45.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

46.     KING denies she acted willfully, maliciously and with the intent to cause injury and harm to Plaintiff. KING is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44.

47.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

48.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

### **THIRD CAUSE OF ACTION**
**(Civil Theft, Cal. *Penal Code* Section 496)**

49.     KING reasserts and re-alleges its responses and defenses as set forth above in Paragraphs 1-48.

50.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

51.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.

52.     KING is without knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 49.

53.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

54.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

55.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52.

56.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

57.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

## FOURTH CAUSE OF ACTION
### (Account Stated)

58.     KING reasserts and re-alleges its responses and defenses as set forth above in Paragraphs 1-57.

59.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.

60.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56.

61.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57.

62.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58.

63.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.

64.     KING is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60.

## RESPONSE TO PRAYER FOR RELIEF

65.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 1.

66.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 2.

67.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 3.

68.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 4.

69.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 5.

70.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 6.

71.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 7.

72.     KING denies that the Plaintiff is entitled to the relief numerated in Paragraph 8.

## RESPONSE TO DEMAND FOR JURY TRIAL

KING admits that the Plaintiff has demanded a trial by jury on all issues so triable. Any allegation in Plaintiff's Complaint not heretofore specifically responded to is hereby denied.

## FIRST DEFENSE

Plaintiff's Complaint fails to state a claim against KING upon which relief can be granted.

## SECOND DEFENSE

KING asserts that it acted in good faith without intent to harm Plaintiff.

## THIRD DEFENSE

At all relevant times herein, the Plaintiff's alleged damages, which KING denies exist, were aggravated by the failure of the Plaintiff to use reasonable diligence to mitigate the same. Therefore, Plaintiff's recovery, if any, should be barred or decreased by reason of its failure to mitigate alleged losses.

**FOURTH DEFENSE**

Plaintiff's damages, if any, were not caused by KING, but by another person or entity for whom or for which KING is not responsible.

**FIFTH DEFENSE**

King asserts that there is no contractual relationship or agreement between Plaintiff and KING.

**SIXTH DEFENSE**

KING asserts that Plaintiff has through representations or actions waived its right to sue, and therefore cannot sustain this action.

**SEVENTH DEFENSE**

KING asserts that Plaintiff has committed a wrongdoing, and this lawsuit is attempting to benefit from this wrongdoing.

**EIGHTH DEFENSE**

KING asserts that Plaintiff obtained KING's cooperation for any and all transactions through misrepresentation by Plaintiff.

**NINTH DEFENSE**

Plaintiff cannot meet the requirements of Cal. Pen. Code § 496 and therefore not entitled to punitive or statutory damages.

**RESERVATION OF DEFENSES**

KING hereby reserves the right to amend her defenses to Plaintiff's Complaint, including, but not limited to, those defenses specifically set forth in Federal Rule of Civil

Procedure 8(c), and as otherwise permitted by law if investigation discovery, and further information should warrant such amendment. KING further reserves the right to request leave to join other parties as necessary.

**WHEREFORE**, having fully answered or otherwise responded to the allegations in Plaintiff's complaint, KING prays that:

(1)     Plaintiff's Complaint be dismissed in its entirety with prejudice, with all costs taxed against Plaintiff;

(2)     KING be dismissed as a party to this action;

(3)     KING recover such other and additional relief as the Court deems just and appropriate.

Respectfully submitted March 28, 2023.

DATED: March, 28, 2023          SARA JACQUELINE KING

                                   / s / Sara J. King
                                _____
                                Sara Jacqueline King
                                In Pro Per

**EXHIBIT "D"**

**F I L E D**
CLERK, U.S. DISTRICT COURT

06/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:23-cr-00079-DOC |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1957: Money Laundering; 18 U.S.C. § 982: Criminal Forfeiture] |
| SARA JACQUELINE KING, | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1343]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1.   Defendant SARA JACQUELINE KING, an attorney licensed to practice law in California, operated King Family Lending LLC ("King Lending") in Newport Beach, California.

1      2.    King Lending purportedly provided short-term, high-

2 interest loans to celebrities, professional athletes, and other

3 high-net-worth individuals secured by the borrower's own assets,

4 including designer handbags, watches, luxury automobiles,

5 yachts, and earnings from guaranteed professional sports

6 contracts (collectively the "loans").

7 B.   <u>THE SCHEME TO DEFRAUD</u>

8      3.    Beginning in or around January 2022 and continuing

9 until at least in or around January 11, 2023, in Orange County,

10 within the Central District of California, and elsewhere,

11 defendant KING, knowingly and with intent to defraud, devised,

12 participated in, and executed a scheme to obtain money and

13 property from investors of King Lending by means of material

14 false and fraudulent pretenses, representations, and promises,

15 and the concealment of material facts.

16      4.    The fraudulent scheme operated, in substance, as

17 follows:

18        a.    Defendant KING, through King Lending, recruited

19 investors to purportedly fund the loans.

20        b.    Defendant KING told investors that their

21 investments were secured by the same collateral as the loans.

22        c.    Defendant KING promised that she would retain

23 possession of the collateral, and in the event a borrower

24 defaulted, defendant KING would sell the collateral and pay the

25 investor in full.

26        d.    Defendant KING represented that she would keep a

27 percentage of the interest earned from the loan for herself and

28

would pass along a percentage of the interest to the investor, along with the investor's initial investment.

        e.   In reality, during this time period, defendant KING never initiated nor funded any loan.  Instead of using the investor funds for loans, defendant KING used the funds to gamble at Las Vegas casinos and support her lavish lifestyle.

    5.  Based on the fraudulent scheme above, defendant KING caused five investors to lose more than $8 million.

B.   <u>THE USE OF AN INTERSTATE WIRE</u>

    6.  On or about August 4, 2022, in Orange County, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant KING caused the transmission of $99,980 from investor L.R. through the Clearing House Interbank Payments System to King Lending's JP Morgan bank account located in Newport Beach, California to fund a purported loan.

COUNT TWO

[18 U.S.C. § 1957]

7.   On or about June 27, 2022, in Orange County, within
the Central District of California, and elsewhere, defendant
SARA JACQUELINE KING knowingly engaged in a monetary transaction
of a value greater than $10,000, involving funds that she knew
to be criminally derived property, and which property, in fact,
was derived from specified unlawful activity, that is, wire
fraud, in violation of Title 18, United States Code, Section
1343, specifically, a $132,156.09 withdrawal from King Lending's
JP Morgan bank account to purchase a Porsche Taycan.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the defendant's conviction of the offense set forth in Count One of this Information.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished

in value; or (e) has been commingled with other property that
cannot be divided without difficulty.

1                       FORFEITURE ALLEGATION TWO

2                          [18 U.S.C. § 982]

3       1.     Pursuant to Rule 32.2(a) of the Federal Rules of

4 Criminal Procedure, notice is hereby given that the United

5 States will seek forfeiture as part of any sentence, pursuant to

6 Title 18, United States Code, Section 982(a)(1), in the event of

7 the defendant's conviction of the offense set forth in Count Two

8 of this Information.

9       2.     The defendant, if so convicted, shall forfeit to the

10 United States of America the following:

11           (a)   Any property, real or personal, involved in such

12 offense, and any property traceable to such property; and

13           (b)   To the extent such property is not available for

14 forfeiture, a sum of money equal to the total value of the

15 property described in subparagraph (a).

16       3.     Pursuant to Title 21, United States Code, Section

17 853(p), as incorporated by Title 18, United States Code, Section

18 982(b)(1), and Title 18, United States Code, Section 982(b)(2),

19 the defendant, if so convicted, shall forfeit substitute

20 property, if, by any act or omission of the defendant, the

21 property described in the preceding paragraph, or any portion

22 thereof: (a) cannot be located upon the exercise of due

23 diligence; (b) has been transferred, sold to, or deposited with

24 a third party; (c) has been placed beyond the jurisdiction of

25 the court; (d) has been substantially diminished in value; or

26 (e) has been commingled with other property that cannot be

27 divided without difficulty. Substitution of assets shall not be

28 ordered, however, where the convicted defendant acted merely as

1    an intermediary who handled but did not retain the property in

2    the course of the money laundering offense unless the defendant,

3    in committing the offense or offenses giving rise to the

4    forfeiture, conducted three or more separate transactions

5    involving a total of $100,000 or more in any twelve-month

6    period.

7

8                                   E. MARTIN ESTRADA
                                     United States Attorney
9

10

11                                   MACK E. JENKINS
                                     Assistant United States Attorney
12                                   Chief, Criminal Division

13                                   BENJAMIN R. BARRON
                                     Assistant United States Attorney
14                                   Chief, Santa Ana Branch Office

15                                   JENNIFER L. WAIER
                                     Assistant United States Attorney
16                                   Deputy Chief, Santa Ana Branch Office

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "E"**

**F I L E D**
CLERK, U.S. DISTRICT COURT

06/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

E. MARTIN ESTRADA
United States Attorney
BENJAMIN R. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
JENNIFER L. WAIER (Cal. Bar No. 209813)
Assistant United States Attorney
    United States Courthouse
    411 West 4th Street, Suite 8000
    Santa Ana, California 927012
    Telephone: (714) 338-3550
    Facsimile: (714) 338-3708
    E-mail:   Jennifer.Waier@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

SARA JACQUELINE KING,

    Defendant.

No. 8:23-cr-00079-DOC

PLEA AGREEMENT FOR DEFENDANT
SARA JACQUELINE KING

1. This constitutes the plea agreement between SARA JACQUELINE KING ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2. Defendant agrees to:

    a. Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a two-count information charging

1  defendant with wire fraud, in violation of 18 U.S.C. § 1343 and money

2  laundering in violation of 18 U.S.C. § 1957.

3          b.  Not contest facts agreed to in this agreement.

4          c.  Abide by all agreements regarding sentencing contained

5  in this agreement.

6          d.  Appear for all court appearances, surrender as ordered

7  for service of sentence, obey all conditions of any bond, and obey

8  any other ongoing court order in this matter.

9          e.  Not commit any crime; however, offenses that would be

10  excluded for sentencing purposes under United States Sentencing

11  Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

12  within the scope of this agreement.

13          f.  Be truthful at all times with Pretrial Services, the

14  United States Probation Office, and the Court.

15          g.  Pay the applicable special assessment at or before the

16  time of sentencing unless defendant lacks the ability to pay and

17  prior to sentencing submits a completed financial statement on a form

18  to be provided by the USAO.

19                          THE USAO'S OBLIGATIONS

20      3.  The USAO agrees to:

21          a.  Not contest facts agreed to in this agreement.

22          b.  Abide by all agreements regarding sentencing contained

23  in this agreement.

24          c.  At the time of sentencing, provided that defendant

25  demonstrates an acceptance of responsibility for the offenses up to

26  and including the time of sentencing, recommend a two-level reduction

27  in the applicable Sentencing Guidelines offense level, pursuant to

28

1  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an

2  additional one-level reduction if available under that section.

3           d.    Recommend that defendant be sentenced to a term of

4  imprisonment no higher than the low end of the applicable Sentencing

5  Guidelines range, provided that the offense level used by the Court

6  to determine that range is 23 or higher (or 21 or higher if

7  prospective Guideline § 4C1.1 for zero-point offenders is

8  applicable), and provided that the Court does not depart downward in

9  offense level or criminal history category.  For purposes of this

10 agreement, the low end of the Sentencing Guidelines range is that

11 defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.

12                          NATURE OF THE OFFENSES

13       4.    Defendant understands that for defendant to be guilty of

14 the crime charged in count one, that is, wire fraud, in violation of

15 Title 18, United States Code, Section 1343, the following must be

16 true: (1) defendant knowingly participated in, devised, or intended

17 to devise a scheme or plan to defraud, or a scheme or plan for

18 obtaining money or property by means of false or fraudulent

19 pretenses, representations, or promises; (2) the statements made or

20 facts omitted as part of the scheme were material; that is, they had

21 a natural tendency to influence, or were capable of influencing, a

22 person to part with money or property; (3) defendant acted with the

23 intent to defraud; that is, the intent to deceive and cheat; and

24 (4) defendant used, or caused to be used, a wire communication to

25 carry out or attempt to carry out an essential part of the scheme.

26       5.    Defendant understands that for defendant to be guilty of

27 the crime charged in count two, that is, money laundering, in

28 violation of 18 U.S.C. § 1957, the following must be true:

(1) defendant knowingly engaged or attempted to engage in a monetary transaction; (2) defendant knew the transaction involved criminally derived property; (3) the property had a value greater than $10,000; (4) the property was, in fact, derived from wire fraud; and (5) the transaction occurred in the United States.

### PENALTIES AND RESTITUTION

6. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343, is: 20 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1957, is: 10 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

8. Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 30 years' imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

9. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised

4

release imposed, defendant may be returned to prison for all or part
of the term of supervised release authorized by statute for the
offenses that resulted in the term of supervised release, which could
result in defendant serving a total term of imprisonment greater than
the statutory maximum stated above.

10. Defendant understands that defendant will be required to
pay full restitution to the victims of the offenses to which
defendant is pleading guilty. Defendant agrees that, in return for
the USAO's compliance with its obligations under this agreement, the
Court may order restitution to persons other than the victims of the
offenses to which defendant is pleading guilty and in amounts greater
than those alleged in the count to which defendant is pleading
guilty. In particular, defendant agrees that the Court may order
restitution to any victim of any of the following for any losses
suffered by that victim as a result any relevant conduct, as defined
in U.S.S.G. § 1B1.3, in connection with the offenses to which
defendant is pleading guilty. The parties currently believe that the
applicable amount of restitution is approximately $8,785,045, but
recognize and agree that this amount could change based on facts that
come to the attention of the parties prior to sentencing.

11. Defendant understands that, by pleading guilty, defendant
may be giving up valuable government benefits and valuable civic
rights, such as the right to vote, the right to possess a firearm,
the right to hold office, and the right to serve on a jury.
Defendant understands that once the court accepts defendant's guilty
plea, it will be a federal felony for defendant to possess a firearm
or ammunition. Defendant understands that the convictions in this
case may also subject defendant to various other collateral

5

consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

12. Defendant understands that, if defendant is not a United States citizen, the felony convictions in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future. The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case. Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

### FACTUAL BASIS

13. Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty. Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 15 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Defendant, an attorney licensed to practice law in California, operated King Family Lending LLC ("King Lending") in Newport Beach, California.

King Lending purportedly provided short-term, high-interest loans to celebrities, professional athletes, and other high-net-worth individuals secured by the borrower's own assets, including designer handbags, watches, luxury automobiles, yachts, and earnings from guaranteed professional sports contracts (collectively the "loans").

Beginning in or around January 2022 and continuing until at least in or around January 11, 2023, in Orange County, within the Central District of California, and elsewhere, defendant, knowingly and with intent to defraud, devised, participated in, and executed a scheme to obtain money and property from investors of King Lending by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

Defendant, through King Lending, recruited investors to purportedly fund the business's loans. Defendant told investors that their investments were secured by the same collateral as the loans. Defendant promised that she would retain possession of the collateral and that, in the event a borrower defaulted, defendant would sell the collateral to pay the investor in full.

Defendant was to keep a percentage of the interest earned from the loans for herself and was to pass along a percentage of the interest to the investor, along with the investor's initial investment.

In reality, during this time period, defendant never initiated or funded any loan. Instead of using the investor funds for loans, defendant used the funds to gamble at Las Vegas casinos and support her lavish lifestyle.

Based on the fraudulent scheme above, defendant caused five investors to lose more than $8 million.

1    In furtherance of the scheme, on or about August 4, 2022,

2  defendant caused the transmission of $99,980 from investor L.R.

3  through the Clearing House Interbank Payments System to King

4  Lending's JP Morgan bank account located in Newport Beach, California

5  to fund a purported loan.

6    In addition, on or about June 27, 2022, defendant knowingly

7  engaged in a monetary transaction of a value greater than $10,000,

8  involving funds that she knew to be criminally derived property, and

9  which property, in fact, was derived from specified unlawful

10  activity, that is, wire fraud, in violation of Title 18, United

11  States Code, Section 1343, specifically, a $132,156.09 withdrawal

12  from King Lending's JP Morgan bank account to purchase a Porsche

13  Taycan.

14                          SENTENCING FACTORS

15    14.  Defendant understands that in determining defendant's

16  sentence the Court is required to calculate the applicable Sentencing

17  Guidelines range and to consider that range, possible departures

18  under the Sentencing Guidelines, and the other sentencing factors set

19  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

20  Sentencing Guidelines are advisory only, that defendant cannot have

21  any expectation of receiving a sentence within the calculated

22  Sentencing Guidelines range, and that after considering the

23  Sentencing Guidelines and the other § 3553(a) factors, the Court will

24  be free to exercise its discretion to impose any sentence it finds

25  appropriate up to the maximum set by statute for the crime of

26  conviction.

27  / / /

28

15. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss > $3,500,000: | +18 | U.S.S.G. § 2B1.1(b)(1)(J) |
| Money Laundering: | +1 | U.S.S.G. §2S1.1(b)(2)(A) |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a)&(b) |
| Total Offense Level: | 23 | |

16. The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 2 are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below. Subject to paragraph 29 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed. Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. Notwithstanding the foregoing, defendant reserves the right to argue for a two-level downward adjustment pursuant to a pending amendment to the Sentencing

9

Guidelines adding Section 4C1.1 (pertaining to certain offenders with
no criminal history points), if the amendment is effective at the
time of sentencing.  Defendant understands that the USPO and the
Court may not apply such an adjustment.  Defendant further agrees
that this or any other pending amendment to the Sentencing Guidelines
will not serve as grounds to withdraw defendant's guilty plea, such
as in the event of any unanticipated change to the availability of an
amendment or the Court's decision on whether to impose such an
adjustment.

17.  Defendant understands that there is no agreement as to
defendant's criminal history or criminal history category.

18.  Defendant and the USAO reserve the right to argue for a
sentence outside the sentencing range established by the Sentencing
Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
(a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

19.  Defendant understands that by pleading guilty, defendant
gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel – and if
necessary have the court appoint counsel - at trial.  Defendant
understands, however, that, defendant retains the right to be
represented by counsel – and if necessary have the court appoint
counsel – at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the
burden of proof placed on the government to prove defendant guilty
beyond a reasonable doubt.

10

1          e.    The right to confront and cross-examine witnesses

2  against defendant.

3          f.    The right to testify and to present evidence in

4  opposition to the charges, including the right to compel the

5  attendance of witnesses to testify.

6          g.    The right not to be compelled to testify, and, if

7  defendant chose not to testify or present evidence, to have that

8  choice not be used against defendant.

9          h.    Any and all rights to pursue any affirmative defenses,

10  Fourth Amendment or Fifth Amendment claims, and other pretrial

11  motions that have been filed or could be filed.

12                 WAIVER OF APPEAL OF CONVICTIONS

13     20.  Defendant understands that, with the exception of an appeal

14  based on a claim that defendant's guilty pleas are involuntary, by

15  pleading guilty defendant is waiving and giving up any right to

16  appeal defendant's conviction on the offenses to which defendant is

17  pleading guilty.  Defendant understands that this waiver includes,

18  but is not limited to, arguments that the statutes to which defendant

19  is pleading guilty are unconstitutional, and any and all claims that

20  the statement of facts provided herein is insufficient to support

21  defendant's plea of guilty.

22          LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

23     21.  Defendant agrees that, provided the Court imposes a term of

24  imprisonment within or below the range corresponding to an offense

25  level of 23 (or 21 if prospective Guideline § 4C1.1 for zero-point

26  offenders is applicable) and the criminal history category calculated

27  by the Court, defendant gives up the right to appeal all of the

28  following: (a) the procedures and calculations used to determine and

1   impose any portion of the sentence; (b) the term of imprisonment
2   imposed by the Court with the exception of the Court's determination
3   of the criminal history category; (c) the fine imposed by the Court,
4   provided it is within the statutory maximum; (d) to the extent
5   permitted by law, the constitutionality or legality of defendant's
6   sentence, provided it is within the statutory maximum; (e) the amount
7   and terms of any restitution order, provided it requires payment of
8   no more than $8,785,045; (f) the term of probation or supervised
9   release imposed by the Court, provided it is within the statutory
10  maximum; and (g) any of the following conditions of probation or
11  supervised release imposed by the Court: the conditions set forth in
12  Second Amended General Order 20-04 of this Court; the drug testing
13  conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the
14  alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

15      22.  The USAO agrees that, provided all portions of the sentence
16  are at or below the statutory maximum specified above, the USAO gives
17  up its right to appeal any portion of the sentence, with the
18  exception that the USAO reserves the right to appeal the amount of
19  restitution ordered if that amount is less than $8,785,045.

20                RESULT OF WITHDRAWAL OF GUILTY PLEA

21      23.  Defendant agrees that if, after entering a guilty plea
22  pursuant to this agreement, defendant seeks to withdraw and succeeds
23  in withdrawing defendant's guilty plea on any basis other than a
24  claim and finding that entry into this plea agreement was
25  involuntary, then (a) the USAO will be relieved of all of its
26  obligations under this agreement; and (b) should the USAO choose to
27  pursue any charge that was not filed as a result of this agreement,
28  then (i) any applicable statute of limitations will be tolled between

1  the date of defendant's signing of this agreement and the filing

2  commencing any such action; and (ii) defendant waives and gives up

3  all defenses based on the statute of limitations, any claim of pre-

4  indictment delay, or any speedy trial claim with respect to any such

5  action, except to the extent that such defenses existed as of the

6  date of defendant's signing this agreement.

7     24.  Defendant also gives up any right to bring a postconviction

8  collateral attack on the convictions or sentence, including any order

9  of restitution, except a post-conviction collateral attack based on a

10 claim of ineffective assistance of counsel or an explicitly

11 retroactive change in the applicable Sentencing Guidelines,

12 sentencing statutes, or statutes of conviction.  Defendant

13 understands that this waiver includes, but is not limited to,

14 arguments that the statute to which defendant is pleading guilty is

15 unconstitutional, that newly discovered evidence purportedly supports

16 defendant's innocence, and any and all claims that the statement of

17 facts provided herein is insufficient to support defendant's plea of

18 guilty.

19                  EFFECTIVE DATE OF AGREEMENT

20    25.  This agreement is effective upon signature and execution of

21 all required certifications by defendant, defendant's counsel, and an

22 Assistant United States Attorney.

23                     BREACH OF AGREEMENT

24    26.  Defendant agrees that if defendant, at any time after the

25 signature of this agreement and execution of all required

26 certifications by defendant, defendant's counsel, and an Assistant

27 United States Attorney, knowingly violates or fails to perform any of

28 defendant's obligations under this agreement ("a breach"), the USAO

13

may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea and (b) the USAO will be relieved of all its obligations under this agreement.

27. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

14

1  Procedure, or any other federal rule, that the statements or any
2  evidence derived from the statements should be suppressed or are
3  inadmissible.

4            COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES
5                            OFFICE NOT PARTIES

6       28.  Defendant understands that the Court and the United States
7  Probation and Pretrial Services Office are not parties to this
8  agreement and need not accept any of the USAO's sentencing
9  recommendations or the parties' agreements to facts or sentencing
10 factors.

11      29.  Defendant understands that both defendant and the USAO are
12 free to: (a) supplement the facts by supplying relevant information
13 to the United States Probation and Pretrial Services Office and the
14 Court, (b) correct any and all factual misstatements relating to the
15 Court's Sentencing Guidelines calculations and determination of
16 sentence, and (c) argue on appeal and collateral review that the
17 Court's Sentencing Guidelines calculations and the sentence it
18 chooses to impose are not error, although each party agrees to
19 maintain its view that the calculations in paragraph 15 are
20 consistent with the facts of this case.  While this paragraph permits
21 both the USAO and defendant to submit full and complete factual
22 information to the United States Probation and Pretrial Services
23 Office and the Court, even if that factual information may be viewed
24 as inconsistent with the facts agreed to in this agreement, this
25 paragraph does not affect defendant's and the USAO's obligations not
26 to contest the facts agreed to in this agreement.

27      30.  Defendant understands that even if the Court ignores any
28 sentencing recommendation, finds facts or reaches conclusions

1 │ different from those agreed to, and/or imposes any sentence up to the
2 │ maximum established by statute, defendant cannot, for that reason,
3 │ withdraw defendant's guilty plea, and defendant will remain bound to
4 │ fulfill all defendant's obligations under this agreement. Defendant
5 │ understands that no one -- not the prosecutor, defendant's attorney,
6 │ or the Court -- can make a binding prediction or promise regarding
7 │ the sentence defendant will receive, except that it will be within
8 │ the statutory maximum.

9 │ NO ADDITIONAL AGREEMENTS

10 │     31. Defendant understands that, except as set forth herein,
11 │ there are no promises, understandings, or agreements between the USAO
12 │ and defendant or defendant's attorney, and that no additional
13 │ promise, understanding, or agreement may be entered into unless in a
14 │ writing signed by all parties or on the record in court.
15 │ / / /
16 │ / / /

1            PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2       32.   The parties agree that this agreement will be considered

3  part of the record of defendant's guilty plea hearing as if the

4  entire agreement had been read into the record of the proceeding.

5  AGREED AND ACCEPTED

6  UNITED STATES ATTORNEY'S OFFICE
   CENTRAL DISTRICT OF CALIFORNIA

7  E. MARTIN ESTRADA

8  United States Attorney

9  *Jennifer Waier*                           6/12/2023

10 _____           Date
   JENNIFER L. WAIER
   Assistant United States Attorney

11

12 _____           6/9/23
                                              Date
13 SARA JACQUELINE KING
   Defendant

14 *M O L*                                    6/9/23

15 _____           Date
   SAMUEL CROSS
16 Deputy Federal Public Defender
   Attorney for Defendant
   SARA JACQUELINE KING

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

SARA JACQUELINE KING
Defendant

6/9/23
Date

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am Sara Jaqueline King's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of her rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____          6/9/23
SAMUEL CROSS                              Date
Attorney for Defendant
SARA JACQUELINE KING

19

**EXHIBIT "F"**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,   ) CERTIFIED TRANSCRIPT
                Plaintiff,  )
    vs.                     )
                            )    SACR-23-00079-DOC
SARA JACQUELINE KING,       )
                Defendant.  )
----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

July 24, 2023

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

2

```
1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    JENNIFER L. WAIER
     Assistant United States Attorney
4    OFFICE OF THE U.S. ATTORNEY
     Santa Ana Branch Office
5    Ronald Reagan Federal Building, Suite 8000
     411 West 4th Street, Suite 8000
6    Santa Ana, CA  92701
     (714) 338-3550
7

8    For the Defendant:

9    SAMUEL OWEN CROSS
     Deputy Federal Public Defender
10   FEDERAL PUBLIC DEFENDER'S OFFICE
     411 West Fourth Street, Suite 7110
11   Santa Ana, CA  92701-4598
     (714) 338-4500
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 12:21 | 1 | SANTA ANA, CALIFORNIA; MONDAY, JULY 24, 2023; 12:21 P.M. |
| 12:21 | 2 | THE COURT:  In the matter of SACR-23-00079-DOC, |
| 12:21 | 3 | United States of America versus Sara Jacqueline King, if you |
| 12:21 | 4 | just remain seated, would you make your appearance on behalf |
| 12:21 | 5 | of the government. |
| 12:21 | 6 | MS. WAIER:  Good afternoon, Your Honor.  Jennifer |
| 12:21 | 7 | Waier on behalf of the United States. |
| 12:22 | 8 | MR. CROSS:  Good afternoon, Your Honor.  Sam Cross |
| 12:22 | 9 | for Ms. King, who is present out of custody. |
| 12:22 | 10 | THE COURT:  Ms. King, would you raise your right |
| 12:22 | 11 | hand? |
| 12:22 | 12 | (Defendant sworn) |
| 12:22 | 13 | THE COURT:  First of all, let me begin by |
| 12:22 | 14 | introducing myself to you.  I'm Judge Carter, and I will be |
| 12:22 | 15 | taking the plea today. |
| 12:22 | 16 | Do you understand that you are now under oath, and |
| 12:22 | 17 | that if you answer any of my questions falsely, your answers |
| 12:22 | 18 | could later be used in a prosecution for perjury or making a |
| 12:22 | 19 | false statement? |
| 12:22 | 20 | THE DEFENDANT:  Yes. |
| 12:22 | 21 | THE COURT:  What's your full name? |
| 12:22 | 22 | THE DEFENDANT:  Sara Jacqueline King. |
| 12:22 | 23 | THE COURT:  I go through the plea sequentially, so |
| 12:22 | 24 | it states on the bottom of the first page that you are going |
| 12:22 | 25 | to plead guilty to a two-count Information charging you with |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:22   1   wire fraud, in violation of 18 USC Section 1343, and money

12:22   2   laundering, in violation of 18 USC Section 1957.  And you

12:22   3   are agreeing not to contest the facts, that you will abide

12:22   4   by all agreements, make all of your court appearances,

12:22   5   commit no further crimes, be truthful at all times in this

12:23   6   process, and pay the special assessment at or before the

12:23   7   time of sentencing.

12:23   8           Is that your understanding?

12:23   9           THE DEFENDANT:  Yes.

12:23   10          THE COURT:  Now, the government has also obligated

12:23   11  themselves.  They are agreeing not to contest the facts, to

12:23   12  abide by all agreements, and at the time of sentencing,

12:23   13  provided that you demonstrate an acceptance of

12:23   14  responsibility, they will recommend a two-level decrease in

12:23   15  the sentencing guideline offense level pursuant to 3E1.1 and

12:23   16  also an additional one level if it's available.  And they

12:23   17  will recommend a sentence to a term imprisonment no higher

12:23   18  than the low end of the applicable sentencing guideline

12:23   19  range provided that the offense level used by the Court to

12:23   20  determine that range is 23 or higher (or 21 or higher if the

12:23   21  prospective Guideline Section 4C1.1 for zero-point offenders

12:23   22  is applicable), and provided that the Court does not depart

12:23   23  downward in offense level or criminal history category.

12:23   24          Do you understand everything I have read to you

12:23   25  thus far?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

5

| | | |
|---|---|---|
| 12:23 | 1 | THE DEFENDANT:  Yes. |
| 12:23 | 2 | THE COURT:  Now, concerning the offense itself, |
| 12:23 | 3 | for you to be guilty of the offense, elements apply to each |
| 12:24 | 4 | of these counts, and each of these elements must be proven, |
| 12:24 | 5 | and they must be proven beyond a reasonable doubt.  In Count |
| 12:24 | 6 | One, wire fraud, in violation of Title 18, United States |
| 12:24 | 7 | Code, Section 1343, the following must be true:  (1) that |
| 12:24 | 8 | you knowingly participated in, devised, or intended to |
| 12:24 | 9 | devise a scheme or plan to defraud, or a scheme or plan for |
| 12:24 | 10 | obtaining money or property by means of false or fraudulent |
| 12:24 | 11 | pretenses, representations, or promises; and (2) that the |
| 12:24 | 12 | statements made or facts omitted as part of the scheme were |
| 12:24 | 13 | material; that is, they have a natural tendency to |
| 12:24 | 14 | influence, or were capable of influencing, a person to part |
| 12:24 | 15 | with money or property; and (3) that you acted with the |
| 12:24 | 16 | intent to defraud; that is, the intent to deceive and cheat; |
| 12:24 | 17 | and (4) that you used, or caused to be used, a wire |
| 12:24 | 18 | communication to carry out or attempt to carry out an |
| 12:24 | 19 | essential part of the scheme. |
| 12:24 | 20 | And for you to be guilty of the crime charges in |
| 12:24 | 21 | Count Two, that is, money laundering, in violation of 18 USC |
| 12:25 | 22 | Section 1957 the following must be true: (1) that you |
| 12:25 | 23 | knowingly engaged or attempted to engage in a monetary |
| 12:25 | 24 | transaction; (2) that you knew the transaction involved |
| 12:25 | 25 | criminally derived property; (3) that the property had a |

6

12:25　1　value greater than $10,000; (4) that the property was in

12:25　2　fact derived from wire fraud; and (5) that the transaction

12:25　3　occurred in the United States.

12:25　4　　　　　Do you understand the elements of the offense?

12:25　5　　　　　THE DEFENDANT:  Yes.

12:25　6　　　　　THE COURT:  You understand that the potential

12:25　7　penalties for a violation of Title 18, United States Code,

12:25　8　Section 1343 is:  20' years imprisonment; a three-year

12:25　9　period of supervised release; a fine of $250,000 or twice

12:25　10　the gross gain or gross loss resulting from the offense,

12:25　11　whichever is greatest; and a mandatory special assessment of

12:25　12　$100.

12:25　13　　　　　You understand that the statutory maximum sentence

12:25　14　that the Court can impose for a violation of Title 18,

12:25　15　United States Section 1957, is:  10 year's imprisonment; a

12:25　16　three-year period of supervised release; a fine of $250,000

12:26　17　or twice the gross gain or loss resulting from the offense,

12:26　18　whichever is greatest; and a mandatory special assessment of

12:26　19　$100.

12:26　20　　　　　You understand, therefore, the total maximum

12:26　21　sentence for all offenses to which you are pleading guilty

12:26　22　is:  30 year's imprisonment; a three-year period of

12:26　23　supervised release; a fine of $500,000 or twice the gross

12:26　24　gain or gross loss resulting from the offenses, whichever is

12:26　25　greatest; and a mandatory special assessment of $200.

12:26  1      You understand that supervised release is that
12:26  2  period of time during which you are subject to various
12:26  3  restrictions and requirements.  If you violate any one or
12:26  4  more of those, you could serve a term greater than the
12:26  5  statutory maximum term I have just stated to you.
12:26  6      By pleading guilty, you will be required to pay
12:26  7  full restitution to the victims of the offense, but the
12:26  8  parties agree in this matter and believe that the applicable
12:26  9  amount of restitution is approximately $8,785,045 but
12:26  10  recognize that this could change depending upon the facts
12:26  11  that come to the attention of the parties prior to
12:26  12  sentencing.
12:26  13      By pleading guilty, you are giving up valuable
12:27  14  government benefits and civic rights, such as the right to
12:27  15  vote, the right to possess a firearm, the right to hold
12:27  16  office, and the right to serve on a jury.  And once the
12:27  17  Court accepts your guilty plea, it would be a federal felony
12:27  18  for you to possess a firearm or ammunition.
12:27  19      You understand that a conviction in this case
12:27  20  could subject you to various other collateral consequences,
12:27  21  including but not limited to, revocation of probation,
12:27  22  parole, or supervised release in another case and suspension
12:27  23  or revocation of a professional license.  And you understand
12:27  24  that there can even be unanticipated collateral consequences
12:27  25  that will not serve as a grounds to withdraw your guilty

12:27   1    plea.

12:27   2            Also, if you are not a citizen of the United

12:27   3    States, a conviction in this case may subject you to:

12:27   4    removal, also known as deportation, which may, under some

12:27   5    circumstances, be mandatory; denial of citizenship; and

12:27   6    denial of admission to the United States in the future.  The

12:27   7    Court cannot, and defendant's attorney also may not be able

12:27   8    to, advise defendant fully regarding the immigration

12:27   9    consequences of the felony convictions in this case.  You

12:27  10    understand that unexpected immigration consequences will not

12:28  11    serve as grounds to withdraw your guilty plea.

12:28  12            Is that all true?

12:28  13            THE DEFENDANT:  Yes.

12:28  14            THE COURT:  Do you have any questions of me or

12:28  15    your counsel thus far?

12:28  16            THE DEFENDANT:  No.

12:28  17            THE COURT:  Counsel, would you state the factual

12:28  18    basis and all the supplemental?

12:28  19            MS. WAIER:  Defendant, an attorney licensed to

12:28  20    practice law in California, operated King Family Lending,

12:28  21    LLC, in Newport Beach, California.  King Lending purportedly

12:28  22    provided short-term, high interest loans to celebrities,

12:28  23    professional athletes, and other high net worth individuals

12:28  24    secured by the borrower's own assets, including designer

12:28  25    handbags, watches, luxury automobiles, yachts, and earnings

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

12:28  1    from guaranteed professional sports contracts.

12:28  2              Beginning in or around January 2022 and continuing

12:28  3    until at least in or around January 11, 2023, in Orange

12:29  4    County, within the Central District of California, and

12:29  5    elsewhere, defendant, knowingly and with intent to defraud,

12:29  6    devised, participated in, and executed a scheme to obtain

12:29  7    money and property from investors of King Lending by means

12:29  8    of material false and fraudulent pretenses, representations,

12:29  9    and promises, and the concealment of material facts.

12:29  10             Defendant, through King Lending, recruited

12:29  11   investors to purportedly fund the business's loans.

12:29  12   Defendant told investors that their investments were secured

12:29  13   by the same collateral as the loans.  Defendant promised

12:29  14   that she would retain possession of the collateral and that

12:29  15   in the event a borrower defaulted, defendant would sell the

12:29  16   collateral to pay the investor in full.

12:29  17             Defendant was to keep a percentage of the interest

12:29  18   earned from the loans for herself and was to pass along a

12:29  19   percentage of the interest to the investor, along with the

12:30  20   investor's initial investment.

12:30  21             In reality, during this time period, defendant

12:30  22   never initiated or funded any loan.  Instead of using the

12:30  23   investor funds for loans, defendant used the funds to gamble

12:30  24   at Las Vegas casinos and support her lavish lifetime.

12:30  25             Based on the fraudulent scheme, defendant caused

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:30 | 1 | five investors to lose more than $8 million. |
| 12:30 | 2 | In furtherance of the scheme, on or about |
| 12:30 | 3 | August 4, 2022, defendant caused the transmission of $99,980 |
| 12:30 | 4 | from investor L.R. through the Clearing House Interbank |
| 12:30 | 5 | Payments System to King Lending's JP Morgan bank account |
| 12:30 | 6 | located in Newport Beach, California, to fund a purportedly |
| 12:30 | 7 | loan. |
| 12:30 | 8 | In addition, on or about June 27, 2022, defendant |
| 12:30 | 9 | knowingly engaged in a monetary transaction of a value |
| 12:31 | 10 | greater than $10,000, involving funds that she knew to be |
| 12:31 | 11 | criminally derived property, and which property, in fact, |
| 12:31 | 12 | was derived from specified unlawful activity, that is, wire |
| 12:31 | 13 | fraud, in violation of Title 18, United States Code, |
| 12:31 | 14 | Section 1343, specifically a $132,156.09 withdrawal from |
| 12:31 | 15 | King Lending's JP Morgan bank account to purchase a Porsche |
| 12:31 | 16 | Taycan. |
| 12:31 | 17 | THE COURT:  Do you want to handle the supplemental |
| 12:31 | 18 | at this time or later? |
| 12:31 | 19 | MS. WAIER:  We'll do it later. |
| 12:31 | 20 | THE COURT:  Is this a correct factual statement |
| 12:31 | 21 | that was jurt read to you?  Is this what in fact occurred? |
| 12:31 | 22 | THE DEFENDANT:  Yes. |
| 12:31 | 23 | THE COURT:  Counsel, do you join in the factual |
| 12:31 | 24 | statement? |
| 12:31 | 25 | MR. CROSS:  I do. |

12:31   1           THE COURT:  I will accept this as your factual

12:31   2   statement.

12:31   3           Therefore, on page 8 involving your sentencing

12:31   4   factors in paragraph 14, all that really says is that these

12:32   5   guidelines used to be mandatory.  They are no longer

12:32   6   mandatory, but they must be taken into account, and they

12:32   7   must at least be considered along with a number of other

12:32   8   factors in Code Section 3553(a).

12:32   9           That calculation takes place in paragraph 15 with

12:32   10  a base offense level of 7 as agreed to by the parties.  A

12:32   11  loss being more than $3.5 million adds 18 levels.  Money

12:32   12  laundering adds a level.  Acceptance of responsibility

12:32   13  reduces this three levels.  An anticipated offense level of

12:32   14  23.

12:32   15          The government will agree to a two-level downward

12:32   16  adjustment for acceptance of responsibility, and an

12:32   17  additional one level if it's available in the conditions set

12:32   18  forth in paragraph 2 are met.  Notwithstanding, it states

12:32   19  that you would certainly like to argue for a two-level

12:32   20  downward adjustment to a pending amendment to the Sentencing

12:32   21  Guidelines, which is 4C1.1, which is why we talked about a

12:33   22  level 21 and a level 23.

12:33   23          If the amendment is effective at the time of

12:33   24  sentencing, you're going to be allowed to argue for that.

12:33   25  And you understand that the government, the Probation

12:33　　1　　Office, and the Court may not apply such an adjustment.  And

12:33　　2　　you further agree that this or any other pending amendment

12:33　　3　　to the guidelines will not serve as a grounds to withdraw

12:33　　4　　your guilty plea, such as in the event of any unanticipated

12:33　　5　　change to the availability of an amendment to the Court's

12:33　　6　　decision on whether to impose such an adjustment.

12:33　　7　　　　　　And this states that there is no agreement as to

12:33　　8　　your criminal history or criminal history category, and the

12:33　　9　　parties reserve the right to argue for a sentence outside

12:33　　10　　the sentencing range established by the Sentencing

12:33　　11　　Guidelines based on the factors set forth in 18 USC Section

12:33　　12　　3553(a).

12:33　　13　　　　　　Now, let me stop.  That's a lot of information.

12:33　　14　　Do you have any questions of your counsel or any questions

12:33　　15　　of me?

12:33　　16　　　　　　THE DEFENDANT:  No.

12:33　　17　　　　　　THE COURT:  Paragraph 19 simply states that you

12:33　　18　　understand that waiving and giving up your constitutional

12:34　　19　　rights so that you can enter a plea of guilty.  You have the

12:34　　20　　right to persist in a plea of not guilty; the right to a

12:34　　21　　speedy and public trial by a jury; the right to be

12:34　　22　　represented by counsel -- and if necessary have the Court

12:34　　23　　appoint counsel -- at trial.  You understand, however, that

12:34　　24　　you do retain the right to be represented by counsel -- and

12:34　　25　　if necessary have the Court appoint counsel -- at every

| | | |
|---|---|---|
| 12:34 | 1 | other stage of the proceedings. |
| 12:34 | 2 | You have right to be presumed innocent and to have |
| 12:34 | 3 | the burden of proof placed on the government to prove you |
| 12:34 | 4 | are guilty beyond a reasonable doubt. |
| 12:34 | 5 | You have the right to confront and cross-examine |
| 12:34 | 6 | witnesses who are called against you. |
| 12:34 | 7 | You have the right to testify and to present |
| 12:34 | 8 | evidence in opposition to these charges, including the right |
| 12:34 | 9 | to compel the attendance of witnesses to testify. |
| 12:34 | 10 | You have the right not to be compelled to testify, |
| 12:34 | 11 | and if you chose not to testify or present evidence to have |
| 12:34 | 12 | that choice not be used against you. |
| 12:34 | 13 | And any and all rights to pursue any affirmative |
| 12:34 | 14 | defense, Fourth Amendment or Fifth Amendment claims, and |
| 12:34 | 15 | other pretrial motions that have been filed or could be |
| 12:34 | 16 | filed. |
| 12:34 | 17 | Do you understand each of those individual rights? |
| 12:35 | 18 | THE DEFENDANT:  Yes. |
| 12:35 | 19 | THE COURT:  Do you waive and give up each of those |
| 12:35 | 20 | individual rights so you may enter a plea of guilty? |
| 12:35 | 21 | THE DEFENDANT:  Yes. |
| 12:35 | 22 | THE COURT:  Then paragraph 20 simply says that |
| 12:35 | 23 | with the exception of an appeal based on a claim that your |
| 12:35 | 24 | guilty pleas are involuntary, by pleading guilty, you are |
| 12:35 | 25 | waiving and giving up any right to appeal your conviction on |

14

| | |
|---|---|
| 12:35 | 1 |
| 12:35 | 2 |
| 12:35 | 3 |
| 12:35 | 4 |
| 12:35 | 5 |
| 12:35 | 6 |
| 12:35 | 7 |
| 12:35 | 8 |
| 12:35 | 9 |
| 12:35 | 10 |
| 12:35 | 11 |
| 12:35 | 12 |
| 12:35 | 13 |
| 12:35 | 14 |
| 12:35 | 15 |
| 12:35 | 16 |
| 12:35 | 17 |
| 12:36 | 18 |
| 12:36 | 19 |
| 12:36 | 20 |
| 12:36 | 21 |
| 12:36 | 22 |
| 12:36 | 23 |
| 12:36 | 24 |
| 12:36 | 25 |

the offenses to which you are pleading guilty.  This waiver
includes, but is not limited to, arguments that the statutes
to which you are pleading guilty are unconstitutional, and
any and all claims that the statement of facts provided
herein is insufficient to support your guilty plea.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Now I'm going to start summarizing.
On page 11, look at paragraph 21.  It has a heading "Limited
Mutual Waiver Of An Appeal Of Sentence."  If you would turn
the page, you will see paragraph 22.

Then it has a heading on paragraph 23, "Result Of
Withdrawal Of Guilty Plea," and what would happen in
paragraph 23.

And if you turn the page, you see paragraph 24,
all part of that same subdivision.

And the "Effective Date Of Agreement," paragraph
25, and what would occur.

"Breach Of Agreement," paragraph 26 and paragraph
27.

Turn the page again, and you will see another
heading, "Court And United States Probation And Pretrial
Services Office Not Parties," paragraphs 28, 29, and 30.

And then turn the page again, and you will see "No
Additional Agreements," paragraph 31.

| | | |
|---|---|---|
| 12:36 | 1 | Have you read all these paragraphs? |
| 12:36 | 2 | THE DEFENDANT:  Yes. |
| 12:36 | 3 | THE COURT:  Have you read this entire plea |
| 12:36 | 4 | agreement? |
| 12:36 | 5 | THE DEFENDANT:  Yes. |
| 12:36 | 6 | THE COURT:  Have you had sufficient time to fairly |
| 12:36 | 7 | and thoughtfully discuss this plea agreement with your |
| 12:36 | 8 | counsel? |
| 12:36 | 9 | THE DEFENDANT:  Yes. |
| 12:36 | 10 | THE COURT:  Counsel, have you had the same |
| 12:36 | 11 | opportunity to discuss this plea agreement with your client? |
| 12:36 | 12 | MR. CROSS:  I have. |
| 12:36 | 13 | THE COURT:  Is this your signature then on |
| 12:36 | 14 | page 17?  It would be at line 12. |
| 12:37 | 15 | THE DEFENDANT:  Yes. |
| 12:37 | 16 | THE COURT:  There is a certification on page 19. |
| 12:37 | 17 | It reads:  "I have read this agreement in its entirety.  I |
| 12:37 | 18 | have had enough time to review and consider this agreement, |
| 12:37 | 19 | and I have carefully and thoroughly discussed every part of |
| 12:37 | 20 | it with my attorney.  I understand the terms of this |
| 12:37 | 21 | agreement, and I voluntarily agree to those terms.  I have |
| 12:37 | 22 | discussed the evidence with my attorney, and my attorney has |
| 12:37 | 23 | advised me of my rights, of possible pretrial motions that |
| 12:37 | 24 | might be filed, of possible defenses that might be asserted |
| 12:37 | 25 | either prior to or at trial, of the sentencing factors set |

| 12:37 | 1 | forth in 18 USC Section 3553(a, of relevant Sentencing |
| 12:37 | 2 | Guideline provisions, and of the consequences of entering |
| 12:37 | 3 | into this agreement.  No promises, inducements, or |
| 12:37 | 4 | representations of any kind have been made to me other than |
| 12:37 | 5 | those contained in this agreement.  No one has threatened or |
| 12:37 | 6 | forced me in any way to enter into this agreement.  I am |
| 12:37 | 7 | satisfied with the representation of my attorney in this |
| 12:37 | 8 | matter, and I am pleading guilty because I am guilty of the |
| 12:38 | 9 | charges and wish to take advantage of the promises set forth |
| 12:38 | 10 | in this agreement and not for any other reason. |
| 12:38 | 11 | Is that all true? |
| 12:38 | 12 | THE DEFENDANT:  Yes. |
| 12:38 | 13 | THE COURT:  Now, counsel, have I misstated any |
| 12:38 | 14 | portion?  If you need a correction on my part, please call |
| 12:38 | 15 | that defect to my attention or if I just summarized too |
| 12:38 | 16 | much, and there is a different portion you would like me to |
| 12:38 | 17 | go over with the defendant. |
| 12:38 | 18 | MR. CROSS:  Nothing from the defense, Your Honor/ |
| 12:38 | 19 | THE COURT:  The same to the government? |
| 12:38 | 20 | MS. WAIER:  No, Your Honor. |
| 12:38 | 21 | I would just the Court to inquire if she has read |
| 12:38 | 22 | the supplement, understands the supplement, and if she has |
| 12:38 | 23 | any questions of the Court or her attorney. |
| 12:38 | 24 | THE COURT:  Why don't you ask her those questions. |
| 12:38 | 25 | MS. WAIER:  Ms. King, have you read the |

| | | |
|---|---|---|
| 12:38 | 1 | supplement? |
| 12:38 | 2 | THE DEFENDANT:  Yes. |
| 12:38 | 3 | MS. WAIER:  Do you understand everything that is |
| 12:38 | 4 | in the supplement? |
| 12:38 | 5 | THE DEFENDANT:  Yes. |
| 12:38 | 6 | THE COURT:  Did you go over that with your |
| 12:38 | 7 | attorney? |
| 12:38 | 8 | THE DEFENDANT:  I did. |
| 12:38 | 9 | THE COURT:  Do you have any questions of the |
| 12:38 | 10 | Court, your counsel, or myself at this time? |
| 12:38 | 11 | THE DEFENDANT:  No. |
| 12:38 | 12 | MS. WAIER:  Thank you. |
| 12:38 | 13 | THE COURT:  So I will incorporate the supplement. |
| 12:38 | 14 | MS. WAIER:  Yes, please. |
| 12:38 | 15 | THE COURT:  All right, I will incorporate the |
| 12:39 | 16 | supplement. |
| 12:39 | 17 | How do you plead to the first count in the Count |
| 12:39 | 18 | Two Information, which is a violation of 18 USC Section |
| 12:39 | 19 | 1343, wire fraud?  Guilty or not guilty. |
| 12:39 | 20 | THE DEFENDANT:  Guilty. |
| 12:39 | 21 | THE COURT:  Counsel, do you join? |
| 12:39 | 22 | MR. CROSS:  I do |
| 12:39 | 23 | THE COURT:  As to the second count, which is 18 |
| 12:39 | 24 | USC Section 1957, money laundering, how do you plead? |
| 12:39 | 25 | Guilty or not guilty? |

18

12:39      1            THE DEFENDANT:  Guilty.

12:39      2            THE COURT:  Counsel, do you join?

12:39      3            MR. CROSS:  I do.

12:39      4            THE COURT:  The Court finds that there is a

12:39      5    knowing and intelligent waiver of your rights, that you

12:39      6    understand the nature and consequences of your plea, that

12:39      7    your plea is freely and voluntarily entered into, and that

12:39      8    there is a sufficient factual basis for this plea.

12:39      9            I accept this plea.  And I will set this on a date

12:39     10    convenient for you, your counsel, and the government.

12:39     11            MS. WAIER:  January 8, 2024, at 1:30 p.m.

12:39     12            THE COURT:  January 8, 2024, at 1:30.

12:39     13            The bail and bond conditions remain the same.

12:39     14            Counsel, thank you very much.

12:39     15            MS. WAIER:  Thank you.

12:39     16            MR. CROSS:  Thank you.

12:39     17            (Whereupon, the proceedings were concluded.)

12:39     18                      *    *    *

12:39     19

12:39     20

12:39     21

12:39     22

12:39     23

12:39     24

12:39     25

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  August 13, 2023

/s/   Sharon A. Seffens  8/13/23
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

**EXHIBIT "G"**

# PROMISSORY NOTE

**$195,000.00**                                                                                   **January 14, 2022**
                                                                                                    **Orange County, California**

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**Maker**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3ʳᵈ Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**Payee**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **ONE HUNDRED NINETY-FIVE THOUSAND DOLLARS** ($**195,000.00**), with interest thereon as provided in this Promissory Note (this "**Note**").

1.      **Certain Definitions**. For the purposes hereof, the terms set forth below shall have the following meanings:

(a)      "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

(b)      "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

(c)      "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note.  If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

(d)      "Interest Rate" shall mean sixty percent (60%) per annum.

(e)     "Maturity Date" shall mean the date which is four months after the date of this Note, subject to acceleration as provided herein.

(f)     "Unpaid Principal Balance" shall mean, at any time, the original stated amount of principal of this Note, less any amounts of principal repaid.

2.     **Payment of Principal and Interest**.

(a)     Interest shall be paid on a monthly basis to Payee beginning on February 14, 2022 and every 30 days thereafter until the Maturity Date.

(b)     The Unpaid Principal Balance and all accrued interest due on this Note shall be paid on the Maturity Date.

(c)     Subject to the provisions of Section 6 below, interest on the Unpaid Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured hereby are funded by Payee to Maker (not from the date of this Note).

(d)     This Note is payable in lawful money of the United States, without prior notice or demand, and without offset or deduction of any nature.

3.     **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be prepaid in whole or in part, at any time, without penalty or prepayment premium. The total amount of Interest for four months is guaranteed regardless of prepayment of the Principal Balance.

4.     **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (a) waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (b) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any person primarily or secondarily liable for the payment of this Note; (c) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (d) consent to any extension of time for the payment of this Note, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.     **Events of Default**.

(a)     Upon the happening of any of the following events (each an "**Event of Default**"), Payee may, at its option, by notice to Maker, declare immediately due and payable the entire Unpaid Principal Balance, together with all accrued interest thereon:

    (i)  If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

    (ii)  If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

    (b)  The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

   **6.**  **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

   **7.**  **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan.  Collateral for said loan is 3 watches: Audemars Piguet Rose Gold Royal Oak Chronograph Black Index; Audemars Piguet Rose Gold Royal Oak Chronograph White Index; Richard Mille RM 030.

   Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party (see Exhibit A), or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

   **8.**  **Fees, Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this Paragraph 8.

   **9.**  **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

   **10.**  **Compliance with Law**. All agreements between Maker and Payee, whether now

existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker.  All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law.  This section shall control all agreements between Maker and Payee relating to this Note.

11. **Attorneys' Fees and Costs**.  In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

12. **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

13. **Headings**.  The section headings used in this Note are for convenience of reference only and shall not affect the meaning or interpretation of this Note.

14. **Governing Law. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF INTEREST LAWS.**

15. **Successors and Assigns**. The term "Payee" shall include Payee's successors and assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and Maker's heirs, successors and permitted assigns (but no assignment or delegation of this Note by Maker shall release Maker from liability hereunder).

*[Signature on following page]*

This Note is **EXECUTED** as of the first date set forth above.

**KING FAMILY LENDING LLC**, a California
limited liability company

By:
Name: Sara J. King
Its: Manager

**EXHIBIT A**

**CERTIFICATE OF APPRAISAL**



TO WHOM IT MAY CONCERN:

THIS IS TO CERTIFY THAT WE ARE ENGAGED IN THE JEWELRY BUSINESS, APPRAISING DIAMONDS, WATCHES, JEWELRY AND

**EXHIBIT "H"**

## PROMISSORY NOTE

**$200,000.00**                                                     **April 27, 2022**
                                                                  **Orange County, California**

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**Maker**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3rd Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**Payee**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **TWO HUNDRED THOUSAND DOLLARS** (**$200,000.00**), with interest thereon as provided in this Promissory Note (this "**Note**").

1.     **Certain Definitions**. For the purposes hereof, the terms set forth below shall have the following meanings:

(a)     "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

(b)     "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

(c)     "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

(d)     "Interest Rate" shall mean seventy-two percent (72%) per annum.

(e)     "Maturity Date" shall mean the date which is three months after the date of this Note, subject to acceleration as provided herein.

(f)     "Unpaid Principal Balance" shall mean, at any time, the original stated amount of principal of this Note, less any amounts of principal repaid.

2.     **Payment of Principal and Interest**.

(a)     Interest shall be paid on a monthly basis to Payee beginning on May 27, 2022 and every 30 days thereafter until the Maturity Date.

(b)     The Unpaid Principal Balance and all accrued interest due on this Note shall be paid on the Maturity Date.

(c)     Subject to the provisions of <u>Section 6</u> below, interest on the Unpaid Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured hereby are funded by Payee to Maker (not from the date of this Note).

(d)     This Note is payable in lawful money of the United States, without prior notice or demand, and without offset or deduction of any nature.

3.     **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be prepaid in whole or in part, at any time, without penalty or prepayment premium. The total amount of Interest for four months is guaranteed regardless of prepayment of the Principal Balance.

4.     **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (a) waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (b) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any person primarily or secondarily liable for the payment of this Note; (c) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (d) consent to any extension of time for the payment of this Note, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.     **Events of Default**.

(a)     Upon the happening of any of the following events (each an "**Event of Default**"), Payee may, at its option, by notice to Maker, declare immediately due and

payable the entire Unpaid Principal Balance, together with all accrued interest thereon. If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

(i)      If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

(b)      The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

6.      **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

7.      **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan.  Collateral for said loan is:  Lamborghini Avendator 2021 *see exhibit A*.

Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party, or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

8.      **Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this Paragraph 8.

3

9.      **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

10.     **Compliance with Law**. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker.  All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law.  This section shall control all agreements between Maker and Payee relating to this Note.

11.     **Attorneys' Fees and Costs**.  In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

12.     **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

13.     **Headings**.  The section headings used in this Note are for convenience of reference only and shall not affect the meaning or interpretation of this Note.

14.     **Governing Law. THIS NOTE SHALL BE GOVERNED BY AND**

4

**CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF INTEREST LAWS.**

15. **Successors and Assigns**. The term "Payee" shall include Payee's successors and assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and Maker's heirs, successors and permitted assigns (but no assignment or delegation of this Note by Maker shall release Maker from liability hereunder).

[*Signature on following page*]

This Note is **EXECUTED** as of the first date set forth above.

**KING FAMILY LENDING LLC**, a
California limited liability company

By: _____

Name: Sara J. King
Its: Manager

**EXHIBIT A**



**Date: April 26, 2022**
**Car Appraisal and Agreed Upon Purchase Value**

**2021 Lamborghini Avendator**        **ZHWUN6ZD**█████        **Market Value: $421,000.00**
                                                                **Agreed Value: $400,000.00**

**Customs By Lopez agrees to purchase the above listed vehicles at the agreed upon value for a period of 3 months from the date of this offer.**

█████████

**Owner**



**EXHIBIT "I"**

## <u>PROMISSORY NOTE</u>

**$500,000.00**

**May 16, 2022**
**Orange County, California**

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**Maker**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3rd Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**Payee**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **FIVE HUNDRED THOUSAND DOLLARS** (**$500,000.00**), with interest thereon as provided in this Promissory Note (this "**Note**").

 1. **<u>Certain Definitions</u>**. For the purposes hereof, the terms set forth below shall have the following meanings:

 (a) "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

 (b) "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

 (c) "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

 (d) "Interest Rate" shall mean forty eight percent (48%) per annum.

(e)     "Maturity Date" shall mean the date which is six months after the   date
of this Note, subject to acceleration as provided herein.

(f)     "Unpaid Principal Balance" shall mean, at any time, the original stated
amount of principal of this Note, less any amounts of principal repaid.

2.     **Payment of Principal and Interest**.

(a)     Interest shall be paid on a monthly basis to Payee beginning on June 30,
2022 and every 30 days thereafter until the Maturity Date.

(b)     The Unpaid Principal Balance and all accrued interest due on this Note shall
be paid on the Maturity Date.

(c)     Subject to the provisions of <u>Section 6</u> below, interest on the Unpaid
Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall
accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured
hereby are funded by Payee to Maker (not from the date of this Note).

(d)     This Note is payable in lawful money of the United States, without prior
notice or demand, and without offset or deduction of any nature.

3.     **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be
prepaid in whole or in part, at any time, without penalty or prepayment premium. The total
amount of Interest for four months is guaranteed regardless of prepayment of the Principal
Balance.

4.     **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors
and other parties now or hereafter liable for the payment of this Note, in whole or in part,
hereby severally (a) waive demand, notice of demand, presentment for payment, notice of
nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate,
notice of acceleration, notice of dishonor and all other notices, and further waive diligence
in collecting this Note, in taking action to collect this Note, in bringing suit to collect this
Note, or in enforcing this Note or any of the security for this Note; (b) agree to any
substitution, subordination, exchange or release of any security for this Note or the release
of any person primarily or secondarily liable for the payment of this Note; (c) agree that
Payee shall not be required to first institute suit or exhaust its remedies hereon against
Maker or others liable or to become liable for the payment of this Note or to enforce its
rights against any security for the payment of this Note; and (d) consent to any extension
of time for the payment of this Note, made by agreement by Payee with any person now or
hereafter liable for the payment of this Note, even if Maker is not a party to such
agreement.

5.     **Events of Default**.

(a)     Upon the happening of any of the following events (each an "**Event of
Default**"), Payee may, at its option, by notice to Maker, declare immediately due and

2

payable the entire Unpaid Principal Balance, together with all accrued interest thereon. If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

       (i)     If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

       (b)     The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

6.    **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

7.    **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan. Collateral for said loan is: Guaranteed National Hockey League Sports Contract.

       Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party, or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

8.    **Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this Paragraph 8.

9.     **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

10.     **Compliance with Law**. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This section shall control all agreements between Maker and Payee relating to this Note.

11.     **Attorneys' Fees and Costs**.  In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

12.     **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

13.     **Headings**.  The section headings used in this Note are for convenience of reference only and shall not affect the meaning or interpretation of this Note.

14.     **Governing Law**. THIS NOTE SHALL BE GOVERNED BY AND

4

**CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF INTEREST LAWS.**

15.    **Successors and Assigns**. The term "Payee" shall include Payee's successors and assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and Maker's heirs, successors and permitted assigns (but no assignment or delegation of this Note by Maker shall release Maker from liability hereunder).

[*Signature on following page*]

This Note is **EXECUTED** as of the first date set forth above.


**KING FAMILY LENDING LLC**, a
California limited liability company



By:
Name: Sara J. King
Its: Manager

**EXHIBIT A**

<u>**PERSONAL GUARANTEE**</u>

**THIS GUARANTEE** (the "Guarantee") dated this 16th day of May 16,  2022

**BETWEEN:**                                        **SARA J. KING**


(the "Guarantor")

                                                                        **OF THE FIRST PART**


**- AND -**

LDR INTERNATIONAL LIMITED
(the "Lender")

                                                                **OF THE SECOND PART**


**- AND -**

KING FAMILY LENDING LLC, A CALIFORNIA LIMITED
LIABILITY COMPANY
(the "Debtor")

                                                                        **OF THE THIRD PART**

**IN CONSIDERATION OF** good and valuable consideration, and any future credit that the Lender may extend from time to time to the Debtor, the receipt and sufficiency of which is hereby acknowledged, the Guarantor  personally guarantees the prompt, full and complete performance of any and all existing duties and obligations of the Debtor to the Lender and the payment of any and all indebtedness due to the Lender by the Debtor, up to a limit of $500,000.00, under the terms of certain debt agreements (the "Agreement"), and the following terms and conditions:

1.      Subject to the above limit, the Guarantor guarantees that the Debtor will promptly pay the full amount of principal and interest of the debt under the Agreement (the "Debt") as and when the same will in any manner be or become due, either according to the terms and conditions provided by the Agreement or upon acceleration of the payment under the Agreement by reason of a default.

2.    The Guarantor agrees not to pledge, hypothecate, mortgage, sell or otherwise transfer any of the Guarantor's assets without the prior written consent of the Lender.

3.    To the extent permitted by law, the Guarantor waives all defenses, counterclaims or offsets that are legally available to the Guarantor with respect to the payment of the Debt of the Debtor.

4.    The Lender is hereby authorized at any time, in its sole discretion and without notice, to take, change, release or in any way deal with any security securing the Debt without in any way impairing the obligation of the Guarantor.

5.    The Lender will be under no obligation to collect or to protect any such security or the Debt, and its neglect or failure to collect or protect the security or the Debt is excused. Acceptance of the Guarantee is waived.

6.    The Lender may grant extensions of time or other indulgences and otherwise deal with the Debtor and with other parties and securities as the Lender may see fit without in any way limiting or lessening the liability of the Guarantor under this Agreement.

7.    Any impairment of the security, which the Lender may from time to time hold as security for the Debt, will in no way operate to discharge the Guarantor in whole or in part, it being specifically agreed that the Lender is not required to exercise diligence to enforce its rights against the Debtor.

8.    The Lender may release, surrender, exchange, modify, impair or extend the periods of duration or the time for performance or payment of any collateral securing the obligations of the Debtor to the Lender, and may also settle or compromise any claim of the Lender against the Debtor or against any other person or corporation whose obligation is held by the Lender as collateral security for any obligation of the Debtor or the Lender.

9.    This Guarantee is for the use and benefit of the Lender, and will also be for the use and benefit of any subsequent Lender to whom the Lender may assign this Guarantee.

10.   The liability of the Guarantor will continue until payment is made of every obligation of the Debtor now or later incurred in connection with the Debt and until payment is made of any loss or damage incurred by the Lender with respect to any matter covered by this Guarantee or any of

the Agreement.

11.     The Guarantor further waives all rights, by statute or otherwise, to require the Lender to institute suit against the Debtor, and to exercise diligence in enforcing this Guarantee or any other instrument.

12.     Any and all present and future debts and liabilities of the Debtor to the Guarantor are postponed in favor of and subordinated to the full payment and performance of all present and future debts and obligations of the Debtor to the Lender. Upon any default by the Debtor under the Agreement, all present and future indebtedness of the Debtor to the Guarantor is hereby assigned to the Lender and any monies thereafter received by the Guarantor from the Debtor will be received in trust for the Lender and upon receipt are to be paid over to the Lender until such time as the Debt owed by the Debtor has been fully paid and satisfied.

13.     The Guarantor represents that at the time of the execution and delivery of this Guarantee nothing exists to impair the effectiveness of this Guarantee.

14.     All of the Lender's rights, powers and remedies available under this Guarantee and under any other agreement in force now or anytime later between the Lender and the Guarantor will be cumulative and not alternative, and will be in addition to all rights, powers and remedies given to the Lender by law or in equity.

15.     The Lender may, at its option, proceed in the first instance against the Guarantor to collect the obligations covered by this Guarantee without first proceeding against any other person, firm or corporation and without resorting to any property held by the Lender as collateral security.

16.     All pronouns will include masculine, feminine and/or neuter gender, single or plural number, as the context of this Guarantee may require.

17.     This Guarantee is made pursuant to the laws of the State of California. In the event that this Guarantee must be enforced by the Lender, all reasonable costs and expenses, including attorney's fees, incurred by the Lender will be paid by the Guarantor.

18.     The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Guarantee will not affect the validity or enforceability of the remaining portions of this

Guarantee or any part of this Guarantee.

19.     No alteration or waiver of this Guarantee or of any of its terms, provisions or conditions will be binding upon the Lender unless made in writing over the signature of the Lender or its representative.

20.     Words of "Guarantee" contained in this Guarantee in no way diminish or impair the absolute liability created in this Guarantee.

21.     Any notice to be given to the Guarantor may be sent by mail, telephone, email or otherwise delivered to the address provided below.

SARA J KING

8500 SUNSET BLVD, STE. 304

LOS ANGELES, CALIFORNIA 90036

(949) 220-3666

SARAJKING@GMAIL.COM

**IN WITNESS WHEREOF** the Guarantor has duly affixed their signature under hand and seal, this 16th day of May, 2022.

_____

SARAH KING

**EXHIBIT "J"**

## PROMISSORY NOTE

$150,000.00                                                          June 20, 2022
                                                          Orange County, California

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**Maker**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3rd Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**Payee**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **ONE HUNDRED FIFTY THOUSAND DOLLARS** (**$150,000.00**), with interest thereon as provided in this Promissory Note (this "**Note**").

1.      **Certain Definitions**. For the purposes hereof, the terms set forth below shall have the following meanings:

(a)      "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

(b)      "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

(c)      "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

(d)      "Interest Rate" shall mean SIXTY PERCENT (60%) per annum.

(e)      "Maturity Date" shall mean the date which is 4 months after the date of this Note, subject to acceleration as provided herein.

(f)      "Unpaid Principal Balance" shall mean, at any time, the original stated amount of principal of this Note, less any amounts of principal repaid.

2.      **Payment of Principal and Interest**.

(a)      Interest shall be paid on a monthly basis to Payee beginning on July 20, 2022 and every 30 days thereafter until the Maturity Date.

(b)      The Unpaid Principal Balance and all accrued interest due on this Note shall be paid on the Maturity Date.

(c)      Subject to the provisions of <u>Section 6</u> below, interest on the Unpaid Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured hereby are funded by Payee to Maker (not from the date of this Note).

(d)      This Note is payable in lawful money of the United States, without prior notice or demand, and without offset or deduction of any nature.

3.      **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be prepaid in whole or in part, at any time, without penalty or prepayment premium. The total amount of Interest for four months is guaranteed regardless of prepayment of the Principal Balance.

4.      **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (a) waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (b) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any person primarily or secondarily liable for the payment of this Note; (c) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (d) consent to any extension of time for the payment of this Note, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.      **Events of Default**.

(a)      Upon the happening of any of the following events (each an "**Event of Default**"), Payee may, at its option, by notice to Maker, declare immediately due and

payable the entire Unpaid Principal Balance, together with all accrued interest thereon. If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

(i)      If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

(b)      The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

6.      **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

7.      **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan.  Collateral for said loan is:

(i)      2017 Hermes Birkin 35cm Black Alligator
(ii)     Piaget Limelight Diamond Watch

Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party, or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

8.      **Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee

3

that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this Paragraph 8.

9. **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

10. **Compliance with Law**. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker. All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law. This section shall control all agreements between Maker and Payee relating to this Note.

11. **Attorneys' Fees and Costs**. In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

12. **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

13. **Headings**. The section headings used in this Note are for convenience of reference

only and shall not affect the meaning or interpretation of this Note.

**14.**     **Governing Law. THIS NOTE SHALL BE GOVERNED BY AND
CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF
CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF
INTEREST LAWS.**

15.     **Successors and Assigns**. The term "Payee" shall include Payee's successors and
assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and
Maker's heirs, successors and permitted assigns (but no assignment or delegation of this
Note by Maker shall release Maker from liability hereunder).

[*Signature on following page*]

5

This Note is **EXECUTED** as of the first date set forth above.


**KING FAMILY LENDING LLC**, a
California limited liability company


By:
Name: Sara J. King
Its: Manager

**EXHIBIT "K"**

**<u>PROMISSORY NOTE</u>**

**$300,000.00**                                                      **August 18, 2022**
                                                              **Orange County, California**

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**<u>Maker</u>**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3rd Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**<u>Payee</u>**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **THREE HUNDRED THOUSAND DOLLARS** (**$300,000.00**), with interest thereon as provided in this Promissory Note (this "**<u>Note</u>**").

    1.    **<u>Certain Definitions</u>**. For the purposes hereof, the terms set forth below shall have the following meanings:

    (a)    "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

    (b)    "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

    (c)    "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

    (d)    "Interest Rate" shall mean FIFTY SEVEN AND SIX TENTHS (57.6%) per annum.

(e)     "Maturity Date" shall mean the date which is three months after the date of this Note, subject to acceleration as provided herein.

(f)     "Unpaid Principal Balance" shall mean, at any time, the original stated amount of principal of this Note, less any amounts of principal repaid.

2.     **Payment of Principal and Interest**.

(a)     Interest shall be paid on a monthly basis to Payee beginning on September 18, 2022 and every 30 days thereafter until the Maturity Date.

(b)     The Unpaid Principal Balance and all accrued interest due on this Note shall be paid on the Maturity Date.

(c)     Subject to the provisions of <u>Section 6</u> below, interest on the Unpaid Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured hereby are funded by Payee to Maker (not from the date of this Note).

(d)     This Note is payable in lawful money of the United States, without prior notice or demand, and without offset or deduction of any nature.

3.     **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be prepaid in whole or in part, at any time, without penalty or prepayment premium. The total amount of Interest for three months is guaranteed regardless of prepayment of the Principal Balance.

4.     **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (a) waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (b) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any person primarily or secondarily liable for the payment of this Note; (c) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (d) consent to any extension of time for the payment of this Note, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.     **Events of Default**.

(a)     Upon the happening of any of the following events (each an "**Event of Default**"), Payee may, at its option, by notice to Maker, declare immediately due and

payable the entire Unpaid Principal Balance, together with all accrued interest thereon. If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

(i) If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

(b) The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

6. **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

7. **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan.  Collateral for said loan is:

(i) One Tiffany's Diamond Engagement Ring, 8.4 carat; round brilliant; color D; flawless

Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party, or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

8. **Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this

Paragraph 8.

9.    **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

10.    **Compliance with Law**. All agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker.  All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law.  This section shall control all agreements between Maker and Payee relating to this Note.

11.    **Attorneys' Fees and Costs**.  In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

12.    **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

13.    **Headings**.  The section headings used in this Note are for convenience of reference only and shall not affect the meaning or interpretation of this Note.

**14.**    <u>**Governing Law**</u>**. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF INTEREST LAWS.**

15.    <u>**Successors and Assigns**</u>. The term "Payee" shall include Payee's successors and assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and Maker's heirs, successors and permitted assigns (but no assignment or delegation of this Note by Maker shall release Maker from liability hereunder).

[*Signature on following page*]

This Note is **EXECUTED** as of the first date set forth above.


**KING FAMILY LENDING LLC**, a
California limited liability company



By: _____
Name: Sara J. King
Its: Manager

**EXHIBIT "L"**

| Loan No. | Purported Collateral | AMOUNT | DURATION (MONTHS) | DATE FUNDED | MATURITY DATE |
|---|---|---|---|---|---|
| Loan 01 | AP Royal Oak Watch Gold /Black Index<br>AP Royal Oak Chronograph Rose Gold White Index<br>Richard Mille RM 030 | $ 195,000 | 4 | 01/14/2022 | 05/31/2022 |
| Loan 02 | 1979 Ferrari 308 GTS<br>1896 Ferrari 328 GTB<br>2003 Chevrolet Corvette<br>2010 Rolls Royce Ghost<br>2014 Aston Martin Vanquish<br>2020 Porsche Taycan 4S | $ 235,000 | 6 | 01/18/2022 | 07/18/2022 |
| Loan 03 | 2006 SeaRay<br>Two-Tone Date Just<br>2007 Maybach | $ 175,000 | 4 | 01/31/2022 | 05/31/2022 |
| Loan 04 | 2017 Tiara F44 | $ 400,000 | 4 | 02/18/2022 | 06/18/2022 |
| Loan 05 | Cartier Jewelry Lot | $ 150,000 | 3 | 02/18/2022 | 05/18/2022 |
| Loan 06 | Hermès Birkin Bag 35; White Himalayan<br>Rolex Daytona Rose Gold | $ 100,000 | 4 | 03/04/2022 | 07/04/2022 |
| Loan 07 | 1956 Chevrolet Truck<br>1971 Chevrolet Chevelle | $ 150,000 | 3 | 03/04/2022 | 06/04/2022 |
| Loan 08 | Patek Phillipe Nautilus, Rose Gold, Tiffany Stamp | $ 350,000 | 3 | 03/15/2022 | 06/14/2022 |
| Loan 09 | 2021 MBZ S580<br>Rolex Yacht Master Yellow Gold | $ 75,000 | 3 | 03/28/2022 | 06/29/2022 |
| Loan 10 | Rolex Oyster Perp, Stainless Steel<br>Diamond Ring, Pear, 5.02k<br>Diamond Ring, Yellow Diamond, 8.74k | $ 120,000 | 4 | 03/28/2022 | 07/28/2022 |
| Loan 11 | Coins | $ 150,000 | 3 | 04/01/2022 | 07/01/2022 |
| Loan 12 | Chanel Classic Bag (Beige)<br>Chanel Classic Bag (Black)<br>Chanel Rocket Bag<br>Cartier Monsieur Watch, Rose Gold, Cartier Tank<br>Francaise, Rose Gold, Cartier Juste Un Clous<br>Bracelet, Rose Gold w/ Diamonds, Cartier Love<br>Bracelet, Rose Gold w/ Diamonds, Cartier Love Ring,<br>White Gold w/ Diamonds<br>Cartier Trinity Ring, w/ Diamonds, Cartier Trinity<br>Bracelet, w/Diamonds | $ 95,000 | 4 | 04/06/2022 | 08/06/2022 |
| Loan 13 | Mercedes Benz G Class, 63 AMG | $ 65,000 | 2 | 04/08/2022 | 06/08/2022 |
| Loan 14 | 2019 Rolls Royce Dawn | $ 100,000 | 3 | 04/11/2022 | 07/11/2022 |
| Loan 15 | Patek Phillipe Nautilus Watch, Platinum and Ruby | $ 150,000 | 4 | 04/11/2022 | 08/11/2022 |
| Loan 16 | Ruby Ring w/ Diamonds, 10.04k | $ 80,000 | 2 | 04/15/2022 | 06/15/2022 |
| Loan 17 | Avengers Comic Book | $ 25,000 | 3 | 04/19/2022 | 07/19/2022 |
| Loan 18 | 1902 Ruble Gold Coin | $ 30,000 | 3 | 04/19/2022 | 07/19/2022 |
| Loan 19 | Van Cleef & Arpels Ruby/Diamond Bracelet | $ 75,000 | 3 | 04/26/2022 | 07/26/2022 |
| Loan 20 | Rolex Daytona, Platinum Ice Blue Face | $ 100,000 | 4 | 04/26/2022 | 08/26/2022 |
| Loan 21 | Lamborghini Aventador | $ 200,000 | 3 | 04/27/2022 | 07/27/2022 |
| Loan 22 | Audemars Piguet Royal Oak, Extra Thin, Black Ceramic | $ 150,000 | 3 | 05/04/2022 | 08/05/2022 |
| Loan 23 | Rolex Rainbow Watch | $ 55,000 | 3 | 05/12/2022 | 08/12/2022 |
| Loan 24 | Audemars Piguet Royal Oak Offshore Chronograph Titanium<br>Audemars Piguet Royal Oak Offshore Ghost | $ 40,000 | 3 | 05/12/2022 | 08/12/2022 |
| Loan 25 | NHL Sports Contract | $ 500,000 | 6 | 05/16/2022 | 10/17/2022 |
| Loan 26 | NHL Sports Contract | $ 200,000 | 4 | 05/24/2022 | 09/25/2022 |
| Loan 27 | MLB Sports Contract | $ 250,000 | 6 | 05/24/2022 | 10/25/2022 |
| Loan 28 | Rolex Day Date II Rose Gold 41mm, Diamond Dial<br>2018 Rolls Royce Ghost | $ 150,000 | 4 | 05/26/2022 | 09/25/2022 |
| Loan 29 | 2016 Aston Martin Vanquish (Silver)<br>AP Rose Gold Chronograph Watch | $ 100,000 | 5 | 05/31/2022 | 10/31/2022 |
| Loan 30 | MLB Sports Contract | $ 300,000 | 3 | 05/31/2022 | 08/31/2022 |
| Loan 31 | NHL Contract | $ 100,000 | 4 | 06/01/2022 | 10/01/2022 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Loan 32 | AP Steel Royal Oak Chronograph Watch<br>2020 Porsche Panamera GTS | $ | 65,000 | 2 | 06/03/2022 | 08/03/2022 |
| Loan 33 | NHL Contract | $ | 500,000 | 4 | 06/10/2022 | 10/10/2022 |
| Loan 34 | 2022 Porsche Taycan 4s | $ | 75,000 | 6 | 06/10/2022 | 12/10/2022 |
| Loan 35 | AP Royal Oak White Ceramic 1st | $ | 150,000 | 0 (7 days) | 06/13/2022 | 06/21/2022 |
| Loan 36 | Rolex Rose Gold Day Date II | $ | 100,000 | 2 | 06/15/2022 | 08/16/2022 |
| Loan 37 | MBZ G 63 (Matte Black) 2021 | $ | 100,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 38 | Hermes Birkin, So Matte, Alligator<br>Piaget Limelight Diamond Watch | $ | 150,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 39 | MBZ G 63 (Red) | $ | 100,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 40 | NHL Sports Contract | $ | 200,000 | 4 | 06/20/2022 | 10/21/2022 |
| Loan 41 | MLSoccer Sports Contract | $ | 500,000 | 6 | 06/22/2022 | 12/21/2022 |
| Loan 42 | Patek 5711 Jumbo Rose Gold/Brown dial | $ | 100,000 | 3 | 06/24/2022 | 09/24/2022 |
| Loan 43 | AP Royal Oak White Gold Frosted/Purple Dial | $ | 75,000 | 2 | 06/24/2022 | 08/24/2022 |
| Loan 44 | AP Royal Oak White Ceramic 2nd | $ | 150,000 | 0 (7 days) | 06/27/2022 | 07/05/2022 |
| Loan 45 | NFL Contract | $ | 250,000 | 5 | 06/27/2022 | 11/27/2022 |
| Loan 46 | AP Royal Oak Chronograph Gold, with Blue dial | $ | 75,000 | 3 | 06/27/2022 | 09/27/2022 |
| Loan 47 | 2017 Tiara F44 | $ | 400,000 | 4 | 07/07/2022 | 11/07/2022 |
| Loan 48 | 2021 MBZ S580<br>Rolex Yacht Master Yellow Gold | $ | 75,000 | 3 | 07/07/2022 | 10/06/2022 |
| Loan 49 | Richard Mille Watch | $ | 100,000 | 2 | 07/07/2022 | 09/07/2022 |
| Loan 50 | NBA Sports Contract | $ | 350,000 | 5 | 07/08/2022 | 12/08/2022 |
| Loan 51 | 2005 Ford GT | $ | 200,000 | 3 | 07/08/2022 | 10/08/2022 |
| Loan 52 | AP Royal Oak White Ceramic 3rd | $ | 150,000 | 0 (7 days) | 07/11/2022 | 07/19/2022 |
| Laon 53 | NBA Contract | $ | 250,000 | 4 | 07/13/2022 | 01/13/2023 |
| Loan 54 | AP Royal Oak Watch Gold /Black Index<br>AP Royal Oak Chronograph Rose Gold White Index<br>Richard Mille RM 030 | $ | 195,000 | 3 | 07/16/2022 | 10/16/2022 |
| Loan 55 | NBA Sports Contract 45901 | $ | 200,000 | 6 | 07/16/2022 | 01/16/2023 |
| Loan 56 | Hermès Birkin Bag 35; White Himalayan<br>Rolex Daytona Rose Gold | $ | 100,000 | 4 | 07/22/2022 | 11/22/2022 |
| Loan 57 | 2019 Rolls Royce Dawn | $ | 100,000 | 3 | 07/22/2022 | 10/22/2022 |
| Loan 58 | 2019 Ferrari 488 Spider | $ | 150,000 | 3 | 07/22/2022 | 10/22/2022 |
| Loan 59 A | NBA Contract: 45992 | $ | 250,000 | 6 | 07/22/2022 | 01/22/2023 |
| Loan 59 B | NBA Contract 45919(b) | $ | 200,000 | 6 | 07/22/2022 | 01/22/2023 |
| Loan 60 | NFL Contract 900173 | $ | 350,000 | 5 | 07/22/2022 | 12/22/2022 |
| Loan 61 | NBA Contract 647007 | $ | 250,000 | 5 | 07/25/2022 | 12/28/2022 |
| Loan 62 | NFL Contract: 900173 | $ | 350,000 | 5 | 07/28/2022 | 12/28/2022 |
| Loan 63 | NBA Contract: 647007 | $ | 200,000 | 5 | 07/28/2022 | 12/28/2022 |
| Loan 64 | AP Royal Oak White Ceramic 4rth | $ | 150,000 | 10 days | 07/28/2022 | 08/05/2022 |
| Loan 65 | Lamborghini Aventador | $ | 200,000 | 3 | 07/28/2022 | 10/28/2022 |
| Loan 66 | NBA Contract: 647972 | $ | 250,000 | 5 | 08/03/2022 | 01/03/2023 |
| Loan 67 | Rolls Royce Cullinan | $ | 150,000 | 3 | 08/03/2022 | 11/03/2022 |
| Loan 68 | Rolex Daytona [White Dial/Black Chronograph] | $ | 50,000 | 3 | 08/04/2022 | 11/04/2022 |
| Loan 69 | AP Royal Oak [Gold Frosted] | $ | 50,000 | 14 days | 08/10/2022 | 08/24/2022 |
| Loan 70 | NBA Contract | $ | 300,000 | 5 | 08/10/2022 | 01/10/2023 |
| Loan 71 | NBA Contract | $ | 250,000 | 5 | 08/12/2022 | 01/10/2023 |
| Loan 72 | Audemars Piguet Royal Oak Tourbillon<br>[Extra Thin, Black Ceramic] | $ | 150,000 | 2 | 08/16/2022 | 10/16/2022 |
| Loan 73 | Audemars Piguet Royal Oak Tourbillon<br>[White Ceramic] | $ | 150,000 | 10 days | 08/16/2022 | 08/23/2022 |
| Loan 74 | MLB Contract 7NN1C3 | $ | 300,000 | 4 | 08/16/2022 | 12/16/2022 |
| Loan 75 | NFL Contract: 944301 | $ | 250,000 | 5 | 08/16/2022 | 01/16/2023 |
| Loan 76 | Tiffany's Diamond Engagement Ring<br>[8.4 carats, D Color, Flawless] | $ | 300,000 | 3 | 08/18/2022 | 11/18/2022 |
| Loan 77 | 2018 Rolls Royce Phantom | $ | 175,000 | 3 | 08/23/2022 | 11/23/2022 |
| Loan 78 | NBA Contract 788634 | $ | 250,000 | 4 | 08/23/2022 | 12/23/2022 |

| | | | | | |
|---|---|---|---|---|---|
| Loan 79 | MLS Contract LA GALAXY 629 | $ 250,000 | 5 | 08/23/2022 | 01/23/2023 |
| Loan 80 | 1979 Ferrari 308 GTS | $ 110,000 | 3 | 08/29/2022 | 11/29/2022 |
| Loan 81 | 2021 BMW M6 Convertible | $ 50,000 | 3 | 08/29/2022 | 11/29/2022 |
| Loan 82 | NBA Contract | $ 250,000 | 4 | 08/29/2022 | 12/29/2022 |
| Loan 83 | Patek Philippe Nautilus (Blue Dial) Rolex Rose Gold Day Date II | $ 100,000 | 2 | 08/29/2022 | 10/29/2022 |
| Loan 84 | NFL Sports Contract | $ 350,000 | 4 | 09/09/2022 | 01/09/2023 |
| Loan 85 | Aston Martin DBS | $ 150,000 | 4 | 09/09/2022 | 01/09/2023 |
| Loan 86 | Patek Philipe Nautilus Watch, Platinum Ruby (2nd) | $ 200,000 | 3 | 09/12/2022 | 12/12/2022 |
| Loan 87 | Audemars Piguet Royal Oak Tourbillon | $ 150,000 | 0 (14 days) | 09/15/2022 | 09/30/2022 |
| Loan 88 | MLS Sports Contract ID: 607 | $ 250,000 | 5 | 09/19/2022 | 02/19/2023 |
| Loan 89 | Bentley Batayaga | $ 150,000 | 3 | 09/20/2022 | 12/20/2022 |
| Loan 90 | NBA Clippers Contract | $ 500,000 | 4 | 10/05/2022 | 02/05/2023 |
| Loan 91 | Commercial Building | $ 350,000 | 3 | 10/05/2022 | 01/05/2023 |
| Loan 92 | Aston Martin DB4 1961 | $ 450,000 | 3 | 10/05/2022 | 01/05/2023 |
| Loan 93 | Audemars Piguet Royal Oak Double Balance Gold | $ 80,000 | 3 | 10/07/2022 | 01/07/2023 |
| Loan 94 | Patek 5711 Jumbo Rose Gold/Brown dial | $ 80,000 | 3 | 10/07/2022 | 01/07/2023 |
| Loan 95 | NFL Sport Contract | $ 500,000 | 4 | 10/12/2022 | 2/12/2023 |
| Loan 96 | NBA Sport Contract | $ 350,000 | 4 | 10/12/2022 | 2/12/2023 |
| Loan 97 | MLB Sport Contract | $ 750,000 | 4 | 10/12/2022 | 2/12/2023 |

**EXHIBIT "M"**

# SECURED PROMISSORY NOTE

**Orange County,**
**California**

**Amount: $195,000.00**                                      **Date: January \_\_\_, 2022**

FOR VALUE RECEIVED, the receipt and adequacy of which is hereby acknowledged by ██ ██████, an individual (hereinafter referred to as "Borrower"), promises to pay to the order of **KING FAMILY LENDING LLC,** a California Limited Liability Company (hereinafter referred to as "Lender"), in accordance with this Secured Promissory Note (hereinafter referred to as the "Note"), and Security Agreement dated January \_\_\_, 2022 attached and incorporated hereto, at such place as the Lender hereof may hereafter designate in writing), in immediately available funds and lawful money of the United States of America, without right to set-off or counterclaim.

    **1.**   <u>Interest.</u> Interest shall accrue on the outstanding unpaid principal balance from the date hereof at the rate of **NINETY SIX PERCENT (96%)** per annum, subject to increase upon default as hereinafter provided. Interest accruing hereunder shall be payable monthly commencing on February \_\_\_, 2022 and continuing on the first day of each consecutive month thereafter, with time being of the essence. Interest accruing and payable under this Note shall be computed and applied on the basis of a 365-day year, actual days elapsed, with time being of the essence. Interest that is not received by Lender on the date such interest is due shall, at the sole discretion of Lender, be added to the principal balance and shall from that date due bear interest at the rate provided in this Note.

    **2.**   <u>Late Charges.</u> If any payment provided for in this Note is not paid when due, it would be impracticable or extremely difficult to fix the actual damages resulting to Lender. Therefore, if any payment provided for in this Note is not paid when due Borrower agrees to pay to Lender a sum equal to TEN PERCENT (10%) of the payment as liquidated damages and not as a penalty, to compensate Lender for the expenses of administering the default. Only one late charge will be collected for each late payment, regardless of the period during which it remains in default.

    **3.**   <u>Fees, Costs, and Expenses</u>. Lender has waived all commitment/origination fees, costs, and expenses, including without limitation attorneys, administrative, insurance fees, incurred in connection with the investigation, negotiation, arrangement, and making of this Note and related loan documents.

    **4.**   <u>Payments.</u> Payments shall be applied first to fees, costs, expenses and sums other than principal and interest due to Lender, then to accrued and unpaid interest hereon, and the balance thereof, if any, to the outstanding principal balance hereof. The amounts borrowed may be prepaid at any time provided written notice of prepayment is received by Lender concurrently therewith.

    **5.**   <u>Maximum Legal Rate - No Usury</u>. Notwithstanding any provision to the contrary contained in this Note, it is expressly provided that in no case or event shall the aggregate of: a) all interest on the unpaid balance of this Note, accrued or paid from the date hereof and b) the aggregate of any other amounts accrued or paid pursuant to this Note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this Note from the date hereof, ever exceed the maximum nonusurious rate of interest permitted on the execution date hereof by whichever of applicable California or United States laws permit the higher maximum nonusurious interest rate ("highest lawful rate"). In this connection, it is expressly understood and agreed that it is the intent of

the Borrower and the Lender to contract in strict compliance with the applicable usury laws of the State of California and of the United States, whichever from time to time permit the higher rate of interest. In furtherance thereof, none of the terms of this Note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest lawful rate. The Borrower or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this Note shall never be liable for Interest in excess of the highest lawful rate. I f, for any reason whatever, the interest paid or received on this Note during its full term produces a rate which exceeds the highest lawful rate, the Lender of this Note shall refund to the payor or at the Lender's option, credit against the principal of this Note such portion of said interest as shall be necessary to cause the interest paid on this Note to produce a rate equal to the highest lawful rate.

**6.**   Default/Acceleration. Borrower shall be in default under this Note upon the occurrence of any of the following events, which shall be referred to in this Note as an "Event of Default":

(a)   There is a failure to make any payment when due under this Note.

(b)   Borrower fails to perform any covenant or observe any condition contained in this Note or Borrower's breach of any covenant, term or condition of this Note.

(c)   Borrower is subject to or affected by:

1.   the appointment of a receiver, liquidator, or trustee;

2.   the filing of any voluntary or involuntary petition for bankruptcy or reorganization;

3.   the inability of any such person to pay his or her debts when due or the admission in writing by any such person that his or her debts cannot be paid when due;

4.   the dissolution, termination of existence, insolvency or business failure of any such person;

5.   any assignment for the benefit of creditors;

6.   the making or suffering of a fraudulent transfer under applicable federal or state law; or

7.   the concealment of any of his or her property in fraud.

In an Event of Default by Borrower, the entire principal sum, with accrued interest thereon and all other sums due under this Note, shall at the option of Lender, become immediately due and payable, and at the option of the Lender, the rate of interest provided for under this Note shall, without notice, be increased to an amount TEN PERCENT (10%) PER YEAR over and above the rate of interest set forth in Paragraph 1 of this Note under the section entitled• interest". Lender shall be entitled to collect all such amounts and to enforce any and all remedies available to it, and Borrower's default shall constitute the requisite showing under California Code of Civil Procedure, Section 1281.8, and any similar provision in any other jurisdiction, that any award Lender may receive in accordance with the terms of this Note may be rendered ineffectual without provisional relief.

**7.**   Guaranty Agreement and Security Agreements. This Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by lender, are being secured by the execution by a Personal Guaranty Agreement, and execution of a Security Agreement, attached hereto and incorporated herein. To secure the payment of this Note, this Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by Lender, Borrower grants to Lender a

first priority security interest in and lien upon all of the following property of Borrower, whether now owned or hereafter acquired by Borrower, whether now existing or hereafter arising, whether fixed or contingent, and wherever located, and all supporting obligations relating to said property, and all proceeds thereof (collectively, "Collateral"):

    (a)  Three watches (as further described in Exhibit A)
        1.  Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with black dial with rose gold band;
        2.  Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with white dial with rose gold band; and
        3.  Richard Mille RM 030 titanium watch, with light blue rubber band.

    (b)  all proceeds (including, without limitation, insurance proceeds), and rights of Borrower to receive payments in respect of and from such interests and related rights, goods, instruments, inventory, investment property, rents, letters of credit, letter-of-credit rights, payment intangibles, money, and all books and records pertaining to the foregoing property and related rights from the above-described property.

Borrower shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Borrower hereby irrevocably appoints Lender as the attorney in fact for Borrower, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Borrower to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

**8.**  <u>Disposition of Collateral on Default.</u> Any collateral given to the Lender at any time will be deemed security for the payment of this Note and any other liabilities of the Borrower to the Lender. In case of default in payment of this Note or any other notes of the Borrower, whether as maker, co-maker, surety, guarantor, or endorser, held by the Lender, or in case the collateral declines in value or otherwise becomes unsatisfactory to the Lender, the Lender is authorized to dispose of all or any part of the collateral security property at public or private sale, without advertisement, or notice to the Borrower, which rights are expressly waived. At such a sale, the Lender may purchase any or all of the property free of any claim or right of redemption of the Borrower, which rights are expressly waived except as provided by law. Neither the sale of the collateral nor the application of its proceeds will prejudice any other rights of the Lender against the Borrower.

**9.**  <u>Lender, Borrower, Use of Loan Proceeds, Successors and Assigns.</u>
Lender is a licensed California Finance Lender. Borrower warrants and represents that the funds being

loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes.

Subject to the prohibition against Borrower's assignment herein, this Note and all the covenants and agreements contained herein shall inure to the benefit of Lender and bind Borrower and all of their respective successors, estates, heirs, personal representatives and assigns. Without limiting the generality of the foregoing, Lender may assign or grant participation in any of Lender's rights under this Note in whole or in part to any person, without notice and without affecting Borrower's liability hereunder.

**10.** <u>Arbitration.</u> Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this Note or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Borrower, and anyone who signs, guarantees or endorses this Note and Lender, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rule. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles, California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

**11.** <u>Costs of Collection.</u> Borrower promises to pay all costs, expenses and attorneys' fees incurred by Lender in the exercise of any remedy (with or without litigation), in any proceeding for the collection of this Note, or in any litigation or controversy arising from or connected with this Note. Such proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which Lender appears to enforce this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement compromise or other activity in which Lender engages to collect any portion of this Note not paid when due or as a result of any default of Borrower.

**12.** <u>Waivers.</u> Borrower and all sureties, guarantors, and endorsers of this Note hereby waive notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor, notice of non-payment, demand. presentment for payment, protest, any notices ln connection with the delivery, presentment, acceptance, performance, default, or enforcement of this Note, diligence in collecting and the filing of suit for the purpose of fixing liability and any and all other notices and demands whatsoever, and consent to any extensions or postponements of time or other indulgence, including time for payment, renewals, releases of liens, waivers, or modifications that may be made by Payee to any party to this Note.

No extension of time for payment of any amount owing on this Note will affect the liability of Borrower or any surety, guarantor, or endorser of this Note. No delay by the Lender or holder in exercising any right under this Note will operate as a waiver of that right; nor will any single or partial

exercise of any right preclude other or further exercise of the right, or the exercise of any other right under this Note or otherwise as permitted by law.

No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in a writing executed by Lender. Any waiver or modification will be valid only to the extent set forth in the writing. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting pursuant to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note or any obligations contained therein. Borrower further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same.

**13.** <u>Governing Law.</u> This Note shall be governed by and construed in accordance with the laws of the State of California. Orange County, California shall be proper place of venue for suit hereon. The Borrower and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceeding in respect of this Note shall be brought in the Central District of the Superior Court of Orange County or if applicable the United States District Court for the Central District of California.

**14.** <u>Records of Payments.</u> The records of the Lender shall, absent manifest error, be binding and conclusive evidence of the amounts owing on this Note. The failure of Lender to record any payment or expenses shall not limit or otherwise affect the obligations of Borrower under this Note.

**15.** <u>Partial Invalidity.</u> If any section or provision of this Note is declared invalid or unenforceable by a court competent jurisdiction, such section or provision shall be enforceable to the fullest extent permitted by law, and such a determination shall not affect the validity or enforceability of the remaining terms hereof; by way of example and not limitation, if any fee exceeds the maximum such fee permitted by law, such fee shall be reduced so as to equal the maximum permitted by law, or if any time period is shorter than required by law, such time period shall be deemed increased to the minimum time period permitted by law. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

**16.** <u>Full Power and Authority.</u> Borrower and each individual executing this Note on behalf of any Borrower have the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower and is enforceable in accordance with its terms.

**17.** <u>Captions/Terms.</u> The various captions and headings contained in this Note are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Note. No provision in this Note is to be interpreted for or against any party because that party or that party's legal representative drafted such provision, it being recognized that all parties have contributed substantially and materially to the preparation of this Note. As used in this Note, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or" the word "person" means and refers to any individual, corporation, trust, estate, partnership, joint venture, government or governmental authority or other entity and the word "affiliate means and refers to any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another entity. All pronouns and any variations thereof, shall be deemed

to refer to the masculine, feminine. neuter, singular or plural as the identity of the person, persons, entity or entities may require. Whenever in this Note locative adverbs such as "herein and "hereunder" are used, the same shall be made in reference to this Note in its entirety and not any specific article, section, subsection, subpart, paragraph or subparagraph.

**18.**   <u>Entire Agreement.</u> This Note and the Security Agreement executed in connection herewith, embody the entire agreement and understanding between Lender and Borrower with respect to this Note and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Borrower acknowledges and agrees that there are no oral agreements between the Borrower and the Lender which have not been incorporated in this Note. No waiver, modification, change, or amendment to any provision of these documents shall be effective unless specifically made in writing and signed by Lender and Borrower.

BORROWER: ▨▨▨▨▨

By: _____

Date:

# SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (the "**Agreement**") is entered into on January ___, 2022  by and between ▆▆▆▆▆▆▆▆▆▆▆, with an address of a ▆▆▆▆▆▆▆▆, Newport Beach, California, 92660 ("**Debtor**"), and King Family Lending LLC ("**Secured Party**"), as follows:

1.     **Secured Obligations**. Debtor has executed and delivered to Secured Party that certain Secured Promissory Note dated as of January ___, 2022 (the "**Note**") in the principal amount of **ONE HUNDRED NINETY FIVE THOUSAND US DOLLARS ($195,000.00**) plus interest and has agreed to pay all indebtedness under the Note and all such legal expenses and obligations thereunder and any past, present, or future liabilities of Debtor to Secured Party, regardless of how acquired by Secured Party (hereinafter sometimes referred to collectively as the "**Secured Obligations**"). Debtor has derived and will continue to derive a material financial benefit from the Note and, in order to induce Secured Party to agree to the terms of the Note, Debtor has agreed to execute and deliver this Agreement to and for the benefit of Secured Party.

2.     **Security Interest**. To secure the full and timely payment and performance of the Secured Obligations, Debtor hereby grants to Secured Party a first priority security interest in and lien upon all of the following property of Debtor, wherever located (collectively, the "**Collateral**").  Debtor hereby understands and agrees that the Collateral shall be held by Secured Party until the earlier of: a) the term of the Note; or b) Debtor has paid to Secured Part all monies owed under the Note.

        a.   Three (3) Watches (identified in detail by Exhibit A attached hereto and incorporated herewith):
- Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with black dial with rose gold band;
- Audemars Piguet 41mm Royal Oak chronograph watch, rose gold with white dial with rose gold band; and
- Richard Mille RM 030 titanium watch, with light blue rubber band.

Debtor shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Debtor hereby irrevocably appoints Lender as the attorney in fact for Debtor, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("**CUCC**") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is

amended from time to time.

Secured Party shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Secured Party, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Secured Party. Each term used in this Agreement to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

3.    <u>Default</u>. The occurrence of any of the following events or conditions shall constitute and shall be referred to in this Agreement as an "**Event of Default**":

a.    Breach or default in the payment or performance of any of the Secured Obligations, or under any instrument or agreement evidencing or securing the Secured Obligations;

b.    Breach or default by Debtor in the performance of any obligations of Debtor under this Security Agreement;

c.    Any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished;

d.    The dissolution, termination of existence, insolvency, business failure, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Debtor; and

e.    If Debtor shall apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

4.    **Rights and Remedies**. During the continuance of an Event of Default and if the Secured Obligations have been accelerated as a result thereof, Secured Party, without notice or demand, may do any one or more of the following, all of which are authorized by Debtor:

a.    Assume ownership of the Collateral;

b.    Settle or adjust disputes and claims directly with account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Secured Obligations with only the net amounts received by Secured Party in payment of such disputed accounts after deducting all reasonable costs and expenses incurred or expended in

connection therewith including, without limitation, all reasonable attorneys' fees and related legal expenses;

      c.      Without notice to or demand upon Debtor or any other obligor, make such payments and do such acts as Secured Party considers necessary or reasonable to protect its security interests in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorities Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, security interest, or lien that in Secured Party's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to any of Debtor's owned or leased premises, Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

      d.      Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9620 of the CUCC), set off and apply to the Secured Obligations any and all indebtedness at any time owing to or for the credit or the account of Debtor held by Secured Party;

      e.      Secured Party is hereby granted a license or other right to use, without charge, Debtor's copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral; and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

      f.      Sell, lease, license or otherwise dispose of the Collateral, including at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as Secured Party determines is commercially reasonable, and Debtor agrees that neither the Collateral nor evidence thereof need be present at the location of such sale or other disposition;

      g.      Secured Party shall give notice of the sale or other disposition of the Collateral as follows:

      (i)      Secured Party shall give Debtor and each holder of a security interest in the Collateral who has filed with Secured Party a written request for notice, a notice in writing of the time and place of public sale or other disposition, or, if the sale or other disposition is a private sale or disposition other than a public sale or disposition, then the time after which such private sale or other disposition is to be made;

      (ii)      The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in the Agreement, at least ten (10) days before the date fixed for any public sale or other disposition of the Collateral, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to persons other than Debtor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Secured Party;

(iii)  If the sale is to be a public sale, Secured Party also shall give notice of the time and place in any manner determined by Secured Party to be commercially reasonable, and In any event at least ten (10) days before the date of the sale;

h.      Secured Party may credit bid and purchase at any public sale or other disposition; and

i.      Any credit extended by Secured Party to any person acquiring title or possession of the Collateral upon any sale, lease, license or other disposition thereof shall not be credited to the Debtor.

Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

Debtor hereby irrevocably stipulates and agrees that Secured Party has the right under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee, or similar official over Debtor to effect the transactions contemplated by this Agreement. Debtor hereby irrevocably agrees not to object to such appointment on any grounds.

The rights and remedies of Secured Party under this Agreement and all other agreements contemplated hereby and thereby shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the CUCC, by law, or in equity. No exercise by Secured Party of any one right or remedy shall be deemed an election of remedies, and no waiver by Secured Party of any Event of Default shall be deemed a continuing waiver of any other or further Event of Default. No delay by Secured Party shall constitute a waiver, election or acquiescence with respect to any right or remedy.

5.      **Waivers**. In consideration of the Note, Debtor agrees as follows:

a.      At any time and in any manner, upon such terms and at such times as it considers best and with or without notice to Debtor, the Secured Party may alter, compromise, accelerate, extend, or change the time or manner for payment of the Secured Obligations, increase or reduce the rate of interest thereon, release or add any one or more obligors, Debtors, pledgors, or endorsers of the Secured Obligations, accept additional or substituted security therefor, or release or subordinate any security therefor, without in any way affecting the security interest created by the Security Agreements, or any covenant of Debtor.

b.      Debtor waives any right to require the Secured Party to proceed against any other person, firm or corporation at any time or to pursue any other remedy in its power, and Debtor agrees that the Secured Party shall not be obligated to resort to any other security with any priority, in any particular order, or at all, even if such action, or lack thereof, destroys, alters or otherwise impairs

subrogation rights of Debtor to proceed against any other person, firm or corporation for reimbursement, or both.

      c.      Debtor waives and agrees not to assert or take advantage of:

      (i)      The defense of any statute of limitations in any action hereunder or for the collection or performance of any Secured Obligations;

      (ii)      Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of the Secured Party to file or enforce a claim against the estate (whether in administration, bankruptcy or other proceedings) of any other person;

      (iii)      Any defense or right based upon election of remedies by the Secured Party, including. without limitation, an election to proceed by nonjudicial rather than judicial foreclosure, even if such election destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both;

      (iv)      Any defense or right based upon the acceptance by Secured Party or an affiliate of Secured Party of a transfer in lieu of foreclosure, without extinguishing the debt, even if such acceptance destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; and

      (v)      Any defense that may arise by reason of any other defense any co-maker, endorser, or pledgor, or by reason of the cessation from any cause whatsoever of the liability of any successors of any endorser, co-maker or pledger.

      d.      Debtor, by execution hereof, represent& to the Secured Party that the relationship between Debtor and any endorser, co-maker, pledger, or other person is such that Debtor has access to all relevant facts and information concerning the Secured Obligations, and that Secured Party can rely upon Debtor having such access. Debtor waives and agrees not to assert any duty on the part of the Secured Party to disclose to Debtor any facts that the Secured Party may now or hereafter know about any endorser. co-maker, pledgor, or other person regardless of whether the Secured Party has reason to believe that any such facts materially increase the risk beyond that which Debtor intends to assume or has reason to believe that such facts are unknown to Debtor or has a reasonable opportunity to communicate such facts to Debtor. Debtor is fully responsible for being and keeping informed of the financial condition and operations of any endorser, co-maker, pledgor, or other person and all circumstances bearing on the risk of nonpayment of any Secured Obligations.

      e.      Debtor waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Secured Obligations or of any action or non-action on the part of any endorser, co-maker, pledger, or other person, the Secured Party, any endorser, any creditor of any endorser, co-maker, pledger, or other person under the Security Agreements or any other instrument or any other person whosoever, in connection with any Secured Obligations held by the Secured Party as collateral or in connection with any Secured Obligations.

f.      Debtor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Debtor's rights of subrogation and reimbursement against any endorser, co- maker, pledgor, or other person, or any other obligor, by operation of any applicable law or otherwise. Without limiting the foregoing waivers. in accordance with Section 2856 of the California Civil Code, Debtor waives any and all rights and defenses available to Debtor by reason of Sections 2787 lo 2855, inclusive, 2899 and 3433 of the California Civil Code.

6.      **No Waiver by Secured Party**. Secured Party's acceptance of partial or delinquent payment, or the failure of Secured Party to exercise any right or remedy will not be a waiver of any of the Secured Obligations or any right of Secured Party, will not be a modification of this Agreement or any of Debtor's obligations under this Agreement. and will not constitute a waiver of any other Event of Default that occurs later.

7.      **Attorneys' Fees**. If any litigation is begun between the parties to this Agreement concerning the Collateral, this Agreement, or the rights and duties of either party in relation to them, the prevailing party will be entitled to a reasonable sum as reimbursement for its attorneys' fees and legal expenses.

8.      **Notices**. Except as otherwise expressly provided in this Agreement or by law, any notice or other communication required or permitted by this Agreement or by law to be served on, given to, or delivered to either party to this Agreement by the other party will be in writing and will be considered served, given, delivered, and received when personally delivered to the party to whom it is directed or, in lieu of personal delivery, when it is deposited in the United States mail, first-class postage prepaid, or delivered by overnight courier, addressed to Debtor at 1101 California Street, Redlands, California 92374 and to Secured Party at 23 Corporate Plaza Drive 150 Newport Beach, CA 92660. Either party, Debtor or Secured Party, may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

9.      **Time of Essence**. Time is expressly declared to be of the essence of this Agreement.

10.     **Governing Law**. This Agreement has been entered into in the State of California and will be construed in accordance with the CUCC and all other internal laws of the State of California, without application of conflicts of laws principles.

11.     **Arbitration**. Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Debtor, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of

the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles. California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

12.     **Validity and Construction**. If one or more of the provisions contained in this Agreement for any reason is held invalid, illegal, or unenforceable, the invalidity, illegality, or unenforceability of that provision will not affect any other provision of this Agreement; and this Agreement will be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

13.     **Integration**. This Agreement, including the other documents referred to  herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the security interest granted by Debtor to Secured Party for the Secured Obligations. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the parties with respect to such subject matter. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

14.     **Effect on Heirs and Assigns**. This Agreement and each of its provisions will be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of each of the parties to this Agreement.

15.     **Execution and Delivery of Agreement**. This Agreement may be executed and delivered by facsimile transmission and in any number of counterparts, each of which, when executed and delivered, shall be original, an all of them together shall constitute the same Agreement. Delivery of this Agreement shall be deemed effective if made to Secured Party. Each Party who delivers a counterpart of this Agreement to Secured Party shall deliver the original signed counterpart to Secured Party within five (5) days following delivery by facsimile, but any failure by any such Party to deliver the original signed counterpart shall not render execution and delivery by facsimile invalid or ineffective.

IN **WITNESS WHEREOF**, this Note has been executed by Debtor hereto on the day and year first above written.

THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[*Signatures on pages to follow*]

Security Agreement
Page 8 of 8

SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR**: ▓▓▓▓▓▓

By: _____

Name: ▓▓▓▓
Date: January ___, 2022

**SECURED PARTY: KING FAMILY LENDING LLC**

By: _____
Name: Sara J. King
Title: Manager
Date: January ___, 2022

# PERSONAL GUARANTEE

**THIS GUARANTEE date this** ██████████

By: ████████

To: **Luxury Asset Lending, LLC**, of 23 Corporate Drive, Newport Beach, California 92660 (the "Lender")

Re: ██████████████ (the "Debtor")

    IN CONSIDERATION OF Lender extending a loan of ██████████████████████ ████████ to the Debtor plus other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor personally guarantees the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness (the "Debt") due to the Lender by the Debtor, under the terms of the Secured Promissory Note and Security Agreement dated June 20, 2019, signed by the Debtor (the "Agreement") and under the following terms and conditions:

1. The Guarantor guarantees that Debtor will promptly pay the full amount of principal and interest of the Debt as and when the same will, in any manner, be or become due, either according to the terms and conditions provided by the Agreement or upon acceleration of the payment under the Agreement by reason of a default;

2. The Guarantor agrees not to pledge, hypothecate, mortgage, sell or otherwise transfer all or substantially all of Guarantor's assets without the prior written consent of the Lender;

3. To the extent permitted by law, the Guarantor waives all defenses, counterclaims or offsets that are legally available to the Guarantor with respect to the payment of the Debt of Debtor; and

4. The Guarantor does hereby authorize and empower any attorney of any court of record of the state of California or elsewhere to appear for and to enter judgment against us, or any of us, in favor of Luxury Asset Lending, LLC,  for any sums due under the Agreement plus interest with costs of suit, release of errors, without stay of execution, and reasonable attorney's fees, and the Guarantor hereby waives and releases all benefit and relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter to be passed.

    IN WITNESS WHEREOF, this personal guaranty is entered into this day o ████████

_____          _____
          Signature                                     Date

King Reuben, PC
220 Newport Center Drive
Suite 240
Newport Beach, CA 92660
sking@kinglawapc.com

**Superior Court of the State of California**

**For the County of Orange**

| | |
|---|---|
| In re the matter of the Confession of Judgment by ⟩<br><br>████████ ⟩<br>Defendant, ⟩<br><br>In Favor of ⟩<br><br>King Family Lending LLC, ⟩<br>Plaintiff. ⟩<br> ⟩<br> ⟩<br> ⟩<br> ⟩<br> ⟩<br> ⟩<br> ⟩ | Case No. |
| | **VERIFIED STATEMENT OF DEFENDANT CONFESSING JUDGMENT** |

   **BLUE F44 LLC**, hereby confess judgment in the above-entitled cause in favor of Plaintiff,

**KING FAMIL LENDING LLC**, in the sum of $195,000.00 and authorize entry of judgment against

me for that sum.

   This confession of judgment is for a debt justly due or to become due, arising out of the

following factual situation: **DEFENDANT BORROWED THE SUM OF ONE HUNDRED**

**NINETY FIVE THOUSAND DOLLARS ($195,000.00) FROM PLAINTIFF IN**

**THAT CERTAIN NOTE**

– 1 –

**ATTACHED HERETO AS EXHIBIT A, SECURED BY THAT CERTAIN PROPERTY AS DETAILED IN THE SECURITY AGREEMENT ATTACHED HERETO AS EXHIBIT B.**

Dated: _____    _____

                                      Manager

1

2                                    **VERIFICATION**

3      I, ███████████████████ the Defendant in the above-entitled cause. I have

4   read the foregoing **VERIFIED STATEMENT OF DEFENDANT CONFESSING JUDGMENT**

5

6   and know the contents thereof. The same is true of my own knowledge, except as to those matters

7   that are therein alleged on information and belief, and as to those matters, I believe them to be true.

8      I declare under penalty of perjury under the laws of the State of California that the foregoing

9   is true and correct.

10

11  Dated:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "N"**

# SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (the "**Agreement**") is entered into on April 27, 2022 by and between ██████████████████ AS LENDING PARTNER ("**Debtor**"), and King Family Lending LLC ("**Secured Party**"), as follows:

1.     **Secured Obligations**. Debtor has executed and delivered to Secured Party that certain Secured Promissory Note dated as of concurrently with this Agreement (the "Note") in the principal amount of TWO HUNDRED THOUSAND DOLLARS (200,000.00) plus interest and has agreed to pay all indebtedness under the Note and all such legal expenses and obligations thereunder and any past, present, or future liabilities of Debtor to Secured Party, regardless of how acquired by Secured Party (hereinafter sometimes referred to collectively as the "Secured Obligations") after a period of 90 days. Debtor has derived and will continue to derive a material financial benefit from the Note and, in order to induce Secured Party to agree to the terms of the Note, Debtor has agreed to execute and deliver this Agreement to and for the benefit of Secured Party.

2.     **Security Interest**. To secure the full and timely payment and performance of the Secured Obligations, Debtor hereby grants to Secured Party a first priority security interest in and lien upon all of the following property of Debtor, wherever located (collectively, the "**Collateral**"). Debtor hereby understands and agrees that the Collateral shall be held by Secured Party until the earlier of: a) the term of the Note; or b) Debtor has paid to Secured Part all monies owed under the Note.

## a.   (1) 2021 LAMBORGHINI AVENTADOR SVJ, GRAY COLOR.

Debtor shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Debtor hereby irrevocably appoints Lender as the attorney in fact for Debtor, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

Secured Party shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition

to any and all other security interests previously or hereafter granted by Debtor to Secured Party, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Secured Party. Each term used in this Agreement to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

3.    Default. The occurrence of any of the following events or conditions shall constitute and shall be referred to in this Agreement as an "Event of Default":

a.   Breach or default in the payment or performance of any of the Secured Obligations, or under any instrument or agreement evidencing or securing the Secured Obligations;

b.   Breach or default by Debtor in the performance of any obligations of Debtor under this Security Agreement;

c.   Any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished;

d.   The dissolution, termination of existence, insolvency, business failure, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Debtor; and

e.   If Debtor shall apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

4.    **Rights and Remedies**. During the continuance of an Event of Default and if the Secured Obligations have been accelerated as a result thereof, Secured Party, without notice or demand, may do any one or more of the following, all of which are authorized by Debtor:

a.   Assume ownership of the Collateral;

b.   Settle or adjust disputes and claims directly with account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Secured Obligations with only the net amounts received by Secured Party in payment of such disputed accounts after deducting all reasonable costs and expenses incurred or expended in connection therewith including, without limitation, all reasonable attorneys' fees and related legal expenses;

c.   Without notice to or demand upon Debtor or any other obligor, make such payments and

do such acts as Secured Party considers necessary or reasonable to protect its security interests in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorities Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, security interest, or lien that in Secured Party's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to any of Debtor's owned or leased premises, Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

d.   Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9620 of the CUCC), set off and apply to the Secured Obligations any and all indebtedness at any time owing to or for the credit or the account of Debtor held by Secured Party;

e.   Secured Party is hereby granted a license or other right to use, without charge, Debtor's copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral; and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

f.   Sell, lease, license or otherwise dispose of the Collateral, including at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as Secured Party determines is commercially reasonable, and Debtor agrees that neither the Collateral nor evidence thereof need be present at the location of such sale or other disposition;

g.   Secured Party shall give notice of the sale or other disposition of the Collateral as follows: (i) Secured Party shall give Debtor and each holder of a security interest in the Collateral who has filed with Secured Party a written request for notice, a notice in writing of the time and place of public sale or other disposition, or, if the sale or other disposition is a private sale or disposition other than a public sale or disposition, then the time after which such private sale or other disposition is to be made; (ii) The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in the Agreement, at least ten (10) days before the date fixed for any public sale or other disposition of the Collateral, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to persons other than Debtor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Secured Party; (iii) If the sale is to be a public sale, Secured Party also shall give notice of the time and place in any manner determined by Secured Party to be commercially reasonable, and in any event at least ten (10) days before the date of the sale;

h.   Secured Party may credit bid and purchase at any public sale or other disposition; and

i.   Any credit extended by Secured Party to any person acquiring title or possession of the Collateral upon any sale, lease, license or other disposition thereof shall not be credited to the Debtor.

Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

Debtor hereby irrevocably stipulates and agrees that Secured Party has the right under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee, or similar official over Debtor to effect the transactions contemplated by this Agreement. Debtor hereby irrevocably agrees not to object to such appointment on any grounds.

The rights and remedies of Secured Party under this Agreement and all other agreements contemplated hereby and thereby shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the CUCC, by law, or in equity. No exercise by Secured Party of any one right or remedy shall be deemed an election of remedies, and no waiver by Secured Party of any Event of Default shall be deemed a continuing waiver of any other or further Event of Default. No delay by Secured Party shall constitute a waiver, election or acquiescence with respect to any right or remedy.

5.   **Waivers**. In consideration of the Note, Debtor agrees as follows:

a.   At any time and in any manner, upon such terms and at such times as it considers best and with or without notice to Debtor, the Secured Party may alter, compromise, accelerate, extend, or change the time or manner for payment of the Secured Obligations, increase or reduce the rate of interest thereon, release or add any one or more obligors, Debtors, pledgors, or endorsers of the Secured Obligations, accept additional or substituted security therefor, or release or subordinate any security therefor, without in any way affecting the security interest created by the Security Agreements, or any covenant of Debtor.

b.   Debtor waives any right to require the Secured Party to proceed against any other person, firm or corporation at any time or to pursue any other remedy in its power, and Debtor agrees that the Secured Party shall not be obligated to resort to any other security with any priority, in any particular order, or at all, even if such action, or lack thereof, destroys, alters or otherwise impairs subrogation rights of Debtor to proceed against any other person, firm or corporation for reimbursement, or both.

c.   Debtor waives and agrees not to assert or take advantage of: (i) The defense of any statute of limitations in any action hereunder or for the collection or performance of any Secured Obligations; (ii) Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of the Secured Party to file or enforce a claim against the estate (whether in administration, bankruptcy or other proceedings) of any other person; (iii) Any defense or right based upon election of remedies by the Secured Party,

including. without limitation, an election to proceed by nonjudicial rather than judicial foreclosure, even if such election destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; (iv) Any defense or right based upon the acceptance by Secured Party or an affiliate of Secured Party of a transfer in lieu of foreclosure, without extinguishing the debt, even if such acceptance destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; and (v) Any defense that may arise by reason of any other defense any co-maker, endorser, or pledgor, or by reason of the cessation from any cause whatsoever of the liability of any successors of any endorser, co-maker or pledger.

d.    Debtor, by execution hereof, represent& to the Secured Party that the relationship between Debtor and any endorser, co-maker, pledger, or other person is such that Debtor has access to all relevant facts and information concerning the Secured Obligations, and that Secured Party can rely upon Debtor having such access. Debtor waives and agrees not to assert any duty on the part of the Secured Party to disclose to Debtor any facts that the Secured Party may now or hereafter know about any endorser. co-maker, pledgor, or other person regardless of whether the Secured Party has reason to believe that any such facts materially increase the risk beyond that which Debtor intends to assume or has reason to believe that such facts are unknown to Debtor or has a reasonable opportunity to communicate such facts to Debtor. Debtor is fully responsible for being and keeping informed of the financial condition and operations of any endorser, co-maker, pledgor, or other person and all circumstances bearing on the risk of nonpayment of any Secured Obligations.

e.    Debtor waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Secured Obligations or of any action or non-action on the part of any endorser, co-maker, pledger, or other person, the Secured Party, any endorser, any creditor of any endorser, co-maker, pledgor, or other person under the Security Agreements or any other instrument or any other person whosoever, in connection with any Secured Obligations held by the Secured Party as collateral or in connection with any Secured Obligations.

f.    Debtor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Debtor's rights of subrogation and reimbursement against any endorser, co- maker, pledgor, or other person, or any other obligor, by operation of any applicable law or otherwise. Without limiting the foregoing waivers. in accordance with Section 2856 of the California Civil Code, Debtor waives any and all rights and defenses available to Debtor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code.

6.    **No Waiver by Secured Party**. Secured Party's acceptance of partial or delinquent payment, or the failure of Secured Party to exercise any right or remedy will not be a waiver of any of the Secured Obligations or any right of Secured Party, will not be a modification of this Agreement or any of Debtor's obligations under this Agreement. and will not constitute a waiver of any other Event of Default that occurs later.

7.      **Attorneys' Fees**. If any litigation is begun between the parties to this Agreement concerning the Collateral, this Agreement, or the rights and duties of either party in relation to them, the prevailing party will be entitled to a reasonable sum as reimbursement for its attorneys' fees and legal expenses.

8.      **Notices**. Except as otherwise expressly provided in this Agreement or by law, any notice or other communication required or permitted by this Agreement or by law to be served on, given to, or delivered to either party to this Agreement by the other party will be in writing and will be considered served, given, delivered, and received when personally delivered to the party to whom it is directed or, in lieu of personal delivery, when it is deposited in the United States mail, first-class postage prepaid, or delivered by overnight courier, addressed to Debtor at the address above and to Secured Party at 23 Corporate Plaza Drive 150 Newport Beach, CA 92660. Either party, Debtor or Secured Party, may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

9.      **Time of Essence**. Time is expressly declared to be of the essence of this Agreement.

10.     **Governing Law**. This Agreement has been entered into in the State of California and will be construed in accordance with the CUCC and all other internal laws of the State of California, without application of conflicts of laws principles.

11.     **Arbitration**. Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Debtor, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles. California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

12.     **Validity and Construction**. If one or more of the provisions contained in this Agreement for any reason is held invalid, illegal, or unenforceable, the invalidity, illegality, or unenforceability of that provision will not affect any other provision of this Agreement; and this Agreement will be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

13.     **Integration**. This Agreement, including the other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the security interest granted by Debtor to Secured Party for the Secured Obligations. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the parties with respect to such subject matter. No waiver and no modification or amendment of any provision of this Agreement shall

be effective unless specifically made in writing and duly signed by the party to be bound thereby.

14.     **Effect on Heirs and Assigns**. This Agreement and each of its provisions will be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of each of the parties to this Agreement.

15.     **Execution and Delivery of Agreement**. This Agreement may be executed and delivered by facsimile transmission and in any number of counterparts, each of which, when executed and delivered, shall be original, an all of them together shall constitute the same Agreement. Delivery of this Agreement shall be deemed effective if made to Secured Party. Each Party who delivers a counterpart of this Agreement to Secured Party shall deliver the original signed counterpart to Secured Party within five (5) days following delivery by facsimile, but any failure by any such Party to deliver the original signed counterpart shall not render execution and delivery by facsimile invalid or ineffective.

IN **WITNESS WHEREOF**, this Note has been executed by Debtor hereto on the day and year first above written.

THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[*Signatures on pages to follow*]

SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR**: ██████████████

By: _____

Name:
Title:
Date: April 27, 2022

**SECURED PARTY: KING FAMILY LENDING LLC**

By: _____
Name: Sara J. King
Title: Manager
Date:

***Additional Documents Attached and Included:***
Secured Promissory Note
Confession of Judgment

Security Agreement
Page 9 of 9

**EXHIBIT A**



**Date: April 26, 2022**
**Car Appraisal and Agreed Upon Purchase Value**

**2021 Lamborghini Avendator**      **ZHWUN6ZD0MLA10439**      **Market Value: $421,000.00**
**Agreed Value: $400,000.00**

**Customs By Lopez agrees to purchase the above listed vehicles at the agreed upon value for a period of 3 months from the date of this offer.**

**Owner**



## SECURED PROMISSORY NOTE

### Orange County, California

**Principal Amount: $ 200,000**                    **Date: April 27, 2022**

**FOR VALUE RECEIVED**, the receipt and adequacy of which is hereby acknowledged by ████████████████ **AS LENDING PARTNER** (hereinafter referred to as "**Borrower**"), promises to pay to the order of **KING FAMILY LENDING LLC**, a California Limited Liability Company (hereinafter referred to as "**Lender**"),  with an address of 110 Newport Center Drive, Ste. 277, Newport Beach, California 92660, in accordance with this Secured Promissory Note (hereinafter referred to as the "**Note**"), and Security Agreement dated concurrently with this Note, attached and incorporated hereto, at such place as the Lender hereof may hereafter designate in writing), the principal sum of TWO HUNDRED THOUSAND DOLLARS ($200,000.00) (the "**Loan Amount**") in immediately available funds and lawful money of the United States of America, without right to set-off or counterclaim together with Interest, as described below, on or before <u>August 25, 2022, a total loan term of 90 days.</u>

    **1.**    **Maturity Date.**  The maturity date of this Secured Promissory Note shall mean the date which is **90 days after the date of this Note.**

    2.    **Interest.** Interest shall accrue on the principal balance from the date hereof at the rate of **ONE HUNDRED TWENTY PERCENT (120%) per annum** ("**Interest**"), subject to increase upon default as hereinafter provided. Interest accruing hereunder shall be payable monthly commencing on the date of this Note and continuing on the first day of each consecutive month thereafter, with time being of the essence. Interest accruing and payable under this Note shall be computed and applied on the basis of a 365-day year, actual days elapsed, with time being of the essence. Interest hat is not received by Lender on the date such interest is due shall, at the sole discretion of Lender, be added to the Principal balance and shall from that date due bear interest at the rate provided in this Note.

    3.    **Late Charges.** If any payment provided for in this Note is not paid when due, it would be impracticable or extremely difficult to fix the actual damages resulting to Lender. Therefore, if any payment provided for in this Note is not paid when due Borrower agrees to pay to Lender a sum equal to TEN PERCENT (10%) of the payment as liquidated damages and not as a penalty, to compensate Lender for the expenses of administering the default. Only one late charge will be collected for each late payment, regardless of the period during which it remains in default.

    4.    **Fees. Costs. and Expenses.**  Lender has waived all commitment/origination fees,

costs, and expenses, including without limitation attorneys, administrative, insurance fees, incurred in connection with the investigation, negotiation, arrangement, and making of this Note and related loan documents.

5.   **Payments.**   Payments shall be applied first to fees, costs, expenses and sums other than principal and interest due to Lender, then to accrued and unpaid interest hereon, and the balance thereof, if any, to the outstanding principal balance hereof. The amounts borrowed may be prepaid at any time provided written notice of prepayment is received by Lender concurrently therewith.

6.   **Maximum Legal Rate- No Usury.** Notwithstanding any provision to the contrary contained in this Note, it is expressly provided that in no case or event shall the aggregate of: a) all interest on the unpaid balance of this Note, accrued or paid from the date hereof and b) the aggregate of any other amounts accrued or paid pursuant to this Note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this Note from the date hereof, ever exceed the maximum nonusurous rate of interest permitted on the execution date hereof by whichever of applicable California or United States laws permit the higher maximum nonusurous interest rate ("highest lawful rate"). In this connection, it is expressly understood and agreed that it is the intent of the Borrower and the Lender to contract in strict compliance with the applicable usury laws of the State of California and of the United States, whichever from time to time permit the higher rate of interest. In furtherance thereof, none of the terms of this Note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest lawful rate. The Borrower or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this Note shall never be liable for Interest in excess of the highest lawful rate. I f, for any reason whatever, the interest paid or received on this Note during its full term produces a rate which exceeds the highest lawful rate, the Lender of this Note shall refund to the payor or at the Lender's option, credit against the principal of this Note such portion of said interest as shall be necessary to cause the interest paid on this Note to produce a rate equal to the highest lawful rate.

7.   **Default/Acceleration.** Borrower shall be in default under this Note upon the occurrence of any of the following events, which shall be referred to in this Note as an "Event of Default":

    (a)    There is a failure to make any payment when due under this Note.

    (b)    Borrower fails to perform any covenant or observe any condition contained in this Note or Borrower's breach of any covenant, term or condition of this Note.

    (c)    Borrower is subject to or affected by:

        1.    the appointment of a receiver, liquidator, or trustee;

        2.    the filing of any voluntary or involuntary petition for

bankruptcy or reorganization;

3.     the inability of any such person to pay his or her debts when
due or the admission in writing by any such person that his or her
debts cannot be paid when due;

4.     the dissolution, termination of existence, insolvency or business
failure of any such person;

5.     any assignment for the benefit of creditors;

6.     the making or suffering of a fraudulent transfer under applicable
federal or state law; or

7.     the concealment of any of his or her property in fraud.

In an Event of Default by Borrower, the entire principal sum, with accrued interest thereon and all other sums due under this Note, shall at the option of Lender, become immediately due and payable, and at the option of the Lender, the rate of interest provided for under this Note shall, without notice, be increased to an amount TEN PERCENT (10%) PER YEAR over and above the rate of interest set forth in Paragraph 1 of this Note under the section entitled• interest". Lender shall be entitled to collect all such amounts and to enforce any and all remedies available to it, and Borrower's default shall constitute the requisite showing under California Code of Civil Procedure, Section 1281.8, and any similar provision in any other jurisdiction, that any award Lender may receive in accordance with the terms of this Note may be rendered ineffectual without provisional relief.

8.     **Guaranty Agreement and Security Agreements.** This Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by lender, are being secured by the execution by a Personal Guaranty Agreement, and execution of a Security Agreement, attached hereto and incorporated herein. To secure the payment of this Note, this Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by Lender, Borrower grants to Lender a first priority security interest in and lien upon all of the following property of Borrower, whether now owned or hereafter acquired by Borrower, whether now existing or hereafter arising, whether fixed or contingent, and wherever located, and all supporting obligations relating to said property, and all proceeds thereof (collectively, "Collateral"):

(a)  As described in the Security Agreement dated herewith.

(b) all proceeds (including, without limitation, insurance proceeds), and rights of Borrower to receive payments in respect of and from such interests and related rights, goods, instruments, inventory, investment property, rents, letters of credit, letter-of- credit rights, payment intangibles, money, and all books and records pertaining to the foregoing property and related rights from the above-described property.

Borrower shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Borrower hereby irrevocably appoints Lender as the attorney in fact for Borrower, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Borrower to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

8.   **Disposition of Collateral on Default.** Any collateral given to the Lender at any time will be deemed security for the payment of this Note and any other liabilities of the Borrower to the Lender. In case of default in payment of this Note or any other notes of the Borrower, whether as maker, co- maker, surety, guarantor, or endorser, held by the Lender, or in case the collateral declines in value or otherwise becomes unsatisfactory to the Lender, the Lender is authorized to dispose of all or any part of the collateral security property at public or private sale, without advertisement, or notice to the Borrower, which rights are expressly waived. At such a sale, the Lender may purchase any or all of the property free of any claim or right of redemption of the Borrower, which rights are expressly waived except as provided by law. Neither the sale of the collateral nor the application of its proceeds will prejudice any other rights of the Lender against the Borrower.

9.   **Lender, Borrower, Use of Loan Proceeds, Successors and Assigns.**

Lender is a licensed California Finance Lender. Borrower warrants and represents that the funds being loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes.

Subject to the prohibition against Borrower's assignment herein, this Note and all the covenants and agreements contained herein shall inure to the benefit of Lender and bind Borrower and all of their respective successors, estates, heirs, personal representatives and assigns. Without limiting the generality of the foregoing, Lender may assign or grant participation in any of Lender's rights under this Note in whole or in part to any person, without notice and without affecting Borrower's liability hereunder.

10.   **Arbitration.** Any dispute, claim or controversy of any kind, whether in contract

or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this Note or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Borrower, and anyone who signs, guarantees or endorses this Note and Lender, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rule. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles, California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

11.   **Costs of Collection.** Borrower promises to pay all costs, expenses and attorneys' fees incurred by Lender in the exercise of any remedy (with or without litigation), in any proceeding for the collection of this Note, or in any litigation or controversy arising from or connected with this Note. Such proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which Lender appears to enforce this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement compromise or other activity in which Lender engages to collect any portion of this Note not paid when due or as a result of any default of Borrower.

12.   **Waivers.** Borrower and all sureties, guarantors, and endorsers of this Note hereby waive notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor, notice of non-payment, demand. presentment for payment, protest, any notices in connection with the delivery, presentment, acceptance, performance, default, or enforcement of this Note, diligence in collecting and the filing of suit for the purpose of fixing liability and any and all other notices and demands whatsoever, and consent to any extensions or postponements of time or other indulgence, including time for payment, renewals, releases of liens, waivers, or modifications that may be made by Payee to any party to this Note. No extension of time for payment of any amount owing on this Note will affect the liability of Borrower or any surety, guarantor, or endorser of this Note. No delay by the Lender or holder in exercising any right under this Note will operate as a waiver of that right; nor will any single or partial exercise of any right preclude other or further exercise of the right, or the exercise of any other right under this Note or otherwise as permitted by law.

No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in a writing executed by Lender. Any waiver or

modification will be valid only to the extent set forth in the writing. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting pursuant to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note or any obligations contained therein. Borrower further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same.

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of California. Orange County, California shall be proper place of venue for suit hereon. The Borrower and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceeding in respect of this Note shall be brought in the Central District of the Superior Court of Orange County or if applicable the United States District Court for the Central District of California.

14. **Records of Payments.** The records of the Lender shall, absent manifest error, be binding and conclusive evidence of the amounts owing on this Note. The failure of Lender to record any payment or expenses shall not limit or otherwise affect the obligations of Borrower under this Note.

15. **Partial Invalidity.** If any section or provision of this Note is declared invalid or unenforceable by a court competent jurisdiction, such section or provision shall be enforceable to the fullest extent permitted by law, and such a determination shall not affect the validity or enforceability of the remaining terms hereof; by way of example and not limitation, if any fee exceeds the maximum such fee permitted by law, such fee shall be reduced so as to equal the maximum permitted by law, or if any time period is shorter than required by law, such time period shall be deemed increased to the minimum time period permitted by law. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

16. **Full Power and Authority.** Borrower and each individual executing this Note on behalf of any Borrower have the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower and is enforceable in accordance with its terms.

17. **Captions/Terms.** The various captions and headings contained in this Note are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Note. No provision in this Note is to be interpreted for or against any party because that party or that party's legal representative drafted such provision, it being recognized that all parties have contributed substantially and materially to the preparation of this Note. As used in this Note, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or" the word "person" means and refers to any individual, corporation, trust, estate, partnership, joint venture, government or governmental authority or other entity and the word "affiliate

means and refers to any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another entity. All pronouns and any validations thereof, shall be deemed to refer to the masculine, feminine. neuter singular or plural as the identity of the person, persons, entity or entities may require. Whenever in this Note locative adverbs such as "herein and "hereunder" are used, the same shall be made in reference to this Note in its entirety and not any specific article, section, subsection, subpart, paragraph or subparagraph.

18.   Entire Agreement. This Note and the Security Agreement executed in connection herewith embody the entire agreement and understanding between Lender and Borrower with respect to this Note and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Borrower acknowledges and agrees that there are no oral agreements between the Borrower and the Lender which have not been incorporated in this Note. No waiver, modification, change, or amendment to any provision of these documents shall be effective unless specifically made in writing and signed by both Lender and Borrower.

**BORROWER:** ████████████████████████

**By:**_____*RFF*_____

**Title (if applicable):**_____

**Date: 4-27-22**

# EXHIBIT "O"

# SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (the "**Agreement**") is entered into on June 20, 2022 by and between **REBECCA TAYLOR** ("**Debtor**"), and King Family Lending LLC ("**Secured Party**"), as follows:

1.     **Secured Obligations**. Debtor has executed and delivered to Secured Party that certain Secured Promissory Note dated as of concurrently with this Agreement (the "Note") in the principal amount of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00) plus interest and has agreed to pay all indebtedness under the Note and all such legal expenses and obligations thereunder and any past, present, or future liabilities of Debtor to Secured Party, regardless of how acquired by Secured Party (hereinafter sometimes referred to collectively as the "Secured Obligations") after a period of 120 days. Debtor has derived and will continue to derive a material financial benefit from the Note and, in order to induce Secured Party to agree to the terms of the Note, Debtor has agreed to execute and deliver this Agreement to and for the benefit of Secured Party.

2.     **Security Interest**. To secure the full and timely payment and performance of the Secured Obligations, Debtor hereby grants to Secured Party a first priority security interest in and lien upon all of the following property of Debtor, wherever located (collectively, the "**Collateral**"). Debtor hereby understands and agrees that the Collateral shall be held by Secured Party until the earlier of: a) the term of the Note; or b) Debtor has paid to Secured Part all monies owed under the Note.

    a.   **(1) HERMES BIRKIN HANDBAG SIZE 30, MATTE BLACK ALLIGATOR, PVD HARDWARE 2011;**
    b.   **(1) PIAGET LIMELIGHT AURA DIAMOND WATCH.**

Debtor shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Debtor hereby irrevocably appoints Lender as the attorney in fact for Debtor, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

Secured Party shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code

("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Secured Party, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Secured Party. Each term used in this Agreement to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

3.      **Default.** The occurrence of any of the following events or conditions shall constitute and shall be referred to in this Agreement as an "Event of Default":

a.   Breach or default in the payment or performance of any of the Secured Obligations, or under any instrument or agreement evidencing or securing the Secured Obligations;

b.   Breach or default by Debtor in the performance of any obligations of Debtor under this Security Agreement;

c.   Any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished;

d.   The dissolution, termination of existence, insolvency, business failure, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Debtor; and

e.   If Debtor shall apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

4.      **Rights and Remedies**. During the continuance of an Event of Default and if the Secured Obligations have been accelerated as a result thereof, Secured Party, without notice or demand, may do any one or more of the following, all of which are authorized by Debtor:

a.   Assume ownership of the Collateral;

b.   Settle or adjust disputes and claims directly with account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Secured Obligations with only the net amounts received by Secured Party in payment of such disputed accounts after deducting all reasonable costs and expenses incurred or expended in connection therewith including, without limitation, all reasonable attorneys' fees and related legal expenses;

c.   Without notice to or demand upon Debtor or any other obligor, make such payments and do such acts as Secured Party considers necessary or reasonable to protect its security interests in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorities Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, security interest, or lien that in Secured Party's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to any of Debtor's owned or leased premises, Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

d.   Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9620 of the CUCC), set off and apply to the Secured Obligations any and all indebtedness at any time owing to or for the credit or the account of Debtor held by Secured Party;

e.   Secured Party is hereby granted a license or other right to use, without charge, Debtor's copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral; and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

f.   Sell, lease, license or otherwise dispose of the Collateral, including at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as Secured Party determines is commercially reasonable, and Debtor agrees that neither the Collateral nor evidence thereof need be present at the location of such sale or other disposition;

g.   Secured Party shall give notice of the sale or other disposition of the Collateral as follows: (i) Secured Party shall give Debtor and each holder of a security interest in the Collateral who has filed with Secured Party a written request for notice, a notice in writing of the time and place of public sale or other disposition, or, if the sale or other disposition is a private sale or disposition other than a public sale or disposition, then the time after which such private sale or other disposition is to be made; (ii) The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in the Agreement, at least ten (10) days before the date fixed for any public sale or other disposition of the Collateral, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to persons other than Debtor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Secured Party; (iii) If the sale is to be a public sale, Secured Party also shall give notice of the time and place in any manner determined by Secured Party to be commercially reasonable, and in any event at least ten (10) days before the date of the sale;

h.   Secured Party may credit bid and purchase at any public sale or other disposition; and

i.   Any credit extended by Secured Party to any person acquiring title or possession of the Collateral upon any sale, lease, license or other disposition thereof shall not be credited to the Debtor.

Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

Debtor hereby irrevocably stipulates and agrees that Secured Party has the right under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee, or similar official over Debtor to effect the transactions contemplated by this Agreement. Debtor hereby irrevocably agrees not to object to such appointment on any grounds.

The rights and remedies of Secured Party under this Agreement and all other agreements contemplated hereby and thereby shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the CUCC, by law, or in equity. No exercise by Secured Party of any one right or remedy shall be deemed an election of remedies, and no waiver by Secured Party of any Event of Default shall be deemed a continuing waiver of any other or further Event of Default. No delay by Secured Party shall constitute a waiver, election or acquiescence with respect to any right or remedy.

5.   **Waivers**. In consideration of the Note, Debtor agrees as follows:

a.   At any time and in any manner, upon such terms and at such times as it considers best and with or without notice to Debtor, the Secured Party may alter, compromise, accelerate, extend, or change the time or manner for payment of the Secured Obligations, increase or reduce the rate of interest thereon, release or add any one or more obligors, Debtors, pledgors, or endorsers of the Secured Obligations, accept additional or substituted security therefor, or release or subordinate any security therefor, without in any way affecting the security interest created by the Security Agreements, or any covenant of Debtor.

b.   Debtor waives any right to require the Secured Party to proceed against any other person, firm or corporation at any time or to pursue any other remedy in its power, and Debtor agrees that the Secured Party shall not be obligated to resort to any other security with any priority, in any particular order, or at all, even if such action, or lack thereof, destroys, alters or otherwise impairs subrogation rights of Debtor to proceed against any other person, firm or corporation for reimbursement, or both.

c.   Debtor waives and agrees not to assert or take advantage of: (i) The defense of any statute of limitations in any action hereunder or for the collection or performance of any Secured Obligations; (ii) Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of the Secured Party to file or enforce a claim against the estate (whether in administration, bankruptcy or other proceedings) of any other

person; (iii) Any defense or right based upon election of remedies by the Secured Party, including. without limitation, an election to proceed by nonjudicial rather than judicial foreclosure, even if such election destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; (iv) Any defense or right based upon the acceptance by Secured Party or an affiliate of Secured Party of a transfer in lieu of foreclosure, without extinguishing the debt, even if such acceptance destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; and (v) Any defense that may arise by reason of any other defense any co-maker, endorser, or pledgor, or by reason of the cessation from any cause whatsoever of the liability of any successors of any endorser, co-maker or pledger.

d.   Debtor, by execution hereof, represent& to the Secured Party that the relationship between Debtor and any endorser, co-maker, pledger, or other person is such that Debtor has access to all relevant facts and information concerning the Secured Obligations, and that Secured Party can rely upon Debtor having such access. Debtor waives and agrees not to assert any duty on the part of the Secured Party to disclose to Debtor any facts that the Secured Party may now or hereafter know about any endorser. co-maker, pledgor, or other person regardless of whether the Secured Party has reason to believe that any such facts materially increase the risk beyond that which Debtor intends to assume or has reason to believe that such facts are unknown to Debtor or has a reasonable opportunity to communicate such facts to Debtor. Debtor is fully responsible for being and keeping informed of the financial condition and operations of any endorser, co-maker, pledgor, or other person and all circumstances bearing on the risk of nonpayment of any Secured Obligations.

e.   Debtor waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Secured Obligations or of any action or non-action on the part of any endorser, co-maker, pledger, or other person, the Secured Party, any endorser, any creditor of any endorser, co-maker, pledgor, or other person under the Security Agreements or any other instrument or any other person whosoever, in connection with any Secured Obligations held by the Secured Party as collateral or in connection with any Secured Obligations.

f.   Debtor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Debtor's rights of subrogation and reimbursement against any endorser, co- maker, pledgor, or other person, or any other obligor, by operation of any applicable law or otherwise. Without limiting the foregoing waivers. in accordance with Section 2856 of the California Civil Code, Debtor waives any and all rights and defenses available to Debtor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code.

6.   **No Waiver by Secured Party**. Secured Party's acceptance of partial or delinquent payment, or the failure of Secured Party to exercise any right or remedy will not be a waiver of any of the Secured Obligations or any right of Secured Party, will not be a modification of this Agreement or any of Debtor's obligations under this Agreement. and will not constitute a waiver of any other Event of Default that occurs later.

7. **Attorneys' Fees**. If any litigation is begun between the parties to this Agreement concerning the Collateral, this Agreement, or the rights and duties of either party in relation to them, the prevailing party will be entitled to a reasonable sum as reimbursement for its attorneys' fees and legal expenses.

8. **Notices**. Except as otherwise expressly provided in this Agreement or by law, any notice or other communication required or permitted by this Agreement or by law to be served on, given to, or delivered to either party to this Agreement by the other party will be in writing and will be considered served, given, delivered, and received when personally delivered to the party to whom it is directed or, in lieu of personal delivery, when it is deposited in the United States mail, first-class postage prepaid, or delivered by overnight courier, addressed to Debtor at the address above and to Secured Party at 23 Corporate Plaza Drive 150 Newport Beach, CA 92660. Either party, Debtor or Secured Party, may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

9. **Time of Essence**. Time is expressly declared to be of the essence of this Agreement.

10. **Governing Law**. This Agreement has been entered into in the State of California and will be construed in accordance with the CUCC and all other internal laws of the State of California, without application of conflicts of laws principles.

11. **Arbitration**. Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Debtor, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles. California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

12. **Validity and Construction**. If one or more of the provisions contained in this Agreement for any reason is held invalid, illegal, or unenforceable, the invalidity, illegality, or unenforceability of that provision will not affect any other provision of this Agreement; and this Agreement will be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

13. **Integration**. This Agreement, including the other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the security interest granted by Debtor to Secured Party for the Secured Obligations. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the parties with respect to such

subject matter. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

14.    **Effect on Heirs and Assigns**. This Agreement and each of its provisions will be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of each of the parties to this Agreement.

15.    **Execution and Delivery of Agreement**. This Agreement may be executed and delivered by facsimile transmission and in any number of counterparts, each of which, when executed and delivered, shall be original, an all of them together shall constitute the same Agreement. Delivery of this Agreement shall be deemed effective if made to Secured Party. Each Party who delivers a counterpart of this Agreement to Secured Party shall deliver the original signed counterpart to Secured Party within five (5) days following delivery by facsimile, but any failure by any such Party to deliver the original signed counterpart shall not render execution and delivery by facsimile invalid or ineffective.

IN **WITNESS WHEREOF**, this Note has been executed by Debtor hereto on the day and year first above written.

THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[*Signatures on pages to follow*]

SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR**: REBECCA TAYLOR

By: _Rebecca Taylor_

Name:
Title:
Date: June 20, 2022

**SECURED PARTY: KING FAMILY LENDING LLC**

By: _____
Name: Sara J. King
Title: Manager
Date: June 20, 2022

***Additional Documents Attached and Included:***
Secured Promissory Note
Confession of Judgment

## SECURED PROMISSORY NOTE

### Orange County, California

**Principal Amount: $150,000**                              **Date: June 20, 2022**

**FOR VALUE RECEIVED**, the receipt and adequacy of which is hereby acknowledged by **REBECCA TAYLOR** an individual with an address of ▮▮▮▮▮▮ Vista Dr., Beverly Hills, California (hereinafter referred to as "**Borrower**") promises to pay to the order of **KING FAMILY LENDING LLC**, a California Limited Liability Company (hereinafter referred to as "**Lender**"),  with an address of 110 Newport Center Drive, Ste. 277, Newport Beach, California 92660, in accordance with this Secured Promissory Note (hereinafter referred to as the "**Note**"), and Security Agreement dated concurrently with this Note, attached and incorporated hereto, at such place as the Lender hereof may hereafter designate in writing), the principal sum of ONE HUNDRED FIFTY THOUSAND DOLLARS (150,000.00) (the "**Loan Amount**") in immediately available funds and lawful money of the United States of America, without right to set-off or counterclaim together with Interest, as described below, <u>on or before October 20, 2022, a total loan term of 120 days.</u>

    1.    **Maturity Date.**  The maturity date of this Secured Promissory Note shall mean the date which is **120 days after the date of this Note.**

    2.    **Interest.** Interest shall accrue on the principal balance from the date hereof at the rate of **NINETY SIX PERCENT (96%) per annum** ("**Interest**"), subject to increase upon default as hereinafter provided. Interest accruing hereunder shall be payable monthly commencing on the date of this Note and continuing on the first day of each consecutive month thereafter, with time being of the essence. Interest accruing and payable under this Note shall be computed and applied on the basis of a 365-day year, actual days elapsed, with time being of the essence. Interest that is not received by Lender on the date such interest is due shall, at the sole discretion of Lender, be added to the Principal balance and shall from that date due bear interest at the rate provided in this Note.

    3.    **Late Charges.** If any payment provided for in this Note is not paid when due, it would be impracticable or extremely difficult to fix the actual damages resulting to Lender. Therefore, if any payment provided for in this Note is not paid when due Borrower agrees to pay to Lender a sum equal to TEN PERCENT (10%) of the payment as liquidated damages and not as a penalty, to compensate Lender for the expenses of administering the default. Only one late charge will be collected for each late payment, regardless of the period during which it remains in default.

    4.    **Fees. Costs. and Expenses.**  Lender has waived all commitment/origination fees,

costs, and expenses, including without limitation attorneys, administrative, insurance fees, incurred in connection with the investigation, negotiation, arrangement, and making of this Note and related loan documents.

5. **Payments.**   Payments shall be applied first to fees, costs, expenses and sums other than principal and interest due to Lender, then to accrued and unpaid interest hereon, and the balance thereof, if any, to the outstanding principal balance hereof. The amounts borrowed may be prepaid at any time provided written notice of prepayment is received by Lender concurrently therewith.

6. **Maximum Legal Rate- No Usury.** Notwithstanding any provision to the contrary contained in this Note, it is expressly provided that in no case or event shall the aggregate of: a) all interest on the unpaid balance of this Note, accrued or paid from the date hereof and b) the aggregate of any other amounts accrued or paid pursuant to this Note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this Note from the date hereof, ever exceed the maximum nonusurous rate of interest permitted on the execution date hereof by whichever of applicable California or United States laws permit the higher maximum nonusurous interest rate ("highest lawful rate"). In this connection, it is expressly understood and agreed that it is the intent of the Borrower and the Lender to contract in strict compliance with the applicable usury laws of the State of California and of the United States, whichever from time to time permit the higher rate of interest. In furtherance thereof, none of the terms of this Note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest lawful rate. The Borrower or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this Note shall never be liable for Interest in excess of the highest lawful rate. I f, for any reason whatever, the interest paid or received on this Note during its full term produces a rate which exceeds the highest lawful rate, the Lender of this Note shall refund to the payor or at the Lender's option, credit against the principal of this Note such portion of said interest as shall be necessary to cause the interest paid on this Note to produce a rate equal to the highest lawful rate.

7. **Default/Acceleration.** Borrower shall be in default under this Note upon the occurrence of any of the following events, which shall be referred to in this Note as an "Event of Default":

    (a)    There is a failure to make any payment when due under this Note.

    (b)    Borrower fails to perform any covenant or observe any condition contained in this Note or Borrower's breach of any covenant, term or condition of this Note.

    (c)    Borrower is subject to or affected by:

        1.    the appointment of a receiver, liquidator, or trustee;

        2.    the filing of any voluntary or involuntary petition for

bankruptcy or reorganization;

3.     the inability of any such person to pay his or her debts when due or the admission in writing by any such person that his or her debts cannot be paid when due;

4.     the dissolution, termination of existence, insolvency or business failure of any such person;

5.     any assignment for the benefit of creditors;

6.     the making or suffering of a fraudulent transfer under applicable federal or state law; or

7.     the concealment of any of his or her property in fraud.

In an Event of Default by Borrower, the entire principal sum, with accrued interest thereon and all other sums due under this Note, shall at the option of Lender, become immediately due and payable, and at the option of the Lender, the rate of interest provided for under this Note shall, without notice, be increased to an amount TEN PERCENT (10%) PER YEAR over and above the rate of interest set forth in Paragraph 1 of this Note under the section entitled• interest". Lender shall be entitled to collect all such amounts and to enforce any and all remedies available to it, and Borrower's default shall constitute the requisite showing under California Code of Civil Procedure, Section 1281.8, and any similar provision in any other jurisdiction, that any award Lender may receive in accordance with the terms of this Note may be rendered ineffectual without provisional relief.

8.     **Guaranty Agreement and Security Agreements.** This Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by lender, are being secured by the execution by a Personal Guaranty Agreement, and execution of a Security Agreement, attached hereto and incorporated herein. To secure the payment of this Note, this Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by Lender, Borrower grants to Lender a first priority security interest in and lien upon all of the following property of Borrower, whether now owned or hereafter acquired by Borrower, whether now existing or hereafter arising, whether fixed or contingent, and wherever located, and all supporting obligations relating to said property, and all proceeds thereof (collectively, "Collateral"):

(a) As described in the Security Agreement dated herewith.

(b) all proceeds (including, without limitation, insurance proceeds), and rights of Borrower to receive payments in respect of and from such interests and related rights, goods, instruments, inventory, investment property, rents, letters of credit, letter-of- credit rights, payment intangibles, money, and all books and records pertaining to the foregoing property and related rights from the above-described property.

Borrower shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Borrower hereby irrevocably appoints Lender as the attorney in fact for Borrower, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Borrower to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

8. **Disposition of Collateral on Default.** Any collateral given to the Lender at any time will be deemed security for the payment of this Note and any other liabilities of the Borrower to the Lender. In case of default in payment of this Note or any other notes of the Borrower, whether as maker, co- maker, surety, guarantor, or endorser, held by the Lender, or in case the collateral declines in value or otherwise becomes unsatisfactory to the Lender, the Lender is authorized to dispose of all or any part of the collateral security property at public or private sale, without advertisement, or notice to the Borrower, which rights are expressly waived. At such a sale, the Lender may purchase any or all of the property free of any claim or right of redemption of the Borrower, which rights are expressly waived except as provided by law. Neither the sale of the collateral nor the application of its proceeds will prejudice any other rights of the Lender against the Borrower.

9. **Lender, Borrower, Use of Loan Proceeds, Successors and Assigns.**

Lender is a licensed California Finance Lender. Borrower warrants and represents that the funds being loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes.

Subject to the prohibition against Borrower's assignment herein, this Note and all the covenants and agreements contained herein shall inure to the benefit of Lender and bind Borrower and all of their respective successors, estates, heirs, personal representatives and assigns. Without limiting the generality of the foregoing, Lender may assign or grant participation in any of Lender's rights under this Note in whole or in part to any person, without notice and without affecting Borrower's liability hereunder.

10. **Arbitration.** Any dispute, claim or controversy of any kind, whether in contract

or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this Note or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Borrower, and anyone who signs, guarantees or endorses this Note and Lender, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rule. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles, California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

11.   **Costs of Collection.** Borrower promises to pay all costs, expenses and attorneys' fees incurred by Lender in the exercise of any remedy (with or without litigation), in any proceeding for the collection of this Note, or in any litigation or controversy arising from or connected with this Note. Such proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which Lender appears to enforce this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement compromise or other activity in which Lender engages to collect any portion of this Note not paid when due or as a result of any default of Borrower.

12.   **Waivers.** Borrower and all sureties, guarantors, and endorsers of this Note hereby waive notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor, notice of non-payment, demand. presentment for payment, protest, any notices in connection with the delivery, presentment, acceptance, performance, default, or enforcement of this Note, diligence in collecting and the filing of suit for the purpose of fixing liability and any and all other notices and demands whatsoever, and consent to any extensions or postponements of time or other indulgence, including time for payment, renewals, releases of liens, waivers, or modifications that may be made by Payee to any party to this Note. No extension of time for payment of any amount owing on this Note will affect the liability of Borrower or any surety, guarantor, or endorser of this Note. No delay by the Lender or holder in exercising any right under this Note will operate as a waiver of that right; nor will any single or partial exercise of any right preclude other or further exercise of the right, or the exercise of any other right under this Note or otherwise as permitted by law.

No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in a writing executed by Lender. Any waiver or

modification will be valid only to the extent set forth in the writing. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting pursuant to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note or any obligations contained therein. Borrower further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same.

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of California. Orange County, California shall be proper place of venue for suit hereon. The Borrower and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceeding in respect of this Note shall be brought in the Central District of the Superior Court of Orange County or if applicable the United States District Court for the Central District of California.

14. **Records of Payments.** The records of the Lender shall, absent manifest error, be binding and conclusive evidence of the amounts owing on this Note. The failure of Lender to record any payment or expenses shall not limit or otherwise affect the obligations of Borrower under this Note.

15. **Partial Invalidity.** If any section or provision of this Note is declared invalid or unenforceable by a court competent jurisdiction, such section or provision shall be enforceable to the fullest extent permitted by law, and such a determination shall not affect the validity or enforceability of the remaining terms hereof; by way of example and not limitation, if any fee exceeds the maximum such fee permitted by law, such fee shall be reduced so as to equal the maximum permitted by law, or if any time period is shorter than required by law, such time period shall be deemed increased to the minimum time period permitted by law. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

16. **Full Power and Authority.** Borrower and each individual executing this Note on behalf of any Borrower have the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower and is enforceable in accordance with its terms.

17. **Captions/Terms.** The various captions and headings contained in this Note are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Note. No provision in this Note is to be interpreted for or against any party because that party or that party's legal representative drafted such provision, it being recognized that all parties have contributed substantially and materially to the preparation of this Note. As used in this Note, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or" the word "person" means and refers to any individual, corporation, trust, estate, partnership, joint venture, government or governmental authority or other entity and the word "affiliate

means and refers to any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another entity. All pronouns and any validations thereof, shall be deemed to refer to the masculine, feminine. neuter singular or plural as the identity of the person, persons, entity or entities may require. Whenever in this Note locative adverbs such as "herein and "hereunder" are used, the same shall be made in reference to this Note in its entirety and not any specific article, section, subsection, subpart, paragraph or subparagraph.

18.   Entire Agreement. This Note and the Security Agreement executed in connection herewith embody the entire agreement and understanding between Lender and Borrower with respect to this Note and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Borrower acknowledges and agrees that there are no oral agreements between the Borrower and the Lender which have not been incorporated in this Note. No waiver, modification, change, or amendment to any provision of these documents shall be effective unless specifically made in writing and signed by both Lender and Borrower.

**BORROWER: REBECCA TAYLOR**

**By:**  _Rebecca Taylor_____

**Title
(if applicable):_____**

**Date: 6-20-2022**

**EXHIBIT "P"**

### SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (the **"Agreement"**) is entered into on July 7, 2022 by and between **BLUE F44 LLC, a California limited liability company** (**"Debtor"**), and King Family Lending LLC (**"Secured Party"**), as follows:

1.      **Secured Obligations**. Debtor has executed and delivered to Secured Party that certain Secured Promissory Note dated as of concurrently with this Agreement (the "Note") in the principal amount of FOUR HUNDRED THOUSAND DOLLARS ($400,000.00) plus interest and has agreed to pay all indebtedness under the Note and all such legal expenses and obligations thereunder and any past, present, or future liabilities of Debtor to Secured Party, regardless of how acquired by Secured Party (hereinafter sometimes referred to collectively as the "Secured Obligations") after a period of 90 days. Debtor has derived and will continue to derive a material financial benefit from the Note and, in order to induce Secured Party to agree to the terms of the Note, Debtor has agreed to execute and deliver this Agreement to and for the benefit of Secured Party.

2.      **Security Interest**. To secure the full and timely payment and performance of the Secured Obligations, Debtor hereby grants to Secured Party a first priority security interest in and lien upon all of the following property of Debtor, wherever located (collectively, the "**Collateral**").  Debtor hereby understands and agrees that the Collateral shall be held by Secured Party until the earlier of: a) the term of the Note; or b) Debtor has paid to Secured Part all monies owed under the Note.

   a.   **(1) Watercraft Vessel: 2017 TiaraFlybridge 44; Hull No. SSUXD003A717**

Debtor shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Debtor hereby irrevocably appoints Lender as the attorney in fact for Debtor, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

Secured Party shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition

to any and all other security interests previously or hereafter granted by Debtor to Secured Party, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Secured Party. Each term used in this Agreement to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

3.      **Default.** The occurrence of any of the following events or conditions shall constitute and shall be referred to in this Agreement as an "Event of Default":

a.   Breach or default in the payment or performance of any of the Secured Obligations, or under any instrument or agreement evidencing or securing the Secured Obligations;

b.   Breach or default by Debtor in the performance of any obligations of Debtor under this Security Agreement;

c.   Any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished;

d.   The dissolution, termination of existence, insolvency, business failure, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Debtor; and

e.   If Debtor shall apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

4.      **Rights and Remedies**. During the continuance of an Event of Default and if the Secured Obligations have been accelerated as a result thereof, Secured Party, without notice or demand, may do any one or more of the following, all of which are authorized by Debtor:

a.   Assume ownership of the Collateral;

b.   Settle or adjust disputes and claims directly with account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Secured Obligations with only the net amounts received by Secured Party in payment of such disputed accounts after deducting all reasonable costs and expenses incurred or expended in connection therewith including, without limitation, all reasonable attorneys' fees and related legal expenses;

c.   Without notice to or demand upon Debtor or any other obligor, make such payments and

do such acts as Secured Party considers necessary or reasonable to protect its security interests in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorities Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, security interest, or lien that in Secured Party's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to any of Debtor's owned or leased premises, Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

d.   Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9620 of the CUCC), set off and apply to the Secured Obligations any and all indebtedness at any time owing to or for the credit or the account of Debtor held by Secured Party;

e.   Secured Party is hereby granted a license or other right to use, without charge, Debtor's copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral; and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

f.   Sell, lease, license or otherwise dispose of the Collateral, including at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as Secured Party determines is commercially reasonable, and Debtor agrees that neither the Collateral nor evidence thereof need be present at the location of such sale or other disposition;

g.   Secured Party shall give notice of the sale or other disposition of the Collateral as follows: (i) Secured Party shall give Debtor and each holder of a security interest in the Collateral who has filed with Secured Party a written request for notice, a notice in writing of the time and place of public sale or other disposition, or, if the sale or other disposition is a private sale or disposition other than a public sale or disposition, then the time after which such private sale or other disposition is to be made; (ii) The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in the Agreement, at least ten (10) days before the date fixed for any public sale or other disposition of the Collateral, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to persons other than Debtor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Secured Party; (iii) If the sale is to be a public sale, Secured Party also shall give notice of the time and place in any manner determined by Secured Party to be commercially reasonable, and in any event at least ten (10) days before the date of the sale;

h.   Secured Party may credit bid and purchase at any public sale or other disposition; and

i.   Any credit extended by Secured Party to any person acquiring title or possession of the Collateral upon any sale, lease, license or other disposition thereof shall not be credited to the Debtor.

Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

Debtor hereby irrevocably stipulates and agrees that Secured Party has the right under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee, or similar official over Debtor to effect the transactions contemplated by this Agreement. Debtor hereby irrevocably agrees not to object to such appointment on any grounds.

The rights and remedies of Secured Party under this Agreement and all other agreements contemplated hereby and thereby shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the CUCC, by law, or in equity. No exercise by Secured Party of any one right or remedy shall be deemed an election of remedies, and no waiver by Secured Party of any Event of Default shall be deemed a continuing waiver of any other or further Event of Default. No delay by Secured Party shall constitute a waiver, election or acquiescence with respect to any right or remedy.

5.   **Waivers**. In consideration of the Note, Debtor agrees as follows:

a.   At any time and in any manner, upon such terms and at such times as it considers best and with or without notice to Debtor, the Secured Party may alter, compromise, accelerate, extend, or change the time or manner for payment of the Secured Obligations, increase or reduce the rate of interest thereon, release or add any one or more obligors, Debtors, pledgors, or endorsers of the Secured Obligations, accept additional or substituted security therefor, or release or subordinate any security therefor, without in any way affecting the security interest created by the Security Agreements, or any covenant of Debtor.

b.   Debtor waives any right to require the Secured Party to proceed against any other person, firm or corporation at any time or to pursue any other remedy in its power, and Debtor agrees that the Secured Party shall not be obligated to resort to any other security with any priority, in any particular order, or at all, even if such action, or lack thereof, destroys, alters or otherwise impairs subrogation rights of Debtor to proceed against any other person, firm or corporation for reimbursement, or both.

c.   Debtor waives and agrees not to assert or take advantage of: (i) The defense of any statute of limitations in any action hereunder or for the collection or performance of any Secured Obligations; (ii) Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of the Secured Party to file or enforce a claim against the estate (whether in administration, bankruptcy or other proceedings) of any other person; (iii) Any defense or right based upon election of remedies by the Secured Party,

including. without limitation, an election to proceed by nonjudicial rather than judicial foreclosure, even if such election destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; (iv) Any defense or right based upon the acceptance by Secured Party or an affiliate of Secured Party of a transfer in lieu of foreclosure, without extinguishing the debt, even if such acceptance destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; and (v) Any defense that may arise by reason of any other defense any co-maker, endorser, or pledgor, or by reason of the cessation from any cause whatsoever of the liability of any successors of any endorser, co-maker or pledger.

d.   Debtor, by execution hereof, represent& to the Secured Party that the relationship between Debtor and any endorser, co-maker, pledger, or other person is such that Debtor has access to all relevant facts and information concerning the Secured Obligations, and that Secured Party can rely upon Debtor having such access. Debtor waives and agrees not to assert any duty on the part of the Secured Party to disclose to Debtor any facts that the Secured Party may now or hereafter know about any endorser. co-maker, pledgor, or other person regardless of whether the Secured Party has reason to believe that any such facts materially increase the risk beyond that which Debtor intends to assume or has reason to believe that such facts are unknown to Debtor or has a reasonable opportunity to communicate such facts to Debtor. Debtor is fully responsible for being and keeping informed of the financial condition and operations of any endorser, co-maker, pledgor, or other person and all circumstances bearing on the risk of nonpayment of any Secured Obligations.

e.   Debtor waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Secured Obligations or of any action or non-action on the part of any endorser, co-maker, pledger, or other person, the Secured Party, any endorser, any creditor of any endorser, co-maker, pledgor, or other person under the Security Agreements or any other instrument or any other person whosoever, in connection with any Secured Obligations held by the Secured Party as collateral or in connection with any Secured Obligations.

f.   Debtor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Debtor's rights of subrogation and reimbursement against any endorser, co- maker, pledgor, or other person, or any other obligor, by operation of any applicable law or otherwise. Without limiting the foregoing waivers. in accordance with Section 2856 of the California Civil Code, Debtor waives any and all rights and defenses available to Debtor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code.

6.   **No Waiver by Secured Party**. Secured Party's acceptance of partial or delinquent payment, or the failure of Secured Party to exercise any right or remedy will not be a waiver of any of the Secured Obligations or any right of Secured Party, will not be a modification of this Agreement or any of Debtor's obligations under this Agreement. and will not constitute a waiver of any other Event of Default that occurs later.

7. **Attorneys' Fees**. If any litigation is begun between the parties to this Agreement concerning the Collateral, this Agreement, or the rights and duties of either party in relation to them, the prevailing party will be entitled to a reasonable sum as reimbursement for its attorneys' fees and legal expenses.

8. **Notices**. Except as otherwise expressly provided in this Agreement or by law, any notice or other communication required or permitted by this Agreement or by law to be served on, given to, or delivered to either party to this Agreement by the other party will be in writing and will be considered served, given, delivered, and received when personally delivered to the party to whom it is directed or, in lieu of personal delivery, when it is deposited in the United States mail, first-class postage prepaid, or delivered by overnight courier, addressed to Debtor at the address above and to Secured Party at 23 Corporate Plaza Drive 150 Newport Beach, CA 92660. Either party, Debtor or Secured Party, may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

9. **Time of Essence**. Time is expressly declared to be of the essence of this Agreement.

10. **Governing Law**. This Agreement has been entered into in the State of California and will be construed in accordance with the CUCC and all other internal laws of the State of California, without application of conflicts of laws principles.

11. **Arbitration**. Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Debtor, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles. California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

12. **Validity and Construction**. If one or more of the provisions contained in this Agreement for any reason is held invalid, illegal, or unenforceable, the invalidity, illegality, or unenforceability of that provision will not affect any other provision of this Agreement; and this Agreement will be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

13. **Integration**. This Agreement, including the other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the security interest granted by Debtor to Secured Party for the Secured Obligations. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the parties with respect to such subject matter. No waiver and no modification or amendment of any provision of this Agreement shall

be effective unless specifically made in writing and duly signed by the party to be bound thereby.

14.     **Effect on Heirs and Assigns**. This Agreement and each of its provisions will be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of each of the parties to this Agreement.

15.     **Execution and Delivery of Agreement**. This Agreement may be executed and delivered by facsimile transmission and in any number of counterparts, each of which, when executed and delivered, shall be original, an all of them together shall constitute the same Agreement. Delivery of this Agreement shall be deemed effective if made to Secured Party. Each Party who delivers a counterpart of this Agreement to Secured Party shall deliver the original signed counterpart to Secured Party within five (5) days following delivery by facsimile, but any failure by any such Party to deliver the original signed counterpart shall not render execution and delivery by facsimile invalid or ineffective.

IN **WITNESS WHEREOF**, this Note has been executed by Debtor hereto on the day and year first above written.

THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[*Signatures on pages to follow*]

SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR**: **BLUE F44 LLC**

By: _Scott Farber_ _____

Name: ████████

Date: July 7, 2022

**SECURED PARTY: KING FAMILY LENDING LLC**

By: _SJK_ _____

Name: Sara J. King

Title: Manager

Date: July 7, 2022

*Additional Documents Attached and Included:*

Secured Promissory Note

Confession of Judgment

# SECURED PROMISSORY NOTE

## Orange County, California

**Principal Amount: $400,000**                    **Date: July 7, 2022**

**FOR VALUE RECEIVED**, the receipt and adequacy of which is hereby acknowledged by **BLUE F44 LLC** a limited liability company with an address of 1220 Bayside Drive, Newport Beach, California (hereinafter referred to as "**Borrower**") promises to pay to the order of **KING FAMILY LENDING LLC**, a California Limited Liability Company (hereinafter referred to as "**Lender**"), with an address of 110 Newport Center Drive, Ste. 277, Newport Beach, California 92660, in accordance with this Secured Promissory Note (hereinafter referred to as the "**Note**"), and Security Agreement dated concurrently with this Note, attached and incorporated hereto, at such place as the Lender hereof may hereafter designate in writing), the principal sum of FOUR HUNDRED THOUSAND DOLLARS (400,000.00) (the "**Loan Amount**") in immediately available funds and lawful money of the United States of America, without right to set-off or counterclaim together with Interest, as described below, <u>on or before November 6, 2022, a total loan term of 120 days.</u>

    1.    **Maturity Date.** The maturity date of this Secured Promissory Note shall mean the date which is **120 days after the date of this Note.**

    2.    **Interest.** Interest shall accrue on the principal balance from the date hereof at the rate of **ONE HUNDRED TWENTY PERCENT (120%) per annum** ("**Interest**"), subject to increase upon default as hereinafter provided. Interest accruing hereunder shall be payable monthly commencing on the date of this Note and continuing on the first day of each consecutive month thereafter, with time being of the essence. Interest accruing and payable under this Note shall be computed and applied on the basis of a 365-day year, actual days elapsed, with time being of the essence. Interest that is not received by Lender on the date such interest is due shall, at the sole discretion of Lender, be added to the Principal balance and shall from that date due bear interest at the rate provided in this Note.

    3.    **Late Charges.** If any payment provided for in this Note is not paid when due, it would be impracticable or extremely difficult to fix the actual damages resulting to Lender. Therefore, if any payment provided for in this Note is not paid when due Borrower agrees to pay to Lender a sum equal to TEN PERCENT (10%) of the payment as liquidated damages and not as a penalty, to compensate Lender for the expenses of administering the default. Only one late charge will be collected for each late payment, regardless of the period during which it remains in default.

4.   **Fees. Costs. and Expenses.**   Lender has waived all commitment/origination fees, costs, and expenses, including without limitation attorneys, administrative, insurance fees, incurred in connection with the investigation, negotiation, arrangement, and making of this Note and related loan documents.

5.   **Payments.**   Payments shall be applied first to fees, costs, expenses and sums other than principal and interest due to Lender, then to accrued and unpaid interest hereon, and the balance thereof, if any, to the outstanding principal balance hereof. The amounts borrowed may be prepaid at any time provided written notice of prepayment is received by Lender concurrently therewith.

6.   **Maximum Legal Rate- No Usury.** Notwithstanding any provision to the contrary contained in this Note, it is expressly provided that in no case or event shall the aggregate of: a) all interest on the unpaid balance of this Note, accrued or paid from the date hereof and b) the aggregate of any other amounts accrued or paid pursuant to this Note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this Note from the date hereof, ever exceed the maximum nonusurous rate of interest permitted on the execution date hereof by whichever of applicable California or United States laws permit the higher maximum nonusurous interest rate ("highest lawful rate"). In this connection, it is expressly understood and agreed that it is the intent of the Borrower and the Lender to contract in strict compliance with the applicable usury laws of the State of California and of the United States, whichever from time to time permit the higher rate of interest. In furtherance thereof, none of the terms of this Note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest lawful rate. The Borrower or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this Note shall never be liable for Interest in excess of the highest lawful rate. I f, for any reason whatever, the interest paid or received on this Note during its full term produces a rate which exceeds the highest lawful rate, the Lender of this Note shall refund to the payor or at the Lender's option, credit against the principal of this Note such portion of said interest as shall be necessary to cause the interest paid on this Note to produce a rate equal to the highest lawful rate.

7.   **Default/Acceleration.** Borrower shall be in default under this Note upon the occurrence of any of the following events, which shall be referred to in this Note as an "Event of Default":

   (a)   There is a failure to make any payment when due under this Note.

   (b)   Borrower fails to perform any covenant or observe any condition contained in this Note or Borrower's breach of any covenant, term or condition of this Note.

   (c)   Borrower is subject to or affected by:

      1.   the appointment of a receiver, liquidator, or trustee;

2.      the filing of any voluntary or involuntary petition for bankruptcy or reorganization;

3.      the inability of any such person to pay his or her debts when due or the admission in writing by any such person that his or her debts cannot be paid when due;

4.      the dissolution, termination of existence, insolvency or business failure of any such person;

5.      any assignment for the benefit of creditors;

6.      the making or suffering of a fraudulent transfer under applicable federal or state law; or

7.      the concealment of any of his or her property in fraud.

In an Event of Default by Borrower, the entire principal sum, with accrued interest thereon and all other sums due under this Note, shall at the option of Lender, become immediately due and payable, and at the option of the Lender, the rate of interest provided for under this Note shall, without notice, be increased to an amount TEN PERCENT (10%) PER YEAR over and above the rate of interest set forth in Paragraph 1 of this Note under the section entitled• interest". Lender shall be entitled to collect all such amounts and to enforce any and all remedies available to it, and Borrower's default shall constitute the requisite showing under California Code of Civil Procedure, Section 1281.8, and any similar provision in any other jurisdiction, that any award Lender may receive in accordance with the terms of this Note may be rendered ineffectual without provisional relief.

8.    **Guaranty Agreement and Security Agreements.** This Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by lender, are being secured by the execution by a Personal Guaranty Agreement, and execution of a Security Agreement, attached hereto and incorporated herein. To secure the payment of this Note, this Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by Lender, Borrower grants to Lender a first priority security interest in and lien upon all of the following property of Borrower, whether now owned or hereafter acquired by Borrower, whether now existing or hereafter arising, whether fixed or contingent, and wherever located, and all supporting obligations relating to said property, and all proceeds thereof (collectively, "Collateral"):

(a) As described in the Security Agreement dated herewith.

(b) all proceeds (including, without limitation, insurance proceeds), and rights of Borrower to receive payments in respect of and from such interests and related rights, goods, instruments, inventory, investment property, rents, letters of credit, letter-of- credit rights, payment intangibles, money, and all books and records pertaining to the foregoing property and related rights from the above-described property.

Borrower shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Borrower hereby irrevocably appoints Lender as the attorney in fact for Borrower, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Borrower to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

8.   **Disposition of Collateral on Default.** Any collateral given to the Lender at any time will be deemed security for the payment of this Note and any other liabilities of the Borrower to the Lender. In case of default in payment of this Note or any other notes of the Borrower, whether as maker, co- maker, surety, guarantor, or endorser, held by the Lender, or in case the collateral declines in value or otherwise becomes unsatisfactory to the Lender, the Lender is authorized to dispose of all or any part of the collateral security property at public or private sale, without advertisement, or notice to the Borrower, which rights are expressly waived. At such a sale, the Lender may purchase any or all of the property free of any claim or right of redemption of the Borrower, which rights are expressly waived except as provided by law. Neither the sale of the collateral nor the application of its proceeds will prejudice any other rights of the Lender against the Borrower.

**9.    Lender, Borrower, Use of Loan Proceeds, Successors and Assigns.**

Lender is a licensed California Finance Lender. Borrower warrants and represents that the funds being loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes.

Subject to the prohibition against Borrower's assignment herein, this Note and all the covenants and agreements contained herein shall inure to the benefit of Lender and bind Borrower and all of their respective successors, estates, heirs, personal representatives and assigns. Without limiting the generality of the foregoing, Lender may assign or grant participation in any of Lender's rights under this Note in whole or in part to any person, without notice and without affecting Borrower's liability hereunder.

10.    **Arbitration.** Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this Note or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Borrower, and anyone who signs, guarantees or endorses this Note and Lender, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rule. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles, California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

11.    **Costs of Collection.** Borrower promises to pay all costs, expenses and attorneys' fees incurred by Lender in the exercise of any remedy (with or without litigation), in any proceeding for the collection of this Note, or in any litigation or controversy arising from or connected with this Note. Such proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which Lender appears to enforce this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement compromise or other activity in which Lender engages to collect any portion of this Note not paid when due or as a result of any default of Borrower.

12.    **Waivers.** Borrower and all sureties, guarantors, and endorsers of this Note hereby waive notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor, notice of non-payment, demand. presentment for payment, protest, any notices in connection with the delivery, presentment, acceptance, performance, default, or enforcement of this Note, diligence in collecting and the filing of suit for the purpose of fixing liability and any and all other notices and demands whatsoever, and consent to any extensions or postponements of time or other indulgence, including time for payment, renewals, releases of liens, waivers, or modifications that may be made by Payee to any party to this Note. No extension of time for payment of any amount owing on this Note will affect the liability of Borrower or any surety, guarantor, or endorser of this Note. No delay by the Lender or holder in exercising any right under this Note will operate as a waiver of that right; nor will any single or partial exercise of any right preclude other or further exercise of the right, or the exercise of any other right under this Note or otherwise as permitted by law.

No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or

modification is specifically agreed to in a writing executed by Lender. Any waiver or modification will be valid only to the extent set forth in the writing. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting pursuant to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note or any obligations contained therein. Borrower further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same.

13.  **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of California. Orange County, California shall be proper place of venue for suit hereon. The Borrower and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceeding in respect of this Note shall be brought in the Central District of the Superior Court of Orange County or if applicable the United States District Court for the Central District of California.

14.  **Records of Payments.** The records of the Lender shall, absent manifest error, be binding and conclusive evidence of the amounts owing on this Note. The failure of Lender to record any payment or expenses shall not limit or otherwise affect the obligations of Borrower under this Note.

15.  **Partial Invalidity.** If any section or provision of this Note is declared invalid or unenforceable by a court competent jurisdiction, such section or provision shall be enforceable to the fullest extent permitted by law, and such a determination shall not affect the validity or enforceability of the remaining terms hereof; by way of example and not limitation, if any fee exceeds the maximum such fee permitted by law, such fee shall be reduced so as to equal the maximum permitted by law, or if any time period is shorter than required by law, such time period shall be deemed increased to the minimum time period permitted by law. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

16.  **Full Power and Authority.** Borrower and each individual executing this Note on behalf of any Borrower have the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower and is enforceable in accordance with its terms.

17.  **Captions/Terms.** The various captions and headings contained in this Note are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Note. No provision in this Note is to be interpreted for or against any party because that party or that party's legal representative drafted such provision, it being recognized that all parties have contributed substantially and materially to the preparation of this Note. As used in this Note, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or" the word "person" means and refers to any individual, corporation, trust, estate, partnership, joint

venture, government or governmental authority or other entity and the word "affiliate means and refers to any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another entity. All pronouns and any validations thereof, shall be deemed to refer to the masculine, feminine. neuter singular or plural as the identity of the person, persons, entity or entities may require. Whenever in this Note locative adverbs such as "herein and "hereunder" are used, the same shall be made in reference to this Note in its entirety and not any specific article, section, subsection, subpart, paragraph or subparagraph.

18.   Entire Agreement. This Note and the Security Agreement executed in connection herewith embody the entire agreement and understanding between Lender and Borrower with respect to this Note and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Borrower acknowledges and agrees that there are no oral agreements between the Borrower and the Lender which have not been incorporated in this Note. No waiver, modification, change, or amendment to any provision of these documents shall be effective unless specifically made in writing and signed by both Lender and Borrower.

**BORROWER: BLUE F44 LLC**

_Scott Farber_
_____
██████████████

**Title
(if applicable):Manager**

**Date:7-7–2022**

# EXHIBIT "Q"

## SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (the "**Agreement**") is entered into on August 23, 2022 by and between **JONA███████████████**, **an individual** ("**Debtor**"), and King Family Lending LLC ("**Secured Party**"), as follows:

1.      **Secured Obligations**. Debtor has executed and delivered to Secured Party that certain Secured Promissory Note dated as of concurrently with this Agreement (the "Note") in the principal amount of ONE HUNDRED SEVENTY FIVE THOUSAND DOLLARS ($175,000.00) plus interest and has agreed to pay all indebtedness under the Note and all such legal expenses and obligations thereunder and any past, present, or future liabilities of Debtor to Secured Party, regardless of how acquired by Secured Party (hereinafter sometimes referred to collectively as the "Secured Obligations") after a period of 90 days. Debtor has derived and will continue to derive a material financial benefit from the Note and, in order to induce Secured Party to agree to the terms of the Note, Debtor has agreed to execute and deliver this Agreement to and for the benefit of Secured Party.

2.      **Security Interest**. To secure the full and timely payment and performance of the Secured Obligations, Debtor hereby grants to Secured Party a first priority security interest in and lien upon all of the following property of Debtor, wherever located (collectively, the "**Collateral**"). Debtor hereby understands and agrees that the Collateral shall be held by Secured Party until the earlier of: a) the term of the Note; or b) Debtor has paid to Secured Part all monies owed under the Note.

### (1) 2018 ROLLS ROYCE PHANTOM, BLACK.

Debtor shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Debtor hereby irrevocably appoints Lender as the attorney in fact for Debtor, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

Secured Party shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Debtor to Secured Party, and

is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Secured Party. Each term used in this Agreement to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

3.     **Default.** The occurrence of any of the following events or conditions shall constitute and shall be referred to in this Agreement as an "Event of Default":

a.   Breach or default in the payment or performance of any of the Secured Obligations, or under any instrument or agreement evidencing or securing the Secured Obligations;

b.   Breach or default by Debtor in the performance of any obligations of Debtor under this Security Agreement;

c.   Any warranty, representation, or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished;

d.   The dissolution, termination of existence, insolvency, business failure, or the commencement of any proceeding under any bankruptcy or insolvency law by or against Debtor; and

e.   If Debtor shall apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

4.     **Rights and Remedies**. During the continuance of an Event of Default and if the Secured Obligations have been accelerated as a result thereof, Secured Party, without notice or demand, may do any one or more of the following, all of which are authorized by Debtor:

a.   Assume ownership of the Collateral;

b.   Settle or adjust disputes and claims directly with account Debtors for amounts and upon terms which Secured Party considers advisable, and in such cases, Secured Party will credit the Secured Obligations with only the net amounts received by Secured Party in payment of such disputed accounts after deducting all reasonable costs and expenses incurred or expended in connection therewith including, without limitation, all reasonable attorneys' fees and related legal expenses;

c.   Without notice to or demand upon Debtor or any other obligor, make such payments and do such acts as Secured Party considers necessary or reasonable to protect its security interests

in the Collateral. Debtor agrees to assemble the Collateral if Secured Party so requires, and to make the Collateral available to Secured Party as Secured Party may designate. Debtor authorities Secured Party to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, security interest, or lien that in Secured Party's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith. With respect to any of Debtor's owned or leased premises, Debtor hereby grants Secured Party a license to enter into possession of such premises and to occupy the same, without charge, for up to 120 days in order to exercise any of Secured Party's rights or remedies provided herein, at law, in equity, or otherwise;

d.   Without notice to Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of Section 9620 of the CUCC), set off and apply to the Secured Obligations any and all indebtedness at any time owing to or for the credit or the account of Debtor held by Secured Party;

e.   Secured Party is hereby granted a license or other right to use, without charge, Debtor's copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral; and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit;

f.   Sell, lease, license or otherwise dispose of the Collateral, including at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Debtor's premises) as Secured Party determines is commercially reasonable, and Debtor agrees that neither the Collateral nor evidence thereof need be present at the location of such sale or other disposition;

g.   Secured Party shall give notice of the sale or other disposition of the Collateral as follows: (i) Secured Party shall give Debtor and each holder of a security interest in the Collateral who has filed with Secured Party a written request for notice, a notice in writing of the time and place of public sale or other disposition, or, if the sale or other disposition is a private sale or disposition other than a public sale or disposition, then the time after which such private sale or other disposition is to be made; (ii) The notice shall be personally delivered or mailed, postage prepaid, to Debtor as provided in the Agreement, at least ten (10) days before the date fixed for any public sale or other disposition of the Collateral, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Collateral that threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to persons other than Debtor claiming an interest in the Collateral shall be sent to such addresses as they have furnished to Secured Party; (iii) If the sale is to be a public sale, Secured Party also shall give notice of the time and place in any manner determined by Secured Party to be commercially reasonable, and in any event at least ten (10) days before the date of the sale;

h.   Secured Party may credit bid and purchase at any public sale or other disposition; and

i.   Any credit extended by Secured Party to any person acquiring title or possession of the

Collateral upon any sale, lease, license or other disposition thereof shall not be credited to the Debtor.

Upon the exercise by Secured Party of any power, right, privilege, or remedy pursuant to this Agreement which requires any consent, approval, registration, qualification, or authorization of any governmental authority, Debtor agrees to execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments, assignments, and other documents and papers that Secured Party or any purchaser of the Collateral may be required to obtain for such governmental consent, approval, registration, qualification, or authorization.

Debtor hereby irrevocably stipulates and agrees that Secured Party has the right under this Agreement, upon the occurrence of an Event of Default, to seek the appointment of a receiver, trustee, or similar official over Debtor to effect the transactions contemplated by this Agreement. Debtor hereby irrevocably agrees not to object to such appointment on any grounds.

The rights and remedies of Secured Party under this Agreement and all other agreements contemplated hereby and thereby shall be cumulative. Secured Party shall have all other rights and remedies not inconsistent herewith as provided under the CUCC, by law, or in equity. No exercise by Secured Party of any one right or remedy shall be deemed an election of remedies, and no waiver by Secured Party of any Event of Default shall be deemed a continuing waiver of any other or further Event of Default. No delay by Secured Party shall constitute a waiver, election or acquiescence with respect to any right or remedy.

5.    **Waivers**. In consideration of the Note, Debtor agrees as follows:

a.    At any time and in any manner, upon such terms and at such times as it considers best and with or without notice to Debtor, the Secured Party may alter, compromise, accelerate, extend, or change the time or manner for payment of the Secured Obligations, increase or reduce the rate of interest thereon, release or add any one or more obligors, Debtors, pledgors, or endorsers of the Secured Obligations, accept additional or substituted security therefor, or release or subordinate any security therefor, without in any way affecting the security interest created by the Security Agreements, or any covenant of Debtor.

b.    Debtor waives any right to require the Secured Party to proceed against any other person, firm or corporation at any time or to pursue any other remedy in its power, and Debtor agrees that the Secured Party shall not be obligated to resort to any other security with any priority, in any particular order, or at all, even if such action, or lack thereof, destroys, alters or otherwise impairs subrogation rights of Debtor to proceed against any other person, firm or corporation for reimbursement, or both.

c.    Debtor waives and agrees not to assert or take advantage of: (i) The defense of any statute of limitations in any action hereunder or for the collection or performance of any Secured Obligations; (ii) Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person, or the failure of the Secured Party to file or enforce a claim against the estate (whether in administration, bankruptcy or other proceedings) of any other person; (iii) Any defense or right based upon election of remedies by the Secured Party, including. without limitation, an election to proceed by nonjudicial rather than judicial

foreclosure, even if such election destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; (iv) Any defense or right based upon the acceptance by Secured Party or an affiliate of Secured Party of a transfer in lieu of foreclosure, without extinguishing the debt, even if such acceptance destroys, alters or otherwise impairs subrogation rights of Debtor or the right of Debtor to proceed against any other person for reimbursement, or both; and (v) Any defense that may arise by reason of any other defense any co-maker, endorser, or pledgor, or by reason of the cessation from any cause whatsoever of the liability of any successors of any endorser, co-maker or pledger.

d.   Debtor, by execution hereof, represent& to the Secured Party that the relationship between Debtor and any endorser, co-maker, pledger, or other person is such that Debtor has access to all relevant facts and information concerning the Secured Obligations, and that Secured Party can rely upon Debtor having such access. Debtor waives and agrees not to assert any duty on the part of the Secured Party to disclose to Debtor any facts that the Secured Party may now or hereafter know about any endorser. co-maker, pledgor, or other person regardless of whether the Secured Party has reason to believe that any such facts materially increase the risk beyond that which Debtor intends to assume or has reason to believe that such facts are unknown to Debtor or has a reasonable opportunity to communicate such facts to Debtor. Debtor is fully responsible for being and keeping informed of the financial condition and operations of any endorser, co-maker, pledgor, or other person and all circumstances bearing on the risk of nonpayment of any Secured Obligations.

e.   Debtor waives demand, protest and notice of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of new or additional Secured Obligations or of any action or non-action on the part of any endorser, co-maker, pledger, or other person, the Secured Party, any endorser, any creditor of any endorser, co-maker, pledgor, or other person under the Security Agreements or any other instrument or any other person whosoever, in connection with any Secured Obligations held by the Secured Party as collateral or in connection with any Secured Obligations.

f.   Debtor waives all rights and defenses arising out of an election of remedies by the Secured Party, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Debtor's rights of subrogation and reimbursement against any endorser, co- maker, pledgor, or other person, or any other obligor, by operation of any applicable law or otherwise. Without limiting the foregoing waivers. in accordance with Section 2856 of the California Civil Code, Debtor waives any and all rights and defenses available to Debtor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code.

6.      **No Waiver by Secured Party**. Secured Party's acceptance of partial or delinquent payment, or the failure of Secured Party to exercise any right or remedy will not be a waiver of any of the Secured Obligations or any right of Secured Party, will not be a modification of this Agreement or any of Debtor's obligations under this Agreement. and will not constitute a waiver of any other Event of Default that occurs later.

7.      **Attorneys' Fees**. If any litigation is begun between the parties to this Agreement

concerning the Collateral, this Agreement, or the rights and duties of either party in relation to them, the prevailing party will be entitled to a reasonable sum as reimbursement for its attorneys' fees and legal expenses.

8.      **Notices**. Except as otherwise expressly provided in this Agreement or by law, any notice or other communication required or permitted by this Agreement or by law to be served on, given to, or delivered to either party to this Agreement by the other party will be in writing and will be considered served, given, delivered, and received when personally delivered to the party to whom it is directed or, in lieu of personal delivery, when it is deposited in the United States mail, first-class postage prepaid, or delivered by overnight courier, addressed to Debtor at the address above and to Secured Party at 110 Newport Center Drive, Ste. 277,  Newport Beach, CA 92660. Either party, Debtor or Secured Party, may change its address for the purpose of this paragraph by giving written notice of the change to the other party in the manner provided in this paragraph.

9.      **Time of Essence**. Time is expressly declared to be of the essence of this Agreement.

10.     **Governing Law**. This Agreement has been entered into in the State of California and will be construed in accordance with the CUCC and all other internal laws of the State of California, without application of conflicts of laws principles.

11.     **Arbitration**. Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Debtor, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles. California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

12.     **Validity and Construction**. If one or more of the provisions contained in this Agreement for any reason is held invalid, illegal, or unenforceable, the invalidity, illegality, or unenforceability of that provision will not affect any other provision of this Agreement; and this Agreement will be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

13.     **Integration**. This Agreement, including the other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the security interest granted by Debtor to Secured Party for the Secured Obligations. There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein. This Agreement supersedes all prior agreements and undertakings between the parties with respect to such subject matter. No waiver and no modification or amendment of any provision of this Agreement shall be effective unless specifically made in writing and duly signed by the party to be bound thereby.

14.     __Effect on Heirs and Assigns__. This Agreement and each of its provisions will be binding on and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and assigns of each of the parties to this Agreement.

15.     __Execution and Delivery of Agreement__. This Agreement may be executed and delivered by facsimile transmission and in any number of counterparts, each of which, when executed and delivered, shall be original, an all of them together shall constitute the same Agreement. Delivery of this Agreement shall be deemed effective if made to Secured Party. Each Party who delivers a counterpart of this Agreement to Secured Party shall deliver the original signed counterpart to Secured Party within five (5) days following delivery by facsimile, but any failure by any such Party to deliver the original signed counterpart shall not render execution and delivery by facsimile invalid or ineffective.

IN **WITNESS WHEREOF**, this Note has been executed by Debtor hereto on the day and year first above written.

THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[*Signatures on pages to follow*]

Security Agreement
Page 8 of 9

## SIGNATURE PAGE TO SECURITY AGREEMENT

**DEBTOR**:  **JONA** ███████████

███████████████

Name:
Title:
Date: August23, 2022

**SECURED PARTY: KING FAMILY LENDING LLC**

By: _____
Name: Sara J. King
Title: Manager
Date: August 23, 2022

***Additional Documents Attached and Included:***
Secured Promissory Note
Confession of Judgment

**SECURED PROMISSORY NOTE**

**Orange County, California**

**Principal Amount: $175,000**                    **Date: August 23, 2022**

**FOR VALUE RECEIVED**, the receipt and adequacy of which is hereby acknowledged by **JONA███████████**, an individual with an address ████████████ (hereinafter referred to as "**Borrower**") promises to pay to the order of **KING FAMILY LENDING LLC**, a California Limited Liability Company (hereinafter referred to as "**Lender**"),  with an address of 110 Newport Center Drive, Ste. 277, Newport Beach, California 92660, in accordance with this Secured Promissory Note (hereinafter referred to as the "**Note**"), and Security Agreement dated concurrently with this Note, attached and incorporated hereto, at such place as the Lender hereof may hereafter designate in writing), the principal sum of ONE HUNDRED SEVENTY FIVE THOUSAND DOLLARS (175,000.00) (the "**Loan Amount**") in immediately available funds and lawful money of the United States of America, without right to set-off or counterclaim together with Interest, as described below, <u>on or before November 22, 2022, a total loan term of 90 days.</u>

1.    **Maturity Date.**  The maturity date of this Secured Promissory Note shall mean the date which is **90 days after the date of this Note.**

2.    **Interest.** Interest shall accrue on the principal balance from the date hereof at the rate of **ONE HUNDRED TWENTY PERCENT (120%) per annum** ("**Interest**"), subject to increase upon default as hereinafter provided. Interest accruing hereunder shall be payable monthly commencing on the date of this Note and continuing on the first day of each consecutive month thereafter, with time being of the essence. Interest accruing and payable under this Note shall be computed and applied on the basis of a 365-day year, actual days elapsed, with time being of the essence. Interest that is not received by Lender on the date such interest is due shall, at the sole discretion of Lender, be added to the Principal balance and shall from that date due bear interest at the rate provided in this Note.

3.    **Late Charges.** If any payment provided for in this Note is not paid when due, it would be impracticable or extremely difficult to fix the actual damages resulting to Lender. Therefore, if any payment provided for in this Note is not paid when due Borrower agrees to pay to Lender a sum equal to TEN PERCENT (10%) of the payment as liquidated damages and not as a penalty, to compensate Lender for the expenses of administering the default. Only one late charge will be collected for each late payment, regardless of the period during which it remains in default.

4.  **Fees. Costs. and Expenses.**  Lender has waived all commitment/origination fees, costs, and expenses, including without limitation attorneys, administrative, insurance fees, incurred in connection with the investigation, negotiation, arrangement, and making of this Note and related loan documents.

5.  **Payments.**  Payments shall be applied first to fees, costs, expenses and sums other than principal and interest due to Lender, then to accrued and unpaid interest hereon, and the balance thereof, if any, to the outstanding principal balance hereof. The amounts borrowed may be prepaid at any time provided written notice of prepayment is received by Lender concurrently therewith.

6.  **Maximum Legal Rate- No Usury.** Notwithstanding any provision to the contrary contained in this Note, it is expressly provided that in no case or event shall the aggregate of: a) all interest on the unpaid balance of this Note, accrued or paid from the date hereof and b) the aggregate of any other amounts accrued or paid pursuant to this Note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this Note from the date hereof, ever exceed the maximum nonusurous rate of interest permitted on the execution date hereof by whichever of applicable California or United States laws permit the higher maximum nonusurous interest rate ("highest lawful rate"). In this connection, it is expressly understood and agreed that it is the intent of the Borrower and the Lender to contract in strict compliance with the applicable usury laws of the State of California and of the United States, whichever from time to time permit the higher rate of interest. In furtherance thereof, none of the terms of this Note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the highest lawful rate. The Borrower or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this Note shall never be liable for Interest in excess of the highest lawful rate. I f, for any reason whatever, the interest paid or received on this Note during its full term produces a rate which exceeds the highest lawful rate, the Lender of this Note shall refund to the payor or at the Lender's option, credit against the principal of this Note such portion of said interest as shall be necessary to cause the interest paid on this Note to produce a rate equal to the highest lawful rate.

7.  **Default/Acceleration.** Borrower shall be in default under this Note upon the occurrence of any of the following events, which shall be referred to in this Note as an "Event of Default":

    (a)    There is a failure to make any payment when due under this Note.

    (b)    Borrower fails to perform any covenant or observe any condition contained in this Note or Borrower's breach of any covenant, term or condition of this Note.

    (c)    Borrower is subject to or affected by:

        1.    the appointment of a receiver, liquidator, or trustee;

2.     the filing of any voluntary or involuntary petition for bankruptcy or reorganization;

3.     the inability of any such person to pay his or her debts when due or the admission in writing by any such person that his or her debts cannot be paid when due;

4.     the dissolution, termination of existence, insolvency or business failure of any such person;

5.     any assignment for the benefit of creditors;

6.     the making or suffering of a fraudulent transfer under applicable federal or state law; or

7.     the concealment of any of his or her property in fraud.

In an Event of Default by Borrower, the entire principal sum, with accrued interest thereon and all other sums due under this Note, shall at the option of Lender, become immediately due and payable, and at the option of the Lender, the rate of interest provided for under this Note shall, without notice, be increased to an amount TEN PERCENT (10%) PER YEAR over and above the rate of interest set forth in Paragraph 1 of this Note under the section entitled• interest". Lender shall be entitled to collect all such amounts and to enforce any and all remedies available to it, and Borrower's default shall constitute the requisite showing under California Code of Civil Procedure, Section 1281.8, and any similar provision in any other jurisdiction, that any award Lender may receive in accordance with the terms of this Note may be rendered ineffectual without provisional relief.

8.   **Guaranty Agreement and Security Agreements.** This Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by lender, are being secured by the execution by a Personal Guaranty Agreement, and execution of a Security Agreement, attached hereto and incorporated herein. To secure the payment of this Note, this Note and any past, present, or future liabilities of Borrower to Lender, regardless of how acquired by Lender, Borrower grants to Lender a first priority security interest in and lien upon all of the following property of Borrower, whether now owned or hereafter acquired by Borrower, whether now existing or hereafter arising, whether fixed or contingent, and wherever located, and all supporting obligations relating to said property, and all proceeds thereof (collectively, "Collateral"):

(a) As described in the Security Agreement dated herewith.

(b) all proceeds (including, without limitation, insurance proceeds), and rights of Borrower to receive payments in respect of and from such interests and related rights, goods, instruments, inventory, investment property, rents, letters of credit, letter-of- credit rights, payment intangibles, money, and all books and records pertaining to the foregoing property and related rights from the above-described property.

Borrower shall execute and deliver to Lender, and to any and all third parties as Lender shall require, all such notices, additional security agreements, assignments, pledge agreements, and amendments thereof, as and when Lender shall require in order to perfect and maintain Lender's rights and security interests under this Note. Borrower hereby irrevocably appoints Lender as the attorney in fact for Borrower, with power of substitution which may be exercised by Lender in its discretion, to execute and deliver any and all such notices, additional security agreements, assignments, pledge agreements, and amendments, if and only if there is an Event of Default. Said power of attorney is deemed coupled with an interest and irrevocable. Lender shall have all of the rights and shall be entitled to exercise and enforce all remedies and powers of a secured party as provided in the California Uniform Commercial Code ("CUCC") and as otherwise provided by law. The security interest herein granted shall be in addition to any and all other security interests previously or hereafter granted by Borrower to Lender, and is and shall remain perfected, in part, by one or more existing financing statements of record in favor of Lender. Each term used in this Note to describe the Collateral, if defined in the CUCC, shall have the meaning assigned to such term under the CUCC as the same is amended from time to time.

8. **Disposition of Collateral on Default.** Any collateral given to the Lender at any time will be deemed security for the payment of this Note and any other liabilities of the Borrower to the Lender. In case of default in payment of this Note or any other notes of the Borrower, whether as maker, co- maker, surety, guarantor, or endorser, held by the Lender, or in case the collateral declines in value or otherwise becomes unsatisfactory to the Lender, the Lender is authorized to dispose of all or any part of the collateral security property at public or private sale, without advertisement, or notice to the Borrower, which rights are expressly waived. At such a sale, the Lender may purchase any or all of the property free of any claim or right of redemption of the Borrower, which rights are expressly waived except as provided by law. Neither the sale of the collateral nor the application of its proceeds will prejudice any other rights of the Lender against the Borrower.

9. **Lender, Borrower, Use of Loan Proceeds, Successors and Assigns.**

Lender is a licensed California Finance Lender. Borrower warrants and represents that the funds being loaned in accordance with the terms of this Note are being used exclusively for commercial purposes and none of the funds being loaned in accordance with the terms of this Note are being used for personal, family, or household purposes.

Subject to the prohibition against Borrower's assignment herein, this Note and all the covenants and agreements contained herein shall inure to the benefit of Lender and bind Borrower and all of their respective successors, estates, heirs, personal representatives and assigns. Without limiting the generality of the foregoing, Lender may assign or grant participation in any of Lender's rights under this Note in whole or in part to any person, without notice and without affecting Borrower's liability hereunder.

10.    **Arbitration.** Any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating to or in any way arising out of this Note or any related agreements, or any past, present, or future loans, services, agreements, relationships, incidents or injuries of any kind whatsoever relating to or involving Borrower, and anyone who signs, guarantees or endorses this Note and Lender, shall be resolved by binding arbitration before ADR Services, Inc. (hereinafter "ADR") in accordance with its Commercial Arbitration Rule. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Any party who fails to submit to binding arbitration following a lawful demand to do so shall bear all costs and expenses incurred by the demanding party in compelling arbitration of the dispute. To the maximum extent practicable, ADR, the arbitrator(s), and the parties shall act to assure that any arbitration proceeding shall be concluded within 180 days of the filing of the dispute with ADR. The hearing on the matter to be arbitrated shall take place in Los Angeles, California. The prevailing party shall recover the costs of the arbitration, including, but not limited to, filing, administrative, and arbitrator(s) fees.

11.    **Costs of Collection.** Borrower promises to pay all costs, expenses and attorneys' fees incurred by Lender in the exercise of any remedy (with or without litigation), in any proceeding for the collection of this Note, or in any litigation or controversy arising from or connected with this Note. Such proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which Lender appears to enforce this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement compromise or other activity in which Lender engages to collect any portion of this Note not paid when due or as a result of any default of Borrower.

12.    **Waivers.** Borrower and all sureties, guarantors, and endorsers of this Note hereby waive notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor, notice of non-payment, demand. presentment for payment, protest, any notices in connection with the delivery, presentment, acceptance, performance, default, or enforcement of this Note, diligence in collecting and the filing of suit for the purpose of fixing liability and any and all other notices and demands whatsoever, and consent to any extensions or postponements of time or other indulgence, including time for payment, renewals, releases of liens, waivers, or modifications that may be made by Payee to any party to this Note. No extension of time for payment of any amount owing on this Note will affect the liability of Borrower or any surety, guarantor, or endorser of this Note. No delay by the Lender or holder in exercising any right under this Note will operate as a waiver of that right; nor will any single or partial exercise of any right preclude other or further exercise of the right, or the exercise of any other right under this Note or otherwise as permitted by law.

No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or

modification is specifically agreed to in a writing executed by Lender. Any waiver or modification will be valid only to the extent set forth in the writing. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting pursuant to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note or any obligations contained therein. Borrower further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same.

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of California. Orange County, California shall be proper place of venue for suit hereon. The Borrower and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceeding in respect of this Note shall be brought in the Central District of the Superior Court of Orange County or if applicable the United States District Court for the Central District of California.

14. **Records of Payments.** The records of the Lender shall, absent manifest error, be binding and conclusive evidence of the amounts owing on this Note. The failure of Lender to record any payment or expenses shall not limit or otherwise affect the obligations of Borrower under this Note.

15. **Partial Invalidity.** If any section or provision of this Note is declared invalid or unenforceable by a court competent jurisdiction, such section or provision shall be enforceable to the fullest extent permitted by law, and such a determination shall not affect the validity or enforceability of the remaining terms hereof; by way of example and not limitation, if any fee exceeds the maximum such fee permitted by law, such fee shall be reduced so as to equal the maximum permitted by law, or if any time period is shorter than required by law, such time period shall be deemed increased to the minimum time period permitted by law. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

16. **Full Power and Authority.** Borrower and each individual executing this Note on behalf of any Borrower have the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower and is enforceable in accordance with its terms.

17. **Captions/Terms.** The various captions and headings contained in this Note are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Note. No provision in this Note is to be interpreted for or against any party because that party or that party's legal representative drafted such provision, it being recognized that all parties have contributed substantially and materially to the preparation of this Note. As used in this Note, the term "including" means "including but not limited to" unless otherwise specified; the word "or" means "and/or" the word "person" means and refers to any individual, corporation, trust, estate, partnership, joint

venture, government or governmental authority or other entity and the word "affiliate means and refers to any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, another entity. All pronouns and any validations thereof, shall be deemed to refer to the masculine, feminine. neuter singular or plural as the identity of the person, persons, entity or entities may require. Whenever in this Note locative adverbs such as "herein and "hereunder" are used, the same shall be made in reference to this Note in its entirety and not any specific article, section, subsection, subpart, paragraph or subparagraph.

18.   Entire Agreement. This Note and the Security Agreement executed in connection herewith embody the entire agreement and understanding between Lender and Borrower with respect to this Note and supersede all prior conflicting or inconsistent agreements, consents and understandings relating to such subject matter. Borrower acknowledges and agrees that there are no oral agreements between the Borrower and the Lender which have not been incorporated in this Note. No waiver, modification, change, or amendment to any provision of these documents shall be effective unless specifically made in writing and signed by both Lender and Borrower.

**BORROWER: JONAT** ████████████

**BY:** _____

**TITLE:**
**DATE: 8-23–22**

**EXHIBIT "R"**

# CERTIFICATE OF APPRAISAL



TO WHOM IT MAY CONCERN:

THIS IS TO CERTIFY THAT WE ARE ENGAGED IN THE JEWELRY BUSINESS, APPRAISING DIAMONDS, WATCHES, JEWELRY AND PRECIOUS STONES OF ALL DESCRIPTIONS. THIS APPRAISAL HAS BEEN MADE AT THE REQUEST OF KING FAMILY LENDING LLC FOR PURPOSES OF ITEMS' AUTHENTICITY AND VALUE.

WE HEREWITH CERTIFY THAT WE HAVE THIS DAY CAREFULLY EXAMINED THE FOLLOWING LISTED AND DESCRIBED ARTICLES, THE PROPERTY OF:

WE ESTIMATE THE VALUE AS LISTED FOR LENDING PURPOSES AT THE CURRENT WHOLESALE VALUE, EXCLUDING FEDERAL AND OTHER TAXES. IN MAKING THIS APPRAISAL, WE HEREBY AGREE TO PURCHASE THE ARTICLE(S) FROM KING FAMILY LENDING LLC FOR A PERIOD OF SIX (6) MONTHS FROM THE DATE LISTED BELOW.

| DESCRIPTION | PHOTO | APPRAISED VALUE |
|---|---|---|
| ONE MENS 41MM AUTOMATIC AUDEMARS PIGUET ROYAL OAK ROSE GOLD CHRONOGRAPH BLACK INDEX WATCH WITH ROSE GOLD AP FOLDING CLASP BAND MODEL # 26320OR.OO.122OR.01 SERIAL # |  | $94,000.00 |
| ONE MENS 41MM AUTOMATIC AUDEMARS PIGUET ROYAL OAK ROSE GOLD CHRONOGRAPH BLACK INDEX WATCH WITH ROSE GOLD AP FOLDING CLASP BAND MODEL # 26320OR.OO.1220OR.02 SERIAL # |  | $98,000.00 |
| ONE MENS 50MMX42.7MM MANUAL RICHARD MILLE RM030 TITATNUM WATCH WITH BLACK RUBBER BAND MODEL # RM030 SERIAL # | | $220,000.00 |

THE FOREGOING APPRAISAL IS MADE WITH THE UNDERSTANDING THAT THE APPRAISER ASSUMES NO LIABILITY WITH RESPECT TO ANY ACTION THAT MAY BE TAKEN ON THE BASIS OF THE APPRAISAL, UNLESS OTHERWISE PROVIDED IN THIS APPRAISAL.



January 7, 2022
_____
DATE

# EXHIBIT "S"

| COIN | ID/GRADE | YEAR | METAL | % | EST VALUE | # | TOTALS |
|---|---|---|---|---|---|---|---|
| FRANKLIN HALF DOLLAR | MS66 | 1953 | SILVER | 90 | $ 31,000.00 | | $ 31,000.00 |
| FRANKLIN HALF DOLLAR | PCGS MS65 50C | 1951 | SILVER | 90 | $ 1,000.00 | | $ 1,000.00 |
| BUFFALO NICKEL | PCGS MS65 D/D | 1938 | SILVER | 100 | $ 1,500.00 | X10 COINS | $ 15,000.00 |
| FRANKLIN HALF DOLLAR | PCGS MS65FBL | 1951 | SILVER | 90 | $ 500.00 | X10 COINS | $ 5,000.00 |
| MORGAN HALF DOLLAR | MS64 | 1884 | SILVER | 90 | $ 150.00 | | $ 150.00 |
| FRANKLIN HALF DOLLAR | MD 65 FBL | 1951 | SILVER | 90 | $ 1,500.00 | | $ 1,500.00 |
| FRANKLIN HALF DOLLAR | PF66 CAMEO | 1959 | SILVER | 90 | $ 2,500.00 | | $ 2,500.00 |
| FRENCH MEDAL | MAZ318 | 1792 | BELL METAL | 100 | $ 4,560.00 | | $ 4,560.00 |
| FRANKLIN HALF DOLLAR | MS66 | 1953 | SILVER | 90 | $ 1,700.00 | | $ 1,700.00 |
| FRANKLIN HALF DOLLAR | MS65FBL | 1951 | SILVER | 90 | $ 168.00 | X16 | $ 2,688.00 |
| US BICENTENNIAL SILVER PROOF SET | | 1776-1976 | SILVER | 90 | $ 2,200.00 | | $ 2,200.00 |
| MORGAN SILVER DOLLAR | MS64 | 1881 | SILVER | 90 | $ 400.00 | | $ 400.00 |
| MORGAN SILVER DOLLAR | MS64 | 1883 | SILVER | 90 | $ 500.00 | | $ 500.00 |
| MORGAN SILVER DOLLAR | MS64 | 1885-0 | SILVER | 90 | $ 2,500.00 | | $ 2,500.00 |
| MORGAN SILVER DOLLAR | MS64 | 1886-0 | SILVER | 90 | $ 10,000.00 | | $ 10,000.00 |
| MORGAN SILVER DOLLAR | MS64 | 1921-D | SILVER | 90 | $ 500.00 | | $ 500.00 |
| BUFFALO NICKEL | MS65 D/D | 1938 | SILVER | 90 | $ 4,500.00 | X11 | $ 49,500.00 |
| GOLD AMERICAN EAGLE | | 2007 | GOLD | 100 | $ 3,000.00 | | $ 3,000.00 |
| 6 LIV MAZ-88 | SP62 | 1792 | BRONZE | 100 | $ 6,000.00 | | $ 6,000.00 |
| NY GOLD OUNCE | | | GOLD | 100 | $ 2,400.00 | | $ 2,400.00 |
| GOLD OUNCE-LUNAR YEAR SET | | | GOLD | 100 | $ 2,400.00 | X10 | $ 24,000.00 |
| LINCOLN PENNY-UNCIRCULATED | MS 62 BN | 1943 | BRONZE | 100 | $ 140,000.00 | | $ 140,000.00 |
| GOLD LIBERTY | PR62 | 1906 | GOLD | 100 | $ 4,500.00 | | $ 4,500.00 |
| GOLD LIBERTY | MS61 | 1857 | GOLD | 100 | $ 8,500.00 | | $ 8,500.00 |

$ 319,098.00

# EXHIBIT "T"

| COLLATERAL | | BRAND | NOTES | VALUE | FIRESALE | |
|---|---|---|---|---|---|---|
| 1 | HANDBAG | CHANEL | BLACK LUCITE & CRYSTAL ROCKET SHIP EVENING BAG | $ 30,000.00 | $ 20,000.00 | |
| 2 | HANDBAG | CHANEL | BEIGE CAVIAR QUILTED MEDIUM CLASSIC/SILVER HARDWARE | $ 8,800.00 | $ 8,000.00 | NEW WITH BOX |
| 3 | HANDBAG | CHANEL | BLACK CAVIAR QUILTED MEDIUM CLASSIC/SILVER HARDWARE | $ 8,800.00 | $ 4,000.00 | |
| 4 | WATCH | CHANEL | MONSIEUR WATCH BEIGE/GOLD | $ 41,000.00 | $ 34,000.00 | |
| 5 | BRACELET | CARTIER | JUSTE UN CLOU ROSE GOLD W/ DIAMONDS | $ 20,000.00 | $ 12,000.00 | |
| 6 | BRACELET | CARTIER | LOVE MODEL ROSE GOLD W/PAVE DIAMONDS | $ 44,000.00 | $ 30,000.00 | |
| 7 | RING | CARTIER | LOVE RING WHITE GOLD W PAVE DIAMONDS | $ 16,400.00 | $ 8,000.00 | |
| 8 | RING | CARTIER | TRINITY RING W/Y/R GOLD W/ DIAMONDS | $ 35,800.00 | $ 15,000.00 | |
| 9 | BRACELET | CARTIER | TRINITY BRACELET W/Y/R GOLD W/ DIAMONDS | $ 75,000.00 | $ 45,000.00 | |
| 10 | WATCH | CARTIER | CARTIER TANK MIDSIZE FRANCAISE ROSE GOLD | $ 22,000.00 | $ 18,000.00 | |
| TOTAL | | | | $301,800.00 | $194,000.00 | |
| LOAN REQUEST | | | | | $ 95,000.00 | |
| LTV | | | | | 48.97% | |
| TERM (MOS) | | | | 4 | | |
| TOTAL INTEREST | | | | 10% | $ 38,000.00 | |
| INTEREST TO FP | | | | 6% | $ 22,800.00 | |
| INTEREST TO KFL | | | | 4% | $ 15,200.00 | |
| FUND DATE | | | | 4/6/22 | | |
| | | | | | | |

# APPRAISAL



**Appraisal Report No.:** 297651

| | |
|---|---|
| Date: | 4/2/2022 |
| Purpose of Appraisal: | Estimated Replacement Value |
| Function of Appraisal: | Collateral Loan |

Chanel Monsieur De Chanel Watch
Case: Rose Gold
Band: White Gold
Band: Crocodile/Black
Brand: Chanel
Box: Yes
Certificate: Yes



Retail Value: $41,000.00
Agreed Value: $34,000.00

Cartier Tank Francaise (Med)
Rose Gold and Silver Dial
Band: Rose Gold
Brand: Cartier
Certificate: Yes
Box: No



Retail Value: $22,000.00
Agreed Value: $18,000.00

Cartier Juste Un Clou Bracelet
Rose Gold with Diamonds
Certificate: Yes
Box: Yes



Retail: $20,000.00
Agreed Value: $12,000.00

Cartier Love Bracelet
Rose Gold with Diamonds
Certificate: Yes
Box: Yes



Retail: $44,000.00
Agreed Value: $30,000.00

Cartier Love Ring
White Gold with Diamonds
Certificate: Yes
Box: Yes



Retail: $16,400.00
Agreed Value: $8,000.00

Cartier Trinity Ring
White/Rose/Yellow Gold with Diamonds
Certificate: Yes
Box: Yes



Retail: $35,000.00
Agreed Value: $15,000.00

Cartier Trinity Bracelet
White/Rose/Yellow Gold with Diamonds
Certificate: Yes
Box: Yes



Retail: $75,000.00
Agreed Value: $45,000.00

We estimate the Agreed Value as listed for collateral loan purposes, excluding taxes. We hereby agree to purchase the above listed items, upon King Family Lending LLC taking full possession and clear title of the items, for a period of six months from the date of this appraisal. This appraisal is an estimate only, and the appraiser assumes no liability with respect to any other uses of this appraisal, unless otherwise provided.

Appraiser

4-2-22

Date

**EXHIBIT "U"**

**PROMISSORY NOTE**

**$175,000.00**                                              **January 28, 2022**
                                              **Orange County, California**

FOR VALUE RECEIVED, **KING FAMILY LENDING LLC**, a California limited liability company, whose address is 110 Newport Center Drive, Suite 277, Newport Beach, California 92660 ("**Maker**"), promises to pay to the order of LDR INTERNATIONAL LIMITED, with an address of 3rd Floor, Yamraj Building Market Square, P.O. Box 3175 Road Town, Tortola, British Virgin Islands ("**Payee**"), at such other place as the Payee may from time to time designate in writing, the principal sum of **ONE HUNDRED SEVETY-FIVE THOUSAND DOLLARS** ($**175,000.00**), with interest thereon as provided in this Promissory Note (this "**Note**").

1.      **Certain Definitions**. For the purposes hereof, the terms set forth below shall have the following meanings:

(a)      "Applicable Law" shall mean (i) the laws of the United States of America applicable to contracts made or performed in the State of California, now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, (ii) the laws of the State of California now or at any time hereafter prescribing or eliminating maximum rates of interest on loans and extensions of credit, and (iii) any other laws at any time applicable to contracts made or performed in the State of California which permit a higher interest rate ceiling hereunder.

(b)      "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or permitted to be closed for business in the State of California.

(c)      "Highest Lawful Rate" shall mean at the time in question the maximum rate of interest which, under Applicable Law, Payee is then permitted to charge Maker in regard to the loan evidenced by this Note. If the maximum rate of interest which, under Applicable Law, Payee is permitted to charge Maker in regard to the loan evidenced by this Note shall change after the date hereof, the Highest Lawful Rate shall be automatically increased or decreased, as the case may be, from time to time as of the effective date of each change in the Highest Lawful Rate without notice to Maker. For purposes of determining the Highest Lawful Rate under the Applicable Law, all fees and other charges contracted for, charged or received by Payee in connection with the loan evidenced by this Note which are either deemed interest under Applicable Law or required under Applicable Law to be deducted from the principal balance hereof to determine the rate of interest charged on this Note shall be taken into account.

(d)      "Interest Rate" shall mean seventy-two percent (72%) per annum.

(e)   "Maturity Date" shall mean the date which is four months after the date of this Note, subject to acceleration as provided herein.

(f)   "Unpaid Principal Balance" shall mean, at any time, the original stated amount of principal of this Note, less any amounts of principal repaid.

2.   **Payment of Principal and Interest**.

(a)   Interest shall be paid on a monthly basis to Payee beginning on February 28, 2022 and every 30 days thereafter until the Maturity Date.

(b)   The Unpaid Principal Balance and all accrued interest due on this Note shall be paid on the Maturity Date.

(c)   Subject to the provisions of Section 6 below, interest on the Unpaid Principal Balance shall be computed at a rate equal to the Interest Rate. Interest shall accrue on the Unpaid Principal Balance from the date that the proceeds of the loan secured hereby are funded by Payee to Maker (not from the date of this Note).

(d)   This Note is payable in lawful money of the United States, without prior notice or demand, and without offset or deduction of any nature.

3.   **Prepayment**. The Unpaid Principal Balance (and all accrued interest) may be prepaid in whole or in part, at any time, without penalty or prepayment premium. The total amount of Interest for four months is guaranteed regardless of prepayment of the Principal Balance.

4.   **Waivers**. Maker and all sureties, endorsers, accommodation parties, guarantors and other parties now or hereafter liable for the payment of this Note, in whole or in part, hereby severally (a) waive demand, notice of demand, presentment for payment, notice of nonpayment, notice of default, protest, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor and all other notices, and further waive diligence in collecting this Note, in taking action to collect this Note, in bringing suit to collect this Note, or in enforcing this Note or any of the security for this Note; (b) agree to any substitution, subordination, exchange or release of any security for this Note or the release of any person primarily or secondarily liable for the payment of this Note; (c) agree that Payee shall not be required to first institute suit or exhaust its remedies hereon against Maker or others liable or to become liable for the payment of this Note or to enforce its rights against any security for the payment of this Note; and (d) consent to any extension of time for the payment of this Note, made by agreement by Payee with any person now or hereafter liable for the payment of this Note, even if Maker is not a party to such agreement.

5.   **Events of Default**.

(a)   Upon the happening of any of the following events (each an "**Event of Default**"), Payee may, at its option, by notice to Maker, declare immediately due and payable the entire Unpaid Principal Balance, together with all accrued interest thereon:

(i)      If Maker fails to pay the entire Unpaid Principal Balance (plus all accrued but unpaid interest) in full on the Maturity Date, without any notice or cure period;

(ii)     If Maker shall: (i) apply for or consent to the appointment of a receiver, trustee or liquidator for any material part of Maker's property, (ii) admit in writing Maker's inability to pay its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated bankrupt or insolvent, (v) file a voluntary petition in bankruptcy, or a petition or an answer seeking an arrangement with creditors or taking advantage of any bankruptcy, insolvency, readjustment of debt, dissolution or liquidation law, or filing an answer admitting the material allegations of a petition filed against Maker in any proceeding under any such law, (vi) suffer the appointment of a trustee or receiver to take possession of all or any substantial part of Maker's assets, or (vii) take any action for the purpose of effectuating any of the foregoing.

(b)      The failure of Payee to exercise the foregoing option of acceleration upon the occurrence of an Event of Default shall not constitute a waiver of the right to exercise the same or any other option of acceleration at any subsequent time.

**6.**     **Default Interest**. If upon the occurrence of an Event of Default, the Unpaid Principal Balance of this Note shall bear interest at a rate equal to the lesser of (a) the Highest Lawful Rate or (b) the Interest Rate plus five percent (5%) per annum (the "**Default Rate**"). The collection by Payee of interest at the Default Rate shall not cure an Event of Default.

**7.**     **Collateral**. Maker is a California Finance Lender and is using all monies to fund a loan. Collateral for said loan is: 2006 SeaRay Sundancer 340; Rolex Men's Watch Date Just, two-tone; 2007 Maybach 62; 2017 Range Rover HSE; 2003 Lamborghini Murcialago.

Upon the occurrence of a Default, Payee has the immediate right to: a) collect collateral from Payee in lieu of payment under this Note and become the owner of the Collateral with full right and title to the Collateral, b) to demand Maker to sell the collateral to a third party (see Exhibit A), or, c) to accelerate this Note and demand immediate full payment. Should Maker sell the Collateral in connection with repayment of this Note, Maker hereby agrees to pay Payee all amounts due and owing hereunder, and in addition, should Maker sell the Collateral for more than what is due and owing under this Note, Maker agrees to pay Payee SIXTY PERCENT (60%) of the additional amount received and Maker will retain FORTY PERCENT (40%).

**8.**     **Fees, Costs, and Interest for Underlying Collateralized Loan**. The Principal Amount is being used by Payee to fund an underlying loan. It is agreed between Maker and Payee that interest and fees earned on that note shall be shared, 60% to Payee and 40% to Maker. The Interest paid to Payee under this Note reflects the same and is included in this Paragraph 8.

**9.**     **Notices**. Any notices required under this Note shall be given in the manner set forth in the Security Agreement.

**10.**    **Compliance with Law**. All agreements between Maker and Payee, whether now

existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency, whether by reason of demand or acceleration of the Maturity Date or otherwise, shall the interest contracted for, charged, received, paid or agreed to be paid to Payee in regard to the loan evidenced by this Note exceed the maximum amount permissible under Applicable Law. If, from any circumstance whatsoever, interest would otherwise be payable to Payee in excess of the maximum amount permissible under Applicable Law, the interest payable to Payee shall be reduced to the maximum amount permissible under Applicable Law; and if from any circumstance Payee shall ever receive anything of value deemed interest by Applicable Law in excess of the maximum amount permissible under Applicable Law, an amount equal to the excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive amount of interest exceeds the Unpaid Principal Balance hereof, such excess shall be refunded to Maker.  All interest paid or agreed to be paid to Payee shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full period (including any renewal or extension) until payment in full of the principal so that the interest hereon for such full period shall not exceed the maximum amount permissible under Applicable Law. Payee expressly disavows any intent to contract for, charge or receive interest in an amount which exceeds the maximum amount permissible under Applicable Law.  This section shall control all agreements between Maker and Payee relating to this Note.

**11.** **Attorneys' Fees and Costs**.  In the event that this Note is placed in the hands of an attorney for collection, or in the event this Note is collected in whole or in part through legal proceedings of any nature, then and in any such case Maker promises to pay on demand by Payee, and, to the extent unpaid upon such demand, there shall be added to the Unpaid Principal Balance, all reasonable costs of collection, including, but not limited to, reasonable attorneys' fees and costs incurred by Payee on account of such collection, whether or not suit is filed (including attorneys' fees incurred in connection with any bankruptcy proceeding (including stay litigation) and on appeal).

**12.** **Cumulative Rights**. The rights and remedies of Payee under this Note are cumulative and in addition to all other rights and remedies which Payee may have at law or in equity. No delay on the Payee in the exercise of any power or right under this Note shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

**13.** **Headings**.  The section headings used in this Note are for convenience of reference only and shall not affect the meaning or interpretation of this Note.

**14.** **Governing Law**. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO SUCH STATE'S CONFLICT OF INTEREST LAWS.**

**15.** **Successors and Assigns**. The term "Payee" shall include Payee's successors and assigns, to whom the benefits of this Note shall inure. This Note shall bind Maker and Maker's heirs, successors and permitted assigns (but no assignment or delegation of this Note by Maker shall release Maker from liability hereunder).

*[Signature on following page]*

4

This Note is **EXECUTED** as of the first date set forth above.


**KING FAMILY LENDING LLC**, a California
limited liability company


By:
Name: Sara J. King
Its: Manager

**EXHIBIT "V"**

| COLLATERAL | YEAR | ASSET | NOTES | VALUE | FIRESALE | |
|---|---|---|---|---|---|---|
| **1** | 1956 | CHEVROLET TRUCK | Sema Show | $ 300,000.00 | $ 225,000.00 | |
| **2** | 1971 | CHEVROLET CHEVILLE | Sema Show | $ 295,000.00 | $ 208,000.00 | |
| **TOTAL** | | | | **$ 595,000.00** | **$ 433,000.00** | |
| **LOAN REQUEST** | | | | | **$ 150,000.00** | |
| **LTV** | | | | | **34.64%** | |
| **TERM (MOS)** | | | | **3** | | |
| **TOTAL INTEREST** | | | | 10% | $ 45,000.00 | |
| **INTEREST TO FP** | | | | 6% | $ 27,000.00 | |
| **INTEREST TO KFL** | | | | 4% | $ 18,000.00 | |
| **FUND DATE** | | | | | | |
| | | | | | | |





**Date: February 20, 2022**
**Car Appraisal and Agreed Upon Purchase Value**

| | | | |
|---|---|---|---|
| **1956 Chevrolet Truck** | **Custom** | **H255L012855** | **$225,000.00** |
| **1971 Chevrolet Cheville** | **Custom** | **136371K159904** | **$208,000.00** |

 **agrees to purchase the above listed vehicles at the agreed upon value for a period of 3 months from the date of this offer.**

**Owner**



# EXHIBIT "W"

# NFL PLAYER CONTRACT

THIS CONTRACT is between ▮▮▮▮▮▮▮▮, hereinafter "Player," and Houston NFL Holdings, L.P., a Delaware corporation (limited partnership) (partnership), hereinafter "Club" operating under the name of the Houston Texans as a member of the National Football League, hereinafter "League." In consideration of the promises made by each to the other, Player and Club agree as follows:

     1.      TERM.  This contract covers 5 football season(s), and will begin on the date of execution or ▮▮▮▮▮▮▮, whichever is later, and end on ▮▮▮▮▮▮▮▮▮▮, unless extended, terminated, or renewed as specified elsewhere in this contract.

     2.      EMPLOYMENT AND SERVICES.  Club employs Player as a skilled football player. Player accepts such employment. He agrees to give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. Player will report promptly for and participate fully in Club's official mandatory mini-camp(s), official preseason training camp, all Club meetings and practice sessions, and all pre-season, regular season, and post-season football games scheduled for or by Club. If invited, Player will practice for and play in any all-star football game sponsored by the League. Player will not participate in any football game not sponsored by the League unless the game is first approved by the League.

     3.      OTHER ACTIVITIES.  Without prior written consent of the Club, Player will not play football or engage in activities related to football otherwise than for Club or engage in any activity other than football which may involve a significant risk of personal injury. Player represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. Player therefore agrees that Club will have the right, in addition to any other right which Club may possess, to enjoin Player by appropriate proceedings from playing football or engaging in football-related activities other than for Club or from engaging in any activity other than football which may involve a significant risk of personal injury.

     4.      PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.  (a) Player grants to Club and the League, separately and together, the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

     (b)      Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on or in conjunction with products, (including, but not limited to, trading cards, clothing, videogames. computer games, collectibles, internet sites, fantasy games, etc.) that arc sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL player on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL

player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This subparagraph (b) shall be construed under Virginia law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract expires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention not to participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement.

5.    COMPENSATION.  For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$5,000,000 for the 

$5,250,000 for the

$5,750,000 for the

$6,000,000 for the

$6,500,000 for the

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and post-season football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits, and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT.  Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or bi-weekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary having become due and payable up to the time of termination.

7.    DEDUCTIONS.  Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.    PHYSICAL CONDITION.  Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or

mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.      INJURY.  Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.     WORKERS' COMPENSATION.  Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.     SKILL, PERFORMANCE AND CONDUCT.  Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgement of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's judgement, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players who Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.     TERMINATION.  The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.     INJURY GRIEVANCE.  Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.     RULES.  Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.     INTEGRITY OF GAME.  Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the

integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.     EXTENSION.  Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.     ASSIGNMENT.  Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

18.     FILING.  This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19.     DISPUTES.  During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20.     NOTICE.  Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21.     OTHER AGREEMENTS.  This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22.     LAW.  This contract is made under and shall be governed by the laws of the State of Texas.

23.     WAIVER AND RELEASE.  Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled <u>White</u> v. <u>National Football League</u>, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in <u>Brown</u> v. <u>Pro Football, Inc</u>. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in <u>White</u> ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the <u>White</u> class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the 1993 Collective Bargaining Agreement (CBA).

24.     OTHER PROVISIONS.  (a) Each of the undersigned hereby confirms that (i) this Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether expressed or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)     Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Stipulation and Settlement Agreement in <u>White</u> v. <u>NFL</u>, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)     The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

25.     SPECIAL PROVISIONS.

See Attachments

THIS CONTRACT is executed in six (6) copies. Player acknowledges that before signing this contract he was given the opportunity to seek advice from or be represented by persons of his own selection.

/s/ ███████████
PLAYER ████████

CLUB Houston Texans

/s/ ████████
By ████████
Vice President of Football Administration

Home Address

Club Address ████████rk
Houston TX 77054

Telephone Number

████                              ████
Date                              Date

/s/ ████████

PLAYER'S CERTIFIED AGENT

███████████████

Priority Sports & Entertainment
_____
Address
███████████████████
_____
██████████   _____
Telephone Number
███████████   _____
█████ Date

| Copy Distribution: | White-League Office | Yellow-Player | Green-Member Club |
| | Blue-Management Council | Gold-NFLPA | Pink–Player Agent |

---

**ATTACHMENT TO**
**NFL PLAYER CONTRACT ("CONTRACT") BETWEEN**
███████████ **("PLAYER")**
**AND**
**HOUSTON TEXANS ("CLUB")**
███████████

**26.**   <u>**Additional Player Services**</u>.

As additional consideration for the compensation provided to Player in the Contract, Player agrees to provide Club with certain promotional services as requested by Club from time to time for no additional compensation, including without limitation:

(a)      Player agrees to perform up to a maximum of **four (4) hours** of service on the Houston Texans Internet Web Site (www.houstontexans.com), (or such other site as may be designated by Club) each month during the term of the Contract. Club and Player will mutually agree on dates and times of service.

(b)      Player agrees to fulfill a minimum of **eight (8)** charitable or public relations/ promotion-related requests for Club during each League Year, provided Club makes the request with reasonable notice to Player and Player does not have any conflict with the date and time of the request. Player will make reasonable efforts to accommodate Club's requests. These requests may include, but are not limited to, speaking engagements and personal appearances as a representative of Club.

(c)      Player agrees to autograph items and memorabilia for Club charitable or public relations/promotional use as reasonably requested by appropriate Club officials.

**27.**   <u>**Media and Marketing**</u>.

(a)      During the term of the Contract, Club and Player agree to work and cooperate with one another in good faith with respect to all Club media and marketing activities. To that end:

(i)      If Player is offered an opportunity to sponsor or endorse a product, service or entity, Player will give Club notice of such offer. If a Substantial Club Sponsor in the applicable category offers Player an opportunity to sponsor or endorse its products, services or entity, and all compensation and other benefits as between the other offer and the offer made by the Substantial Club Sponsor are equal or substantially and materially similar, Player agrees to give greater favor to the Substantial Club Sponsor (which term shall include any sponsor in one of the Designated Categories listed on <u>Exhibit A</u> attached hereto).

(ii)      If Player is offered a media opportunity (such as a regularly-scheduled program, show or similar opportunity on television, radio or the Internet (or other interactive media) or similar media, Player will give Club notice of such offer. If a Club Media Partner offers Player a similar media opportunity and all compensation and other benefits as between the other offer and the offer made by Club Media Partner (which term shall include any Club radio, television or other media entity that carries or broadcasts Club's games or programs/specials) are equal or substantially and materially similar, Player agrees to give greater favor to Club Media Partner.

(iii)      Player agrees to work proactively and cooperate with Club to reach agreements with respect to Substantial Club Sponsors and Club Media Partners on a commercially reasonable basis prior to commencing discussions with any competitors of such Substantial Club Sponsor or Club Media Partner. Club will use its commercially reasonable efforts to ensure that Player receives competitive compensation and other benefits so that all such compensation and benefits will be equal or substantially and materially similar to competitive market arrangements.

(b)      Notwithstanding the foregoing, this marketing limitation shall not apply with respect to any current sponsorship or endorsement arrangement of Player in effect as of the date of the Contract, which sponsorships and endorsements are listed on Exhibit A attached hereto and shall continue until termination or expiration by their terms.

(c)      In no event shall Player be obligated to do any such marketing or media activity not in his best interest as objectively and reasonably advised by his marketing representative or legal counsel.

(d)      Player agrees to refrain from engaging in any marketing or media activity, other than through Club, that would reasonably infer Club's sponsorship or endorsement of such activity, including without limitation, use of Club's name, logo, mark, color or other symbol identifying Club.

PLAYER            AF                              CLUB            CO
INITIAL          _____                          INITIAL        _____

DATE____█___                                     DATE____█__

---

**Page 2**
**█  ATTACHMENT (continued)**

(e)      Player's obligations hereunder shall be subject to the provisions of the NFL Group Licensing Program.

## 28.   Governing Law and Jurisdiction.

Further to Paragraph 22 of this Contract and subject in all respects to Article 41 and Article 70, Section 1 of the Collective Bargaining Agreement ("CBA"), dated _____, with respect to Governing Law, the parties agree that any dispute, claim or cause of action under this Contract concerning rights and liabilities arising from the Player-Club relationship or arising out of or related to this Contract (a "dispute") shall be governed by and construed in accordance with the laws of the State of Texas, including without limitation, workers' compensation disputes. Club and Player agree that jurisdiction of all workers' compensation claims and other matters related to workers' compensation, including but not limited to the matters recited in Paragraph 10 of this Contract, and including all issues of law, issue of fact and matters related to workers' compensation benefits, shall be exclusively determined by the Workers' Compensation Division of the Texas Department of Insurance and exclusively decided in accordance with the internal laws of the State of Texas, as set forth in the **Texas Labor Code, Title 5, Workers' Compensation**, including, without limitation, Section 406.095, without resort to choice of law rules, regardless of the location or situs of the injury giving rise to the dispute. Player acknowledges and understands his right to bring claims for workers' compensation in multiple jurisdictions, but hereby elects the State of Texas as the sole

jurisdiction for resolving his workers' compensation claims against Club. Player acknowledges that he has received compensation for his knowing waiver of his right to bring such claims in jurisdictions other than Texas. In addition, Club and Player agree that this Contract calls for performance in Harris County, Texas, and further agree that jurisdiction and venue for any and all disputes shall lie exclusively in the State Courts of Harris County, Texas. This Paragraph shall survive termination or expiration of this Contract as respects Club.

This Paragraph shall have no application to any injury sustained by Player after this Contract is assigned by waivers or trade to another club domiciled out of the State of Texas.

**29.**    **Insurable Interest**.

Club has an insurable interest in Player, and Player agrees to cooperate reasonably with Club in all matters pertaining to that interest, including taking a physical examination for insurance purposes.

**30.**    **Tax Ramifications**.

Club, Player, and Player Representative acknowledge and agree that (a) none of the NFL, its member Clubs, the NFLMC, or any of their advisors or affiliates have any responsibility to provide the NFLPA, any player, or any of their advisors or affiliates with tax advice; (b) the NFLPA does not have any responsibility to provide the NFL, any of its member Clubs, the NFLMC, or any of their advisors or affiliates with tax advice; and (c) the NFLPA does not have any responsibility to provide Player, Player representative, or any of their advisors or affiliates with tax advice. Club does not assume any responsibility with respect to any income, employment, or other tax incurred by Player and Player does not assume any responsibility with respect to any income, employment, or other tax incurred by Club under this Contract.

**31.**    **Automatic Conversions**.

Player and Club agree that on one or more occasions and at any time during the duration of this Contract, Club shall have the option to (i) convert a portion of Player's ▓▓▓▓▓▓▓▓▓▓▓ Paragraph 5 Salary into Signing Bonus, or (ii) convert part or all of the Roster Bonus(es), if any, set forth in this Contract into Signing Bonus. If Club exercises its option(s) to convert such Paragraph 5 Salary and/or Roster Bonus(es) as provided herein, Club shall use the same form of "Signing Bonus Addendum" as the Signing Bonus Addendum of even date herewith between Player and Club except that (i) such converted Paragraph 5 Salary shall be payable in 17 equal weekly installments over the ensuing Regular Season and (ii) such converted Roster Bonus(es) shall be payable within 10 days after the applicable Roster Bonus was originally to be paid. Player agrees to execute superseding NFL Player Contract(s) effecting the conversion(s) without receiving any additional consideration from Club.

Player further agrees that the conversion(s) itself (or themselves), if effected, shall constitute valuable and adequate consideration for Player's agreement to execute the new NFL Player Contract(s) and that Player shall be in default under the terms and conditions of this Contract if he refuses or fails to promptly execute the new NFL Player Contract(s) after requested by Club.

**32.**    **Representation and Warranty**.

By signing this Contract, Player hereby represents and warrants, as of the date of his signature, except as otherwise disclosed to Club, that he has (1) not been charged with, indicted for, convicted of or pled *nolo contendere* to any felony and/or misdemeanor involving fraud or moral turpitude, and (2) not engaged in conduct which could subject him to a charge, indictment or conviction of any such offense. Player acknowledges and agrees his full and complete disclosure to Club of all information related to this representation and

| PLAYER INITIAL | AF _____ | CLUB INITIAL | CO _____ |
|---|---|---|---|
| DATE __▓▓▓__ | | DATE __▓▓▓__ | |

**Page 3**
████ **ATTACHMENT (continued)**

warranty has been relied upon by Club and is a condition precedent and material inducement to Club's entering into this Contract and Club's payment to Player of any amounts hereunder.

**33.** ████ **One Year Conditional Full Paragraph 5 Skill, Injury, and Salary Cap Guarantee ("████ Guarantee").**

Despite any contrary language in this Contract, Club agrees that for the ████ League Year only, Club will pay Player **Five Million and No/100 Dollars ($5,000,000.00)** of the **Five Million and No/100 Dollars ($5,000,000.00)** salary provided in Paragraph 5, despite the fact that Player's Contract is terminated via the NFL waiver system (i) because, in Club's sole judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster; and/or (ii) if due to a NFL football related injury or death suffered while performing services pursuant to the Contract, Player is unable, in the sole discretion of Club's physician, to pass Club's preseason physical examination for the ████ League Year as a result of such injury and/or (iii) due to Club's determination to create room for "Salary Cap" purposes (in any year in which a salary cap is in effect). The ████ Guarantee by Club will not apply in any year after ████, regardless of whether Player is, as of this date, under contract or option to Club for a subsequent year, and regardless of whether Player passes Club's physical examination for a year subsequent to ████.

Player shall be in default of his obligations under this Paragraph if in the ████ League Year (a) Player, without the prior written consent of Club's Head Coach or General Manager, fails or refuses to report to Club or fails to practice with or play for Club or leaves Club for any reason whatsoever (other than Player's injury (or death resulting therefrom) suffered while performing services under the Contract), including, but not limited to, (i) Player's retirement; (ii) Player's incarceration; (iii) Player's injury or disability resulting from his breach of Paragraph 3 of the Contract or as a result of his participating in hazardous activities which involve a significant risk of personal injury and are non-football in nature, including, without limitation, water or snow skiing, surfing, hang gliding, bungee jumping, scuba diving, sky diving, rock or mountain climbing, race car driving as driver or passenger, riding a motorcycle, motor bike, all-terrain or similar vehicle as driver or passenger, travel on or flight in any test or experimental aircraft, or serving as a pilot or crew member on any flight; and (iv) Player's suspension by the NFL or Club for Conduct Detrimental or for violating any of the NFL's disciplinary policies or programs, specifically including the NFL Personal Conduct Policy but specifically excluding the NFL Policy and Program for Substances of Abuse and the NFL Policy on Anabolic Steroids and Related Substances, or (b) Player materially breaches any provision of this Contract, including, without limitation, any representation and warranty. In the event Player is in default hereunder, then the ████ Guarantee shall immediately be deemed null and void from the beginning and in its entirety regardless of whether or not the ████ Guarantee had otherwise been earned according to its terms at the time of Player's default, and Club shall be relieved of the obligation to guarantee such forfeited proportionate amount.

In the event of any such default, Player will be entitled to earn the specified Paragraph 5 Salary on a non-guaranteed basis, subject to any applicable fines and/or forfeitures. This ████ Guarantee is for the ████ League Year only and in no way supersedes or obviates the applicability of the League's waiver system to Player nor does it provide Player a guaranteed spot on the Club's roster.

If Player becomes entitled to the ████ Guarantee by reason of termination of this Contract, Club shall pay the unpaid amounts of the ████ Guarantee no later than the earlier of: (i) the date(s) set forth in the Contract; or (ii) a date determined by Club that is no later than the last day of the "applicable 2½ month period" (as defined in Treas. Reg. § 1.409A-1(b)(4)(i)(A)). Any payment made before the payment date that would apply if not for termination of this Contract shall be discounted to the then-present value determined in accordance with the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 of the calendar year in which the Contract is

terminated (or, if The Wall Street Journal is not published on such February 1, then the last day before such February 1 on which *The Wall Street Journal* is published).

In the event this Contract is terminated and Player subsequently plays for any football organization (including Club), Club's obligation under this ███ Guarantee shall be reduced by the amount of any and all compensation (including, without limitation, salary, signing, reporting, workout, roster, option, and/or incentive bonuses) received, earned or that reasonably could have been earned by Player from such other football organization or Club, as applicable, during or with respect to the remainder of the term covered by this ███ Guarantee, and Player shall reimburse Club for any such amounts.

**34.** ███ **One Year Conditional Partial Paragraph 5 Skill, Injury, and Salary Cap Guarantee ("**███ **Guarantee").**

Despite any contrary language in this Contract, Club agrees that for the ███ League Year only, Club will pay Player **Three Million Two Hundred Fifty Thousand and No/100 Dollars ($3,250,000.00)** of the **Five Million Two Hundred Fifty Thousand and No/100 Dollars ($5,250,000.00)** salary provided in Paragraph 5, despite the fact that Player's Contract is terminated via the NFL waiver system (i) because, in Club's sole judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster; and/or (ii) if due to a NFL football related injury or death suffered while performing services pursuant to the Contract, Player is unable, in the sole discretion of Club's physician, to pass Club's preseason physical examination for the ███ League Year as a result of such injury and/or (iii) due to Club's determination to create room for "Salary Cap" purposes (in any year in which a salary cap is in effect). The ███ Guarantee by Club will not apply in any year after ███, regardless of whether Player

PLAYER       AF                    CLUB       CO
INITIAL     _____               INITIAL     _____

DATE __███__                  DATE __███__

---

**Page 4**
███
**ATTACHMENT (continued)**

is, as of this date, under contract or option to Club for a subsequent year, and regardless of whether Player passes Club's physical examination for a year subsequent to ███

Player shall be in default of his obligations under this Paragraph if in the ███ League Year (a) Player, without the prior written consent of Club's Head Coach or General Manager, fails or refuses to report to Club or fails to practice with or play for Club or leaves Club for any reason whatsoever (other than Player's injury (or death resulting therefrom) suffered while performing services under the Contract), including, but not limited to, (i) Player's retirement; (ii) Player's incarceration; (iii) Player's injury or disability resulting from his breach of Paragraph 3 of the Contract or as a result of his participating in hazardous activities which involve a significant risk of personal injury and are non-football in nature, including, without limitation, water or snow skiing, surfing, hang gliding, bungee jumping, scuba diving, sky diving, rock or mountain climbing, race car driving as driver or passenger, riding a motorcycle, motor bike, all-terrain or similar vehicle as driver or passenger, travel on or flight in any test or experimental aircraft, or serving as a pilot or crew member on any flight; and (iv) Player's suspension by the NFL or Club for Conduct Detrimental or for violating any of the NFL's disciplinary policies or programs, specifically including the NFL Personal Conduct Policy but specifically excluding the NFL Policy and Program for Substances of Abuse and the NFL Policy on Anabolic Steroids and Related Substances, or (b) Player materially breaches any provision of this Contract, including, without limitation, any representation and warranty. In the event Player is in default hereunder, then the ███ Guarantee shall immediately be deemed null and void from the beginning and in its entirety regardless of whether or not the ███ Guarantee had otherwise been earned according to its terms at the

time of Player's default, and Club shall be relieved of the obligation to guarantee such forfeited proportionate amount.

In the event of any such default, Player will be entitled to earn the specified Paragraph 5 Salary on a non-guaranteed basis, subject to any applicable fines and/or forfeitures. This ██ Guarantee is for the ██ League Year only and in no way supersedes or obviates the applicability of the League's waiver system to Player nor does it provide Player a guaranteed spot on the Club's roster.

If Player becomes entitled to the ██ Guarantee by reason of termination of this Contract, Club shall pay the unpaid amounts of the ██ Guarantee no later than the earlier of: (i) the date(s) set forth in the Contract; or (ii) a date determined by Club that is no later than the last day of the "applicable 2½ month period" (as defined in Treas. Reg. § 1.409A-1(b)(4)(i)(A)). Any payment made before the payment date that would apply if not for termination of this Contract shall be discounted to the then-present value determined in accordance with the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 of the calendar year in which the Contract is terminated (or, if *The Wall Street Journal* is not published on such February 1, then the last day before such February 1 on which *The Wall Street Journal* is published).

In the event this Contract is terminated and Player subsequently plays for any football organization (including Club), Club's obligation under this ██ Guarantee shall be reduced by the amount of any and all compensation (including, without limitation, salary, signing, reporting, workout, roster, option, and/or incentive bonuses) received, earned or that reasonably could have been earned by Player from such other football organization or Club, as applicable, during or with respect to the remainder of the term covered by this ██ Guarantee, and Player shall reimburse Club for any such amounts.

| PLAYER INITIAL | AF | CLUB INITIAL | CO |
|---|---|---|---|
| DATE ██ | | DATE ██ | |

---

**Page 5**
██
**ATTACHMENT (continued)**

**35.**   ██  **Forty-Six (46) Man Active Roster Bonuses**.

Player will receive a bonus in the amount of **Thirty-One Thousand Two Hundred Fifty and No/100 Dollars ($31,250.00)** (each a "Game Roster Bonus" and collectively the "██ Roster Bonuses") for each of the sixteen (16) games during each of the ██ Regular Seasons that he is a member of the Club's 46-Man Active Roster, commencing with Game 1 of each such Regular Season. Each Game Roster Bonus, if earned, will be paid concurrent with Player's Paragraph 5 salary during the Regular Season. **The maximum amount Player can earn under this Paragraph 35 is Five Hundred Thousand and No/100 Dollars ($500,000.00) for each of the ██ ██ League Years. THE MAXIMUM AMOUNT PLAYER CAN EARN UNDER THIS PARAGRAPH 35 FOR THE ENTIRE TERM OF THIS CONTRACT (██ LEAGUE YEARS) IS TWO MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($2,500,000.00).**

Notwithstanding anything to the contrary herein, if, during any League Year, Club participates in more than sixteen (16) Regular Season games, then Player will receive an amount for each game he is a member of Club's 46-Man Active Roster equal to F**ive Hundred Thousand and No/100 Dollars ($500,000.00)** divided by the number of Regular Season games in the applicable League Year(s). For example, if Club participates in eighteen (18) Regular Season games in the ██ League Year, then Player will receive T**wenty-Seven Thousand Seven Hundred Seventy Seven and 77/100 Dollars ($27,777.77)** for each Regular Season game he is a member of the Club's 46-man Active Roster.

It is expressly understood that no part of any Game Roster Bonus is part of any salary specified in the Contract, that the Game Roster Bonus shall not be deemed part of any salary specified in the Contract if Club exercises any option for Player's services in a League Year subsequent to the final League Year, and that such obligations of Club are not terminable via the NFL Waiver System, provided that Player has not defaulted under or breached the terms of the Contract, including this Attachment, prior to such Contract termination.

Player shall be subject to forfeiture of Salary to the maximum extent permitted under Article 4, Section 9 of the CBA, dated ███████. For the purposes of this Paragraph, Salary refers to the ███████ Roster Bonuses payable to Player as described above.

Player hereby expressly authorizes Club, in its sole discretion with prior notice to Player, to deduct and offset, at any time and from time to time, all or part of any sums owed by Player to Club hereunder from any current or deferred wages, salaries, bonuses and/or additional compensation owed to Player by Club. Such deductions will be made in accordance with Article 4, Section 9(h) of the CBA, dated ███████. If the full outstanding amount owed to Club cannot be satisfied by such deductions as set forth above, then Club shall retain all available rights and remedies to compel immediate payment.

PLAYER      AF            CLUB      CO

INITIAL         _____      INITIAL      _____

DATE ___███___          DATE ___███___

---

**Page 6**
███████**ATTACHMENT (continued)**

36.     ███████ **Paragraph 5 Salary De-Escalator**.

For each of the ███ through ███ League Years, if Player fails to fully satisfy any of the following conditions:

(a)    Player satisfactorily participates in and completes Club's "Off-Season Program". For the purposes of this Contract, Player shall be deemed to have satisfactorily participated in and completed Club's "Off-Season Program" under the following circumstances:

    (i)    Player has satisfactorily completed participation in at least eight (8) of the nine (9) total weeks of Club's scheduled "Off-Season Program", including any Club mandatory mini-camp(s); and

    (ii)    Calculation of Player's number of weeks of completion will be based upon the completion of four (4) total days in each week of Club's nine (9) week "Off-Season Program" as prescribed by the Club's Head Strength and Conditioning Coach or his designated staff member. Any workouts in excess of four (4) days per week and workouts performed before or after the Club's nine (9) week "Off-Season Program" will not count towards the calculation of credited participation and completion; and

    (iii)    Player's workout schedule and successful completion of such workouts will be determined solely by Club's Head Strength and Conditioning Coach and any schedule changes must be approved by the Club's Head Strength and Conditioning Coach or the Head Athletic Trainer as soon as practicable; or

(b)    Player timely reports to and fully participates in Club's entire off-season mandatory Veteran mini-camp(s); or

(c)    Player timely reports to and fully participates in the Club's entire pre-season training camp(s); or

(d)    From the execution of this Contract until the Tuesday immediately preceding Club's first (1st) Regular Season game of each League Year (███████), Player otherwise honors all of his contractual obligations to Club,

THEN, Player's Paragraph 5 Salary for that League Year shall be reduced by **One Hundred Thousand and No/100 Dollars ($100,000.00)**. Nothing contained in this Paragraph 36 will constitute a guarantee of any portion of Player's Paragraph 5 Salary included in the Contract.

If Player is unable to participate fully and satisfactorily in the "Off-Season Program" due to injury, Player must rehabilitate such injury as required by and under the supervision of Club's Head Athletic Trainer until such time as full participation in the "Off-Season Program" can be achieved. Supervised rehabilitation by Player with Club's Head Athletic Trainer will count towards Player's eight (8) week completion requirement. Player's satisfactory participation in the "Off-Season Program" shall be determined solely upon records maintained by Club, which shall be final and binding on the parties.

37.     **409A Requirements**.

Except to the extent that an intent to be subject to Section 409A is expressly set forth in the Contract, this Contract shall be interpreted and administered consistent with the intent that all compensation payable hereunder shall be exempt from the requirements of Section 409A of the Internal Revenue Code by reason of the "short-term deferral" rule set forth in Treas. Reg. § 1.409A-1(b)(4). No payment shall be made after the "applicable 2-1/2 month period" (as defined in Treas. Reg. §1.409A-1(b)(4)(i)(A)).

PLAYER          AF                      CLUB          CO
INITIAL         _____                 INITIAL       _____

DATE  _____                            DATE  _____


**Page 7**
████ **ATTACHMENT (continued)**

**TO THE EXTENT ANY TERM SET FORTH ABOVE IS DEEMED UNENFORCEABLE BECAUSE SUCH TERM CONFLICTS WITH THE COLLECTIVE BARGAINING AGREEMENT, DATED ████ OR FOR ANY OTHER REASON, THE REMAINDER OF THE TERMS SHALL REMAIN IN FULL FORCE AND EFFECT AND SUCH UNENFORCEABLE TERM SHALL BE REDUCED TO THE EXTENT NECESSARY SO THAT THE TERM,  AS SO REDUCED, IS ENFORCEABLE (INCLUDING, BUT NOT LIMITED TO, ANY PROVISION RELATING TO THE REPAYMENT BY PLAYER TO CLUB OF ANY UNEARNED PORTION OF ANY PAYMENT PROVIDED FOR HEREUNDER, WHICH SHALL BE REDUCED TO THE MAXIMUM AMOUNT PERMITTED BY THE TERMS OF THIS CONTRACT AND THE CBA, DATED ████. THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION OF THIS CONTRACT SHALL NOT AFFECT THE VALIDITY OR ENFORCEABILITY OF ANY OTHER PROVISION HEREOF, WHICH SHALL REMAIN IN FULL FORCE AND EFFECT, AND THIS CONTRACT SHALL BE CONSTRUED AS IF SUCH UNENFORCEABLE PROVISION HAD NEVER BEEN CONTAINED HEREIN. FURTHERMORE, IN LIEU OF SUCH UNENFORCEABLE PROVISION, THERE SHALL BE ADDED AUTOMATICALLY AS A PART OF THIS CONTRACT A PROVISION AS SIMILAR IN ITS TERMS TO SUCH UNENFORCEABLE PROVISION AS MAY BE PERMITTED BY THE TERMS OF THE CBA, DATED ████.**

PLAYER          AF                      CLUB          CO
INITIAL         _____                 INITIAL       _____

DATE  _____                            DATE  _____

**Page 8**

█████ **ATTACHMENT (continued)**

**EXHIBIT A**

**<u>Designated Categories</u>**

| Category: | Defined as: |
|---|---|
| Airline | Anything that flies |
| Automotive | Anything on four wheels |
| Beer | Beer; Wine; Spirits; Mixers |
| Energy | Electricity and Natural Gas |
| Financial/Banks | Banks; Investments |
| Furniture/Electronics | Retail Furniture and Electronic |
| Gasoline | Oil and Gasoline (refined and unrefined/retail and wholesale); Automotive Aftermarket |
| Grocery | Supermarts; Warehouse clubs; Convenience marts |
| Healthcare | Hospitals; Health care providers; Rehab |
| Home Improvement | Hardware; Do-it-yourself Super Stores |
| Insurance | All insurance companies |
| Quick Service Restaurants | Fast food; Dine-in; Pizza; Take-out |
| Soda/Water/Tea | Carbonated and Non-carbonated Non-alcohol Beverages |
| *Telecom/Wireless/Technology | All telecom-related business, both voice and data; Wireless communications; Telecommunications-related technology, including Internet Service Providers |

\* *"Dot.com" companies will be classified by their core business (e.g., Groceryworks.corn is in Grocery Category; America Online is in the Telecom/Wireless/Technology category).*

### <u>*Other Sponsorship and Endorsements*</u>

1) Mobli Media Inc — Technology Category;
2) Boombah - Apparel and Shoe Category;
3) Game Breaker Sports — Memorabilia and Signing Category;
4) Pro Tips 4 U — Technology Category;
5) Muscle Prodigy - Health and fitness mobile device application category;
6) Joe Myers Ford —LOCAL automotive dealership only. Expires ███;
7) Wristband.net - Wristbands only;
8) Fuse Science Contract — Soda, Water Tea Category: Nutritional Supplements, Nutraceuticals, nutritional, medical, dietary supplement, including without limitation in the sports and fitness field; This is important since it covers a wide range including sports and energy drinks;
9) ProCamps Contract —Football Camps;
10) Verizon Contract - Texans Sponsor Expires ███████

PLAYER INITIAL    AF   _____

CLUB INITIAL    CO   _____

DATE __███__

DATE __███__

**Signing Bonus Addendum**
**to NFL Player Contract**

This Signing Bonus Addendum (the "Agreement"), dated as of ████████, is between ████████ ("Player") and **Houston NFL Holdings, L.P.** ("Club"), and is attached and made a part for all purposes of the NFL Player Contract of even date herewith between Player and Club (the "Contract") for the League Years ████ (the "Contract Year(s)").

**1.** As additional consideration for the execution of the Contract for the Contract Years, for Player's receiving medical clearance to practice and play after taking Club's physical examination, Club agrees to pay Player the sum of **Twelve Million Five Hundred Thousand and No/100 Dollars ($12,500,000.00)** as a signing bonus (the "Signing Bonus"), payable as follows:

| Amount: | | Due and Payable: |
|---|---|---|
| $ | 3,125,000 | **Within fifteen (15) days after** ████████ |
| $ | 1,562,500 | **Within five (5) days after** ████████ |
| $ | 1,562,500 | **Within five (5) days after** ████████ |
| $ | 6,250,000 | **Within five (5) days after** ████████ |

**2.** Player's entitlement to the Signing Bonus is expressly conditional on Player's receiving medical clearance to practice and play after taking the physical examination. Player's entitlement to the Signing Bonus and Player's obligation to forfeit and return (or relinquish and forego) the Signing Bonus shall be governed exclusively by the terms of Article 4, Section 9 of the Collective Bargaining Agreement, dated ████████. Payment of the Signing Bonus prior to Player's passing Club's physical examination shall not be a waiver of the condition that he receive medical clearance to practice and play.

**3.** It is expressly understood that no part of the Signing Bonus is part of any salary specified in the Contract, that the Signing Bonus shall not be deemed part of any salary specified in the Contract if Club exercises any option for Player's services in a Contract Year subsequent to the final Contract Year, and that such obligations of Club are not terminable if the Contract is terminated for skill or injury via the NFL Waiver System, provided that Player has not breached the terms of the Contract or this Agreement prior to such Contract termination.

**4.** Forfeiture of Signing Bonus. Player shall be subject to forfeiture of Salary to the maximum extent permitted under Article 4, Section 9 of the CBA, dated ████████. For the purposes of this Agreement, Salary refers to the Signing Bonus payable to player as described above.

**5.** It is understood and agreed that Player's waiver of rights to certain unpaid and/or unearned amounts and Player's obligation to repay or refund certain portions of the Signing Bonus in the event Player breaches hereunder are express conditions of the Contract and this Agreement, and, but for these conditions, Club would not have executed the Contract and this Agreement. Player hereby expressly authorizes Club, in its sole discretion, to deduct and off set, at any time and from time to time, all or part of any sums owed by Player to Club from any current, future or deferred wages, salaries, bonuses, severance pay, grievance awards and/or additional compensation owed to Player by Club. Such deductions will be made in accordance with Article 4, Section 9 of the CBA, dated ████████. In the event the full outstanding amount owed to Club cannot be satisfied by authorized deductions from amounts owed to, or coming due to, Player as set forth above, then Club shall retain all available rights and remedies to compel immediate payment.

**6.** No term or condition of this Agreement, and no breach thereof, shall be waived, altered or modified except by written instrument signed by Player and Club.

**7.** Club, in its sole discretion, shall be entitled to purchase a policy of insurance naming Club as beneficiary and insuring **Ten Million and No/100 Dollars ($10,000,000.00)** of this **Signing Bonus**, dated as of ████, ████████ **Contract Years and a portion of the** ████ **Year** in the event Player is unable to perform the services required by the Contract due to an NFL football-related or non-football related injury or death resulting therefrom, as set forth under the terms and conditions of such policy.

**To the extent any term set forth above is deemed unenforceable because such term or provision conflicts with the Collective Bargaining Agreement, dated ███████████ or for any other reason, the remainder of the terms shall remain in full force and effect and such unenforceable term shall be reduced to the extent necessary so that the term, as so reduced, are enforceable (including, but not limited to, any provision relating to the repayment by Player to Club of any unearned portion of the Signing Bonus, which shall be reduced to the maximum amount permitted by the terms of this Agreement and the CBA, dated ██████████ ███. The invalidity or unenforceability of any term of this Agreement shall not affect the validity or enforceability of any other provision hereof, which shall remain in full force and effect, and this Agreement shall be construed as if such unenforceable provision had never been contained herein.**

In witness whereof, Club and Player have executed this Agreement as of the day and year first referenced above.

**CLUB — HOUSTON NFL HOLDINGS, L.P.**          **PLAYER —** ████████████
By  RCM Sports & Leisure, L.P., its general partner
By:  Houston NFL Holdings GP, L.L.C., its general partner

/s/ ███████████ _____          /s/ ████████ _____

Vice President of Football Administration

Date: ████ _____          Date: █████ _____

---

**PLAYER INFORMATION**          **CLUB: HOUSTON TEXAS**          **DATE:** ██████ _____
        **(PLEASE PRINT)**

**The following information must be supplied by NFL rookie players and those veterans who have broken service. This sheet must accompany the player contract sent to the League office by the club, at the time of signing.**

**NAME:** ____ ███████ _____ ███████ _____ ISA _____
                **(Last)**                **(First)**                **(Middle)**

**HOME ADDRESS:** _____ Houston, TX _____ 77056 _____
                **(Number & Street)**          **(City & State)**          **(Zip Code)**

**PHONE:**                          **CELL** __ —
                                   **PHONE:**
_____             _____

**PAGER:—**                        **E-**
                                   **MAIL:**
_____             _____

**SOC. SECURITY**                  **HEIGHT:6'1"**     **WEIGHT: 230**
**#:**
_____             _____          _____

**DATE OF BIRTH: 8/24/86**          **BIRTH**          Albuquerque, NM
                                   **CITY/STATE:**
_____             _____

**AGENT'S**          ███████████          **AGENT'S PHONE:(**████████
**NAME:**
_____             _____

**WIFE'S NAME:** ███████  **NO. OF CHILDREN:** 1  _____

**Circle One:** **MARRIED** _____  **HIGH SCHOOL GRADUATION (Month/Year):** _____

**HIGH SCHOOL:** **Mission Bay H.S.** _____  **San Diego, CA** _____

(Name)  (City & State)

**DATE FIRST ENROLLED AT ANY COLLEGE OR JR. COLLEGE**  **Aug '04**  **PLAYING POSITION:**  **RB**

(Month/Year)

**COLLEGES AND/OR JR. COLLEGES ATTENDED (If transferred, list all schools in order)**

| College | Start (Month/Year) | End (Month/Year) |
|---|---|---|
| N/A | | |

**COLLEGE GRADUATE?**  **NO** _____  **IF EXPECTED TO GRADUATE LIST DATE:** _____

(Yes/No)  (Month/Year)

**YEARS PLAYED COLLEGE FOOTBALL:**  **'05 RSF – '08 SR** _____

(Indicated red shirt year)  (Example: 96FA-AS, 87 50, 88 87, 89 SA)

**PRO EXPERIENCE** — List in order all major, minor, and semi-pro teams you have played with:

| TEAM | LEAGUE | DATES |
|---|---|---|
| HOUSTON TEXANS | NFL | ██████████ |
| | | |

**LIST ANY RELATIVES WHO PLAY OR COACH IN THE NFL OR HAVE IN THE PAST:**  **N/A** _____

I attest that I am not contractually obligated to any other football organization, team or league, I hereby authorize the above named colleges to release to the NFL information pertaining to my matriculation date and dates of attendance.

**PLAYER'S SIGNATURE:**  **/s/** ████████ _____

# EXHIBIT "X"

**CHASE ○**

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction
* The laws of a specific state will consider these funds to be "abandoned"
  if the Cashier's Check is not cashed by a certain time
    - Please cash/deposit this Cashier's Check as soon as possible to
      prevent this from occurring
    - In most cases, the funds will be considered "abandoned"
      before the "Void After" Date
* Placing a Stop Payment on a Cashier's Check
    - Stop Payment can only be placed if the Cashier's Check
      is lost, stolen, or destroyed
    - We may not re-issue or refund the funds after the stop payment has
      been placed until 90 days after the original check was issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check
  or for any other information about this item

FOR YOUR PROTECTION SAVE THIS COPY          **Customer Copy**

**CASHIER'S CHECK**          9590311318

01/14/2022
Void after 7 years

**Remitter:**     SARA J KING

$** 193,000.00 **

**Pay To The Order Of:**

Memo:
Note: For information only. Comment has no effect on bank's payment.

Drawn:  **JPMORGAN CHASE BANK, N.A.**
NON NEGOTIABLE

**EXHIBIT "Y"**


CHASE

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction
* The laws of a specific state will consider these funds to be "abandoned" if the Cashier's Check is not cashed by a certain time
    - Please cash/deposit this Cashier's Check as soon as possible to prevent this from occurring
    - In most cases, the funds will be considered "abandoned" before the "Void After" Date
* Placing a Stop Payment on a Cashier's Check
    - Stop Payment can only be placed if the Cashier's Check is lost, stolen, or destroyed
    - We may not re-issue or refund the funds after the stop payment has been placed until 90 days after the original check was issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check or for any other information about this item

FOR YOUR PROTECTION SAVE THIS COPY

**CASHIER'S CHECK**

Customer Copy

959032

03/28/2022

Void after 7 years

**Remitter:** KING FAMILY LENDING LLC

$** 120,000

**Pay To The Order Of:** JAIME SAUL HONG

Memo:———————————————————————

Note: For information only. Comment has no effect on bank's payment.

Drawer **JPMORGAN CHASE BANK, N.A.**

**NON NEGOTIABLE**

**EXHIBIT "Z"**


# CHASE

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction
* The laws of a specific state will consider these funds to be "abandoned"
  if the Cashier's Check is not cashed by a certain time
    - Please cash/deposit this Cashier's Check as soon as possible to
      prevent this from occurring
    - In most cases, the funds will be considered "abandoned"
      before the "Void After" Date
* Placing a Stop Payment on a Cashier's Check
    - Stop Payment can only be placed if the Cashier's Check
      is lost, stolen, or destroyed
    - We may not re-issue or refund the funds after the stop payment has
      been placed until 90 days after the original check was issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check
  or for any other information about this item

**FOR YOUR PROTECTION SAVE THIS COPY**
**CASHIER'S CHECK**

**Customer Copy**

9502034839

07/22/2022
Void after 7 years

**Remitter:**   KING FAMILY LENDING LLC

$** 150,000.00 **

**Pay To The
Order Of:**   DAV█████IAN   

Drawer:  **JPMORGAN CHASE BANK, N.A.**
**NON NEGOTIABLE**

Memo: _____

Note: For information only. Comment has no effect on bank's payment.

# EXHIBIT "AA"

**glong0607@gmail.com**

| | |
|---|---|
| **From:** | Sara King <sarajking@gmail.com> |
| **Sent:** | Sunday, March 27, 2022 3:03 AM |
| **To:** | Laurent |
| **Subject:** | Borrower docs $120k |
| **Attachments:** | BorrowerDocs_Diamonds_3-28-22_redacted__.pdf; Untitled attachment 01564.txt |

Hi Laurent,

Attached are the unsigned borrower docs for the $120,000.00 loan. On Monday,=the borrower will sign prior to funding. I will send you proof of funding o= Monday.

Best,
Sara

**EXHIBIT "BB"**

**glong0607@gmail.com**

| | |
|---|---|
| **From:** | Sara King <sarajking@gmail.com> |
| **Sent:** | Wednesday, March 30, 2022 11:57 PM |
| **To:** | Laurent Reiss |
| **Subject:** | Coin Loin $150k |
| **Attachments:** | BORROWER DOCS COINS.pdf; PROMISSORY NOTE_COINS.pdf |

Hi Laurent,

Hope your travels are well.=

I have one last loan for the month - it=;s one I first sent to you in the very beginning, a coin collection. =The borrower paid back the funds, and now needs them again.  History =n this guy is that he makes a lot of money, owns a drywall company, and us=s cash for "extracurricular" activities that he doesn't want=his company books to show (ha). I have known him for a few years and he wa= a law client of mine - borrowers often, and has always paid. <=iv>
He needs the money tomorrow (3/31) and he agreed to 10% =which is more than the last loan funded) for a period of 3 months. LTV is =8%. If you're interested, we would need to fund him by tomorrow, which=means you would have to fund today. If this is too quick for you - no prob=em!

I likely will not be looking at any dea=s next week due to a law conference I am speaking at, so thought you may l=ke this one. :)

Let me know!

SARA J.=KING
*Licensed Attorney in Calif=rnia and Washington, D.C.*
=p class="MsoNormal" style="margin:0in 0in 0.0001pt;font-size:11pt;font-family:Calibri,sans-serif;line-height:12pt">*California SuperLawy=r 2019-2022*

=span style="font-size:9pt;font-family:Arial,sans-serif;color:rgb(127,127,127)">*California Rising Star 2019-2022*

This e-mail transmission and any documents, fi=es or previous e-mail messages attached to it may contain confidential inf=rmation that is legally privileged.  If you are not the intended reci=ient or a person responsible for delivering it to the intended recipient, =ou are hereby notified that any disclosure, copying, distribution or use o= any of the information contained in or attached to this transmission is s=rictly prohibited.  If you have received this transmission in error, =lease immediately notify us by reply e-mail or by forwarding the message t= sarajking@g=ail.com or by telephone at (949) 220-3666 and destroy the original tra=smission and its attachments without reading or saving them in any manner.=C2 Thank you.

**EXHIBIT "CC"**

**glong0607@gmail.com**

| | |
|---|---|
| **From:** | Sara King <sarajking@gmail.com> |
| **Sent:** | Thursday, January 27, 2022 1:03 AM |
| **To:** | Laurent Reiss |
| **Cc:** | kamran Pahlavi |
| **Subject:** | Loan Request |
| **Attachments:** | Loan Request_1-26-22.pdf |

Hi Laurent,

I hope you are doing w=ll! I have reserved the day tomorrow to complete a final draft of the gene=al agreement. My apologies for the delay, Kamran and I moved into a new pl=ce and finally are getting settled.

There is=a new loan on deck, and attached is the details. Although the agreement is=not yet finalized, I'm still operating on as such. I am awaiting the a=praisers' written confirmations (although, I did receive a verbal thum=s up today).  The client is a referral from a current client and requ=sted funding by Friday.

Sending your way in=accordance with your first right for consideration. If you're interest=d, I can send you the "client package" (i.e., copies of titles, =lient documents, and written appraisals/purchase agreements) today (Thursd=y) later in the day.

Best,
Sara

--
<=iv>

SARA J. KING*Licensed Attorney in California and Washington, D.C.*

This e-mail transmission and a=y documents, files or previous e-mail messages attached to it may contain =onfidential information that is legally privileged.  If you are not t=e intended recipient or a person responsible for delivering it to the inte=ded recipient, you are hereby notified that any disclosure, copying, distr=bution or use of any of the information contained in or attached to this t=ansmission is strictly prohibited.  If you have received this transmi=sion in error, please immediately notify us by reply e-mail or by forwardi=g the message to sarajking@gmail.com or by telephone at (858) 776-6445 and destroy =he original transmission and its attachments without reading or saving the= in any manner.  Thank you.

# EXHIBIT "DD"

**glong0607@gmail.com**

| | |
|---|---|
| **From:** | Sara King <sarajking@gmail.com> |
| **Sent:** | Wednesday, May 25, 2022 11:54 PM |
| **To:** | Laurent |
| **Subject:** | Re: Rolex and Ghost Deal |
| **Attachments:** | Rolex3.JPG; Untitled attachment 01723.txt; Rolex1.PNG; Untitled attachment 01726.txt; Rolex2.PNG; Untitled attachment 01729.txt |

I have known this woman for 9 years - if we can fund by today (Thursday) it w=uld be great as she can also get us in with celebrities for lending; surpri=ingly, they never have cash.


Sent from my iPhone

On May 25, 2022, at 10:50 PM, Laurent <laurentreiss@yahoo.com> wrote:

The Rolex is a 36mm or 41mm ? Because a 36mm is more like 45-50k an= a 41mm more 60k and the colour of the car inside and outside ? And mileage=?

Laurent


> On 26 May 2022, at 03:54, Sara King <sarajking@gmail.com> wrote:
>
> Hi Laurent,
>
> Both checked out. Ideally, she would like funding by tomorrow, as you�=99ll see below, if by tomorrow she's willing to pay a higher intere=t rate.
>
> Attached are photos as you requested- up close for inspection! Watch value= at $50k. Box included, she has the Rolex card she's trying to find= but value contemplates no card.
>
> The Rolls Ghost is at the shop and valued at $230k.
>
> Loan amount: $150k
> Term: 4 months
> Rate: 10% if funded tomorrow (Thursday); 8% if Friday.
> LTV: 53%
>
> She is a friend of mine and a famous hair extension person for the stars. H=r biggest clients are the Kardashians. She wants to expand the business and=didn't like the potential investors. She makes good money; I was he= lawyer for a period of time and had access to her books.
>
> Tomorrow we receive $10,500 in interest payments so the amount to fund is:=$139,500.00.  Sending promissory note in a separate email if you are able t= fund tomorrow morning!
>

**EXHIBIT "EE"**

**glong0607@gmail.com**

| | |
|---|---|
| **From:** | Sara King <sarajking@gmail.com> |
| **Sent:** | Friday, January 14, 2022 1:20 PM |
| **To:** | Laurent Reiss |
| **Cc:** | kamran Pahlavi |
| **Subject:** | Watch Loan-Closed |
| **Attachments:** | PROMISSORY NOTE_watches_1-14-22.pdf; PFR_PFS_watchloan_1-14-22.pdf; ChecktoBorrower_watch loan_1-14-2022.pdf; FUNDINGCONFIRM_watchloan_11422.pdf |

Hi Laurent,

**Attached please find:=/u>**
-Updated note between company and LDR; I've included=Paragraph 8 to reflect the 60/40 split

-screen sh=t for funds received $194,980 (-$20 wire fee), and screen shot of funds wi=hdrawn for funding.

-copy of cashier's check =o borrower: $193,000

-Funding Confirmation <=div>

As noted above, KFL is in possession of $1,980. Th=se are fees charged to the borrower, as discussed (i.e., legal, administra=ive) and the 60/40 split on these will be included with payment on the Mat=rity date.

First one is done!

--
SARA J. KING
*Licensed Attorney in California and Washington, D.C.*

This e-mail transmission and any d=cuments, files or previous e-mail messages attached to it may contain conf=dential information that is legally privileged.  If you are not the i=tended recipient or a person responsible for delivering it to the intended=recipient, you are hereby notified that any disclosure, copying, distribut=on or use of any of the information contained in or attached to this trans=ission is strictly prohibited.  If you have received this transmissio= in error, please immediately notify us by reply e-mail or by forwarding t=e message to  or by telephone at (858) 776-6445 and destroy the =riginal transmission and its attachments without reading or saving them in=any manner.  Thank you.

**EXHIBIT "FF"**


CHASE◆ Case 8:23-cv-00257-DOC-JDE   Document 36-2   Filed 09/11/23   Page 297 of 398   Page ID
#:504
February 01, 2022 through February 28, 2022

Account Number:    000000792382308

## ATM & DEBIT CARD WITHDRAWALS

**DATE      DESCRIPTION**                                                                                      **AMOUNT**

**Total ATM & Debit Card Withdrawals**                                                                          **$0.00**

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

February 01, 2022 through February 28, 2022

Account Number:  000000792382308

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/18 | 02/14 International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Ldr International Limited Ref: Beneficiary: 66666 Ssn: 0495705 Trn: 3482182045Es | $23,850.00 |
| 02/28 | 02/28 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0372063 Trn: 3314652059Es | 23,850.00 |
| 02/28 | 02/28 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0372059 Trn: 3314692059Es | 10,500.00 |

**Total Electronic Withdrawals** **$58,200.00**

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/19 | 02/19 Withdrawal | $400,000.00 |
| 02/19 | 02/19 Withdrawal | 150,000.00 |

**Total Other Withdrawals** **$550,000.00**

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.

## On June 12, 2022, fees for non-Chase ATM transactions are changing

We're making the following fee changes and, depending on the type of account you have with us, you may be affected:

- **Non-Chase ATM transactions fee\* (Domestic Withdrawal, Domestic & International Balance Inquiry, Domestic & International Balance Transfers)**: This fee will increase from $2.50 to $3.00, but you can still avoid it by using Chase ATMs. The International Withdrawal Fee for ATMs outside the U.S., Puerto Rico and the U.S. Virgin Islands remains $5.00 per withdrawal. We'll continue to waive these fees for customers receiving Chase Military Banking benefits on their Chase Business Complete Checking<sup>SM</sup> accounts.

Please note: We'll continue to waive these fees for Chase Performance Business Checking® and Chase Platinum Business Checking<sup>SM</sup> accounts.

For more information about banking fees, please read the Additional Banking Services and Fees for Business Accounts Deposit Account Agreement, which you can find at **chase.com/business-deposit-disclosures** , or visit a branch.

If you have any questions, please call the number on this statement. We accept operator relay calls.

\* Fees from the ATM owner/networks may still apply.

| CHECKING SUMMARY | Chase Performance Business Checking | |
|---|---|---|
| | INSTANCES | AMOUNT |
| **Beginning Balance** | | $21,775.20 |
| Deposits and Additions | 7 | 887,290.00 |
| ATM & Debit Card Withdrawals | 0 | -0.00 |
| Electronic Withdrawals | 4 | -397,850.00 |
| Other Withdrawals | 4 | -445,000.00 |
| Fees | 1 | -130.00 |
| **Ending Balance** | 16 | $66,085.20 |

Your account ending in 5690 is linked to this account for overdraft protection.

---

9 Signals in Document



6 Dollar Amount Edits



3 Editing Software Detected



No Account Number Edits



No Account Holder Edits



No Account Holder Address Edits



No Suspicious Document Origin

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/03 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/ USD20 Ssn: 0387469 Trn: 0905370062Fc | $249,980.00 |
| 03/14 | Online Transfer From Chk ...8982 Transaction#: 13841220173 | 9,750.00 |
| 03/14 | Fedwire Credit Via: Wells Fargo Bank, N.A./121000248 B/O: Yuri R Spiro Beverly Hills, CA 90210-4507 Ref: Chase Nyc/Ctr/Bnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-000000007923 Rfb=000064507352 9812 Obi=Repayment of Loan Info Bbi =/Chgs/USD0,00/ Imad: 0314I1B7031R015148 Trn: 0695580073Ff | 25,000.00 |
| 03/15 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0422804 Trn: 0980520074Fc | 349,980.00 |
| 03/23 | Online Transfer From Chk ...8982 Transaction#: 13883153495 | 47,100.00 |
| 03/28 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0362005 Trn: 0825020087Fc | 194,980.00 |
| 03/28 | Online Transfer From Chk ...8982 Transaction#: 13964946908 | 10,500.00 |

**Total Deposits and Additions** **$887,290.00**

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|

**Total ATM & Debit Card Withdrawals** **$0.00**

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/15 | 03/15 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0237822 Trn: 3022922074Es | $9,750.00 |
| 03/15 | 03/15 Domestic Wire Transfer Via: Capital One, N.A./0650000090 A/C: Hung Nguyen Newport Coast, CA 92660 US IMAD: 0315BQgc08C003474 TRN: 30558212077Es | 350,000.00 |
| 03/23 | 03/23 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0207719 Trn: 3046832082Es | 24,000.00 |
| 03/24 | 03/24 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0252789 Trn: 3109732083Es | 14,100.00 |
| **Total Electronic Withdrawals** | | **$397,850.00** |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/04 | 03/04 Withdrawal | $100,000.00 |
| 03/04 | 03/04 Withdrawal | 150,000.00 |
| 03/28 | 03/28 Withdrawal | 75,000.00 |
| 03/28 | 03/28 Withdrawal | 120,000.00 |
| **Total Other Withdrawals** | | **$445,000.00** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/03 | Service Charges For The Month of February | $130.00 |
| **Total Fees** | | **$130.00** |

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.



## CHECKING SUMMARY

Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$66,085.20** |
| Deposits and Additions | 12 | 1,081,910.00 |
| ATM & Debit Card Withdrawals | 0 | -0.00 |
| Electronic Withdrawals | 5 | -555,500.00 |
| Other Withdrawals | 7 | -525,000.00 |
| Fees | 1 | -120.00 |
| **Ending Balance** | **25** | **$67,375.20** |

Your account ending in 5690 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/01 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0358822 Trn: 0864430091Fc | $149,980.00 |
| 04/04 | Online Transfer From Chk ...8982 Transaction#: 14060893788 | 15,000.00 |
| 04/05 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0151031 Trn: 0353980095Fc | 94,980.00 |
| 04/08 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0373916 Trn: 0863990098Fc | 64,980.00 |

7 Signals in Document

4 Dollar Amount Edits

1 Editing Software Detected

1 Invalid Transaction Dates

1 Unreconciled Balance

No Account Number Edits

No Account Holder Edits

## DEPOSITS AND ADDITIONS  (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/11 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0343286 Trn: 0794560101Fc | 249,980.00 |
| 04/15 | Online Transfer From Chk ...8982 Transaction#: 14116119747 | 30,750.00 |
| 04/18 | Online Transfer From Chk ...8982 Transaction#: 14152382726 | 47,100.00 |
| 04/19 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0350198 Trn: 0825920109Fc | 134,980.00 |
| 04/26 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0389379 Trn: 0898120116Fc | 71,980.00 |
| 04/27 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0475315 Trn: 1094720117Fc | 199,980.00 |
| 04/28 | Online Transfer From Chk ...8982 Transaction#: 14152654995 | 11,700.00 |
| 04/30 | Online Transfer From Chk ...8982 Transaction#: 14152984931 | 10,500.00 |

**Total Deposits and Additions**      **$1,081,910.00**

## ATM & DEBIT CARD WITHDRAWALS

DATE   DESCRIPTION                 AMOUNT

**Total ATM & Debit Card Withdrawals**      **$0.00**

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/01 | 04/01 Online Domestic Wire Transfer A/C: Kennneth Johnson Newport Beach, CA 92660 Trn: 3007812137Es | $150,000.00 |
| 04/06 | 04/06 Online Domestic Wire Transfer Via: Wells Fargo N.A./121000248 A/C: Jaime Saul Newport Beach CA 92612 US Imad: 0406B1Qgc08C0120499 Trn: 3272132118Es | 95,000.00 |
| 04/08 | 04/08 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0443250 Trn: 3377532098Es | 10,500.00 |
| 04/11 | 04/11 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Scott Jay Farber Beverly Hills, CA 90210 US Imad: 0411B1Qgc03C009189 Trn: 3378802098Es | 100,000.00 |
| 04/27 | 04/27 Online Domestic Wire Transfer Via: Wells Fargo N.A./121000248 A/C: Robert Freedman Beverly Hills, CA 90210 US Imad: 0427B1Qgc03C009429 Trn: 33788025371Es | 200,000.00 |

**Total Electronic Withdrawals**     **$555,500.00**

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/08 | 04/08 Withdrawal | $65,000.00 |
| 04/11 | 04/11 Withdrawal | 150,000.00 |
| 04/15 | 04/15 Withdrawal | 80,000.00 |
| 04/19 | 04/19 Withdrawal | 25,000.00 |
| 04/19 | 04/19 Withdrawal | 30,000.00 |
| 04/26 | 04/26 Withdrawal | 75,000.00 |
| 04/26 | 04/26 Withdrawal | 100,000.00 |

**Total Other Withdrawals**     **$525,000.00**

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/05 | Service Charges For The Month of March | $120.00 |

**Total Fees**     **$120.00**

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.

## On June 12, 2022, fees for non-Chase ATM transactions are changing

We're making the following fee changes and, depending on the type of account you have with us, you may be affected:

- **Non-Chase ATM transactions fee** (Domestic Withdrawal, Domestic & International Balance Inquiry, Domestic & International Balance Transfers): This fee will increase from $2.50 to $3.00, but you can still avoid it by using Chase ATMs. The International Withdrawal Fee for ATMs outside the U.S., Puerto Rico and the U.S. Virgin Islands remains $5.00 per withdrawal. We'll continue to waive these fees for customers receiving Chase Military Banking benefits on their Chase Business Complete Checking℠ accounts.

Please note: We'll continue to waive these fees for Chase Performance Business Checking® and Chase Platinum Business Checking℠ accounts.

For more information about banking fees, please read the Additional Banking Services and Fees for Business Accounts Deposit Account Agreement, which you can find at **chase.com/business-deposit-disclosures**, or visit a branch.

If you have any questions, please call the number on this statement. We accept operator relay calls.

* Fees from the ATM owner/networks may still apply.

| CHECKING SUMMARY | Chase Performance Business Checking | |
|---|---|---|
| | INSTANCES | AMOUNT |
| **Beginning Balance** | | **$67,375.20** |
| Deposits and Additions | 13 | 1,771,080.00 |
| ATM & Debit Card Withdrawals | 0 | -0.00 |
| Electronic Withdrawals | 5 | -1,400,000.00 |
| Other Withdrawals | 4 | -345,000.00 |
| Fees | 1 | -315.00 |
| **Ending Balance** | **23** | **$93,140.20** |

Your account ending in 5690 is linked to this account for overdraft protection.



## 71 Signals in Document

**1** Account Number Edits

**34** Dollar Amount Edits

**14** Date Edits

**19** Transaction Description Edits

**3** Editing Software Detected

✓ No Account Holder Edits

✓ No Account Holder Address Edits


## DEPOSITS AND ADDITIONS

| DATE | | AMOUNT |
|------|-------------|--------|
| 05/05 | • 'description' contains multiple different fonts       Mc--Montecarlo Ref: <br> • 'description' contains text that has been added   S/Ac-0000000 <br> to the document (highlighted in red)      k Julius Baer A ND <br> ed BB I=/Chgs/ | $149,980.00 |
| 05/05 | Online Transfer From Chk ...8982 Transaction#: 14274293033 | 24,000.00 |
| 05/11 | Online Transfer From Chk ...8982 Transaction#: 14274447349 | 26,550.00 |
| 05/12 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0213493 Trn: 0490920132Fc | 47,730.00 |
| 05/16 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0336558 Trn: 0775820136Fc | 263,430.00 |
| 05/16 | Online Transfer From Chk ...8982 Transaction#: 14347415132 | 235,350.00 |
| 05/18 | Online Transfer From Chk ...8982 Transaction#: 14347413050 | 197,100.00 |
| 05/20 | Book Transfer Credit B/O: Hybrid Enterprises LLC Los Angeles CA 90013-2600 US Trn: 3525062140Es | 30,000.00 |
| 05/24 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0225413 Trn: 0520980144Fc | 236,480.00 |
| 05/27 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0230978 Trn: 0548960147Fc | 139,480.00 |
| 05/27 | Online Transfer From Chk ...8982 Transaction#: 14433400752 | 25,800.00 |
| 05/31 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0781386 Trn: 1784270151Fc | 197,980.00 |
| 05/31 | Online Transfer From Chk ...8982 Transaction#: 14631200935 | 197,200.00 |
| **Total Deposits and Additions** | | **$1,771,080.00** |



April 30, 2022 through May 31, 2022

Account Number:    000000792382308

## ATM & DEBIT CARD WITHDRAWALS

**DATE**    **DESCRIPTION**    **AMOUNT**

**Total ATM & Debit Card Withdrawals**    $0.00

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |


# ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 05/04 | 05/04 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Ryan Sauter Los Angeles, CA 90013 US Imad: 0504B1Qgc04C000791 Trn: 3122552125Es | $150,000.00 |
| 05/17 | 05/17 Online Domestic Wire Transfer Via: City Ntl Bank/122016066 A/C: Trustee National Hockey League Los Angeles, CA 90021 Ref: 4175 US Imad: 0517B1Qgc03C017814 Trn: 3316422132Es | 500,000.00 |
| 05/24 | 05/24 Online Domestic Wire Transfer Via: City Ntl Bank/122016066 A/C: Trustee National Hockey League Los Angeles, CA 90021 Ref: 4213 Imad: 0524B1Qgc08C013532 Trn: 3273572136Es | 200,000.00 |
| 05/24 | 05/24 Online Domestic Wire Transfer Via: Capital One N.A. /056073502 A/C: Trustee MLB Los Angeles, CA 90021 Ref: 6591 Imad: 0524B1Qgc08C019114 | 250,000.00 |
| 05/31 | 05/31 Online Domestic Wire Transfer Via: Capital One N.A. /056073502 A/C: Trustee MLB Los Angeles, CA 90021 Ref: 6532 Imad: 0531B1Qgc08C019237 | 300,000.00 |

**Total Electronic Withdrawals**                    **$1,400,000.00**

# OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 05/12 | 05/12 Withdrawal | $40,000.00 |
| 05/12 | 05/12 Withdrawal | 55,000.00 |
| 05/26 | 05/26 Withdrawal | 150,000.00 |
| 05/31 | 05/31 Withdrawal | 100,000.00 |

**Total Other Withdrawals**                    **$345,000.00**

# FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 05/04 | Service Charges For The Month of April | $315.00 |

**Total Fees**                    **$315.00**

## CHECKING SUMMARY
Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$93,140.20** |
| Deposits and Additions | 25 | 2,831,700.00 |
| ATM & Debit Card Withdrawals | 0 | -0.00 |
| Electronic Withdrawals | 7 | -1,775,000.00 |
| Other Withdrawals | 10 | -990,000.00 |
| Fees | 1 | -280.00 |
| **Ending Balance** | **43** | **$159,560.20** |

Your account ending in 5690 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/01 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0401259 Trn: 0935690152Fc | $99,980.00 |
| 06/01 | Online Transfer From Chk ...8982 Transaction#: 14505252606 | 5,000.00 |
| 06/02 | Online Transfer From Chk ...8982 Transaction#: 14481225046 | 9,000.00 |
| 06/03 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0256729 Trn: 0616310154Fc | 64,980.00 |
| 06/05 | Online Transfer From Chk ...8982 Transaction#: 14505252605 | 9,000.00 |
| 06/05 | Online Transfer From Chk ...8982 Transaction#: 14599202899 | 165,000.00 |
| 06/09 | Online Transfer From Chk ...8982 Transaction#: 14505252676 | 76,550.00 |
| 06/10 | Online Transfer From Chk ...8982 Transaction#: 14505252771 | 15,000.00 |

**52** Dollar Amount Edits

**14** Date Edits

**32** Transaction Description Edits

**5** Editing Software Detected

No Account Number Edits

No Account Holder Edits

No Account Holder Address Edits



## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/10 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0159394 Trn: 0387680161Fc | 297,430.00 |
| 06/13 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0292405 Trn: 0679770164Fc | 149,980.00 |
| 06/14 | Online Transfer From Chk ...8982 Transaction#: 14577442128 | 20,700.00 |
| 06/16 | Online Transfer From Chk ...8982 Transaction#: 14577442132 | 460,600.00 |
| 06/16 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0150976 Trn: 0360030167Fc | 87,680.00 |
| 06/16 | Online Transfer From Chk ...8982 Transaction#: 14577442483 | 20,000.00 |
| 06/19 | Online Transfer From Chk ...8982 Transaction#: 14577442594 | 441,400.00 |
| 06/21 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0690107 Trn: 1563410172Fc | 164,880.00 |
| 06/22 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0247555 Trn: 0621540173Fc | 75,980.00 |
| 06/24 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0405694 Trn: 0947970175Fc | 155,380.00 |
| 06/27 | Online Transfer From Chk ...8982 Transaction#: 14642427865 | 51,100.00 |
| 06/27 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0389273 Trn: 0894420178Fc | 199,980.00 |
| 06/28 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0390803 Trn: 0869760179Fc | 155,980.00 |
| 06/28 | Online Transfer From Chk ...8982 Transaction#: 14642427991 | 86,500.00 |
| 06/30 | Online Transfer From Chk ...8982 Transaction#: 14642428223 | 19,000.00 |

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/30 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14670003327 Info: Iid: 20220627021000021P1Brjpm00540013191 Recd: 07:05:25 Trn: 9670003327Rx | 100.00 |
| 06/30 | Online Transfer From Chk ...8982 Transaction#: 14669432281 | 500.00 |

**Total Deposits and Additions**      **$2,831,700.00**

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|

**Total ATM & Debit Card Withdrawals**      **$0.00**

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | |
|--|--|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|--|--|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $0.00 |
| Total Card Deposits & Credits | $0.00 |

**CHASE** ○

June 01, 2022 through June 30, 2022

Account Number:     000000792382308

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/01 | 06/01 Online Domestic Wire Transfer Via: City Natl Bank/122016066 A/C: Trustee National Hockey League Los Angeles, CA 90021 Imad: 0601B1Qgc06C010933 Trn: 3534992152Es | $100,000.00 |
| 06/10 | 06/10 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Trustee National Football League Los Angeles, CA US Imad: 0610B1Qgc08C004668 Trn: 3148472161Es | 500,000.00 |
| 06/10 | 06/10 Domestic Wire Transfer Via: Cal Bk & Trust/121002042 A/C: Bhp Holding Partner Ltd Dba Beverlyref: Account Full Name: Bhp Holding Partner Ltd Dba Beverly Hills Porsche Ref: Taycan 4s Imad: 0610B1Qgc08C022294 Trn: 3328792161Es | 75,000.00 |
| 06/20 | 06/20 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Rebecca R. Taylor Beverly Hills CA 90210 US Imad: 0620B1Qgc03C000730 Trn: 3112572165Es | 150,000.00 |
| 06/20 | 06/20 Online Domestic Wire Transfer Via: City Ntl Bank/122016066 A/C: Trustee National Hockey League Los Angeles, CA 90021 Imad: 0620B1Qgc08C004668 Trn: 3148472171Es | 200,000.00 |
| 06/22 | 06/22 Online Domestic Wire Transfer Via: Capital One N.A. /056073502 A/C: Trustee Major League Soccer Los Angeles, CA US Ref: 1601 Imad: 0622B1Qgc08C007087 | 500,000.00 |
| 06/27 | 06/27 Online Domestic Wire Transfer Via: City Natl Bank/122016066 A/C: Trustee National Hockey League Los Angeles, CA 90021 Imad: 0627B1Qgc06C012033 Trn: 3534992174Es | 250,000.00 |

**Total Electronic Withdrawals**                                                                     **$1,775,000.00**

**EXHIBIT "GG"**

**DECLARATION**
**Case No. : 823CV00257DOCJDEX**

Melissa Gonzalez, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is14800 Frye Road, Fort Worth, Texas 76155.

3. I am a Transactions Specialist III and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as the "Bank") in the National Subpoena Processing Department located in Fort Worth, Texas.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from, information transmitted by a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Dated: 06/07/2023

By: Melissa Gonzalez

    Melissa Gonzalez
    Transactions Specialist III
    JPMORGAN CHASE BANK, N.A.

SB1450694-F1

SUBP91a



JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

January 06, 2022 through January 31, 2022
Account Number:   **000000792382308**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-242-7338** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00359627 DRE 703 219 03222 NNNNNNNNNNN  1 000000000 64 0000
KING FAMILY LENDING LLC
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660



## CHECKING SUMMARY   Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $0.00 |
| Deposits and Additions | 5 | 619,940.00 |
| ATM & Debit Card Withdrawals | 5 | -18,582.80 |
| Electronic Withdrawals | 1 | -100.00 |
| Other Withdrawals | 3 | -598,000.00 |
| Ending Balance | 14 | $3,257.20 |

Your account ending in 5690 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/14 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0397424 Trn: 0917950014Fc | $194,980.00 |
| 01/18 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0676443 Trn: 1516880018Fc | 234,980.00 |
| 01/20 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13485920830 Info:  Iid: 20220120021000021P1Brjpm00050046114 Recd: 16:14:29 Trn: 9485920830Rx | 5,000.00 |
| 01/20 | Online Transfer From Chk ...3768 Transaction#: 13485929788 | 10,000.00 |
| 01/31 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0364723 Trn: 0838560031Fc | 174,980.00 |
| **Total Deposits and Additions** | | **$619,940.00** |

Page 1 of 4

**CHASE** ⬡

January 06, 2022 through January 31, 2022
Account Number:  **000000792382308**

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/20 | Card Purchase          01/20 Apple.Com/US 800-676-2775 CA Card 3216 | $2,970.97 |
| 01/21 | Card Purchase          01/21 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 01/21 | Card Purchase          01/20 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |
| 01/28 | Card Purchase With Pin  01/28 Neiman Marcus 01 Nei Beverly Hills CA Card 3216 | 832.20 |
| 01/31 | Card Purchase          01/28 Yves Saint Laurent # Beverly Hills CA Card 3216 | 6,427.65 |
| **Total ATM & Debit Card Withdrawals** | | **$18,582.80** |

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | | |
|---|---|---|
| | Total ATM Withdrawals & Debits | $0.00 |
| | Total Card Purchases | $18,582.80 |
| | Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | | |
|---|---|---|
| | Total ATM Withdrawals & Debits | $0.00 |
| | Total Card Purchases | $18,582.80 |
| | Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/14 | 01/14 Online Transfer To Mma ...5690 Transaction#: 13451426345 | $100.00 |
| **Total Electronic Withdrawals** | | **$100.00** |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/14 | 01/14 Withdrawal | $193,000.00 |
| 01/18 | 01/18 Withdrawal | 230,000.00 |
| 01/31 | 01/31 Withdrawal | 175,000.00 |
| **Total Other Withdrawals** | | **$598,000.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 01/14 | $1,880.00 |
| 01/18 | 6,860.00 |
| 01/20 | 18,889.03 |
| 01/21 | 10,537.05 |
| 01/28 | 9,704.85 |
| 01/31 | 3,257.20 |

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Maintenance Fee | $0.00 |
| Excess Product Fees | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |



January 06, 2022 through January 31, 2022
Account Number:  **000000792382308**



## SERVICE CHARGE SUMMARY  *(continued)*

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|---|---|
| Checks Paid / Debits | 8 |
| Deposits / Credits | 4 |
| Deposited Items | 0 |
| **Total Transactions** | **12** |

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| Your Product Includes: | | | | | |
| **ACCOUNT** 000000792382308 | | | | | |
| Waived Monthly Service Fee | 0 | | | $30.00 | $0.00 |
| Transactions | 12 | 0 | 12 | $0.00 | $0.00 |
| **Subtotal** | | | | | **$0.00** |
| **Other Fees** | | | | | |
| Electronic Credits | 4 | 999,999,999 | 0 | $0.40 | $0.00 |
| Non-Electronic Transactions | 8 | 250 | 0 | $0.40 | $0.00 |
| Domestic Incoming Wire Fee | 3 | 2 | 1 | $0.00 | $0.00 |
| ATM - Non Chase Inquiry | 1 | 0 | 1 | $2.50 | $0.00 |
| **Total Service Charge** | | | | | **$0.00** |
| **ACCOUNT** 000000792382308 | | | | | |
| Electronic Credits | 4 | | | | |
| Non-Electronic Transactions | 8 | | | | |
| Domestic Incoming Wire Fee | 3 | | | | |
| ATM - Non Chase Inquiry | 1 | | | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 3 of 4



This Page Intentionally Left Blank



CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

February 01, 2022 through February 28, 2022

Account Number:  **000000792382308**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-242-7338** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00033579 DRE 703 210 06222 NNNNNNNNNNN  1 000000000 D2 0000
KING FAMILY LENDING LLC
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660



### CHECKING SUMMARY   Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $3,257.20 |
| Deposits and Additions | 11 | 719,465.00 |
| ATM & Debit Card Withdrawals | 28 | -60,458.23 |
| Electronic Withdrawals | 6 | -70,200.00 |
| Other Withdrawals | 3 | -575,000.00 |
| Ending Balance | 48 | $17,063.97 |

Your account ending in 5690 is linked to this account for overdraft protection.

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/07 | Online Transfer From Chk ...3768 Transaction#: 13619419835 | $5,000.00 |
| 02/10 | Online Transfer From Chk ...3768 Transaction#: 13640658397 | 30,000.00 |
| 02/10 | Online Transfer From Chk ...3768 Transaction#: 13640187021 | 1,680.00 |
| 02/14 | Online Transfer From Chk ...3768 Transaction#: 13667883483 | 25,000.00 |
| 02/18 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Bbi=/Ocmt/USD550000,/ Ssn: 0407400 Trn: 0904250049Fc | 550,000.00 |
| 02/22 | Wire Reversal B/O: JPMC Cb Funds Transfer Previous Daytampa FL 33610-9128 US Org: Mbr/0959 Bank of America, N.A. Ref:/Bnf/Our Ref Jpm220221-006436 Chaserof0272850053Fc Rtn Dtd 02/14/202 2 Trn 3482182045Es As Bbk Sts Wron G Iban Loss Fees Trn: 5390800053Hh | 23,785.00 |
| 02/22 | Online Transfer From Chk ...8982 Transaction#: 13712602522 | 3,000.00 |
| 02/22 | Online Transfer From Chk ...8982 Transaction#: 13715485593 | 3,000.00 |
| 02/22 | Online Transfer From Chk ...3768 Transaction#: 13723984129 | 3,000.00 |
| 02/23 | Online Transfer From Chk ...3768 Transaction#: 13729701577 | 50,000.00 |
| 02/28 | Online Transfer From Chk ...3768 Transaction#: 13764690211 | 25,000.00 |
| **Total Deposits and Additions** | | **$719,465.00** |

Page 1 of 4

SB1450694-F1



February 01, 2022 through February 28, 2022
Account Number:    **000000792382308**

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/03 | Card Purchase         02/02 Evi* Pechanga Resort 702-8553000 CA Card 3216 | $2,150.00 |
| 02/08 | Card Purchase         02/07 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 5,375.00 |
| 02/11 | Card Purchase With Pin  02/11 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/11 | Card Purchase With Pin  02/11 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 3216 | 1,075.00 |
| 02/22 | Card Purchase With Pin  02/21 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/22 | Non-Chase ATM Withdraw  02/21 45000 Pechanga Pkwy Temecula CA Card 3216 | 304.95 |
| 02/22 | Card Purchase With Pin  02/22 7-Eleven West Hollywoo CA Card 3216 | 16.78 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 3216 | 1,075.00 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 3216 | 1,075.00 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/24 | Card Purchase         02/22 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 5,375.00 |
| 02/24 | Card Purchase         02/22 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 3,225.00 |
| 02/24 | Non-Chase ATM Withdraw  02/24 11154 Hwy 76 Pala CA Card 3216 | 504.00 |
| 02/25 | Card Purchase         02/23 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 5,375.00 |
| 02/25 | Card Purchase         02/24 Asai Pala Casino Resort Pala CA Card 3216 | 3,210.00 |
| 02/25 | Card Purchase         02/24 Asai Pala Casino Resort Pala CA Card 3216 | 3,210.00 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 3216 | 1,075.00 |
| 02/28 | Card Purchase         02/25 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 3,225.00 |
| **Total ATM & Debit Card Withdrawals** | | **$60,458.23** |

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

|  |  |  |
|--|--|--|
| | Total ATM Withdrawals & Debits | $808.95 |
| | Total Card Purchases | $59,649.28 |
| | Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

|  |  |  |
|--|--|--|
| | Total ATM Withdrawals & Debits | $808.95 |
| | Total Card Purchases | $59,649.28 |
| | Total Card Deposits & Credits | $0.00 |

Page 2 of 4

**CHASE** ⬡

February 01, 2022 through February 28, 2022
Account Number: **000000792382308**



## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/10 | 02/10 Online Transfer To Chk ...8982 Transaction#: 13640283950 | $2,000.00 |
| 02/14 | 02/14 International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Ldr International Limited Ref: Beneficiary: 66666 Ssn: 0495705 Trn: 3482182045Es | 23,850.00 |
| 02/23 | 02/23 Online Transfer To Chk ...8982 Transaction#: 13733275099 | 5,000.00 |
| 02/23 | 02/23 Online Realtime Transfer To Total Checking  2372 Transaction#: 13733302288 Reference#: 9733302288Rx | 5,000.00 |
| 02/28 | 02/28 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0372063 Trn: 3314652059Es | 23,850.00 |
| 02/28 | 02/28 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0372059 Trn: 3314692059Es | 10,500.00 |
| **Total Electronic Withdrawals** | | **$70,200.00** |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/10 | 02/10 Withdrawal | $25,000.00 |
| 02/22 | 02/19 Withdrawal | 400,000.00 |
| 02/22 | 02/19 Withdrawal | 150,000.00 |
| **Total Other Withdrawals** | | **$575,000.00** |

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|------|--------|
| 02/03 | $1,107.20 | 02/11 | 37.20 | 02/23 | 54,837.97 |
| 02/07 | 6,107.20 | 02/14 | 1,187.20 | 02/24 | 45,733.97 |
| 02/08 | 732.20 | 02/18 | 551,187.20 | 02/25 | 29,638.97 |
| 02/10 | 5,412.20 | 02/22 | 22,362.97 | 02/28 | 17,063.97 |

## SERVICE CHARGE SUMMARY

| | | |
|---|---|---|
| Maintenance Fee | $0.00 | Waived by checking and relationship balances |
| Excess Product Fees | $0.00 | |
| Other Service Charges | $130.00 | |
| **Total Service Charges** | **$130.00** | Will be assessed on 3/3/22 |

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|------------------------------------------|------------------------|
| Checks Paid / Debits | 35 |
| Deposits / Credits | 1 |
| Deposited Items | 0 |
| **Total Transactions** | **36** |

**SB1450694-F1**

7



February 01, 2022 through February 28, 2022
Account Number:    000000792382308

## SERVICE CHARGE DETAIL

| DESCRIPTION<br>Your Product Includes: | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **ACCOUNT** 000000792382308 | | | | | |
| Waived Monthly Service Fee | 0 | | | $30.00 | $0.00 |
| Transactions | 36 | 0 | 36 | $0.00 | $0.00 |
| **Subtotal** | | | | | **$0.00** |
| **Other Fees** | | | | | |
| Electronic Credits | 1 | 999,999,999 | 0 | $0.40 | $0.00 |
| Non-Electronic Transactions | 35 | 250 | 0 | $0.40 | $0.00 |
| Domestic Incoming Wire Fee | 1 | 2 | 0 | $0.00 | $0.00 |
| Online US Dollar Intl Wire Fee | 2 | 0 | 2 | $40.00 | $80.00 |
| US Dollar Intl Wire Fee | 1 | 0 | 1 | $50.00 | $50.00 |
| ATM - Non Chase Withdrawal | 2 | 0 | 2 | $2.50 | $0.00 |
| **Total Service Charge (Will be assessed on 3/3/22)** | | | | | **$130.00** |
| **ACCOUNT** 000000792382308 | | | | | |
| Electronic Credits | 1 | | | | |
| Non-Electronic Transactions | 35 | | | | |
| Domestic Incoming Wire Fee | 1 | | | | |
| Online US Dollar Intl Wire Fee | 2 | | | | |
| US Dollar Intl Wire Fee | 1 | | | | |
| ATM - Non Chase Withdrawal | 2 | | | | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 4 of 4



**CHASE**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

March 01, 2022 through March 31, 2022
Account Number:   **000000792382308**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-242-7338** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00032651 DRE 703 210 09522 NNNNNNNNNNN  1 000000000 D2 0000
KING FAMILY LENDING LLC
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660-5975



## On June 12, 2022, fees for non-Chase ATM transactions are changing

We're making the following fee changes and, depending on the type of account you have with us, you may be affected:

- **Non-Chase ATM transactions fee\* (Domestic Withdrawal, Domestic & International Balance Inquiry, Domestic & International Balance Transfers)**: This fee will increase from S2.50 to $3.00, but you can still avoid it by using Chase ATMs. The International Withdrawal Fee for ATMs outside the U.S., Puerto Rico and the U.S. Virgin Islands remains $5.00 per withdrawal. We'll continue to waive these fees for customers receiving Chase Military Banking benefits on their Chase Business Complete Checking[SM] accounts.

Please note: We'll continue to waive these fees for Chase Performance Business Checking® and Chase Platinum Business Checking[SM] accounts.

For more information about banking fees, please read the Additional Banking Services and Fees for Business Accounts Deposit Account Agreement, which you can find at **chase.com/business-deposit-disclosures**, or visit a branch.

If you have any questions, please call the number on this statement. We accept operator relay calls.

*\* Fees from the ATM owner/networks may still apply.*

| CHECKING SUMMARY | Chase Performance Business Checking | |
|---|---|---|
| | **INSTANCES** | **AMOUNT** |
| **Beginning Balance** | | **$17,063.97** |
| Deposits and Additions | 30 | 886,067.00 |
| ATM & Debit Card Withdrawals | 59 | -260,006.79 |
| Electronic Withdrawals | 45 | -553,432.00 |
| Other Withdrawals | 5 | -51,888.88 |
| Fees | 1 | -130.00 |
| **Ending Balance** | **140** | **$37,673.30** |

Your account ending in 5690 is linked to this account for overdraft protection.

Page 1 of 8



March 01, 2022 through March 31, 2022
Account Number: **000000792382308**

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/01 | Online Transfer From Chk ...3768 Transaction#: 13780269597 | $5,000.00 |
| 03/03 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch02085150006666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0387469 Trn: 0905370062Fc | 249,980.00 |
| 03/03 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13797027902 Info: Iid: 20220303021000021P1Brjpm00050021749 Recd: 10:51:27 Tm: 9797027902Rx | 250.00 |
| 03/03 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13797144408 Info: Iid: 20220303021000021P1Brjpm00040030591 Recd: 11:04:55 Tm: 9797144408Rx | 200.00 |
| 03/03 | Online Transfer From Mma ...5690 Transaction#: 13794313270 | 5,000.00 |
| 03/03 | Online Transfer From Chk ...8982 Transaction#: 13794663783 | 2,000.00 |
| 03/03 | Online Transfer From Mma ...5690 Transaction#: 13794922776 | 600.00 |
| 03/09 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13844052854 Info: Iid: 20220309021000021P1Brjpm00570044610 Recd: 15:07:58 Tm: 9844052854Rx | 3,000.00 |
| 03/09 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13844238867 Info: Iid: 20220309021000021P1Brjpm00560037493 Recd: 15:36:19 Tm: 9844238867Rx | 3,000.00 |
| 03/09 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13841329220 Info: Iid: 20220309021000021P1Brjpm00560015144 Recd: 08:43:30 Tm: 9841329220Rx | 2,000.00 |
| 03/09 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13844700106 Info: Iid: 20220309021000021P1Brjpm00570053958 Recd: 16:47:09 Tm: 9844700106Rx | 2,000.00 |
| 03/09 | Online Transfer From Chk ...8982 Transaction#: 13841220173 | 300.00 |
| 03/09 | Online Transfer From Chk ...8982 Transaction#: 13844249846 | 177.00 |
| 03/11 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13862875633 Info: Iid: 20220311021000021P1Brjpm00570064184 Recd: 19:30:20 Tm: 9862875633Rx | 4,000.00 |
| 03/14 | Fedwire Credit Via: Wells Fargo Bank, N.A./121000248 B/O: Yuri R Spiro Beverly Hills, CA 90210-4507 Ref: Chase Nyc/Ctr/Bnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-000000007923 Rfb=000064507352 9812 Obi=Repayment of Loan Info Bbi =/Chgs/USD0,00/ Imad: 0314I1B7031R015148 Trn: 0695580073Fl | 25,000.00 |
| 03/14 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13881388953 Info: Iid: 20220314021000021P1Brjpm00570065064 Recd: 20:01:53 Tm: 9881388953Rx | 5,000.00 |
| 03/14 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13873427827 Info: Iid: 20220313021000021P1Brjpm00040044404 Recd: 17:01:32 Tm: 9873427827Rx | 2,500.00 |
| 03/14 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13874077171 Info: Iid: 20220313021000021P1Brjpm00580048424 Recd: 19:00:12 Tm: 9874077171Rx | 2,000.00 |
| 03/15 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch02085150006666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0422804 Trn: 0980520074Fc | 349,980.00 |
| 03/15 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13883692723 Info: Iid: 20220315021000021P1Brjpm00040010514 Recd: 07:28:03 Tm: 9883692723Rx | 5,000.00 |
| 03/15 | Online Transfer From Chk ...8982 Transaction#: 13883153495 | 900.00 |
| 03/22 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13934714649 Info: Iid: 20220321021000021P1Brjpm00000072075 Recd: 23:49:24 Tm: 9934714649Rx | 5,000.00 |
| 03/23 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13945930528 Info: Iid: 20220323021000021P1Brjpm00060045492 Recd: 17:15:45 Tm: 9945930528Rx | 5,000.00 |
| 03/28 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch02085150006666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0362005 Trn: 0825020087Fc | 194,980.00 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13964918485 Info: Iid: 20220325021000021P1Brjpm00500088037 Recd: 23:27:01 Tm: 9964918485Rx | 5,000.00 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13965288027 Info: Iid: 20220326021000021P1Brjpm00510003337 Recd: 01:19:06 Tm: 9965288027Rx | 3,000.00 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13965420835 Info: Iid: 20220326021000021P1Brjpm00510001610 Recd: 02:39:38 Tm: 9965420835Rx | 2,500.00 |

Page 2 of 8



March 01, 2022 through March 31, 2022

Account Number: **000000792382308**

## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-13969973953 Info: Iid: 2022032602100021P1Brjpm00060070298 Recd: 19:53:27 Tm: 9969973953Rx | 500.00 |
| 03/28 | Online Transfer From Chk ...8982 Transaction#: 13964946908 | 1,400.00 |
| 03/31 | Online Transfer From Chk ...8982 Transaction#: 14002380011 | 800.00 |
| **Total Deposits and Additions** | | **$886,067.00** |



## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/01 | Card Purchase          02/28 Nordstrom #333 Newport Beach CA Card 3216 | $2,799.27 |
| 03/01 | Card Purchase With Pin  03/01 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 03/01 | Card Purchase With Pin  03/01 Evi*Pechanga Res Temecula CA Card 3216 | 537.50 |
| 03/02 | Card Purchase          03/01 Evi* Pechanga Resort 702-8553000 CA Card 3216 | 3,225.00 |
| 03/02 | Card Purchase With Pin  03/01 Evi*Pechanga Res Temecula CA Card 3216 | 2,687.50 |
| 03/03 | Non-Chase ATM Withdraw  03/03 3730 Las Vegas Blvd S Las Vegas NV Card 3216 | 308.99 |
| 03/03 | Non-Chase ATM Withdraw  03/03 3730 Las Vegas Blvd S Las Vegas NV Card 3216 | 108.99 |
| 03/03 | Non-Chase ATM Withdraw  03/03 3730 Las Vegas Blvd S Las Vegas NV Card 3216 | 68.99 |
| 03/04 | Card Purchase          03/02 Evi* Aria Resort And 702-8553000 NV Card 3216 | 3,145.99 |
| 03/04 | Card Purchase          03/03 Evi* Aria Resort And 702-8553000 NV Card 3216 | 3,145.99 |
| 03/04 | Card Purchase          03/03 Evi* Aria Resort And 702-8553000 NV Card 3216 | 10,400.00 |
| 03/04 | Card Purchase          03/03 Evi* Aria Resort And 702-8553000 NV Card 3216 | 10,400.00 |
| 03/07 | Card Purchase          03/03 Parkreceipts.Com -V 866-366-8391 TX Card 3216 | 43.35 |
| 03/07 | Non-Chase ATM Withdraw  03/07 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | 506.99 |
| 03/08 | Card Purchase          03/06 Evi* Aria Resort And 702-8553000 NV Card 3216 | 10,400.00 |
| 03/08 | Card Purchase          03/07 Evi* Aria Resort And 702-8553000 NV Card 3216 | 10,400.00 |
| 03/08 | Card Purchase          03/07 Evi* Aria Resort And 702-8553000 NV Card 3216 | 10,400.00 |
| 03/09 | Card Purchase          03/07 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |
| 03/09 | Card Purchase          03/07 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |
| 03/09 | Card Purchase          03/07 Evi* Aria Resort And 702-8553000 NV Card 3216 | 3,145.99 |
| 03/09 | Card Purchase          03/08 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 1,065.99 |
| 03/09 | Non-Chase ATM Withdraw  03/09 3730 Las Vegas Blvd S Las Vegas NV Card 3216 | 108.99 |
| 03/09 | Non-Chase ATM Withdraw  03/09 3730 Las Vegas Blvd S Las Vegas NV Card 3216 | 308.99 |
| 03/10 | Card Purchase          03/09 Aria - Front Desk Las Vegas NV Card 3216 | 1,145.04 |
| 03/10 | Card Purchase          03/09 Evi* Aria Resort And 702-8553000 NV Card 3216 | 1,286.99 |
| 03/10 | Card Purchase          03/09 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |
| 03/14 | Card Purchase          03/12 City of Santa Monica Santa Monica CA Card 3216 | 5.00 |
| 03/14 | Card Purchase          03/12 Restoration Hardware Ontario CA Card 3216 | 1,852.20 |
| 03/14 | Card Purchase          03/13 Instacart*1549 Httpsinstacar CA Card 3216 | 502.09 |
| 03/14 | Card Purchase          03/14 Doordash*Pavilions Www.Doordash. CA Card 3216 | 58.13 |
| 03/14 | Card Purchase          03/13 Intermix-Beverly Hil Beverly Hills CA Card 3216 | 3,336.48 |
| 03/14 | Card Purchase          03/14 Doordash*Kurosh PERS Www.Doordash. CA Card 3216 | 121.61 |
| 03/15 | Card Purchase          03/13 IN N Out Burger 055 Los Angeles CA Card 3216 | 9.53 |
| 03/16 | Card Purchase          03/16 Lyft   *Ride Mon 7Pm Lyft.Com CA Card 3216 | 54.19 |
| 03/16 | Card Purchase          03/14 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/16 | Card Purchase          03/15 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 4,170.99 |
| 03/16 | Card Purchase          03/15 Chanel #23 Las Vegas NV Card 3216 | 10,404.01 |
| 03/16 | Non-Chase ATM Withdraw  03/16 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | 506.99 |
| 03/17 | Card Purchase          03/15 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/17 | Card Purchase          03/15 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 10,400.00 |
| 03/17 | Card Purchase          03/16 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 10,400.00 |
| 03/17 | Card Purchase          03/16 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |

Page 3 of 8

**CHASE** ⬡

March 01, 2022 through March 31, 2022
Account Number: **000000792382308**

## ATM & DEBIT CARD WITHDRAWALS | *(continued)*

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 03/17 | Card Purchase | 03/16 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 15,600.00 |
| 03/18 | Card Purchase | 03/17 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 9,360.00 |
| 03/21 | Non-Chase ATM Withdraw 03/21 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 03/22 | Card Purchase | 03/21 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 8,320.00 |
| 03/22 | Card Purchase | 03/21 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 10,400.00 |
| 03/22 | Card Purchase | 03/21 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/23 | Card Purchase | 03/22 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 9,360.00 |
| 03/23 | Card Purchase | 03/22 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/23 | Card Purchase | 03/22 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/23 | Card Purchase | 03/22 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 5,205.99 |
| 03/25 | Card Purchase | 03/25 Doordash*Bluestone L Www.Doordash. CA Card 3216 | 29.76 |
| 03/28 | Card Purchase | 03/26 Doordash*Bluestone L Www.Doordash. CA Card 3216 | 30.76 |
| 03/28 | Card Purchase | 03/26 Doordash*Magnolia Ba Www.Doordash. CA Card 3216 | 16.13 |
| 03/28 | Non-Chase ATM Withdraw 03/25 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 306.99 |
| 03/30 | Card Purchase | 03/28 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 20,800.00 |
| 03/30 | Card Purchase | 03/29 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 20,800.00 |
| 03/30 | Non-Chase ATM Withdraw 03/30 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| **Total ATM & Debit Card Withdrawals** | | | **$260,006.79** |

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | | |
|---|---|---|
| | Total ATM Withdrawals & Debits | $3,239.90 |
| | Total Card Purchases | $256,766.89 |
| | Total Card Deposits & Credits | $0.00 |
| ATM & Debit Card Totals | | |
| | Total ATM Withdrawals & Debits | $3,239.90 |
| | Total Card Purchases | $256,766.89 |
| | Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/01 | Orig CO Name:Premeirbusinessc     Orig ID:9000327993 Desc Date:030122 CO Entry Descr:Web Pmts  Sec:Web   Trace#:111924682774898 Eed:220301  Ind ID:Yp9P99 Ind Name:King Family Lending Ll | $3,990.00 |
| 03/01 | 03/01 Online Transfer To Chk ...8982 Transaction#: 13779600109 | 5,000.00 |
| 03/03 | Zelle Payment To Sara Jpm9999Er3Fd | 2,000.00 |
| 03/03 | Zelle Payment To Sara Jpm9999Eviv2 | 120.00 |
| 03/03 | Zelle Payment To Sara Jpm9999Exsmw | 250.00 |
| 03/03 | 03/03 Online Transfer To Chk ...8982 Transaction#: 13798071487 | 50,000.00 |
| 03/04 | 03/04 Online Transfer To Chk ...3768 Transaction#: 13810161211 | 100,000.00 |
| 03/04 | 03/04 Online Realtime Transfer To Total Checking  2372 Transaction#: 13810360185 Reference#: 9810360185Rx | 15,000.00 |
| 03/08 | 03/07 Online Transfer To Chk ...8982 Transaction#: 13833058155 | 5,000.00 |
| 03/08 | 03/08 Online Transfer To Chk ...8982 Transaction#: 13833538637 | 2,000.00 |
| 03/08 | 03/08 Online Transfer To Chk ...8982 Transaction#: 13837516707 | 2,000.00 |
| 03/09 | 03/09 Online Transfer To Chk ...8982 Transaction#: 13844058985 | 3,000.00 |
| 03/09 | 03/09 Online Transfer To Chk ...8982 Transaction#: 13844071264 | 300.00 |
| 03/09 | 03/09 Online Transfer To Chk ...8982 Transaction#: 13844706335 | 2,000.00 |
| 03/11 | Zelle Payment To Mon Amour Jpm9999Pd517 | 1,000.00 |



March 01, 2022 through March 31, 2022
Account Number:  **000000792382308**

## ELECTRONIC WITHDRAWALS *(continued)*



| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/11 | Zelle Payment To P Parik 13862940496 | 1,000.00 |
| 03/14 | 03/14 Online Realtime Transfer To Total Checking  2372 Transaction#: 13879778182 Reference#: 9879778182Rx | 10,000.00 |
| 03/14 | 03/14 Online Transfer To Chk ...8982 Transaction#: 13881735150 | 5,000.00 |
| 03/15 | 03/15 Online Transfer To Chk ...8982 Transaction#: 13882684360 | 1,000.00 |
| 03/15 | 03/15 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0237822 Trn: 3022922074Es | 9,750.00 |
| 03/15 | 03/15 Online Transfer To Chk ...8982 Transaction#: 13884254410 | 1,400.00 |
| 03/15 | 03/15 Online Transfer To Chk ...8982 Transaction#: 13888153589 | 10,000.00 |
| 03/16 | 03/16 Online Transfer To Chk ...8982 Transaction#: 13891900239 | 5,000.00 |
| 03/16 | 03/16 Online Transfer 13891901211 To Total Checking #####2372 Transaction #: 13891901211 | 5,000.00 |
| 03/16 | 03/16 Online Transfer To Chk ...8982 Transaction#: 13891998799 | 50,000.00 |
| 03/16 | 03/16 Online Realtime Transfer To Total Checking  2372 Transaction#: 13896449705 Reference#: 9896449705Rx | 10,000.00 |
| 03/16 | 03/16 Online Realtime Transfer To Total Checking  2372 Transaction#: 13896463331 Reference#: 9896463331Rx | 10,000.00 |
| 03/18 | 03/17 Online Realtime Transfer To Total Checking  2372 Transaction#: 13906227676 Reference#: 9906227676Rx | 25,000.00 |
| 03/21 | 03/21 Online Transfer To Chk ...8982 Transaction#: 13930366748 | 5,000.00 |
| 03/21 | 03/21 Online Transfer To Chk ...8982 Transaction#: 13931998152 | 15,000.00 |
| 03/22 | 03/21 Online Transfer To Chk ...8982 Transaction#: 13934718493 | 5,000.00 |
| 03/22 | 03/22 Online Transfer To Chk ...8982 Transaction#: 13935036072 | 25,000.00 |
| 03/23 | 03/23 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0207719 Trn: 3046832082Es | 24,000.00 |
| 03/24 | 03/24 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0252789 Trn: 3109732083Es | 14,100.00 |
| 03/28 | 03/25 Online Transfer To Chk ...8982 Transaction#: 13964968504 | 8,000.00 |
| 03/28 | 03/25 Online Transfer To Chk ...8982 Transaction#: 13964979469 | 500.00 |
| 03/28 | 03/26 Online Realtime Transfer To Total Checking  2372 Transaction#: 13965424002 Reference#: 9965424002Rx | 3,500.00 |
| 03/28 | Zelle Payment To Sara Jpm999A5V9Z0 | 2,000.00 |
| 03/28 | Zelle Payment To Sara Jpm999A5Vvkv | 22.00 |
| 03/28 | Zelle Payment To Sara Jpm999A6Otg2 | 500.00 |
| 03/28 | 03/28 Online Transfer To Chk ...8982 Transaction#: 13978739719 | 75,000.00 |
| 03/29 | 03/29 Online Realtime Transfer To Total Checking  2372 Transaction#: 13986582854 Reference#: 9986582854Rx | 8,000.00 |
| 03/29 | 03/29 Online Realtime Transfer To Total Checking  2372 Transaction#: 13986738662 Reference#: 9986738662Rx | 20,000.00 |
| 03/30 | 03/30 Online Realtime Transfer To Total Checking  2372 Transaction#: 13992208222 Reference#: 9992208222Rx | 10,000.00 |
| 03/31 | 03/31 Online Realtime Transfer To Total Checking  2372 Transaction#: 14003726232 Reference#: 9003726232Rx | 3,000.00 |
| **Total Electronic Withdrawals** | | **$553,432.00** |

**SB1450694-F1**

13

**CHASE**

March 01, 2022 through March 31, 2022
Account Number:  **000000792382308**

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/07 | 03/07 Withdrawal | $8,888.88 |
| 03/08 | 03/08 Withdrawal | 3,000.00 |
| 03/15 | 03/15 Withdrawal | 20,000.00 |
| 03/21 | 03/19 Withdrawal | 5,000.00 |
| 03/22 | 03/22 Withdrawal | 15,000.00 |
| **Total Other Withdrawals** | | **$51,888.88** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 03/03 | Service Charges For The Month of February | $130.00 |
| **Total Fees** | | **$130.00** |

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|------|--------|
| 03/01 | $7,049.70 | 03/11 | 2,126.07 | 03/23 | 16,605.93 |
| 03/02 | 1,137.20 | 03/14 | 15,750.56 | 03/24 | 2,505.93 |
| 03/03 | 206,180.23 | 03/15 | 329,471.03 | 03/25 | 2,476.17 |
| 03/04 | 64,088.25 | 03/16 | 229,128.86 | 03/28 | 119,980.29 |
| 03/07 | 54,649.03 | 03/17 | 184,376.88 | 03/29 | 91,980.29 |
| 03/08 | 11,449.03 | 03/18 | 150,016.88 | 03/30 | 39,873.30 |
| 03/09 | 5,704.09 | 03/21 | 124,509.89 | 03/31 | 37,673.30 |
| 03/10 | 126.07 | 03/22 | 60,583.90 | | |

## SERVICE CHARGE SUMMARY

| | | |
|------|------|------|
| Maintenance Fee | $0.00 | Waived by checking and relationship balances |
| Excess Product Fees | $0.00 | |
| Other Service Charges | $120.00 | |
| **Total Service Charges** | **$120.00** | Will be assessed on 4/5/22 |

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|------------------------------------------|------------------------|
| Checks Paid / Debits | 79 |
| Deposits / Credits | 21 |
| Deposited Items | 0 |
| **Total Transactions** | **100** |



March 01, 2022 through March 31, 2022
Account Number: **000000792382308**

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| Your Product Includes: | | | | | |
| **ACCOUNT** 000000792382308 | | | | | |
| Waived Monthly Service Fee | 0 | | | $30.00 | $0.00 |
| Transactions | 100 | 0 | 100 | $0.00 | $0.00 |
| **Subtotal** | | | | | **$0.00** |
| **Other Fees** | | | | | |
| Electronic Credits | 21 | 999,999,999 | 0 | $0.40 | $0.00 |
| Non-Electronic Transactions | 79 | 250 | 0 | $0.40 | $0.00 |
| Domestic Incoming Wire Fee | 4 | 2 | 2 | $0.00 | $0.00 |
| Online US Dollar Intl Wire Fee | 3 | 0 | 3 | $40.00 | $120.00 |
| ATM - Non Chase Withdrawal | 10 | 0 | 10 | $2.50 | $0.00 |
| **Total Service Charge (Will be assessed on 4/5/22)** | | | | | **$120.00** |
| **ACCOUNT** 000000792382308 | | | | | |
| Electronic Credits | 21 | | | | |
| Non-Electronic Transactions | 79 | | | | |
| Domestic Incoming Wire Fee | 4 | | | | |
| Online US Dollar Intl Wire Fee | 3 | | | | |
| ATM - Non Chase Withdrawal | 10 | | | | |



**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC



 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 7 of 8



March 01, 2022 through March 31, 2022
Account Number:    **000000792382308**

This Page Intentionally Left Blank

Page 8 of 8



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

April 01, 2022 through April 29, 2022

Account Number: **000000792382308**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-242-7338** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00034279 DRE 703 210 12422 NNNNNNNNNNN  1 000000000 D2 0000
KING FAMILY LENDING LLC
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660-5975



---

## CHECKING SUMMARY

Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$37,673.30** |
| Deposits and Additions | 30 | 1,049,893.33 |
| ATM & Debit Card Withdrawals | 40 | -354,258.20 |
| Electronic Withdrawals | 55 | -697,955.31 |
| Other Withdrawals | 2 | -20,400.00 |
| Fees | 1 | -120.00 |
| **Ending Balance** | **128** | **$14,833.12** |

Your account ending in 5690 is linked to this account for overdraft protection.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/01 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0358822 Trn: 0864430091Fc | $149,980.00 |
| 04/04 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14039163233 Info: Iid: 20220404021000021P1Brjpm00520053412 Recd: 15:14:55 Trn: 9039163233Rx | 500.00 |
| 04/04 | Online Transfer From Mma ...5690 Transaction#: 14037055002 | 2,347.00 |
| 04/05 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0151031 Trn: 0353980095Fc | 94,980.00 |
| 04/06 | Online Transfer From Chk ...3768 Transaction#: 14054955645 | 8,000.00 |
| 04/07 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14060901477 Info: Iid: 20220407021000021P1Brjpm00000026084 Recd: 13:04:39 Trn: 9060901477Rx | 70.00 |
| 04/07 | Online Transfer From Chk ...8982 Transaction#: 14060893788 | 23.00 |
| 04/07 | Online Transfer From Mma ...5690 Transaction#: 14060907003 | 0.33 |
| 04/08 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch0208515000666662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0373916 Trn: 0863990098Fc | 64,980.00 |

**SB1450694-F1**

17



April 01, 2022 through April 29, 2022
Account Number:   **000000792382308**

## DEPOSITS AND ADDITIONS  *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/08 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14074008456 Info:  Iid: 20220408021000021P1Brjpm00000074261 Recd: 20:51:28 Tm: 9074008456Rx | 4,000.00 |
| 04/11 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0343286 Trn: 0794560101Fc | 249,980.00 |
| 04/11 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14078566948 Info:  Iid: 20220409021000021P1Brjpm00020035892 Recd: 15:17:38 Tm: 9078566948Rx | 2,500.00 |
| 04/11 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14078562728 Info:  Iid: 20220409021000021P1Brjpm00020035768 Recd: 15:16:52 Tm: 9078562728Rx | 1,500.00 |
| 04/14 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14107748063 Info:  Iid: 20220414021000021P1Brjpm00020007758 Recd: 00:28:10 Tm: 9107748063Rx | 5,000.00 |
| 04/15 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14115734686 Info:  Iid: 20220415021000021P1Brjpm00020000463 Recd: 00:29:36 Tm: 9115734686Rx | 5,000.00 |
| 04/15 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14116369317 Info:  Iid: 20220415021000021P1Brjpm00510006276 Recd: 04:00:44 Tm: 9116369317Rx | 1,000.00 |
| 04/15 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14124745920 Info:  Iid: 20220415021000021P1Brjpm00500053541 Recd: 17:53:50 Tm: 9124745920Rx | 500.00 |
| 04/15 | Online Transfer From Chk ...3768 Transaction#: 14116119747 | 93.00 |
| 04/18 | Zelle Payment From John Mccabe Wfct0Qd86Lsb | 2,000.00 |
| 04/18 | Zelle Payment From John Mccabe 14136937367 | 1,600.00 |
| 04/18 | Zelle Payment From John Mccabe 14132608595 | 1,500.00 |
| 04/18 | Zelle Payment From John Mccabe 14131686447 | 500.00 |
| 04/18 | Zelle Payment From John Mccabe 14136813355 | 400.00 |
| 04/19 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0350198 Trn: 0825920109Fc | 134,980.00 |
| 04/19 | Real Time Transfer Recd From Aba/021000021 From: Sara J King Ref: Mms-14151678980 Info:  Iid: 20220419021000021P1Brjpm00500065458 Recd: 19:48:38 Tm: 9151678980Rx | 5,000.00 |
| 04/19 | Online Transfer From Chk ...3768 Transaction#: 14151519273 | 17,000.00 |
| 04/19 | Online Transfer From Chk ...8982 Transaction#: 14152382726 | 17,000.00 |
| 04/19 | Online Transfer From Chk ...3768 Transaction#: 14152654995 | 7,500.00 |
| 04/26 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0389379 Trn: 0898120116Fc | 71,980.00 |
| 04/27 | Chips Credit Via: Bank of America, N.A./0959 B/O: Reiss Laurent Mc--Montecarlo Ref: Nbnf=King Family Lending LLC Newport Beach CA 92660-5975 US/Ac-0000000 07923 Org=/Ch020851500066662001 Mc --Montecarlo Ogb=Bank Julius Baer A ND CO.Ltd., Zuric Zurich Switzerlan D 8001 Ch Obi=20.00 Fee Deducted BB I=/Chgs/USD20 Ssn: 0475315 Trn: 1094720117Fc | 199,980.00 |
| **Total Deposits and Additions** | | **$1,049,893.33** |

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 04/01 | Card Purchase | 03/30 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | $22,880.00 |
| 04/01 | Card Purchase | 03/30 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 14,560.00 |
| 04/04 | Card Purchase | 04/01 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/04 | Card Purchase | 04/02 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 20,800.00 |
| 04/04 | Card Purchase | 04/02 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,145.99 |
| 04/04 | Non-Chase ATM Withdraw  04/04 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |

Page 2 of 8



April 01, 2022 through April 29, 2022
Account Number:   **000000792382308**



## ATM & DEBIT CARD WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|--|-------:|
| 04/05 | Card Purchase | 04/04 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 2,104.99 |
| 04/06 | Card Purchase | 04/05 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/07 | Card Purchase | 04/06 Door To Door Valet Cle 310-3589422 CA Card 3216 | 745.45 |
| 04/07 | Card Purchase | 04/06 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 7,800.00 |
| 04/07 | Non-Chase ATM Withdraw  04/07 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 86.99 |
| 04/07 | Non-Chase ATM Withdraw  04/07 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 86.99 |
| 04/08 | Non-Chase ATM Withdraw  04/08 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/11 | Card Purchase | 04/08 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/11 | Card Purchase | 04/08 Door To Door Valet Cle 310-3589422 CA Card 3216 | 393.97 |
| 04/11 | Card Purchase | 04/08 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,670.99 |
| 04/11 | Non-Chase ATM Withdraw  04/08 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 206.99 |
| 04/11 | Non-Chase ATM Withdraw  04/08 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 106.99 |
| 04/11 | Card Purchase | 04/09 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,970.99 |
| 04/11 | Non-Chase ATM Withdraw  04/10 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 106.99 |
| 04/11 | Non-Chase ATM Withdraw  04/11 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/12 | Card Purchase | 04/11 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 22,880.00 |
| 04/13 | Card Purchase | 04/11 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 22,880.00 |
| 04/14 | Card Purchase | 04/13 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/15 | Non-Chase ATM Withdraw  04/15 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/18 | Non-Chase ATM Withdraw  04/15 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/18 | Card Purchase | 04/16 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 1,586.99 |
| 04/18 | Non-Chase ATM Withdraw  04/18 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 106.99 |
| 04/19 | Card Purchase | 04/17 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 1,904.99 |
| 04/20 | Card Purchase | 04/19 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 10,400.00 |
| 04/21 | Card Purchase | 04/19 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/22 | Card Purchase | 04/21 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 15,600.00 |
| 04/25 | Card Purchase | 04/22 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 2,945.99 |
| 04/25 | Card Purchase | 04/23 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 2,945.99 |
| 04/25 | Non-Chase ATM Withdraw  04/24 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/26 | Non-Chase ATM Withdraw  04/26 3131 Las Vegas Blvd So Las Vegas NV Card 3216 | | 506.99 |
| 04/27 | Card Purchase | 04/26 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 23,920.00 |
| 04/29 | Card Purchase | 04/27 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 20,800.00 |
| 04/29 | Card Purchase | 04/27 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 20,800.00 |
| 04/29 | Card Purchase | 04/28 Evi* Wynn Las Vegas 702-8553000 NV Card 3216 | 3,670.99 |
| **Total ATM & Debit Card Withdrawals** | | | **$354,258.20** |

## ATM & DEBIT CARD SUMMARY

Sara King  Card 3216

| | |
|---|---:|
| Total ATM Withdrawals & Debits | $4,250.87 |
| Total Card Purchases | $350,007.33 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---:|
| Total ATM Withdrawals & Debits | $4,250.87 |
| Total Card Purchases | $350,007.33 |
| Total Card Deposits & Credits | $0.00 |

Page 3 of 8



April 01, 2022 through April 29, 2022
Account Number: **000000792382308**

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/01 | 04/01 Online Realtime Transfer To Total Checking  2372 Transaction#: 14013143894 Reference#: 9013143894Rx | $25,000.00 |
| 04/01 | 04/01 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0401B1Qgc06C015467 Trn: 3684512091Es | 50,000.00 |
| 04/01 | 04/01 Online Transfer To Chk ...8982 Transaction#: 14017135632 | 20,000.00 |
| 04/04 | Zelle Payment To Sara Jpm999Af9Tty | 5,000.00 |
| 04/04 | 04/04 Online Transfer To Mma ...5690 Transaction#: 14035122122 | 2,347.31 |
| 04/04 | Zelle Payment To Sara Jpm999Ahx9Zg | 230.00 |
| 04/05 | 04/05 Online Realtime Transfer To Total Checking  2372 Transaction#: 14044648402 Reference#: 9044648402Rx | 5,000.00 |
| 04/05 | Zelle Payment To Sara Jpm999Aiqpdp | 5,000.00 |
| 04/05 | 04/05 Online Transfer To Chk ...8982 Transaction#: 14044682088 | 2,000.00 |
| 04/05 | 04/05 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0405B1Qgc05C007589 Trn: 3326452095Es | 25,000.00 |
| 04/05 | 04/05 Online Realtime Transfer To Total Checking  2372 Transaction#: 14046265615 Reference#: 9046265615Rx | 20,000.00 |
| 04/05 | 04/05 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0405B1Qgc08C018784 Trn: 3532722095Es | 5,000.00 |
| 04/05 | 04/05 Online Transfer To Chk ...3768 Transaction#: 14048488980 | 8,000.00 |
| 04/07 | Zelle Payment To Sara Jpm999Akt7He | 300.00 |
| 04/07 | 04/07 Online Realtime Transfer To Total Checking  2372 Transaction#: 14063485639 Reference#: 9063485639Rx | 15.00 |
| 04/08 | 04/08 Online Realtime Transfer To Total Checking  2372 Transaction#: 14069010180 Reference#: 9069010180Rx | 5,000.00 |
| 04/08 | Zelle Payment To P Parik 14070229907 | 2,000.00 |
| 04/08 | 04/08 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank Julius Baer And CO. Ag Zurich, Zurich 8001 Switzerland Ben: Laurent Reiss Tortola Ch Ref: Funding Investments Ssn: 0443250 Trn: 3377532098Es | 10,500.00 |
| 04/08 | 04/08 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0408B1Qgc03C009189 Trn: 3378802098Es | 15,000.00 |
| 04/08 | Zelle Payment To Sara Jpm999An0Ua6 | 3,000.00 |
| 04/08 | 04/08 Online Realtime Transfer To Total Checking  2372 Transaction#: 14072699922 Reference#: 9072699922Rx | 3,000.00 |
| 04/08 | 04/08 Online Realtime Transfer To Total Checking  2372 Transaction#: 14073895228 Reference#: 9073895228Rx | 1,600.00 |
| 04/11 | 04/11 Online Realtime Transfer To Total Checking  2372 Transaction#: 14088744841 Reference#: 9088744841Rx | 10,000.00 |
| 04/11 | 04/11 Online Transfer To Chk ...8982 Transaction#: 14088751777 | 10,000.00 |
| 04/11 | 04/11 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0411B1Qgc01C010954 Trn: 3471752101Es | 25,000.00 |
| 04/11 | 04/11 Online Realtime Transfer To Total Checking  2372 Transaction#: 14092750007 Reference#: 9092750007Rx | 15,000.00 |
| 04/12 | 04/12 Online Transfer 14094279976 To Total Checking ####2372 Transaction #: 14094279976 | 10,000.00 |
| 04/12 | 04/12 Online Transfer To Chk ...8982 Transaction#: 14094282729 | 5,000.00 |
| 04/12 | 04/12 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0412B1Qgc08C001567 Trn: 3109082102Es | 50,000.00 |
| 04/13 | 04/13 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0413B1Qgc07C009151 Trn: 3277972103Es | 25,000.00 |
| 04/14 | Zelle Payment To Sara Jpm999Asy3Kd | 5,000.00 |
| 04/14 | 04/14 Online Transfer To Chk ...8982 Transaction#: 14107752553 | 5,000.00 |
| 04/14 | 04/14 Online Transfer To Chk ...3768 Transaction#: 14107755609 | 4,793.00 |
| 04/15 | Zelle Payment To Sara Jpm999Au4O69 | 4,470.00 |
| 04/15 | 04/15 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0415B1Qgc03C005981 Trn: 3292382105Es | 1,000.00 |

Page 4 of 8



April 01, 2022 through April 29, 2022
Account Number:  **000000792382308**



## ELECTRONIC WITHDRAWALS (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/18 | 04/17 Online Realtime Transfer To Total Checking  2372 Transaction#: 14133765809 Reference#: 9133765809Rx | 500.00 |
| 04/18 | 04/17 Online Realtime Transfer To Total Checking  2372 Transaction#: 14133772673 Reference#: 9133772673Rx | 2,000.00 |
| 04/19 | 04/19 Online Realtime Transfer To Total Checking  2372 Transaction#: 14148489638 Reference#: 9148489638Rx | 25,000.00 |
| 04/19 | 04/19 Online Transfer To Chk ...3768 Transaction#: 14148496612 | 30,000.00 |
| 04/19 | 04/19 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0419B1Qgc03C008298 Trn: 3237112109Es | 25,000.00 |
| 04/19 | 04/19 Online Transfer To Chk ...8982 Transaction#: 14149558397 | 17,000.00 |
| 04/19 | 04/19 Online Realtime Transfer To Total Checking  2372 Transaction#: 14151545952 Reference#: 9151545952Rx | 20,000.00 |
| 04/22 | 04/22 Online Realtime Transfer To Total Checking  2372 Transaction#: 14173055747 Reference#: 9173055747Rx | 1,400.00 |
| 04/25 | 04/24 Online Realtime Transfer To Total Checking  2372 Transaction#: 14183740277 Reference#: 9183740277Rx | 3,500.00 |
| 04/25 | 04/24 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0425B1Qgc06C000285 Trn: 3345912112Es | 1,300.00 |
| 04/25 | 04/25 Online Realtime Transfer To Total Checking  2372 Transaction#: 14188573404 Reference#: 9188573404Rx | 1,000.00 |
| 04/26 | 04/26 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0426B1Qgc04C005460 Trn: 3224442116Es | 25,000.00 |
| 04/26 | 04/26 Online Realtime Transfer To Total Checking  2372 Transaction#: 14198429156 Reference#: 9198429156Rx | 22,000.00 |
| 04/27 | 04/27 Online Realtime Transfer To Total Checking  2372 Transaction#: 14205840749 Reference#: 9205840749Rx | 25,000.00 |
| 04/27 | 04/27 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0427B1Qgc06C009559 Trn: 3379822117Es | 25,000.00 |
| 04/27 | 04/27 Online Transfer To Chk ...3768 Transaction#: 14208685279 | 5,000.00 |
| 04/28 | 04/28 Online Realtime Transfer To Total Checking  2372 Transaction#: 14212465481 Reference#: 9212465481Rx | 25,000.00 |
| 04/28 | 04/28 Online Transfer To Chk ...8982 Transaction#: 14212875131 | 25,000.00 |
| 04/28 | 04/28 Online Realtime Transfer To Total Checking  2372 Transaction#: 14212926317 Reference#: 9212926317Rx | 11,000.00 |
| 04/28 | 04/28 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0428B1Qgc08C020134 Trn: 3265532118Es | 25,000.00 |
| **Total Electronic Withdrawals** | | **$697,955.31** |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/11 | 04/11 Withdrawal | $20,000.00 |
| 04/27 | 04/27 Withdrawal | 400.00 |
| **Total Other Withdrawals** | | **$20,400.00** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 04/05 | Service Charges For The Month of March | $120.00 |
| **Total Fees** | | **$120.00** |

The monthly service fee of $30.00 was waived this period because you maintained a relationship balance (combined business deposits) of $35,000.00 or more.

**SB1450694-F1**

21

**CHASE** ⬙

April 01, 2022 through April 29, 2022
Account Number:   **000000792382308**

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|------|--------|
| 04/01 | $55,213.30 | 04/12 | 81,593.02 | 04/21 | 30,170.07 |
| 04/04 | 2,110.01 | 04/13 | 33,713.02 | 04/22 | 13,170.07 |
| 04/05 | 24,865.02 | 04/14 | 0.02 | 04/25 | 971.10 |
| 04/06 | 8,945.02 | 04/15 | 616.03 | 04/26 | 25,444.11 |
| 04/07 | 3.92 | 04/18 | 1,915.06 | 04/27 | 146,104.11 |
| 04/08 | 28,376.93 | 04/19 | 64,490.07 | 04/28 | 60,104.11 |
| 04/11 | 169,473.02 | 04/20 | 54,090.07 | 04/29 | 14,833.12 |

## SERVICE CHARGE SUMMARY

| | | |
|---|---|---|
| Maintenance Fee | $0.00 | Waived by checking and relationship balances |
| Excess Product Fees | $0.00 | |
| Other Service Charges | $315.00 | |
| **Total Service Charges** | **$315.00** | Will be assessed on 5/4/22 |

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|---|---|
| Checks Paid / Debits | 77 |
| Deposits / Credits | 17 |
| Deposited Items | 0 |
| **Total Transactions** | **94** |

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| Your Product includes: | | | | | |
| **ACCOUNT** 000000792382308 | | | | | |
| Waived Monthly Service Fee | 0 | | | $30.00 | $0.00 |
| Transactions | 94 | 0 | 94 | $0.00 | $0.00 |
| **Subtotal** | | | | | **$0.00** |
| **Other Fees** | | | | | |
| Electronic Credits | 17 | 999,999,999 | 0 | $0.40 | $0.00 |
| Non-Electronic Transactions | 77 | 250 | 0 | $0.40 | $0.00 |
| Online Domestic Wire Fee | 13 | 2 | 11 | $25.00 | $275.00 |
| Domestic Incoming Wire Fee | 7 | 0 | 7 | $0.00 | $0.00 |
| Online US Dollar Intl Wire Fee | 1 | 0 | 1 | $40.00 | $40.00 |
| ATM - Non Chase Withdrawal | 13 | 0 | 13 | $2.50 | $0.00 |
| **Total Service Charge (Will be assessed on 5/4/22)** | | | | | **$315.00** |
| **ACCOUNT** 000000792382308 | | | | | |
| Electronic Credits | 17 | | | | |
| Non-Electronic Transactions | 77 | | | | |
| Online Domestic Wire Fee | 13 | | | | |
| Domestic Incoming Wire Fee | 7 | | | | |
| Online US Dollar Intl Wire Fee | 1 | | | | |
| ATM - Non Chase Withdrawal | 13 | | | | |

Page 6 of 8



April 01, 2022 through April 29, 2022
Account Number:     **000000792382308**



**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 7 of 8



This Page Intentionally Left Blank

# EXHIBIT "HH"

**DECLARATION**
**Case No. : 823cv00257DOCJDEx**

David M Henson, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is 7610 West Washington Street, Indianapolis, Indiana 46231.

3. I am a Transactions Specialist IV and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as the "Bank") in the National Subpoena Processing Department located in Indianapolis, Indiana.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from, information transmitted by a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Dated: _August 22, 2023_____

By: _____
    David M Henson
    Transactions Specialist IV
    JPMORGAN CHASE BANK, N.A.

SB1478499-F1                                                                                      SUBP91a

**Table Of Contents :**
**SB1478499-F1**

**Account Number : 00000000000815402372**
  Statement and/or items                                                    1



**CHASE ◻**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

December 22, 2021 through January 10, 2022
Account Number: **000000815402372**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00490360 DRE 703 219 01122 NNNNNNNNNNN   1 000000000 06 0000
SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660



---

### CHECKING SUMMARY | Chase Total Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$0.00** |
| Deposits and Additions | 7,913.74 |
| ATM & Debit Card Withdrawals | -4,423.93 |
| Electronic Withdrawals | -3,019.59 |
| **Ending Balance** | **$470.22** |

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | **Beginning Balance** | | **$0.00** |
| 12/22 | Zelle Payment From Kamran Abbasvahid Bacmzvnjetpb | **10.00** | 10.00 |
| 12/23 | Deposit       1994273324 | **700.00** | 710.00 |
| 12/23 | Zelle Payment To Maire Berger Jpm916954749 | -500.00 | 210.00 |
| 12/24 | Zelle Payment From Edward Bilezikchian 13309230372 | **1,500.00** | 1,710.00 |
| 12/27 | ATM Cash Deposit       12/27 1470 Jamboree Rd Newport Beach CA Card 0934 | **997.00** | 2,707.00 |
| 12/27 | ATM Withdrawal       12/25 1470 Jamboree Rd Newport Beach CA Card 0934 | -200.00 | 2,507.00 |
| 12/28 | Card Purchase       12/28 Doordash*Lotus Bistr Www.Doordash. CA Card 0934 | -26.84 | 2,480.16 |
| 12/28 | Card Purchase       12/27 Chevron 0202016 Newport Beach CA Card 0934 | -45.74 | 2,434.42 |
| 12/28 | Zelle Payment To Maire Berger Jpm924597096 | -1,000.00 | 1,434.42 |
| 12/29 | Zelle Payment From Edward Bilezikchian 13334128128 | **1,500.00** | 2,934.42 |
| 12/29 | Card Purchase       12/29 Doordash*Mint Leaf T Www.Doordash. CA Card 0934 | -44.59 | 2,889.83 |
| 12/29 | Card Purchase       12/29 Doordash*Newport Win Www.Doordash. CA Card 0934 | -102.78 | 2,787.05 |
| 12/29 | Att       Payment   266391001Smt2H  Web ID: 9864031005 | -259.59 | 2,527.46 |
| 12/29 | Zelle Payment To Mom Jpm925930197 | -200.00 | 2,327.46 |
| 12/30 | Square Inc       * Cash App T200434175530   CCD ID: 8800429876 | **800.00** | 3,127.46 |
| 12/30 | Card Purchase       12/30 Afterpay 185-52896014 CA Card 0934 | -47.15 | 3,080.31 |
| 12/30 | Card Purchase       12/30 Doordash*Lotus Bistr Www.Doordash. CA Card 0934 | -36.38 | 3,043.93 |

Page 1 of 4

---

**SB1478499-F1**

**CHASE** ◆

December 22, 2021 through January 10, 2022

Account Number: **000000815402372**

## TRANSACTION DETAIL  *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 12/30 | Card Purchase Card 0934 | 12/30 Doordash*Bacio Di LA Www.Doordash. CA | -19.96 | 3,023.97 |
| 12/30 | Roar Digital      Betmgm | 084003995467350 Web ID: 9044048977 | -10.00 | 3,013.97 |
| 12/31 | Card Purchase Card 0934 | 12/31 Doordash*Newport Win Www.Doordash. CA | -100.78 | 2,913.19 |
| 12/31 | Card Purchase Card 0934 | 12/31 Doordash*Mags Donuts Www.Doordash. CA | -28.04 | 2,885.15 |
| 12/31 | Card Purchase Card 0934 | 12/31 Doordash*Zinque (Zin Www.Doordash. CA | -45.09 | 2,840.06 |
| 12/31 | Zelle Payment To Mom Jpm930978813 | | -1,000.00 | 1,840.06 |
| 12/31 | Card Purchase With Pin  12/31 Crown Ace Hardware Newport Beach CA Card 0934 | | -141.23 | 1,698.83 |
| 01/03 | ATM Cash Deposit      01/03 1470 Jamboree Rd Newport Beach CA Card 0934 | | **80.00** | 1,778.83 |
| 01/03 | Payment Sent | 01/01 Apple Cash 877-233-8552 CA Card 0934 | -50.00 | 1,728.83 |
| 01/03 | Card Purchase Card 0934 | 01/01 Doordash*Hen House G Www.Doordash. CA | -59.17 | 1,669.66 |
| 01/03 | Card Purchase Card 0934 | 01/01 Doordash*Handels Hom Www.Doordash. CA | -39.87 | 1,629.79 |
| 01/03 | Card Purchase | 01/01 Ralphs Via Instacart Ralphs.Com CA Card 0934 | -283.08 | 1,346.71 |
| 01/03 | Card Purchase | 01/02 Instacart Httpsinstacar CA Card 0934 | -39.66 | 1,307.05 |
| 01/03 | Card Purchase With Pin  01/01 Ulta #620 Newport Beach CA Card 0934 | | -40.40 | 1,266.65 |
| 01/03 | Card Purchase With Pin  01/01 Neiman Marcus 01 Nei Newport Beach CA Card 0934 | | -274.75 | 991.90 |
| 01/03 | Card Purchase | 01/02 Instacart*1102 Httpsinstacar CA Card 0934 | -50.44 | 941.46 |
| 01/03 | Card Purchase 0934 | 01/02 Etsy.Com - Psychicdraw 718-8557955 NY Card | -6.41 | 935.05 |
| 01/03 | Card Purchase Card 0934 | 01/02 Etsy.Com - Scorpiomoon 718-8557955 NY | -7.19 | 927.86 |
| 01/03 | Card Purchase 0934 | 01/02 Doordash*Red O Www.Doordash. CA Card | -15.78 | 912.08 |
| 01/03 | Card Purchase Card 0934 | 01/02 Doordash*Mama Ds Ita Www.Doordash. CA | -28.20 | 883.88 |
| 01/03 | ATM Withdrawal      01/02 1470 Jamboree Rd Newport Beach CA Card 0934 | | -600.00 | 283.88 |
| 01/04 | Zelle Payment From Kamran Abbasvahid Bacj9Yhfkngz | | **200.00** | 483.88 |
| 01/04 | Card Purchase Card 0934 | 01/04 Amzn Mktp US*8D62E3P Amzn.Com/Bill WA | -104.88 | 379.00 |
| 01/04 | Card Purchase 0934 | 01/03 Chevron 0093042 Newport Beach CA Card | -57.26 | 321.74 |
| 01/04 | Card Purchase Card 0934 | 01/04 Doordash*Newport Win Www.Doordash. CA | -32.43 | 289.31 |
| 01/04 | Card Purchase With Pin  01/04 Ulta #620 Newport Beach CA Card 0934 | | -13.44 | 275.87 |
| 01/05 | Zelle Payment From Heidi King Wfct0D9Lp32V | | **1,200.00** | 1,475.87 |
| 01/05 | Zelle Payment From Ashley King Wfct0D9L397J | | **500.00** | 1,975.87 |
| 01/05 | Card Purchase 0934 | 01/05 Tst* Billy S At The Newport Beach CA Card | -80.96 | 1,894.91 |
| 01/05 | Card Purchase | 01/05 Alo-Yoga 132-32487531 CA Card 0934 | -51.72 | 1,843.19 |
| 01/05 | Card Purchase Card 0934 | 01/05 Doordash*Newport Win Www.Doordash. CA | -51.14 | 1,792.05 |
| 01/06 | Card Purchase Card 0934 | 01/05 Amzn Mktp US*Ax52R38 Amzn.Com/Bill WA | -18.74 | 1,773.31 |
| 01/06 | Card Purchase 0934 | 01/05 Chevron 0093042 Newport Beach CA Card | -27.89 | 1,745.42 |
| 01/06 | Card Purchase 0934 | 01/05 Pet Oasis - Newport Newport Beach CA Card | -56.37 | 1,689.05 |

Page 2 of 4

**CHASE** ◯

December 22, 2021 through January 10, 2022
Account Number:   **000000815402372**



## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 01/06 | Card Purchase 0934 | 01/06 Doordash*Lotus Bistr Www.Doordash. CA Card | -66.48 | 1,622.57 |
| 01/06 | Card Purchase 0934 | 01/05 Exxonmobil   976160 Corona Del MA CA Card | -52.62 | 1,569.95 |
| 01/06 | Card Purchase Card 0934 | 01/06 Doordash*Newport Win Www.Doordash. CA | -98.28 | 1,471.67 |
| 01/06 | Card Purchase 0934 | 01/06 Etsy.Com - Juliescalli 718-8557955 NY Card | -10.50 | 1,461.17 |
| 01/06 | Card Purchase 0934 | 01/06 Etsy.Com - Psychioderr 718-8557955 NY Card | -3.56 | 1,457.61 |
| 01/06 | Card Purchase 0934 | 01/06 Etsy.Com - Phoenixinsi 718-8557955 NY Card | -8.08 | 1,449.53 |
| 01/06 | Card Purchase 0934 | 01/06 Etsy.Com - Quasaranais 718-8557955 NY Card | -4.94 | 1,444.59 |
| 01/06 | Card Purchase 0934 | 01/06 Etsy.Com - Tuztarot 718-8557955 NY Card | -5.72 | 1,438.87 |
| 01/06 | Card Purchase With Pin | 01/06 Chevron/Terrible Her Newport Beach CA Card 0934 | -24.29 | 1,414.58 |
| 01/07 | Card Purchase 0934 | 01/06 Enterprise Rent-A-CA Newport Beach CA Card | -423.26 | 991.32 |
| 01/07 | Card Purchase 0934 | 01/06 City of Newport Beac Newport Beach CA Card | -1.90 | 989.42 |
| 01/07 | Card Purchase Card 0934 | 01/07 Doordash*Flemings PR Www.Doordash. CA | -80.88 | 908.54 |
| 01/07 | Card Purchase 0934 | 01/06 Laz Parking 140291 Newport Beach CA Card | -12.00 | 896.54 |
| 01/07 | Card Purchase Card 0934 | 01/07 Doordash*Mags Donuts Www.Doordash. CA | -44.44 | 852.10 |
| 01/07 | Card Purchase Card 0934 | 01/07 Doordash*Pavilions Www.Doordash. CA Card | -31.27 | 820.83 |
| 01/10 | Card Purchase Return 0934 | 01/08 Enterprise Rent-A-CA Newport Beach CA | **176.74** | 997.57 |
| 01/10 | Zelle Payment From Kamran Abbasvahid Bacjmex5Ezf3 | | **250.00** | 1,247.57 |
| 01/10 | Card Purchase | 01/08 Lyft   Ride Thu 3Pm 8558659553 CA Card 0934 | -9.97 | 1,237.60 |
| 01/10 | Card Purchase Card 0934 | 01/08 Doordash*Newport Win Www.Doordash. CA | -100.78 | 1,136.82 |
| 01/10 | Card Purchase | 01/08 Instacart Httpsinstacar CA Card 0934 | -42.59 | 1,094.23 |
| 01/10 | Card Purchase | 01/08 IL Farro Newport Beach CA Card 0934 | -116.90 | 977.33 |
| 01/10 | Card Purchase 0934 | 01/08 Sq *Handel's Newport Newport Beach CA Card | -18.59 | 958.74 |
| 01/10 | Card Purchase With Pin | 01/08 Nordstrom #333 901 N Newport Beach CA Card 0934 | -66.81 | 891.93 |
| 01/10 | Card Purchase 0934 | 01/09 Doordash*Pavilions Www.Doordash. CA Card | -20.20 | 871.73 |
| 01/10 | Card Purchase | 01/09 Coinbase, Inc. 8325639309 De Card 0934 | -50.00 | 821.73 |
| 01/10 | Card Purchase With Pin | 01/09 Chevron/Terrible Her Newport Beach CA Card 0934 | -48.58 | 773.15 |
| 01/10 | Card Purchase Card 0934 | 01/10 Doordash*Darbari Per Www.Doordash. CA | -86.02 | 687.13 |
| 01/10 | Card Purchase 0934 | 01/10 Newlife Vitamin Shop Www.Newlifevi OR Card | -113.04 | 574.09 |
| 01/10 | Coinbase.Com   Xc8Wmhz6   Xc8Wmhz6Acbb   Web ID: 1455293997 | | -50.00 | 524.09 |
| 01/10 | Card Purchase With Pin  01/10 Ulta #620 Newport Beach CA Card 0934 | | -53.87 | 470.22 |
| | **Ending Balance** | | | **$470.22** |



Page 3 of 4



December 22, 2021 through January 10, 2022

Account Number:   **000000815402372**

A Monthly Service Fee was **not** charged to your Chase Total Checking account.  Here are the three ways you can avoid this fee during any statement period.

- **Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network.**
  (Your total electronic deposits this period were $800.00. Note: some deposits may be listed on your previous statement)

- **OR,** keep a balance at the beginning of each day of **$1,500.00 or more in this account.**
  (Your balance at the beginning of each day was $10.00)

- **OR,** keep an **average beginning day balance of $5,000.00 or more in qualifying linked deposits and investments.**
  (Your average beginning day balance of qualifying linked deposits and investments was $1,366.22)

---

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

---

Page 4 of 4

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing an ATM transaction.  The image you requested is not available.**

**Posting Date: 03-Jan-22**

**Sequence Number: 007090435015**

**Dollar Amount: 80.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: G21Aug23-1104**

**This is a substitute document representing an Electronic Transaction. The image you requested is not available. (examples include: Online Payments, Phone Funds Transfer Deposit, Credit Due to ATM/Dep Error, Wire Transfer)**

**Posting Date 03-Jan-22**

**Sequence Number 007090435016**

**Amount 80.00**

**Account Number: 2372**



JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

January 11, 2022 through February 08, 2022
Account Number:  **000000815402372**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00491801 DRE 703 219 04022 NNNNNNNNNNN  1 000000000 06 0000
SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660



## CHECKING SUMMARY   Chase Total Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$470.22** |
| Deposits and Additions | 306,331.52 |
| Checks Paid | -3,646.50 |
| ATM & Debit Card Withdrawals | -31,266.85 |
| Electronic Withdrawals | -105,669.59 |
| Other Withdrawals | -154,000.00 |
| Fees | -125.00 |
| **Ending Balance** | **$12,093.80** |

## CHECKS PAID

| CHECK NUMBER | DATE PAID | AMOUNT |
|---|---|---|
| 6400  ^ | 01/18 | $3,646.50 |
| **Total Checks Paid** | | **$3,646.50** |

If you see a check description in the Transaction Detail section, it means your check has already been converted for electronic payment. Because of this, we're not able to return the check to you or show you an image on Chase.com.
^ An image of this check may be available for you to view on Chase.com.

## TRANSACTION DETAIL

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|---|---|---|---|---|
| | **Beginning Balance** | | | **$470.22** |
| 01/11 | Card Purchase | 01/09 Stogz Los Angeles CA Card 0934 | -50.57 | 419.65 |
| 01/11 | Card Purchase Card 0934 | 01/11 Doordash*Newport Win Www.Doordash. CA | -78.58 | 341.07 |
| 01/11 | Gemini Trust CO  ACH Txfer  C7004518 | Web ID: 1475153145 | -100.00 | 241.07 |
| 01/11 | Gemini Trust CO  ACH Txfer  C7004527 | Web ID: 1475153145 | -100.00 | 141.07 |
| 01/11 | Gemini Trust CO  ACH Txfer  C7016205 | Web ID: 1475153145 | -25.00 | 116.07 |
| 01/12 | Card Purchase | 01/11 Pdfiller, Inc 855-7501663 MA Card 0934 | -0.89 | 115.18 |
| 01/12 | Card Purchase | 01/11 Pdfsimpli 844-898-4076 San Juan Card 0934 | -1.45 | 113.73 |
| 01/12 | Card Purchase With Pin  01/12 Ralphs #0 2555 East Newport Beach CA Card 0934 | | -36.55 | 77.18 |

Page 1 of 8



January 11, 2022 through February 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL (continued)

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 01/13 | Payment Received       01/14 Cash App*Cash Out Visa Direct CA Card 0934 | **1,970.00** | 2,047.18 |
| 01/13 | Etsy Inc        Deposit            PPD ID: 3204898921 | **0.01** | 2,047.19 |
| 01/13 | Card Purchase        01/12 Onlinevinlookupcom 855-2170787 CA Card 0934 | -23.95 | 2,023.24 |
| 01/13 | Card Purchase        01/12 Crown Ace Hardware Newport Beach CA Card 0934 | -12.00 | 2,011.24 |
| 01/13 | Chime3_Debit      P2P          Sara King      Web ID: 2330165200 | -25.00 | 1,986.24 |
| 01/13 | Card Purchase        01/13 Afterpay 185-52896014 CA Card 0934 | -47.15 | 1,939.09 |
| 01/14 | Deposit       1994285723 | **70,000.00** | 71,939.09 |
| 01/14 | Card Purchase        01/13 Amzn Mktp US*Hd3Lw9T Amzn.Com/Bill WA Card 0934 | -18.93 | 71,920.16 |
| 01/14 | Coinbase Inc.     8889087930 Yervmvcd      Web ID: 1327000623 | -100.00 | 71,820.16 |
| 01/14 | Coinbase Inc.     8889087930 Bn9Bglcx      Web ID: 1327000623 | -50.00 | 71,770.16 |
| 01/14 | Coinbase Inc.     8889087930 V5Cplsgh      Web ID: 1327000623 | -50.00 | 71,720.16 |
| 01/14 | Coinbase Inc.     8889087930 Zmkpltu7      Web ID: 1327000623 | -50.00 | 71,670.16 |
| 01/14 | Coinbase Inc.     8889087930 X8Dtmfez      Web ID: 1327000623 | -50.00 | 71,620.16 |
| 01/14 | Zelle Payment To Orelief LLC Accounts Jpm955650788 | -2,000.00 | 69,620.16 |
| 01/18 | Card Purchase Return   01/16 Amzn Mktp US Amzn.Com/Bill WA Card 0934 | 10.76 | 69,630.92 |
| 01/18 | Card Purchase Return   01/14 Pdfiller, Inc 855-7501663 MA Card 0934 | 0.89 | 69,631.81 |
| 01/18 | Deposit       1994285727 | **230,000.00** | 299,631.81 |
| 01/18 | Payment Sent        01/13 Coinbase Https://Www.F CA Card 0934 | -100.00 | 299,531.81 |
| 01/18 | Card Purchase        01/14 Chevron 0093042 Newport Beach CA Card 0934 | -6.00 | 299,525.81 |
| 01/18 | Card Purchase        01/14 Loan Post Dba Lendingwi Miami FL Card 0934 | -447.00 | 299,078.81 |
| 01/18 | Card Purchase        01/14 Alo-Yoga 132-32487531 CA Card 0934 | -491.36 | 298,587.45 |
| 01/18 | Card Purchase        01/15 Alo-Yoga 132-32487531 CA Card 0934 | -56.03 | 298,531.42 |
| 01/18 | Recurring Card Purchase 01/15 Onlinevinlookupcom Concord CA Card 0934 | -1.00 | 298,530.42 |
| 01/18 | Coinbase Inc.     8889087930 72Mcflzp      Web ID: 1327000623 | -1,000.00 | 297,530.42 |
| 01/18 | Coinbase Inc.     8889087930 Evuu3Fbq      Web ID: 1327000623 | -500.00 | 297,030.42 |
| 01/18 | Coinbase Inc.     8889087930 Hpt66Evu      Web ID: 1327000623 | -500.00 | 296,530.42 |
| 01/18 | Coinbase Inc.     8889087930 Jk28Aspr      Web ID: 1327000623 | -500.00 | 296,030.42 |
| 01/18 | Card Purchase        01/15 Amzn Mktp US*Gz30I9W Amzn.Com/Bill WA Card 0934 | -157.35 | 295,873.07 |
| 01/18 | Card Purchase With Pin  01/15 Chevron/Terrible Her Newport Beach CA Card 0934 | -72.62 | 295,800.45 |
| 01/18 | Card Purchase        01/15 Chevron 0093042 Newport Beach CA Card 0934 | -51.58 | 295,748.87 |
| 01/18 | Card Purchase        01/15 Doordash*Bristol Far Www.Doordash. CA Card 0934 | -111.86 | 295,637.01 |
| 01/18 | Card Purchase        01/15 Doordash*Day & Night Www.Doordash. CA Card 0934 | -347.91 | 295,289.10 |
| 01/18 | Card Purchase        01/15 City of Santa Monica Santa Monica CA Card 0934 | -7.50 | 295,281.60 |
| 01/18 | Card Purchase        01/15 Victoria Beckham Httpsvictoria NY Card 0934 | -80.00 | 295,201.60 |
| 01/18 | Card Purchase        01/15 City of Santa Monica Santa Monica CA Card 0934 | -2.00 | 295,199.60 |
| 01/18 | Card Purchase        01/15 City of Santa Monica Santa Monica CA Card 0934 | -5.50 | 295,194.10 |
| 01/18 | Card Purchase        01/17 Nordstrom Direct #080 800-285-5800 IA Card 0934 | -111.63 | 295,082.47 |
| 01/18 | Zelle Payment To Torah Jpm958432046 | -2,000.00 | 293,082.47 |

Page 2 of 8



January 11, 2022 through February 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 01/18 | Payment Sent      01/15 Cash App*Torah Vyas 8774174551 CA Card 0934 | -1,000.00 | 292,082.47 |
| 01/18 | Card Purchase With Pin  01/15 Ulta #620 Newport Beach CA Card 0934 | -79.44 | 292,003.03 |
| 01/18 | Card Purchase With Pin  01/16 Chevron/Terrible Her Newport Beach CA Card 0934 | -30.48 | 291,972.55 |
| 01/18 | Card Purchase      01/17 Doordash*Wine Lab Www.Doordash. CA Card 0934 | -170.11 | 291,802.44 |
| 01/18 | Card Purchase With Pin  01/16 Neiman Marcus 01 Nei Newport Beach CA Card 0934 | -581.84 | 291,220.60 |
| 01/18 | Zelle Payment To Mon Amour Jpm959712736 | -1,000.00 | 290,220.60 |
| 01/18 | Card Purchase      01/17 Something Navy 917-9698787 NY Card 0934 | -134.69 | 290,085.91 |
| 01/18 | Card Purchase      01/18 Lyft  Ride Sun 8Pm 8558659553 CA Card 0934 | -45.50 | 290,040.41 |
| 01/18 | Card Purchase With Pin  01/17 Planet Beauty Irvine Irvine CA Card 0934 | -491.02 | 289,549.39 |
| 01/18 | Card Purchase      01/18 Instacart Httpsinstacar CA Card 0934 | -95.70 | 289,453.69 |
| 01/18 | Card Purchase      01/18 Instacart*1102 Httpsinstacar CA Card 0934 | -196.81 | 289,256.88 |
| 01/18 | Check       # 6400 | -3,646.50 | 285,610.38 |
| 01/18 | Coinbase Inc.   8889087930 Pmzpejpu       Web ID: 1327000623 | -1,000.00 | 284,610.38 |
| 01/18 | Gemini Trust CO  ACH Txfer  C7075442       Web ID: 1475153145 | -100.00 | 284,510.38 |
| 01/18 | Gemini Trust CO  ACH Txfer  C7075160       Web ID: 1475153145 | -100.00 | 284,410.38 |
| 01/18 | Gemini Trust CO  ACH Txfer  C7075168       Web ID: 1475153145 | -50.00 | 284,360.38 |
| 01/18 | Gemini Trust CO  ACH Txfer  C7075173       Web ID: 1475153145 | -20.00 | 284,340.38 |
| 01/18 | Att       Payment   530330004Smt2Y  Web ID: 9864031005 | -259.59 | 284,080.79 |
| 01/18 | Zelle Payment To Seeeester Jpm962098083 | -1,500.00 | 282,580.79 |
| 01/18 | Payment Sent      01/18 Cash App*Cash Card 8774174551 CA Card 0934 | -53.88 | 282,526.91 |
| 01/18 | 01/18 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0118B1Qgc01C009570 Trn: 3576902018Es | -4,000.00 | 278,526.91 |
| 01/18 | Card Purchase With Pin  01/18 Chevron/Terrible Her Newport Beach CA Card 0934 | -27.89 | 278,499.02 |
| 01/18 | 01/18 Withdrawal | -75,000.00 | 203,499.02 |
| 01/18 | 01/18 Withdrawal | -60,000.00 | 143,499.02 |
| 01/18 | ATM Withdrawal      01/18 1470 Jamboree Rd Newport Beach CA Card 0934 | -1,000.00 | 142,499.02 |
| 01/18 | Online Domestic Wire Fee | -25.00 | 142,474.02 |
| 01/19 | Card Purchase      01/18 Pet Oasis - Newport Newport Beach CA Card 0934 | -133.02 | 142,341.00 |
| 01/19 | Card Purchase      01/18 Alo-Yoga 132-32487531 CA Card 0934 | -185.34 | 142,155.66 |
| 01/19 | Gemini Trust CO  ACH Txfer  C7126438       Web ID: 1475153145 | -1,000.00 | 141,155.66 |
| 01/19 | Card Purchase      01/19 Afterpay 185-52896014 CA Card 0934 | -119.34 | 141,036.32 |
| 01/19 | Card Purchase With Pin  01/19 10122 - Costa Mesa #10 Costa Mesa CA Card 0934 | -220.90 | 140,815.42 |
| 01/19 | Card Purchase With Pin  01/19 Chevron/Terrible Her Newport Beach CA Card 0934 | -40.66 | 140,774.76 |
| 01/19 | 01/19 Withdrawal | -9,000.00 | 131,774.76 |
| 01/20 | Payment Sent      01/19 Apple Cash 877-233-8552 CA Card 0934 | -100.00 | 131,674.76 |
| 01/20 | Card Purchase      01/18 Newport Hills Animal Newport Beach CA Card 0934 | -68.36 | 131,606.40 |
| 01/20 | Card Purchase      01/19 Starbucks Store 1980 Newport Beach CA Card 0934 | -4.45 | 131,601.95 |
| 01/20 | Card Purchase      01/20 Jetsuitex 800-435-9579 TX Card 0934 | -773.00 | 130,828.95 |
| 01/20 | Card Purchase      01/20 Spotify USA 877-7781161 NY Card 0934 | -9.99 | 130,818.96 |
| 01/20 | Zelle Payment To Sara Jpm965085299 | -1,500.00 | 129,318.96 |
| 01/20 | Zelle Payment To Sara Jpm965107040 | -500.00 | 128,818.96 |

Page 3 of 8





January 11, 2022 through February 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 01/20 | 01/20 Online Realtime Transfer To Perfbus Chk 2308 Transaction#: 13485920830 Reference#: 9485920830Rx | | -5,000.00 | 123,818.96 |
| 01/21 | Card Purchase Return 01/21 Jetsuitex 800-435-9579 TX Card 0934 | | **90.00** | 123,908.96 |
| 01/21 | Card Purchase 0934 | 01/19 Wynn Las Vegas Hotel Las Vegas NV Card | -416.33 | 123,492.63 |
| 01/21 | Card Purchase 0934 | 01/21 Lyft Ride Wed 8Pm 8558659553 CA Card | -52.63 | 123,440.00 |
| 01/21 | Card Purchase Card 0934 | 01/21 Instacart Httpsinstacar CA Card 0934 | -277.69 | 123,162.31 |
| 01/24 | Card Purchase Card 0934 | 01/21 Amzn Mktp US*El7Ey7Y Amzn.Com/Bill WA | -40.51 | 123,121.80 |
| 01/24 | Card Purchase Card 0934 | 01/21 Lawdepot +1877509439 Httpswww.Lawd CA | -35.00 | 123,086.80 |
| 01/24 | Card Purchase 0934 | 01/21 Ysi*Aka West Hollywood 610-3897828 PA Card | -41.20 | 123,045.60 |
| 01/24 | Card Purchase Card 0934 | 01/22 Amzn Mktp US*3J1H18A Amzn.Com/Bill WA | -169.48 | 122,876.12 |
| 01/24 | Card Purchase 0934 | 01/22 Realcheck Paystub Www.Realcheck FL Card | -26.97 | 122,849.15 |
| 01/24 | Card Purchase Card 0934 | 01/23 Amzn Mktp US*Gz0X29J Amzn.Com/Bill WA | -128.94 | 122,720.21 |
| 01/24 | Card Purchase With Pin 01/23 Containerstorecostames Costa Mesa CA Card 0934 | | -159.33 | 122,560.88 |
| 01/24 | Card Purchase With Pin 01/23 Petco 922 Costa Mesa CA Card 0934 | | -283.71 | 122,277.17 |
| 01/24 | Card Purchase 0934 | 01/24 Doordash*Handels Hom Www.Doordash. CA | -14.53 | 122,262.64 |
| 01/24 | Coinbase Inc. 8889087930 B2G2Dq8A Web ID: 1327000623 | | -2,500.00 | 119,762.64 |
| 01/24 | Coinbase Inc. 8889087930 Czn8Dwfv Web ID: 1327000623 | | -1,000.00 | 118,762.64 |
| 01/24 | Coinbase Inc. 8889087930 4Ln46Ln7 Web ID: 1327000623 | | -1,000.00 | 117,762.64 |
| 01/24 | 01/24 Online Domestic Wire Transfer Via: Capital One NA/065000090 A/C: Bprep8500 Sunset LLC Los Angeles CA 90069 US Ref: E304/Bnf/E304/Time/08:01 Imad: 0124B1Qgc07C003616 Trn: 3147072024Es | | -15,060.00 | 102,702.64 |
| 01/24 | Card Purchase With Pin 01/24 Chevron/Terrible Her Newport Beach CA Card 0934 | | -53.97 | 102,648.67 |
| 01/24 | Online Domestic Wire Fee | | -25.00 | 102,623.67 |
| 01/25 | Card Purchase 0934 | 01/24 Alo-Yoga 132-32487531 CA Card 0934 | -289.12 | 102,334.55 |
| 01/25 | Card Purchase 0934 | 01/24 City of Santa Monica Santa Monica CA Card | -1.25 | 102,333.30 |
| 01/25 | Card Purchase 0934 | 01/24 City of Santa Monica Santa Monica CA Card | -7.50 | 102,325.80 |
| 01/25 | Card Purchase 0934 | 01/24 Qbe Insurance 888-5602745 NY Card 0934 | -232.15 | 102,093.65 |
| 01/25 | Card Purchase 0934 | 01/25 Poshmark 650-488-7740 CA Card 0934 | -159.86 | 101,933.79 |
| 01/25 | Card Purchase 0934 | 01/25 Doordash*Dks Donuts Www.Doordash. CA | -40.95 | 101,892.84 |
| 01/25 | 01/25 Online Domestic Wire Transfer Via: Capital One NA/065000090 A/C: Bprep8500 Sunset LLC Los Angeles CA 90069 US Ref: E304/Bnf/E304/Time/08:02 Imad: 0125B1Qgc07C002830 Trn: 3048392025Es | | -7,530.00 | 94,362.84 |
| 01/25 | Zelle Payment To P Parik 13522399750 | | -2,000.00 | 92,362.84 |
| 01/25 | Online Domestic Wire Fee | | -25.00 | 92,337.84 |
| 01/26 | Zelle Payment From Zarahi Arroyo Wfct0Q7Qr3Zy | | **1,000.00** | 93,337.84 |
| 01/26 | Card Purchase 0934 | 01/24 Farmers Market Parking Los Angeles CA Card | -6.00 | 93,331.84 |
| 01/26 | Card Purchase 0934 | 01/25 Chevron 0093042 Newport Beach CA Card | -82.96 | 93,248.88 |

Page 4 of 8

**SB1478499-F1**



January 11, 2022 through February 08, 2022
Account Number: **000000815402372**



## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 01/26 | Card Purchase Card 0934 | 01/26 Doordash*Mint Leaf T Www.Doordash. CA | -56.64 | 93,192.24 |
| 01/26 | Card Purchase | 01/25 Restoration Hardware Irvine CA Card 0934 | -2,232.58 | 90,959.66 |
| 01/26 | Card Purchase | 01/26 Instacart Httpsinstacar CA Card 0934 | -229.00 | 90,730.66 |
| 01/26 | Card Purchase | 01/26 Instacart Httpsinstacar CA Card 0934 | -30.96 | 90,699.70 |
| 01/26 | Card Purchase | 01/26 Instacart Httpsinstacar CA Card 0934 | -85.25 | 90,614.45 |
| 01/26 | Card Purchase 0934 | 01/26 Doordash*Blue Bottle Www.Doordash. CA Card | -19.54 | 90,594.91 |
| 01/27 | Card Purchase | 01/26 Lyft  Ride Tue 9Am 8558659553 CA Card 0934 | -60.59 | 90,534.32 |
| 01/27 | Card Purchase | 01/26 Pdfsimpli 844-898-4076 San Juan Card 0934 | -39.95 | 90,494.37 |
| 01/27 | Card Purchase Card 0934 | 01/27 Amazon.Com*Ta0D29X73 Amzn.Com/Bill WA | -23.67 | 90,470.70 |
| 01/27 | Card Purchase | 01/27 Afterpay 185-52896014 CA Card 0934 | -47.15 | 90,423.55 |
| 01/27 | Card Purchase With Pin Card 0934 | 01/27 Dylan's Candy Bar - LA Los Angeles CA | -25.20 | 90,398.35 |
| 01/27 | Card Purchase With Pin Card 0934 | 01/27 Sheltams Farmers Markt Los Angeles CA | -85.37 | 90,312.98 |
| 01/27 | Card Purchase With Pin Card 0934 | 01/27 Containerstorelosangel Los Angeles CA | -32.84 | 90,280.14 |
| 01/28 | Card Purchase | 01/27 Alo-Yoga Httpsaloyoga. CA Card 0934 | -79.38 | 90,200.76 |
| 01/28 | Card Purchase | 01/27 Alo-Yoga 132-32487531 CA Card 0934 | -385.44 | 89,815.32 |
| 01/28 | Card Purchase 0934 | 01/27 Doordash*Sunset Stri Www.Doordash. CA Card | -248.90 | 89,566.42 |
| 01/28 | Card Purchase 0934 | 01/27 Tst* Norah Restauran West Hollywoo CA Card | -174.41 | 89,392.01 |
| 01/28 | 01/28 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Heidi King Rancho Santa Fe CA 92067 US Ref:/Time/14:46 Imad: 0128B1Qgc05C010050 Tm: 3450082028Es | | -10,000.00 | 79,392.01 |
| 01/28 | Zelle Payment To Sara Jpm980088582 | | -2,000.00 | 77,392.01 |
| 01/28 | Online Domestic Wire Fee | | -25.00 | 77,367.01 |
| 01/31 | Card Purchase 0934 | 01/28 State Farm  Insurance 800-956-6310 IL Card | -975.96 | 76,391.05 |
| 01/31 | Card Purchase 0934 | 01/27 Farmers Market Parking Los Angeles CA Card | -8.00 | 76,383.05 |
| 01/31 | Payment Sent 0934 | 01/28 Cash App*John Mccab 8774174551 CA Card | -2,500.00 | 73,883.05 |
| 01/31 | Card Purchase 0934 | 01/28 Neiman Marcus Rest 0 Beverly Hills CA Card | -68.18 | 73,814.87 |
| 01/31 | Zelle Payment To Mon Amour Jpm981986987 | | -2,000.00 | 71,814.87 |
| 01/31 | Card Purchase | 01/30 Instacart*1549 Httpsinstacar CA Card 0934 | -492.32 | 71,322.55 |
| 01/31 | Recurring Card Purchase 01/31 Adobe Acropro Trial 408-536-6000 CA Card 0934 | | -14.99 | 71,307.56 |
| 01/31 | Zelle Payment To Sara Jpm984400828 | | -1,500.00 | 69,807.56 |
| 01/31 | Card Purchase Card 0934 | 01/31 Amazon Prime*Os4Sl55 Amzn.Com/Bill WA | -2.14 | 69,805.42 |
| 01/31 | 01/31 Withdrawal | | -10,000.00 | 59,805.42 |
| 02/01 | Payment Sent | 01/31 Apple Cash 877-233-8552 CA Card 0934 | -50.00 | 59,755.42 |
| 02/01 | Card Purchase 0934 | 01/30 Pelican Hill Resort Newport Coast CA Card | -2,386.00 | 57,369.42 |
| 02/02 | Card Purchase 0934 | 01/31 Pelican Hill Resort Newport Coast CA Card | -165.85 | 57,203.57 |
| 02/02 | Card Purchase 0934 | 01/31 IN N Out Burger 037 Westminster CA Card | -7.88 | 57,195.69 |
| 02/02 | Recurring Card Purchase 02/01 Inyourstarsreading 844-6593879 NY Card 0934 | | -0.20 | 57,195.49 |

Page 5 of 8



January 11, 2022 through February 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 02/02 | Zelle Payment To Sara Jpm989205559 | | -2,000.00 | 55,195.49 |
| 02/02 | Card Purchase | 02/01 Apple Store R124 Los Angeles CA Card 0934 | -113.91 | 55,081.58 |
| 02/02 | Coinbase Inc. 8889087930 Kmnj7Mkd Web ID: 1327000623 | | -2,500.00 | 52,581.58 |
| 02/02 | Card Purchase With Pin 02/02 Evi*Pechanga Res Temecula CA Card 0934 | | -2,150.00 | 50,431.58 |
| 02/03 | Card Purchase Return 02/03 Poshmark 650-488-7740 CA Card 0934 | | 159.86 | 50,591.44 |
| 02/03 | Card Purchase Card 0934 | 02/02 Amzn Mktp US*Hb1R54K Amzn.Com/Bill WA | -121.26 | 50,470.18 |
| 02/03 | Card Purchase 0934 | 02/02 Starbucks Store 61621 Los Angeles CA Card | -3.95 | 50,466.23 |
| 02/03 | Card Purchase 0934 | 02/02 Chevron 0098744 West Hollywoo CA Card | -57.87 | 50,408.36 |
| 02/03 | Card Purchase Card 0934 | 02/03 Doordash*Westwood th Www.Doordash. CA | -76.01 | 50,332.35 |
| 02/03 | Card Purchase | 02/03 Afterpay 185-52896014 CA Card 0934 | -119.34 | 50,213.01 |
| 02/04 | Card Purchase Card 0934 | 02/03 Amzn Mktp US*Ig7X26M Amzn.Com/Bill WA | -221.37 | 49,991.64 |
| 02/04 | Card Purchase 0934 | 02/03 Dickssportinggoods.Com Coraopolis PA Card | -176.39 | 49,815.25 |
| 02/04 | Card Purchase Card 0934 | 02/03 Amzn Mktp US*Si3Gl2S Amzn.Com/Bill WA | -153.37 | 49,661.88 |
| 02/04 | Card Purchase Card 0934 | 02/03 Amzn Mktp US*2U8Uv7H Amzn.Com/Bill WA | -11.32 | 49,650.56 |
| 02/04 | Card Purchase Card 0934 | 02/04 Amzn Mktp US*9P1962Z Amzn.Com/Bill WA | -19.69 | 49,630.87 |
| 02/04 | Card Purchase 0934 | 02/03 Bensoleimani.Com 188-82164277 CA Card | -441.09 | 49,189.78 |
| 02/07 | ATM Cash Deposit 0934 | 02/07 1470 Jamboree Rd Newport Beach CA Card | 2,800.00 | 51,989.78 |
| 02/07 | Zelle Payment From Kamran Abbasvahid Bacxar0Xuom5 | | 300.00 | 52,289.78 |
| 02/07 | Card Purchase Card 0934 | 02/05 Amzn Mktp US*Rr03W4A Amzn.Com/Bill WA | -150.46 | 52,139.32 |
| 02/07 | Card Purchase 0934 | 02/03 Neimanmarcus.Com 888-888-4757 TX Card | -181.78 | 51,957.54 |
| 02/07 | Card Purchase 0934 | 02/06 Neimanmarcus.Com 888-888-4757 TX Card | -140.02 | 51,817.52 |
| 02/07 | Card Purchase 0934 | 02/03 Neimanmarcus.Com 888-888-4757 TX Card | -49.61 | 51,767.91 |
| 02/07 | Card Purchase 0934 | 02/06 Neimanmarcus.Com 888-888-4757 TX Card | -49.61 | 51,718.30 |
| 02/07 | Card Purchase 0934 | 02/03 Neimanmarcus.Com 888-888-4757 TX Card | -33.08 | 51,685.22 |
| 02/07 | Payment Sent | 02/04 Apple Cash 877-233-8552 CA Card 0934 | -50.00 | 51,635.22 |
| 02/07 | Card Purchase Card 0934 | 02/05 Amzn Mktp US*Wn7S06Y Amzn.Com/Bill WA | -478.55 | 51,156.67 |
| 02/07 | Card Purchase | 02/05 Instacart Httpsinstacar CA Card 0934 | -120.99 | 51,035.68 |
| 02/07 | Card Purchase Card 0934 | 02/05 Doordash*Angelini Os Www.Doordash. CA | -67.75 | 50,967.93 |
| 02/07 | Card Purchase 0934 | 02/05 Cvs/Pharmacy #09652 West Hollywoo CA Card | -89.74 | 50,878.19 |
| 02/07 | Card Purchase 0934 | 02/05 Cvs/Pharmacy #09661 Los Angeles CA Card | -104.91 | 50,773.28 |
| 02/07 | Card Purchase With Pin 02/05 Ikea Burbank Burbank CA Card 0934 | | -725.91 | 50,047.37 |
| 02/07 | Card Purchase | 02/05 Instacart*1549 Httpsinstacar CA Card 0934 | -421.47 | 49,625.90 |
| 02/07 | Card Purchase | 02/07 Apple.Com/US 800-676-2775 CA Card 0934 | -63.02 | 49,562.88 |
| 02/07 | Card Purchase 0934 | 02/06 Doordash*Sunset Stri Www.Doordash. CA Card | -233.88 | 49,329.00 |

*Page 6 of 8*



January 11, 2022 through February 08, 2022
Account Number: **000000815402372**



## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 02/07 | Card Purchase          02/06 Instacart Httpsinstacar CA Card 0934 | -471.42 | 48,857.58 |
| 02/07 | Card Purchase          02/06 Doordash*Din Tai Fun Www.Doordash. CA | -93.67 | 48,763.91 |
| 02/07 | Card Purchase With Pin  02/06 Shell Service Station Los Angeles CA Card 0934 | -75.16 | 48,688.75 |
| 02/07 | Card Purchase With Pin  02/06 Shell Service Station Los Angeles CA Card 0934 | -82.85 | 48,605.90 |
| 02/07 | Card Purchase          02/06 Apple.Com/US 800-676-2775 CA Card 0934 | -63.02 | 48,542.88 |
| 02/07 | Card Purchase          02/06 Instacart*1102 Httpsinstacar CA Card 0934 | -142.16 | 48,400.72 |
| 02/07 | Card Purchase          02/06 Amazon Prime*V59Hd9O Amzn.Com/Bill WA Card 0934 | -14.00 | 48,386.72 |
| 02/07 | Zelle Payment To P Parik 13615122306 | -1,500.00 | 46,886.72 |
| 02/07 | Coinbase Inc.     8889087930 M53Rtav8        Web ID: 1327000623 | -10,000.00 | 36,886.72 |
| 02/07 | Coinbase Inc.     8889087930 Faq6L2Te        Web ID: 1327000623 | -5,000.00 | 31,886.72 |
| 02/07 | Coinbase Inc.     8889087930 Av6Hxx4X        Web ID: 1327000623 | -5,000.00 | 26,886.72 |
| 02/07 | Card Purchase With Pin  02/07 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 24,199.22 |
| 02/07 | Zelle Payment To J Hawaii 13620958185 | -800.00 | 23,399.22 |
| 02/08 | Card Purchase          02/07 Amzn Mktp US*Sn43P48 Amzn.Com/Bill WA Card 0934 | -9.44 | 23,389.78 |
| 02/08 | Zelle Payment To Sara Jpm101051761 | -1,200.00 | 22,189.78 |
| 02/08 | 02/08 Online Domestic Wire Transfer A/C: Kering Americas Inc. Wire Transfer Wayne NJ 07470- US Trn: 3139402039Es | -10,000.00 | 12,189.78 |
| 02/08 | Card Purchase With Pin  02/08 Up0674 Laguna Hills CA Card 0934 | -70.98 | 12,118.80 |
| 02/08 | Online Domestic Wire Fee | -25.00 | 12,093.80 |
| | **Ending Balance** | | **$12,093.80** |

A Monthly Service Fee was **not** charged to your Chase Total Checking account.  Here are the three ways you can avoid this fee during any statement period.

- **Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network.**
  (Your total electronic deposits this period were $1,970.01. Note: some deposits may be listed on your previous statement)

- **OR,** keep a balance at the beginning of each day of **$1,500.00 or more in this account.**
  (Your balance at the beginning of each day was $77.18)

- **OR,** keep an average beginning day balance of **$5,000.00 or more in qualifying linked deposits and investments.**
  (Your average beginning day balance of qualifying linked deposits and investments was $70,529.77)

Page 7 of 8



January 11, 2022 through February 08, 2022
Account Number:  **000000815402372**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
  • Your name and account number
  • The dollar amount of the suspected error
  • A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 8 of 8



CHASE ◉

DEPOSIT

CHECKING ☑
SAVINGS ☐
CHASE LIQUID ☐

R/T 500001020

Today's Date
1/14/22

Customer Name *(Please Print)*
Sara King

Sign Here *(If cash is received from this deposit)* - - - - - - - - - - - -
X

N13060-CH (Rev. 07/12)   10111327   06/21

▼ Start your account number here

815402372

CASH ▶
CHECK ▶
TOTAL FROM OTHER SIDE ▶
SUBTOTAL ▶
CASH BACK ▶

TOTAL $   70000.00

⑈1994285723⑈ ⑆500001020⑆

JPMorganChaseBank 011406 150866 960000023597

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing a Cash In ticket.  The image you requested is not available.**

**Posting Date 14-Jan-22**

**Sequence number 003170539900**

**Amount 70000.00**

**Account Number 2372**



**CHASE** ⬤

**DEPOSIT**

CHECKING ☑
SAVINGS ☐
CHASE LIQUID ☐

R/T 500001020

Today's Date 1/18/22

Customer Name *(Please Print)*
Sara Icing

CASH ▶
CHECK ▶
TOTAL FROM OTHER SIDE ▶
SUBTOTAL ▶
CASH BACK ▶

Sign Here *(If cash is received from this deposit)* - - - - - - - - - - - - - - -
X

N13060-CH (Rev. 07/12)   10111327   05/21

▼ Start your account number here

8 1 5 4 0 2 3 7 2

TOTAL $   230000.00

⑈ ꓱ ꓱ ꓱ ꓱ ꓱ ꓱ ꓱ ꓱ ꓱ ꓱ

⑈1994285727⑈ ⑆500001020⑆

JPMorganChaseBank 011806 150866 960080023713

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing a Cash In ticket.  The image you requested is not available.**

**Posting Date 18-Jan-22**

**Sequence number 002870716137**

**Amount 230000.00**

**Account Number 2372**



SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH, CA 92660-5975

6400

90/7162

DATE 1 · 15 · 22

PAY TO THE ORDER OF  Premier Work Spaces            $ 3646.50

Three thousand six hundred forty six 59/100                    DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO  Mille Rent

⑈322271627⑈   8154023720⑈6400

Seq:  1
Dep:  071178
Date: 01/17/22

For Deposit Only to
Premier Office Centers, LLC
Premier Office Centers,LLC DBA Pre

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing an ATM transaction.  The image you
requested is not available.**

**Posting Date: 07-Feb-22**

**Sequence Number: 004780443063**

**Dollar Amount: 2800.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: G21Aug23-1104**

**This is a substitute document representing an Electronic Transaction. The image you requested is not available. (examples include: Online Payments, Phone Funds Transfer Deposit, Credit Due to ATM/Dep Error, Wire Transfer)**

**Posting Date 07-Feb-22**

**Sequence Number 004780443064**

**Amount 2800.00**

**Account Number: 2372**



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

February 09, 2022 through March 08, 2022

Account Number: **000000815402372**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00491090 DRE 703 219 06822 NNNNNNNNNNN  1 000000000 06 0000
SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660



---

### CHECKING SUMMARY    Chase Total Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$12,093.80** |
| Deposits and Additions | 224,849.67 |
| ATM & Debit Card Withdrawals | -114,985.03 |
| Electronic Withdrawals | -100,793.41 |
| Other Withdrawals | -18,000.00 |
| Fees | -187.50 |
| **Ending Balance** | **$2,977.53** |

### TRANSACTION DETAIL

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|---|---|---|---|---|
| | Beginning Balance | | | $12,093.80 |
| 02/09 | Card Purchase 0934 | 02/08 Sq *The Hair Shop LA Los Angeles CA Card | -448.95 | 11,644.85 |
| 02/09 | Card Purchase | 02/08 Instacart Httpsinstacar CA Card 0934 | -657.53 | 10,987.32 |
| 02/09 | Card Purchase 0934 | 02/09 Doordash*Erewhon Www.Doordash. CA Card | -82.84 | 10,904.48 |
| 02/09 | Recurring Card Purchase 02/09 Newlife Vitamin Shop Www.Newlifevi OR Card 0934 | | -113.04 | 10,791.44 |
| 02/10 | Payment Sent 0934 | 02/09 Cash App*Torah Vyas 8774174551 CA Card | -2,500.00 | 8,291.44 |
| 02/10 | Card Purchase 0934 | 02/10 Etsy.Com - Intuitivere 718-8557955 NY Card | -5.00 | 8,286.44 |
| 02/10 | Card Purchase 0934 | 02/10 Afterpay 185-52896014 CA Card 0934 | -47.13 | 8,239.31 |
| 02/10 | Card Purchase With Pin  02/10 Shell Service Station Los Angeles CA Card 0934 | | -85.00 | 8,154.31 |
| 02/11 | Real Time Transfer Recd From Aba/021000021 From: Coinbase Ref: 6JC7Z7Ax Info:  Iid: 20220211021000021P1Brjpm00570017118 Recd: 09:50:07 Trn: 0276921042Ru | | 29,807.52 | 37,961.83 |
| 02/11 | Gemini Trust CO  ACH Txfer  D954327     Web ID: 1475153145 | | 1,145.77 | 39,107.60 |
| 02/11 | Card Purchase | 02/10 Pdfiller, Inc 855-7501663 MA Card 0934 | -96.00 | 39,011.60 |
| 02/11 | Card Purchase | 02/10 Nikepos_US Los Angeles CA Card 0934 | -225.25 | 38,786.35 |
| 02/11 | Card Purchase Card 0934 | 02/11 Doordash*The Thai in Www.Doordash. CA | -36.89 | 38,749.46 |
| 02/11 | Card Purchase With Pin  02/11 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 36,061.96 |

**CHASE** ◯

February 09, 2022 through March 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 02/14 | Recurring Card Purchase 02/11 Onlinevinlookupcom Concord CA Card 0934 | -23.95 | 36,038.01 |
| 02/14 | Card Purchase        02/12 Doordash*Cvs Www.Doordash. CA Card 0934 | -19.47 | 36,018.54 |
| 02/14 | Card Purchase        02/12 Pet Oasis - Newport Newport Beach CA Card 0934 | -376.26 | 35,642.28 |
| 02/14 | Card Purchase        02/12 Instacart Httpsinstacar CA Card 0934 | -445.00 | 35,197.28 |
| 02/14 | Zelle Payment To Torah Jpm109807583 | -2,000.00 | 33,197.28 |
| 02/14 | Payment Sent        02/12 Cash App*Torah Vyas 8774174551 CA Card 0934 | -1,500.00 | 31,697.28 |
| 02/14 | Card Purchase        02/12 Instacart Httpsinstacar CA Card 0934 | -742.51 | 30,954.77 |
| 02/14 | Card Purchase        02/13 Doordash*Sunset Stri Www.Doordash. CA Card 0934 | -160.53 | 30,794.24 |
| 02/14 | Card Purchase        02/12 Instacart Httpsinstacar CA Card 0934 | -43.23 | 30,751.01 |
| 02/14 | Card Purchase        02/12 Amzn Mktp US*1Q1G62Z Amzn.Com/Bill WA Card 0934 | -15.42 | 30,735.59 |
| 02/14 | Card Purchase With Pin  02/13 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 28,048.09 |
| 02/14 | Card Purchase With Pin  02/13 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 25,360.59 |
| 02/14 | Card Purchase With Pin  02/13 Evi*Pechanga Res Temecula CA Card 0934 | -2,150.00 | 23,210.59 |
| 02/14 | Card Purchase        02/13 Doordash*Bluestone L Www.Doordash. CA Card 0934 | -27.66 | 23,182.93 |
| 02/14 | Att        Payment   216015003Smt2B  Web ID: 9864031005 | -225.09 | 22,957.84 |
| 02/14 | Zelle Payment To Sara Jpm113637944 | -2,000.00 | 20,957.84 |
| 02/15 | Card Purchase        02/12 Newport Hills Animal Newport Beach CA Card 0934 | -638.00 | 20,319.84 |
| 02/15 | Card Purchase        02/14 Loan Post Dba Lendingwi Miami FL Card 0934 | -447.00 | 19,872.84 |
| 02/15 | Card Purchase        02/15 Lyft  Ride Sun 5Am 8558659553 CA Card 0934 | -488.31 | 19,384.53 |
| 02/15 | 02/15 Online Domestic Wire Transfer A/C: Lww8 Property, LLC Phoenix AZ 85050-1032 US Trn: 3170902046Es | -3,500.00 | 15,884.53 |
| 02/15 | Card Purchase With Pin  02/15 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 13,197.03 |
| 02/15 | Online Domestic Wire Fee | -25.00 | 13,172.03 |
| 02/15 | Non-Chase ATM Fee-Inq | -2.50 | 13,169.53 |
| 02/16 | Card Purchase        02/15 Chevron 0098744 West Hollywoo CA Card 0934 | -89.60 | 13,079.93 |
| 02/16 | Payment Sent        02/15 Cash App*John Mccabi 8774174551 CA Card 0934 | -800.00 | 12,279.93 |
| 02/16 | Zelle Payment To J Hawaii 13684763853 | -1,000.00 | 11,279.93 |
| 02/17 | Card Purchase Return  02/16 Bensoleimani.Com 188-82164277 CA Card 0934 | 441.09 | 11,721.02 |
| 02/17 | Card Purchase        02/17 Amzn Mktp US*1B32O9K Amzn.Com/Bill WA Card 0934 | -60.60 | 11,660.42 |
| 02/17 | Card Purchase        02/17 Afterpay 185-52896014 CA Card 0934 | -119.34 | 11,541.08 |
| 02/18 | Card Purchase        02/18 The Shop At Equin 186-63326549 NY Card 0934 | -290.18 | 11,250.90 |
| 02/18 | Aetna Sm Grp   Payments  B2204825734928  Tel ID: 7066033492 | -7,618.32 | 3,632.58 |
| 02/18 | Card Purchase With Pin  02/18 Temecula Premiu Temecula CA Card 0934 | -56.52 | 3,576.06 |
| 02/18 | Card Purchase With Pin  02/18 Evi*Pechanga Res Temecula CA Card 0934 | -2,150.00 | 1,426.06 |
| 02/22 | ATM Cash Deposit     02/19 105 E 17th St Costa Mesa CA Card 0934 | 7,000.00 | 8,426.06 |
| 02/22 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-13716406681 Info:  Iid: 20220221021000021P1Brjpm00560019980 Recd: 11:27:54 Trn: 9716406681Rx | 25,000.00 | 33,426.06 |
| 02/22 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-13703902131 Info:  Iid: 20220219021000021P1Brjpm00580032657 Recd: 08:41:53 Trn: 9703902131Rx | 10,000.00 | 43,426.06 |

**SB1478499-F1**



February 09, 2022 through March 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*



| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 02/22 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-13715502146 Info:  Iid: 20220221021000021P1Brjpm00570008079 Recd: 06:22:09 Trn: 9715502146Rfx | | 2,500.00 | 45,926.06 |
| 02/22 | Card Purchase | 02/18 Amz*Kissusa Orders@Kissus NY Card 0934 | -148.67 | 45,777.39 |
| 02/22 | Card Purchase | 02/19 Instacart Httpsinstacar CA Card 0934 | -52.74 | 45,724.65 |
| 02/22 | Card Purchase | 02/20 Amzn Mktp US*Ug22S9H Amzn.Com/Bill WA Card 0934 | -179.96 | 45,544.69 |
| 02/22 | Card Purchase | 02/20 Alo-Yoga 132-32487531 CA Card 0934 | -1,171.70 | 44,372.99 |
| 02/22 | Card Purchase | 02/19 Farmers Market Parking Los Angeles CA Card 0934 | -6.00 | 44,366.99 |
| 02/22 | Recurring Card Purchase 02/20 Spotify USA 877-7781161 NY Card 0934 | | -9.99 | 44,357.00 |
| 02/22 | Card Purchase | 02/20 Amzn Mktp US*1I4Tb6J Amzn.Com/Bill WA Card 0934 | -309.08 | 44,047.92 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 41,360.42 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 38,672.92 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 35,985.42 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 33,297.92 |
| 02/22 | Card Purchase With Pin  02/20 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 30,610.42 |
| 02/22 | Card Purchase With Pin  02/21 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 27,922.92 |
| 02/22 | Zelle Payment To Sara Jpm126097799 | | -300.00 | 27,622.92 |
| 02/22 | Zelle Payment To J Hawaii 13715526858 | | -1,700.00 | 25,922.92 |
| 02/22 | Card Purchase With Pin  02/21 Arco #42216 Costa Mesa CA Card 0934 | | -98.86 | 25,824.06 |
| 02/22 | Card Purchase | 02/21 Etsy.Com - Crownparkcr 718-8557955 NY Card 0934 | -1.50 | 25,822.56 |
| 02/22 | Card Purchase | 02/21 Lawdepot +1877509439 Httpswww.Lawd CA Card 0934 | -35.00 | 25,787.56 |
| 02/22 | Card Purchase | 02/22 Instacart*1549 Httpsinstacar CA Card 0934 | -223.23 | 25,564.33 |
| 02/22 | Zelle Payment To Mon Amour Jpm127997939 | | -500.00 | 25,064.33 |
| 02/22 | Zelle Payment To J Hawaii 13723615415 | | -1,200.00 | 23,864.33 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 21,176.83 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 18,489.33 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 15,801.83 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 13,114.33 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -1,075.00 | 12,039.33 |
| 02/22 | Card Purchase With Pin  02/22 Evi*Pechanga Res Temecula CA Card 0934 | | -1,075.00 | 10,964.33 |
| 02/22 | 02/22 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0222B1Qgc03C014608 Trn: 3683102053Es | | -8,000.00 | 2,964.33 |
| 02/22 | Online Domestic Wire Fee | | -25.00 | 2,939.33 |
| 02/22 | Non-Chase ATM Fee-Inq | | -2.50 | 2,936.83 |
| 02/23 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-13729714608 Info:  Iid: 20220223021000021P1Brjpm00030029264 Recd: 12:09:53 Trn: 9729714608Rfx | | 25,000.00 | 27,936.83 |
| 02/23 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13733302288 Info:  Iid: 20220223021000021P1Brjpm00040053418 Recd: 19:48:11 Trn: 9733302288Rfx | | 5,000.00 | 32,936.83 |
| 02/23 | Payment Sent | 02/22 Cash App*John Mccab 8774174551 CA Card 0934 | -1,000.00 | 31,936.83 |
| 02/23 | Zelle Payment To J Hawaii 13729773426 | | -1,000.00 | 30,936.83 |
| 02/23 | 02/23 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0223B1Qgc08C012453 Trn: 3289082054Es | | -5,000.00 | 25,936.83 |



Page 3 of 8

**SB1478499-F1** 24

**CHASE**

February 09, 2022 through March 08, 2022

Account Number: **000000815402372**

## TRANSACTION DETAIL (continued)

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|--|--------|---------|
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 23,249.33 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -1,612.50 | 21,636.83 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -1,612.50 | 20,024.33 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -537.50 | 19,486.83 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -537.50 | 18,949.33 |
| 02/23 | Card Purchase With Pin  02/23 Evi*Pechanga Res Temecula CA Card 0934 | | -537.50 | 18,411.83 |
| 02/23 | Zelle Payment To Sara Jpm130480372 | | -800.00 | 17,611.83 |
| 02/23 | Online Domestic Wire Fee | | -25.00 | 17,586.83 |
| 02/24 | JPMorgan Chase  Ext Trnsfr            PPD ID: 9200502231 | | 10,000.00 | 27,586.83 |
| 02/24 | JPMorgan Chase  Ext Trnsfr            PPD ID: 9200502231 | | 10,000.00 | 37,586.83 |
| 02/24 | Payment Sent          02/24 Cash App*John Mccab 8774174551 CA Card 0934 | | -800.00 | 36,786.83 |
| 02/24 | Card Purchase           02/23 Amzn Mktp US*1B0HI3D Amzn.Com/Bill WA Card 0934 | | -6.81 | 36,780.02 |
| 02/24 | Card Purchase           02/23 Evi* Pechanga Resort 702-8553000 CA Card 0934 | | -3,225.00 | 33,555.02 |
| 02/24 | Card Purchase           02/23 Evi* Pechanga Resort 702-8553000 CA Card 0934 | | -3,225.00 | 30,330.02 |
| 02/24 | Card Purchase           02/23 Pdfsimpli 844-898-4076 San Juan Card 0934 | | -39.95 | 30,290.07 |
| 02/24 | 02/24 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0224B1Qgc07C011860 Trn: 3440172055Es | | -5,000.00 | 25,290.07 |
| 02/24 | Non-Chase ATM Withdraw  02/24 11154 Hwy 76 Pala CA Card 0934 | | -504.00 | 24,786.07 |
| 02/24 | Online Domestic Wire Fee | | -25.00 | 24,761.07 |
| 02/24 | Non-Chase ATM Fee-With | | -2.50 | 24,758.57 |
| 02/25 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-13746840793 Info:  Iid: 20220225021000021P1Brjpm00570054260 Recd: 18:56:51 Trn: 9746840793Rx | | 25,000.00 | 49,758.57 |
| 02/25 | Card Purchase           02/25 Amzn Mktp US*1B8Y11R Amzn.Com/Bill WA Card 0934 | | -139.38 | 49,619.19 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 46,931.69 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 44,244.19 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 41,556.69 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 38,869.19 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -2,687.50 | 36,181.69 |
| 02/25 | Card Purchase With Pin  02/25 Evi*Pechanga Res Temecula CA Card 0934 | | -537.50 | 35,644.19 |
| 02/28 | Card Purchase           02/26 Doordash*Zinque (Zin Www.Doordash. CA Card 0934 | | -187.86 | 35,456.33 |
| 02/28 | Recurring Card Purchase 02/28 Adobe Acropro Subs 408-536-6000 CA Card 0934 | | -14.99 | 35,441.34 |
| 02/28 | 02/28 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Heidi King Rancho Santa Fe CA 92067 US Ref:/Time/03:38 Imad: 0228B1Qgc04C001895 Trn: 3074212059Es | | -10,000.00 | 25,441.34 |
| 02/28 | 02/28 Online Domestic Wire Transfer A/C: Lww8 Property, LLC Phoenix AZ 85050-1032 US Trn: 3202522059Es | | -3,500.00 | 21,941.34 |
| 02/28 | 02/28 Withdrawal | | -10,000.00 | 11,941.34 |
| 02/28 | Online Domestic Wire Fee | | -25.00 | 11,916.34 |
| 02/28 | Online Domestic Wire Fee | | -25.00 | 11,891.34 |
| 03/01 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13780184963 Info:  Iid: 20220301021000021P1Brjpm00040042840 Recd: 13:11:17 Trn: 9780184963Rx | | 10,000.00 | 21,891.34 |
| 03/01 | Card Purchase           02/28 Nordstrom #333 Newport Beach CA Card 0934 | | -480.51 | 21,410.83 |

Page 4 of 8

CHASE ◆

February 09, 2022 through March 08, 2022
Account Number: **000000815402372**



## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 03/01 | Zelle Payment To Sara Jpm9999Cg946 | -2,000.00 | 19,410.83 |
| 03/01 | Card Purchase With Pin  03/01 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 16,723.33 |
| 03/01 | 03/01 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0301B1Qgc03C011961 Trn: 3609052060Es | -5,000.00 | 11,723.33 |
| 03/01 | Online Domestic Wire Fee | -25.00 | 11,698.33 |
| 03/02 | Card Purchase With Pin  03/01 Evi*Pechanga Res Temecula CA Card 0934 | -2,687.50 | 9,010.83 |
| 03/02 | Zelle Payment To J Hawaii 13786231414 | -2,000.00 | 7,010.83 |
| 03/03 | Payment Received        03/03 Coinbase Visa Direct CA Card 0934 | 955.29 | 7,966.12 |
| 03/03 | Card Purchase        03/03 Amzn Mktp US*1W7Ua9E Amzn.Com/Bill WA Card 0934 | -80.44 | 7,885.68 |
| 03/03 | Zelle Payment To Sara Jpm9999Ep2C8 | -2,000.00 | 5,885.68 |
| 03/03 | Non-Chase ATM Withdraw  03/03 3730 Las Vegas Blvd S Las Vegas NV Card 0934 | -508.99 | 5,376.69 |
| 03/03 | Card Purchase        03/03 Aria -  Elements Las Vegas NV Card 0934 | -47.22 | 5,329.47 |
| 03/03 | Payment Sent        03/03 Cash App*Sara King* 8774174551 CA Card 0934 | -200.00 | 5,129.47 |
| 03/03 | Payment Sent        03/03 Cash App*Sara King* 8774174551 CA Card 0934 | -100.00 | 5,029.47 |
| 03/03 | Payment Sent        03/03 Cash App*Sara King* 8774174551 CA Card 0934 | -250.00 | 4,779.47 |
| 03/03 | Payment Sent        03/03 Cash App*Sara King* 8774174551 CA Card 0934 | -100.00 | 4,679.47 |
| 03/03 | 03/03 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 1379702790 Reference#: 9797027902Rx | -250.00 | 4,429.47 |
| 03/03 | 03/03 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 1379714440 Reference#: 9797144408Rx | -200.00 | 4,229.47 |
| 03/03 | Non-Chase ATM Fee-With | -2.50 | 4,226.97 |
| 03/04 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13810165811 Info:  Iid: 20220304021000021P1Bripm00050056953 Recd: 16:03:36 Trn: 9810165811Rx | 25,000.00 | 29,226.97 |
| 03/04 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13810360185 Info:  Iid: 20220304021000021P1Bripm00030043638 Recd: 16:24:28 Trn: 9810360185Rx | 15,000.00 | 44,226.97 |
| 03/04 | JPMorgan Chase   Ext Trnsfr        PPD ID: 9200502231 | 3,000.00 | 47,226.97 |
| 03/04 | Card Purchase        03/03 Evi* Aria Resort And 702-8553000 NV Card 0934 | -2,629.99 | 44,596.98 |
| 03/04 | Card Purchase        03/03 Evi* Aria Resort And 702-8553000 NV Card 0934 | -1,586.99 | 43,009.99 |
| 03/04 | Zelle Payment To Sara Jpm9999Ghgxa | -1,000.00 | 42,009.99 |
| 03/04 | Card Purchase        03/04 Instacart*1102 Httpsinstacar CA Card 0934 | -349.30 | 41,660.69 |
| 03/04 | Card Purchase        03/04 Instacart Httpsinstacar CA Card 0934 | -140.99 | 41,519.70 |
| 03/07 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13827463126 Info:  Iid: 20220307021000021P1Bripm00560027523 Recd: 09:51:25 Trn: 9827463126Rx | 20,000.00 | 61,519.70 |
| 03/07 | Card Purchase        03/05 Fleur Du Mal LA 142-42385302 NY Card 0934 | -2,468.14 | 59,051.56 |
| 03/07 | Card Purchase        03/05 Instacart*1969 Httpsinstacar CA Card 0934 | -333.17 | 58,718.39 |
| 03/07 | Card Purchase        03/05 Doordash*Sunset Stri Www.Doordash. CA Card 0934 | -112.67 | 58,605.72 |
| 03/07 | Card Purchase        03/05 Doordash*Fortune Hou Www.Doordash. CA Card 0934 | -52.51 | 58,553.21 |
| 03/07 | Card Purchase        03/05 Amazon Prime*1W0Wt5H Amzn.Com/Bill WA Card 0934 | -14.00 | 58,539.21 |

**SB1478499-F1**



February 09, 2022 through March 08, 2022
Account Number:  **000000815402372**

## TRANSACTION DETAIL _(continued)_

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 03/07 | Card Purchase | 03/05 Afterpay 185-52896014 CA Card 0934 | -119.33 | 58,419.88 |
| 03/07 | Card Purchase | 03/05 Sq *The Hair Shop LA Los Angeles CA Card 0934 | -318.62 | 58,101.26 |
| 03/07 | Payment Sent 0934 | 03/05 Cash App*John Mccab 8774174551 CA Card | -1,000.00 | 57,101.26 |
| 03/07 | Card Purchase | 03/06 Jetsuitex 800-435-9579 TX Card 0934 | -289.00 | 56,812.26 |
| 03/07 | Card Purchase 0934 | 03/05 Jetblue    27921869 Salt Lake Cty UT Card | -1,498.61 | 55,313.65 |
| 03/07 | Card Purchase 0934 | 03/06 Etsy.Com - Glamshoeslo 718-8557955 NY Card | -371.28 | 54,942.37 |
| 03/07 | Card Purchase | 03/07 Instacart*1176 Httpsinstacar CA Card 0934 | -44.07 | 54,898.30 |
| 03/07 | Card Purchase Card 0934 | 03/07 Amazon Prime*1Z6KY9C Amzn.Com/Bill WA | -14.00 | 54,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 H5Sxm4Fp      Web ID: 1327000623 | -5,000.00 | 49,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 Jcfytlyp      Web ID: 1327000623 | -5,000.00 | 44,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 Qu7Ngfz7      Web ID: 1327000623 | -5,000.00 | 39,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 5Xck26Sv      Web ID: 1327000623 | -3,000.00 | 36,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 Qkfwpren      Web ID: 1327000623 | -2,500.00 | 34,384.30 |
| 03/07 | Coinbase Inc. | 8889087930 Sq6P58Ru      Web ID: 1327000623 | -2,500.00 | 31,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 5Mrgnjax      Web ID: 1327000623 | -2,500.00 | 29,384.30 |
| 03/07 | Coinbase Inc. | 8889087930 Ltm6Czgw      Web ID: 1327000623 | -2,500.00 | 26,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 7H2A379N      Web ID: 1327000623 | -2,500.00 | 24,384.30 |
| 03/07 | Coinbase Inc. | 8889087930 A8Zn6Jlk      Web ID: 1327000623 | -2,500.00 | 21,884.30 |
| 03/07 | Coinbase Inc. | 8889087930 H8Qb4Swy      Web ID: 1327000623 | -2,000.00 | 19,884.30 |
| 03/07 | Non-Chase ATM Withdraw  03/07 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | | -506.99 | 19,377.31 |
| 03/07 | Non-Chase ATM Fee-With | | -2.50 | 19,374.81 |
| 03/08 | Card Purchase | 03/08 Lytt   *Ride Sun 3Pm Lyft.Com CA Card 0934 | -77.28 | 19,297.53 |
| 03/08 | Card Purchase 0934 | 03/06 Evi* Aria Resort And 702-8553000 NV Card | -8,320.00 | 10,977.53 |
| 03/08 | 03/08 Withdrawal | | -8,000.00 | 2,977.53 |
| | **Ending Balance** | | | **$2,977.53** |

A Monthly Service Fee is **not** charged to your Chase Total Checking account.  Here are the three ways you can avoid this fee during any statement period.

- **Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network.**
  (Your total electronic deposits this period were $217,408.58. Note: some deposits may be listed on your previous statement)

- **OR, keep a balance at the beginning of each day of $1,500.00 or more in this account.**
  (Your balance at the beginning of each day was $1,426.06)

- **OR, keep an average beginning day balance of $5,000.00 or more in qualifying linked deposits and investments.**
  (Your average beginning day balance of qualifying linked deposits and investments was $19,030.50)



February 09, 2022 through March 08, 2022
Account Number:     **000000815402372**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**



Page 7 of 8



February 09, 2022 through March 08, 2022
Account Number:   **000000815402372**

This Page Intentionally Left Blank

**SB1478499-F1**                                                                 **29**

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing an ATM transaction.  The image you requested is not available.**

**Posting Date: 22-Feb-22**

**Sequence Number: 007370855421**

**Dollar Amount: 7000.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: G21Aug23-1104**

**This is a substitute document representing an Electronic Transaction. The image you requested is not available. (examples include: Online Payments, Phone Funds Transfer Deposit, Credit Due to ATM/Dep Error, Wire Transfer)**

**Posting Date 22-Feb-22**

**Sequence Number 007370855422**

**Amount 7000.00**

**Account Number: 2372**



JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

March 09, 2022 through April 08, 2022
Account Number: **000000815402372**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00486828 DRE 703 219 09922 NNNNNNNNNNN  1 000000000 06 0000
SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660-5975



**We're making a change to the Non-Chase ATM Transaction Fee**

On June 12, 2022, we're increasing the Non-Chase ATM Transaction Fee* from $2.50 to $3. This fee applies when you use a Non-Chase ATM for Domestic Withdrawals, Domestic & International Balance Inquiries, or Domestic & International Balance Transfers. The International Withdrawal Fee for ATMs outside the U.S., Puerto Rico and the U.S. Virgin Islands remains $5 per withdrawal. As a reminder, you won't pay a fee for using Chase ATMs and you may get these fees waived depending on the type of account(s) you have.

- We'll continue to waive this fee on the following types of accounts: Chase Sapphire℠ Checking, Chase Private Client Checking℠, Chase Premier Savings℠, Chase Plus Savings℠, Chase Private Client Savings℠ and Chase Premier Plus Checking℠ with Military Banking Enhanced Benefits.
- We'll continue to waive the first four Non-Chase ATM transaction fees for each statement period for Chase Premier Plus Checking and Chase Premier Checking℠ accounts.

If you'd like to see the full Fee Schedule on the Additional Banking Services and Fees document, please go to **chase.com/disclosures** or visit a branch.

Please call the number on this statement if you have any questions. We accept operator relay calls.

*Fees from the ATM owner/networks may still apply.*

### CHECKING SUMMARY   Chase Total Checking

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$2,977.53** |
| Deposits and Additions | 323,491.97 |
| ATM & Debit Card Withdrawals | -116,730.42 |
| Electronic Withdrawals | -174,462.75 |
| Other Withdrawals | -29,000.00 |
| Fees | -170.00 |
| **Ending Balance** | **$6,106.33** |

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $2,977.53 |
| 03/09 | Deposit     1995474771 | 8,500.00 | 11,477.53 |
| 03/09 | Zelle Payment From Ashley King Wfct0Qb3Vvmf | 2,000.00 | 13,477.53 |
| 03/09 | Payment Received      03/09 Cash App*Cash Out Visa Direct CA Card 0934 | 1,965.00 | 15,442.53 |

Page 1 of 10

**CHASE**

March 09, 2022 through April 08, 2022

Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 03/09 | Zelle Payment From Sara King Back6Jjpunhg | **1,200.00** | 16,642.53 |
| 03/09 | Zelle Payment From John Mccabe Wfct0Qb354T4 | **500.00** | 17,142.53 |
| 03/09 | Card Purchase          03/07 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,104.99 | 15,037.54 |
| 03/09 | Recurring Card Purchase 03/09 Newlife Vitamin Shop Www.Newlifevi OR Card 0934 | -113.04 | 14,924.50 |
| 03/09 | Non-Chase ATM Withdraw  03/09 3730 Las Vegas Blvd S Las Vegas NV Card 0934 | -508.99 | 14,415.51 |
| 03/09 | 03/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13841329220 Reference#: 9841329220Rx | -2,000.00 | 12,415.51 |
| 03/09 | 03/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13844052854 Reference#: 9844052854Rx | -3,000.00 | 9,415.51 |
| 03/09 | 03/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13844238867 Reference#: 9844238867Rx | -3,000.00 | 6,415.51 |
| 03/09 | 03/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13844700106 Reference#: 9844700106Rx | -2,000.00 | 4,415.51 |
| 03/09 | Card Purchase With Pin  03/09 Evi*Wynn Las Veg Las Vegas NV Card 0934 | -1,044.95 | 3,370.56 |
| 03/09 | Non-Chase ATM Fee-With | -2.50 | 3,368.06 |
| 03/10 | Zelle Payment From Express Limo Services Inc 13846987579 | **1,000.00** | 4,368.06 |
| 03/10 | Card Purchase          03/09 Delta Air  00623034348 Delta.Com CA Card 0934 | -458.60 | 3,909.46 |
| 03/10 | Card Purchase          03/09 The Drug Store Las Vegas NV Card 0934 | -131.12 | 3,778.34 |
| 03/10 | Card Purchase          03/09 Tst* Cipriani - Las Veg Las Vegas NV Card 0934 | -64.19 | 3,714.15 |
| 03/10 | Card Purchase With Pin  03/09 Hudson St1374 Las Vegas NV Card 0934 | -47.33 | 3,666.82 |
| 03/10 | Card Purchase          03/10 California Pizza Las Las Vegas NV Card 0934 | -9.31 | 3,657.51 |
| 03/10 | Non-Chase ATM Withdraw  03/09 5757 Wayne Newton Blvd Las Vegas NV Card 0934 | -503.00 | 3,154.51 |
| 03/10 | Non-Chase ATM Fee-With | -2.50 | 3,152.01 |
| 03/11 | Real Time Transfer Recd From Aba/021000021 From: Coinbase Ref: K5Rudg59 Info:  Iid: 20220311021000021P1Brjpm00570061850 Recd: 19:27:58 Trn: 0553151070Ru | 15,441.13 | 18,593.14 |
| 03/11 | Card Purchase          03/09 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -1,065.99 | 17,527.15 |
| 03/11 | Card Purchase          03/10 Lyft   *Ride Thu 6Am Lyft.Com CA Card 0934 | -219.82 | 17,307.33 |
| 03/11 | Card Purchase          03/11 Lyft   *Ride Thu 5Pm Lyft.Com CA Card 0934 | -81.68 | 17,225.65 |
| 03/11 | Card Purchase          03/10 Jetblue    27921875 Salt Lake Cty UT Card 0934 | -998.60 | 16,227.05 |
| 03/11 | Card Purchase          03/11 Doordash*Crepes By L Www.Doordash. CA Card 0934 | -58.52 | 16,168.53 |
| 03/11 | Card Purchase With Pin  03/11 7-Eleven Jamaica NY Card 0934 | -5.32 | 16,163.21 |
| 03/11 | Zelle Payment To Seeeester Jpm9999Pcyha | -2,000.00 | 14,163.21 |
| 03/11 | 03/11 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13862875633 Reference#: 9862875633Rx | -4,000.00 | 10,163.21 |
| 03/14 | Real Time Transfer Recd From Aba/021000021 From: Coinbase Ref: Huzdns6V Info:  Iid: 20220314021000021P1Brjpm00580075876 Recd: 19:03:36 Trn: 0488851073Rw | 17,565.74 | 27,728.95 |
| 03/14 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13879778182 Info:  Iid: 20220314021000021P1Brjpm00560039643 Recd: 16:01:26 Trn: 9879778182Rx | 10,000.00 | 37,728.95 |
| 03/14 | Recurring Card Purchase 03/11 Onlinevinlookupcom Concord CA Card 0934 | -23.95 | 37,705.00 |
| 03/14 | Card Purchase          03/11 Jfk Wfan Jamaica NY Card 0934 | -54.44 | 37,650.56 |
| 03/14 | Card Purchase          03/11 Ec New York Spor Jamaica NY Card 0934 | -27.86 | 37,622.70 |
| 03/14 | Card Purchase          03/12 Doordash*Sunset Stri Www.Doordash. CA Card 0934 | -169.88 | 37,452.82 |

Page 2 of 10

**SB1478499-F1**

**CHASE** 

March 09, 2022 through April 08, 2022
Account Number:   **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|--|--------|---------|
| 03/14 | Card Purchase 0934 | 03/12 Doordash*Full House Www.Doordash. CA Card | -47.30 | 37,405.52 |
| 03/14 | Card Purchase Card 0934 | 03/12 Doordash*The Thai th Www.Doordash. CA | -25.95 | 37,379.57 |
| 03/14 | Payment Sent | 03/13 Apple Cash 877-233-8552 CA Card 0934 | -100.00 | 37,279.57 |
| 03/14 | Card Purchase | 03/12 Restoration Hardware Ontario CA Card 0934 | -1,088.17 | 36,191.40 |
| 03/14 | Card Purchase | 03/12 Instacart Httpsinstacar CA Card 0934 | -522.24 | 35,669.16 |
| 03/14 | Card Purchase 0934 | 03/13 Doordash*Vincenti Www.Doordash. CA Card | -110.10 | 35,559.06 |
| 03/14 | Card Purchase | 03/13 Doordash*Cvs Www.Doordash. CA Card 0934 | -52.30 | 35,506.76 |
| 03/14 | Card Purchase Card 0934 | 03/13 Amzn Mktp US*1Z5F607 Amzn.Com/Bill WA | -7.99 | 35,498.77 |
| 03/14 | Card Purchase Card 0934 | 03/13 Amzn Mktp US*1Z4VA37 Amzn.Com/Bill WA | -62.86 | 35,435.91 |
| 03/14 | Card Purchase Card 0934 | 03/13 Amzn Mktp US*1Z7844K Amzn.Com/Bill WA | -17.13 | 35,418.78 |
| 03/14 | Card Purchase Card 0934 | 03/14 Amzn Mktp US*1Z7Tq6I Amzn.Com/Bill WA | -129.76 | 35,289.02 |
| 03/14 | Card Purchase Card 0934 | 03/13 Doordash*Peets Coffe Www.Doordash. CA | -17.08 | 35,271.94 |
| 03/14 | Card Purchase | 03/13 Restoration Hardware Ontario CA Card 0934 | -1,962.45 | 33,309.49 |
| 03/14 | Card Purchase Card 0934 | 03/13 Doordash*Magnolia Ba Www.Doordash. CA | -13.99 | 33,295.50 |
| 03/14 | Card Purchase Card 0934 | 03/14 Amzn Mktp US*1Z22Q4Z Amzn.Com/Bill WA | -48.52 | 33,246.98 |
| 03/14 | 03/13 Online Realtime Transfer To Perlbus Chk  2308 Transaction#: 13873427827 Reference#: 9873427827Rx | | -2,500.00 | 30,746.98 |
| 03/14 | 03/13 Online Realtime Transfer To Perlbus Chk  2308 Transaction#: 13874077171 Reference#: 9874077171Rx | | -2,000.00 | 28,746.98 |
| 03/14 | Zelle Payment To Mon Amour Jpm9999Sj55X | | -2,000.00 | 26,746.98 |
| 03/14 | 03/14 Online Realtime Transfer To Perlbus Chk  2308 Transaction#: 13881388953 Reference#: 9881388953Rx | | -5,000.00 | 21,746.98 |
| 03/14 | Card Purchase With Pin  03/14 7-Eleven Los Angeles CA Card 0934 | | -33.76 | 21,713.22 |
| 03/14 | Card Purchase With Pin  03/14 7-Eleven North Hollywo CA Card 0934 | | -44.78 | 21,668.44 |
| 03/14 | 03/14 Withdrawal | | -10,000.00 | 11,668.44 |
| 03/15 | Card Purchase Card 0934 | 03/14 Amzn Mktp US*1Z9Dm0Y Amzn.Com/Bill WA | -193.33 | 11,475.11 |
| 03/15 | Card Purchase Card 0934 | 03/14 Amzn Mktp US*1Z2G56Q Amzn.Com/Bill WA | -68.36 | 11,406.75 |
| 03/15 | Card Purchase Card 0934 | 03/14 Loan Post Dba Londingwi Miami FL Card 0934 | -447.00 | 10,959.75 |
| 03/15 | 03/14 Online Realtime Transfer To Perlbus Chk  2308 Transaction#: 13883692723 Reference#: 9883692723Rx | | -5,000.00 | 5,959.75 |
| 03/15 | Zelle Payment To Mon Amour Jpm9999T0Nfq | | -1,000.00 | 4,959.75 |
| 03/16 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13896431884 Info:  Iid: 20220316021000021P1Brjpm00580048785 Recd: 17:06:44 Tm: 9896431884Rx | | 10,000.00 | 14,959.75 |
| 03/16 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13896449705 Info:  Iid: 20220316021000021P1Brjpm00580048907 Recd: 17:10:05 Tm: 9896449705Rx | | 10,000.00 | 24,959.75 |
| 03/16 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13896463331 Info:  Iid: 20220316021000021P1Brjpm00580044458 Recd: 17:11:22 Tm: 9896463331Rx | | 10,000.00 | 34,959.75 |
| 03/16 | Card Purchase 0934 | 03/15 Evi* Wynn Las Vegas 702-8553000 NV Card | -2,629.99 | 32,329.76 |



Page 3 of 10

CHASE ❖

March 09, 2022 through April 08, 2022
Account Number:   **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 03/17 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13905614937 Info:  Iid: 20220317021000021P1Brjpm00580077835 Recd: 21:39:22 Trn: 9905614937Rx | 10,000.00 | 42,329.76 |
| 03/17 | JPMorgan Chase  Ext Trnsfr         PPD ID: 9200502231 | **5,000.00** | 47,329.76 |
| 03/17 | Card Purchase         03/16 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,629.99 | 44,699.77 |
| 03/17 | Card Purchase         03/16 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -10,400.00 | 34,299.77 |
| 03/18 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13906227676 Info:  Iid: 20220317021000021P1Brjpm00040074318 Recd: 23:42:01 Trn: 9906227676Rx | 25,000.00 | 59,299.77 |
| 03/18 | Card Purchase         03/17 Amzn Mktp US*1N0H31G Amzn.Com/Bill WA Card 0934 | -42.99 | 59,256.78 |
| 03/18 | Card Purchase         03/18 Jetsuitex 800-435-9579 TX Card 0934 | -284.00 | 58,972.78 |
| 03/18 | Card Purchase         03/18 Jetsuitex 800-435-9579 TX Card 0934 | -289.00 | 58,683.78 |
| 03/18 | Card Purchase         03/18 Doordash*Vincenti Www.Doordash. CA Card 0934 | -72.25 | 58,611.53 |
| 03/18 | 03/18 Online Domestic Wire Transfer Via: Capital One NA/065000090 A/C: Bprep8500 Sunset LLC Los Angeles CA 90069 US Ref: E304/Bnf/E304/Time/08:02 Imad: 0318B1Qgc08C003474 Trn: 3058212077Es | -8,000.00 | 50,611.53 |
| 03/18 | Online Domestic Wire Fee | -25.00 | 50,586.53 |
| 03/21 | Card Purchase         03/19 Doordash*Terners Liq Www.Doordash. CA Card 0934 | -248.29 | 50,338.24 |
| 03/21 | Card Purchase         03/19 Doordash*Tacos Neza Www.Doordash. CA Card 0934 | -13.35 | 50,324.89 |
| 03/21 | Zelle Payment To Mon Amour Jpm9999Xmhjh | -500.00 | 49,824.89 |
| 03/21 | Card Purchase         03/19 Doordash*Met Him At Www.Doordash. CA Card 0934 | -31.67 | 49,793.22 |
| 03/21 | Card Purchase         03/19 Starbucks Store 61621 Los Angeles CA Card 0934 | -21.99 | 49,771.23 |
| 03/21 | Card Purchase         03/19 Instacart*1102 Httpsinstacar CA Card 0934 | -212.58 | 49,558.65 |
| 03/21 | Card Purchase         03/19 Instacart Httpsinstacar CA Card 0934 | -98.99 | 49,459.66 |
| 03/21 | Card Purchase         03/20 Instacart Httpsinstacar CA Card 0934 | -46.64 | 49,413.02 |
| 03/21 | Card Purchase         03/20 Doordash*Cvs Www.Doordash. CA Card 0934 | -53.05 | 49,359.97 |
| 03/21 | Recurring Card Purchase 03/20 Spotify USA 877-7781161 NY Card 0934 | -9.99 | 49,349.98 |
| 03/21 | Card Purchase         03/20 Ralphs Via Instacart Ralphs.Com CA Card 0934 | -431.23 | 48,918.75 |
| 03/21 | Card Purchase         03/21 Jetsuitex 800-435-9579 TX Card 0934 | -289.00 | 48,629.75 |
| 03/21 | Non-Chase ATM Withdraw 03/21 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 48,122.76 |
| 03/21 | 03/21 Withdrawal | -10,000.00 | 38,122.76 |
| 03/21 | Non-Chase ATM Fee-With | -2.50 | 38,120.26 |
| 03/22 | Card Purchase         03/21 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -10,400.00 | 27,720.26 |
| 03/22 | Card Purchase         03/21 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -3,145.99 | 24,574.27 |
| 03/22 | Card Purchase         03/22 Jetsuitex 800-435-9579 TX Card 0934 | -379.00 | 24,195.27 |
| 03/22 | Card Purchase         03/21 Lawdepot +1877509439 Httpswww.Lawd CA Card 0934 | -35.00 | 24,160.27 |
| 03/22 | 03/21 Online Realtime Transfer To Pprfbus Chk  2308 Transaction#: 13934714649 Reference#: 9934714649Rx | -5,000.00 | 19,160.27 |
| 03/22 | Att        Payment   009825003Smt2L  Web ID: 9864031005 | -292.75 | 18,867.52 |
| 03/22 | Zelle Payment To J Hawaii 13938373739 | -500.00 | 18,367.52 |
| 03/22 | 03/22 Withdrawal | -9,000.00 | 9,367.52 |

Page 4 of 10



March 09, 2022 through April 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL (continued)

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 03/23 | ATM Cash Deposit 0934 | 03/23 1470 Jamboree Rd Newport Beach CA Card | **8,100.00** | 17,467.52 |
| 03/23 | ATM Cash Deposit 0934 | 03/23 1470 Jamboree Rd Newport Beach CA Card | **6,700.00** | 24,167.52 |
| 03/23 | Card Purchase 0934 | 03/22 Evi* Wynn Las Vegas 702-8553000 NV Card | -5,205.99 | 18,961.53 |
| 03/23 | 03/23 Online Realtime Transfer To Perfbus Chk 2308 Transaction#: 13945930528 Reference#: 9945930528Rx | | -5,000.00 | 13,961.53 |
| 03/24 | Card Purchase | 03/23 Pdfsimpli 844-898-4076 San Juan Card 0934 | -39.95 | 13,921.58 |
| 03/24 | Card Purchase 0934 | 03/24 Doordash*Sunset Stri Www.Doordash. CA Card | -151.81 | 13,769.77 |
| 03/24 | Card Purchase 0934 | 03/24 Jetsuitex 800-435-9579 TX Card 0934 | -1,456.00 | 12,313.77 |
| 03/24 | Card Purchase 0934 | 03/24 Dd Doordash Pavilions 855-973-1040 CA Card | -59.60 | 12,254.17 |
| 03/24 | Card Purchase 0934 | 03/24 Dd Doordash Zinquzin- 855-973-1040 CA Card | -49.08 | 12,205.09 |
| 03/24 | Card Purchase Card 0934 | 03/24 Amzn Mktp US*1645J0A Amzn.Com/Bill WA | -27.97 | 12,177.12 |
| 03/24 | Card Purchase Card 0934 | 03/24 Amzn Mktp US*165887T Amzn.Com/Bill WA | -19.83 | 12,157.29 |
| 03/25 | Card Purchase Card 0934 | 03/24 Amzn Mktp US*161P09E Amzn.Com/Bill WA | -38.48 | 12,118.81 |
| 03/25 | Card Purchase 0934 | 03/24 Ralphs Via Instacart Ralphs.Com CA Card 0934 | -192.82 | 11,925.99 |
| 03/25 | Card Purchase 0934 | 03/24 Holly MA Via Instaca Www.Instagram CA Card | -361.55 | 11,564.44 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13978751716 Info: Iid: 20220328021000021P1Bripm00000020007 Recd: 12:12:25 Trn: 9978751716Rx | | **25,000.00** | 36,564.44 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13978840834 Info: Iid: 20220328021000021P1Bripm00500024309 Recd: 14:45:03 Trn: 9978840834Rx | | **15,000.00** | 51,564.44 |
| 03/28 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13965424002 Info: Iid: 20220326021000021P1Bripm00520003299 Recd: 02:42:23 Trn: 9965424002Rx | | **3,500.00** | 55,064.44 |
| 03/28 | Payment Received 0934 | 03/26 Cash App*Cash Out Visa Direct CA Card | **2,456.25** | 57,520.69 |
| 03/28 | Payment Received 0934 | 03/26 Cash App*Cash Out Visa Direct CA Card | **1,965.00** | 59,485.69 |
| 03/28 | Payment Received 0934 | 03/26 Cash App*Cash Out Visa Direct CA Card | **982.50** | 60,468.19 |
| 03/28 | Card Purchase | 03/24 City of B H Parking Beverly Hills CA Card 0934 | -4.00 | 60,464.19 |
| 03/28 | Card Purchase Card 0934 | 03/26 Amzn Mktp US*1N5Pe12 Amzn.Com/Bill WA | -18.73 | 60,445.46 |
| 03/28 | 03/25 Online Realtime Transfer To Perfbus Chk 2308 Transaction#: 13964918485 Reference#: 9964918485Rx | | -5,000.00 | 55,445.46 |
| 03/28 | Card Purchase 0934 | 03/25 Evi* Wynn Las Vegas 702-8553000 NV Card | -2,629.99 | 52,815.47 |
| 03/28 | 03/26 Online Realtime Transfer To Perfbus Chk 2308 Transaction#: 13965288027 Reference#: 9965288027Rx | | -3,000.00 | 49,815.47 |
| 03/28 | 03/26 Online Realtime Transfer To Perfbus Chk 2308 Transaction#: 13965420835 Reference#: 9965420835Rx | | -2,500.00 | 47,315.47 |
| 03/28 | Zelle Payment To Sara Jpm999A5V6DX | | -100.00 | 47,215.47 |
| 03/28 | Zelle Payment To Sara Jpm999A5VA6X | | -4,200.00 | 43,015.47 |
| 03/28 | Zelle Payment To Sara Jpm999A6Om9V | | -700.00 | 42,315.47 |

Page 5 of 10



**CHASE** ⬡

March 09, 2022 through April 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 03/28 | 03/26 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 13969973953 Reference#: 9969973953Rx | -500.00 | 41,815.47 |
| 03/28 | Non-Chase ATM Withdraw  03/26 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 41,308.48 |
| 03/28 | Non-Chase ATM Withdraw  03/26 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 40,801.49 |
| 03/28 | Card Purchase          03/26 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -1,286.99 | 39,514.50 |
| 03/28 | Zelle Payment To Sara Jpm999A6Zsa2 | -1,300.00 | 38,214.50 |
| 03/28 | 03/28 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Wlv LLC Las Vegas NV 89109 US Ref: S King Imad: 0328B1Qgc01C008247 Trn: 3482772087Es | -20,000.00 | 18,214.50 |
| 03/28 | Online Domestic Wire Fee | -25.00 | 18,189.50 |
| 03/28 | Non-Chase ATM Fee-With | -2.50 | 18,187.00 |
| 03/28 | Non-Chase ATM Fee-With | -2.50 | 18,184.50 |
| 03/29 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13986738662 Info:  Iid: 2022032902 1000021P1Brjpm00520042159 Recd: 15:35:19 Trn: 9986738662Rx | 20,000.00 | 38,184.50 |
| 03/29 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13986582854 Info:  Iid: 20220329021000021P1Brjpm00000044829 Recd: 15:10:20 Trn: 9986582854Rx | 8,000.00 | 46,184.50 |
| 03/29 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-13986586842 Info:  Iid: 20220329021000021P1Brjpm00060033359 Recd: 15:10:55 Trn: 9986586842Rx | 2,000.00 | 48,184.50 |
| 03/29 | 03/29 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0329B1Qgc07C012406 Trn: 3292872088Es | -15,000.00 | 33,184.50 |
| 03/29 | 03/29 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0329B1Qgc01C008457 Trn: 3428622088Es | -10,000.00 | 23,184.50 |
| 03/29 | Zelle Payment To Rose Gordon 13987883072 | -1,800.00 | 21,384.50 |
| 03/29 | Online Domestic Wire Fee | -25.00 | 21,359.50 |
| 03/29 | Online Domestic Wire Fee | -25.00 | 21,334.50 |
| 03/30 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-13992208222 Info:  Iid: 20220330021000021P1Brjpm00060029100 Recd: 12:18:33 Trn: 9992208222Rx | 10,000.00 | 31,334.50 |
| 03/30 | Card Purchase          03/29 Apple.Com/Bill 866-712-7753 CA Card 0934 | -11.99 | 31,322.51 |
| 03/30 | Card Purchase          03/29 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -12,480.00 | 18,842.51 |
| 03/30 | 03/30 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Heidi King Rancho Santa Fe CA 92067 US Ref:/Time/12:27 Imad: 0330B1Qgc05C009070 Trn: 3290582089Es | -10,000.00 | 8,842.51 |
| 03/30 | Zelle Payment To Sara Jpm999Aarak7 | -5,000.00 | 3,842.51 |
| 03/30 | Non-Chase ATM Withdraw  03/30 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 3,335.52 |
| 03/30 | Online Domestic Wire Fee | -25.00 | 3,310.52 |
| 03/30 | Non-Chase ATM Fee-With | -2.50 | 3,308.02 |
| 03/31 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14003726232 Info:  Iid: 20220331021000021P1Brjpm00520078451 Recd: 18:19:34 Trn: 9003726232Rx | 3,000.00 | 6,308.02 |
| 03/31 | Recurring Card Purchase 03/31 Adobe Acropro Subs 408-536-6000 CA Card 0934 | -14.99 | 6,293.03 |

Page 6 of 10

**SB1478499-F1**

## CHASE ⬡

March 09, 2022 through April 08, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | | AMOUNT | BALANCE |
|------|-------------|---|--------|---------|
| 03/31 | Card Purchase | 03/30 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 6,288.04 |
| 04/01 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14013143894 Info:  Iid: 20220401021000021P1Brjpm00060042879 Recd: 11:41:15 Tm: 9013143894Rx | | 25,000.00 | 31,288.04 |
| 04/01 | Real Time Transfer Recd From Aba/021000021 From: King Reuben, A Professional Corporation Ref: Mms-14017146127 Info:  Iid: 20220401021000021P1Brjpm00510040982 Recd: 16:45:52 Tm: 9017146127Rx | | 20,000.00 | 51,288.04 |
| 04/01 | Card Purchase | 03/31 Apple.Com/Bill 866-712-7753 CA Card 0934 | -57.99 | 51,230.05 |
| 04/01 | Card Purchase 0934 | 03/31 Evi* Wynn Las Vegas 702-8553000 NV Card | -2,629.99 | 48,600.06 |
| 04/01 | Card Purchase | 04/01 Jetsuitex 800-435-9579 TX Card 0934 | -739.00 | 47,861.06 |
| 04/04 | Payment Received 0934 | 04/04 Cash App*Cash Out Visa Direct CA Card | 936.35 | 48,797.41 |
| 04/04 | Card Purchase 0934 | 03/31 Alaska Air  02721334697 Seattle WA Card | -298.60 | 48,498.81 |
| 04/04 | Card Purchase 0934 | 03/31 Alaska Air  02721334697 Seattle WA Card | -298.60 | 48,200.21 |
| 04/04 | Card Purchase 0934 | 03/31 Alaska Air  02721334697 Seattle WA Card | -298.60 | 47,901.61 |
| 04/04 | Card Purchase 0934 | 03/31 Alaska Air  02721334697 Seattle WA Card | -298.60 | 47,603.01 |
| 04/04 | Card Purchase 0934 | 03/31 Alaska Air  02721334697 Seattle WA Card | -298.60 | 47,304.41 |
| 04/04 | Card Purchase 0934 | 04/01 Evi* Wynn Las Vegas 702-8553000 NV Card | -14,560.00 | 32,744.41 |
| 04/04 | Card Purchase 0934 | 04/02 Evi* Wynn Las Vegas 702-8553000 NV Card | -14,560.00 | 18,184.41 |
| 04/04 | Zelle Payment To Sara Jpm999Af9S46 | | -5,000.00 | 13,184.41 |
| 04/04 | Card Purchase 0934 | 04/03 Evi* Wynn Las Vegas 702-8553000 NV Card | -11,440.00 | 1,744.41 |
| 04/04 | Card Purchase | 04/04 Apple.Com/Bill 866-712-7753 CA Card 0934 | -39.99 | 1,704.42 |
| 04/04 | Non-Chase ATM Withdraw  04/04 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | | -506.99 | 1,197.43 |
| 04/04 | 04/04 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14039163233 Reference#: 9039163233Rx | | -500.00 | 697.43 |
| 04/04 | Zelle Payment To Sara Jpm999Ahxcrm | | -600.00 | 97.43 |
| 04/04 | Non-Chase ATM Fee-With | | -2.50 | 94.93 |
| 04/05 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14046265615 Info:  Iid: 20220405021000021P1Brjpm00500037200 Recd: 13:35:37 Tm: 9046265615Rx | | 20,000.00 | 20,094.93 |
| 04/05 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14044648402 Info:  Iid: 20220405021000021P1Brjpm00020026578 Recd: 10:12:07 Tm: 9044648402Rx | | 5,000.00 | 25,094.93 |
| 04/05 | Zelle Payment To Sara Jpm999Aiqrcf | | -5,000.00 | 20,094.93 |
| 04/05 | 04/05 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0405B1Qgc03C008274 Trn: 3377542095Es | | -20,000.00 | 94.93 |
| 04/05 | Online Domestic Wire Fee | | -25.00 | 69.93 |
| 04/07 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14063485639 Info:  Iid: 20220407021000021P1Brjpm00000059391 Recd: 19:22:45 Tm: 9063485639Rx | | 15.00 | 84.93 |
| 04/07 | Payment Received 0934 | 04/07 Cash App*Cash Out Visa Direct CA Card | 1,965.00 | 2,049.93 |



*Page 7 of 10*





March 09, 2022 through April 08, 2022
Account Number:   **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 04/07 | Zelle Payment From Express Limo Services Inc 14062426145 | **1,500.00** | 3,549.93 |
| 04/07 | Zelle Payment From Express Limo Services Inc 14062514348 | **1,100.00** | 4,649.93 |
| 04/07 | Recurring Card Purchase 04/06 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 4,644.94 |
| 04/07 | Card Purchase          04/06 Apple.Com/Bill 866-712-7753 CA Card 0934 | -29.99 | 4,614.95 |
| 04/07 | Card Purchase          04/07 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 4,611.96 |
| 04/07 | Card Purchase          04/07 Amazon Prime*1H6Eb0H Amzn.Com/Bill WA Card 0934 | -16.15 | 4,595.81 |
| 04/07 | Zelle Payment To Sara Jpm999Akt7Sj | -1,900.00 | 2,695.81 |
| 04/07 | Recurring Card Purchase 04/07 Apple.Com/Bill 866-712-7753 CA Card 0934 | -9.99 | 2,685.82 |
| 04/07 | 04/07 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14060901477 Reference#: 9060901477Rx | -70.00 | 2,615.82 |
| 04/07 | Non-Chase ATM Withdraw  04/07 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -106.99 | 2,508.83 |
| 04/07 | Non-Chase ATM Fee-With | -2.50 | 2,506.33 |
| 04/08 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14069010180 Info:  Iid: 20220408021000021P1Brjpm00020021452 Recd: 11:08:30 Trn: 9069010180Rx | **5,000.00** | 7,506.33 |
| 04/08 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14072699922 Info:  Iid: 20220408021000021P1Brjpm00520062836 Recd: 17:54:24 Trn: 9072699922Rx | **3,000.00** | 10,506.33 |
| 04/08 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14073895228 Info:  Iid: 20220408021000021P1Brjpm00000078392 Recd: 20:34:15 Trn: 9073895228Rx | **1,600.00** | 12,106.33 |
| 04/08 | Zelle Payment From Sara King Bacpvkseuudw | **3,500.00** | 15,606.33 |
| 04/08 | Zelle Payment To P Parik 14070219465 | -2,000.00 | 13,606.33 |
| 04/08 | Zelle Payment To Sara Jpm999An0X8M | -3,500.00 | 10,106.33 |
| 04/08 | 04/08 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14074008456 Reference#: 9074008456Rx | -4,000.00 | 6,106.33 |
| | **Ending Balance** | | **$6,106.33** |

A Monthly Service Fee was not charged to your Chase Total Checking account.  Here are the three ways you can avoid this fee during any statement period.

- **Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network.**
  (Your total electronic deposits this period were $309,391.97. Note: some deposits may be listed on your previous statement)

- **OR, keep a balance at the beginning of each day of $1,500.00 or more in this account.**
  (Your balance at the beginning of each day was $69.93)

- **OR, keep an average beginning day balance of $5,000.00 or more in qualifying linked deposits and investments.**
  (Your average beginning day balance of qualifying linked deposits and investments was $18,669.15)

Page 8 of 10



March 09, 2022 through April 08, 2022

Account Number: **000000815402372**



**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A.  Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 9 of 10



This Page Intentionally Left Blank

**CHASE ⬡**

**DEPOSIT**

CHECKING ☐
SAVINGS ☐
CHASE LIQUID ☐

R/T 500001020

Today's Date
03- 07- 2022

Customer Name *(Please Print)*
Sara King

CASH ▶        8500.00

CHECK ▶

TOTAL FROM OTHER SIDE ▶

Sign Here *(If cash is received from this deposit)* - - - - - - - - - - - - -
X

SUBTOTAL ▶

N13060-CH (Rev 07/12)   10138756   07/21

CASH BACK ▶

▼ Start your account number here

815402372

TOTAL **$**        8500.00

⑈ 1995474771⑈ ⑉500001020⑈

JPMorganChaseBank 030903 202012 960660038348

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing a Cash In ticket.  The image you requested is not available.**

**Posting Date 09-Mar-22**

**Sequence number 008870658839**

**Amount 8500.00**

**Account Number 2372**

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing an ATM transaction.  The image you requested is not available.**

**Posting Date: 23-Mar-22**

**Sequence Number: 004090487769**

**Dollar Amount: 8100.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: G21Aug23-1104**

**This is a substitute document representing an Electronic Transaction. The image you
requested is not available. (examples include: Online Payments, Phone Funds Transfer
Deposit, Credit Due to ATM/Dep Error, Wire Transfer)**

**Posting Date 23-Mar-22**

**Sequence Number 004090487770**

**Amount 8100.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing an ATM transaction. The image you requested is not available.**

**Posting Date: 23-Mar-22**

**Sequence Number: 004090495182**

**Dollar Amount: 6700.00**

**Account Number: 2372**

**21-Aug-23**

**Reference Case Number: G21Aug23-1104**

**This is a substitute document representing an Electronic Transaction. The image you requested is not available. (examples include: Online Payments, Phone Funds Transfer Deposit, Credit Due to ATM/Dep Error, Wire Transfer)**

**Posting Date 23-Mar-22**

**Sequence Number 004090495183**

**Amount 6700.00**

**Account Number: 2372**



**CHASE**

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

April 09, 2022 through May 09, 2022
Account Number: **000000815402372**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-800-935-9935** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

00485712 DRE 703 219 13022 NNNNNNNNNNN  1 000000000 06 0000
SARA J KING
4409 SAN JOAQUIN PLZ
NEWPORT BEACH CA 92660-5975



---

## CHECKING SUMMARY   Chase Total Checking

| | AMOUNT |
|---|---|
| Beginning Balance | **$6,106.33** |
| Deposits and Additions | 246,900.00 |
| ATM & Debit Card Withdrawals | -56,532.76 |
| Electronic Withdrawals | -196,062.71 |
| Fees | -372.50 |
| Ending Balance | **$38.36** |

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | **$6,106.33** |
| 04/11 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14092750007 Info:  Iid: 20220411021000021P1Brjpm00000066481 Recd: 20:24:57 Trn: 9092750007Rx | **15,000.00** | 21,106.33 |
| 04/11 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14088744841 Info:  Iid: 20220411021000021P1Brjpm00060016435 Recd: 10:52:18 Trn: 9088744841Rx | **10,000.00** | 31,106.33 |
| 04/11 | Deposit      1083339815 | **4,000.00** | 35,106.33 |
| 04/11 | Zelle Payment From King Reuben, A Professional Corporation 14088753443 | **5,000.00** | 40,106.33 |
| 04/11 | Recurring Card Purchase 04/09 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 40,103.34 |
| 04/11 | Card Purchase       04/08 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,629.99 | 37,473.35 |
| 04/11 | Recurring Card Purchase 04/09 Newlife Vitamin Shop Www.Newlifevi OR Card 0934 | -113.04 | 37,360.31 |
| 04/11 | Non-Chase ATM Withdraw  04/09 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -406.99 | 36,953.32 |
| 04/11 | 04/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14078562728 Reference#: 9078562728Rx | -1,500.00 | 35,453.32 |
| 04/11 | 04/09 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14078566948 Reference#: 9078566948Rx | -2,500.00 | 32,953.32 |
| 04/11 | Card Purchase       04/11 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.99 | 32,946.33 |
| 04/11 | Non-Chase ATM Withdraw  04/11 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 32,439.34 |
| 04/11 | Zelle Payment To Bf Jpm999Apz7B0 | -1,500.00 | 30,939.34 |

Page 1 of 6

CHASE ⬡

April 09, 2022 through May 09, 2022

Account Number:  **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 04/11 | 04/11 Online Domestic Wire Transfer Via: Capital One NA/065000090 A/C: Bprop8500 Sunset LLC Los Angeles CA 90069 US Ref: E304/Bnf/E304/Time/12:40 Imad: 0411B1Qgc01C009174 Trn: 3384932101Es | -7,500.00 | 23,439.34 |
| 04/11 | Online Domestic Wire Fee | -25.00 | 23,414.34 |
| 04/11 | Non-Chase ATM Fee-With | -2.50 | 23,411.84 |
| 04/11 | Non-Chase ATM Fee-With | -2.50 | 23,409.34 |
| 04/12 | Recurring Card Purchase 04/11 Onlinevinlookupcom Concord CA Card 0934 | -23.95 | 23,385.39 |
| 04/13 | JPMorgan Chase  Ext Trnsfr          PPD ID: 9200502231 | 10,000.00 | 33,385.39 |
| 04/13 | Card Purchase          04/11 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -14,560.00 | 18,825.39 |
| 04/13 | Recurring Card Purchase 04/12 Apple.Com/Bill 866-712-7753 CA Card 0934 | -11.99 | 18,813.40 |
| 04/13 | Att         Payment   552096003Smt2H  Web ID: 9864031005 | -262.71 | 18,550.69 |
| 04/13 | Recurring Card Purchase 04/13 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 18,545.70 |
| 04/13 | Recurring Card Purchase 04/13 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 18,542.71 |
| 04/14 | 04/14 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14107748063 Reference#: 9107748063Rx | -5,000.00 | 13,542.71 |
| 04/14 | 04/14 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0414B1Qgc06C013925 Trn: 3398462104Es | -11,000.00 | 2,542.71 |
| 04/14 | Online Domestic Wire Fee | -25.00 | 2,517.71 |
| 04/15 | Zelle Payment From Express Limo Services Inc 14115711031 | 5,000.00 | 7,517.71 |
| 04/15 | Zelle Payment From Paramaz Bilezikchyan Wfct0Qd5Vyp8 | 3,500.00 | 11,017.71 |
| 04/15 | Zelle Payment From Laura Mamani Wfct0Qd5W4R7 | 1,500.00 | 12,517.71 |
| 04/15 | Zelle Payment From Sara King Bacmlityzmle | 500.00 | 13,017.71 |
| 04/15 | Card Purchase          04/14 Loan Post Dba Lendingwi Miami FL Card 0934 | -447.00 | 12,570.71 |
| 04/15 | 04/15 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14115734686Rx Reference#: 9115734686Rx | -5,000.00 | 7,570.71 |
| 04/15 | 04/15 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14116369317 Reference#: 9116369317Rx | -1,000.00 | 6,570.71 |
| 04/15 | Non-Chase ATM Withdraw 04/15 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 6,063.72 |
| 04/15 | 04/15 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0415B1Qgc07C007964 Trn: 3289422105Es | -1,300.00 | 4,763.72 |
| 04/15 | 04/15 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14124745920 Reference#: 9124745920Rx | -500.00 | 4,263.72 |
| 04/15 | Online Domestic Wire Fee | -25.00 | 4,238.72 |
| 04/15 | Non-Chase ATM Fee-With | -2.50 | 4,236.22 |
| 04/18 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14133772673 Info:  Iid: 20220417021000021P1Brjpm00510007886 Recd: 00:18:25 Trn: 9133772673Rx | 2,000.00 | 6,236.22 |
| 04/18 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14133765809 Info:  Iid: 20220417021000021P1Brjpm00510007719 Recd: 00:15:45 Trn: 9133765809Rx | 500.00 | 6,736.22 |
| 04/18 | Zelle Payment From Express Limo Services Inc 14141652062 | 1,000.00 | 7,736.22 |
| 04/18 | Card Purchase          04/14 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,945.99 | 4,790.23 |
| 04/18 | Card Purchase          04/17 Encore Theater 702-770-2540 NV Card 0934 | -88.03 | 4,702.20 |
| 04/18 | Card Purchase          04/17 The Drug Store Las Vegas NV Card 0934 | -59.61 | 4,642.59 |
| 04/18 | Card Purchase          04/16 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,429.99 | 2,212.60 |
| 04/18 | Recurring Card Purchase 04/18 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.99 | 2,205.61 |

*Page 2 of 6*



April 09, 2022 through May 09, 2022

Account Number:   **000000815402372**

## TRANSACTION DETAIL *(continued)*



| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 04/18 | Card Purchase With Pin  04/18 Resorts World LA Resor Las Vegas NV Card 0934 | -524.95 | 1,680.66 |
| 04/18 | Non-Chase ATM Withdraw  04/18 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -46.99 | 1,633.67 |
| 04/18 | Non-Chase ATM Fee-With | -2.50 | 1,631.17 |
| 04/19 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14148489638 Info:  Iid: 20220419021000021P1Bripm00060014210 Recd: 11:53:26 Tm: 9148489638Rx | **25,000.00** | 26,631.17 |
| 04/19 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14151545952 Info:  Iid: 20220419021000021P1Bripm00000067946 Recd: 19:26:41 Tm: 9151545952Rx | **20,000.00** | 46,631.17 |
| 04/19 | Card Purchase          04/18 Resorts World Las Vegas Las Vegas NV Card 0934 | -432.99 | 46,198.18 |
| 04/19 | 04/19 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0419B1Qgc02C007623 Trn: 3246072109Es | -25,000.00 | 21,198.18 |
| 04/19 | 04/19 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14151678980 Reference#: 9151678980Rx | -5,000.00 | 16,198.18 |
| 04/19 | Online Domestic Wire Fee | -25.00 | 16,173.18 |
| 04/20 | Zelle Payment To Bf Jpm999B015Fn | -2,000.00 | 14,173.18 |
| 04/20 | Recurring Card Purchase 04/20 Spotify USA 877-7781161 NY Card 0934 | -9.99 | 14,163.19 |
| 04/20 | Recurring Card Purchase 04/20 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 14,160.20 |
| 04/20 | 04/20 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Heidi King Rancho Santa Fe CA 92067 US Ref:/Time/12:49 Imad: 0420B1Qgc08C010215 Trn: 3251602110Es | -3,000.00 | 11,160.20 |
| 04/20 | Online Domestic Wire Fee | -25.00 | 11,135.20 |
| 04/21 | Card Purchase          04/19 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,629.99 | 8,505.21 |
| 04/21 | Recurring Card Purchase 04/20 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 8,500.22 |
| 04/21 | Card Purchase          04/20 Pdfsimpli 844-898-4076 San Juan Card 0934 | -39.95 | 8,460.27 |
| 04/22 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14173055747 Info:  Iid: 20220422021000021P1Bripm00060045853 Recd: 13:40:10 Tm: 9173055747Rx | **1,400.00** | 9,860.27 |
| 04/22 | Deposit      1159944156 | **5,000.00** | 14,860.27 |
| 04/22 | Card Purchase          04/21 Instacart Httpsinstacar CA Card 0934 | -215.67 | 14,644.60 |
| 04/22 | Recurring Card Purchase 04/21 Apple.Com/Bill 866-712-7753 CA Card 0934 | -14.99 | 14,629.61 |
| 04/22 | Non-Chase ATM Withdraw  04/21 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 14,122.62 |
| 04/22 | 04/22 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0422B1Qgc02C008187 Trn: 3315062112Es | -4,500.00 | 9,622.62 |
| 04/22 | 04/22 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0422B1Qgc07C010742 Trn: 3350972112Es | -1,500.00 | 8,122.62 |
| 04/22 | Online Domestic Wire Fee | -25.00 | 8,097.62 |
| 04/22 | Online Domestic Wire Fee | -25.00 | 8,072.62 |
| 04/22 | Non-Chase ATM Fee-With | -2.50 | 8,070.12 |
| 04/25 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14183740277 Info:  Iid: 20220424021000021P1Bripm00510001597 Recd: 04:56:57 Tm: 9183740277Rx | **3,500.00** | 11,570.12 |

*Page 3 of 6*

**CHASE** ◻

April 09, 2022 through May 09, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 04/25 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14188573404 Info:  Iid: 20220425021000021P1Brjpm00500004043 Recd: 00:44:47 Trn: 9188573404Rfx | 1,000.00 | 12,570.12 |
| 04/25 | Recurring Card Purchase 04/22 Lawdepot.Com 877-509-4398 De Card 0934 | -35.00 | 12,535.12 |
| 04/25 | Card Purchase        04/22 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,945.99 | 9,589.13 |
| 04/25 | Card Purchase        04/23 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.49 | 9,582.64 |
| 04/25 | Zelle Payment To Bf Jpm999B4Obtm | -2,000.00 | 7,582.64 |
| 04/25 | Card Purchase        04/24 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,945.99 | 4,636.65 |
| 04/25 | Zelle Payment To Bf Jpm999B5Hepk | -2,000.00 | 2,636.65 |
| 04/25 | Non-Chase ATM Withdraw  04/24 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 2,129.66 |
| 04/25 | Recurring Card Purchase 04/25 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.99 | 2,122.67 |
| 04/25 | Non-Chase ATM Fee-With | -2.50 | 2,120.17 |
| 04/26 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14198429156 Info:  Iid: 20220426021000021P1Brjpm00510031236 Recd: 13:19:50 Trn: 9198429156Rfx | 22,000.00 | 24,120.17 |
| 04/26 | Card Purchase        04/24 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,104.99 | 22,015.18 |
| 04/26 | 04/26 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0426B1Qgc07C010942 Trn: 3332762116Es | -20,000.00 | 2,015.18 |
| 04/26 | Zelle Payment To Bf Jpm999B7Mu6C | -2,000.00 | 15.18 |
| 04/26 | Online Domestic Wire Fee | -25.00 | -9.82 |
| 04/27 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14205840749 Info:  Iid: 20220427021000021P1Brjpm00020033554 Recd: 14:06:41 Trn: 9205840749Rfx | 25,000.00 | 24,990.18 |
| 04/27 | Recurring Card Purchase 04/27 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 24,985.19 |
| 04/27 | Recurring Card Purchase 04/27 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 24,982.20 |
| 04/27 | 04/27 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0427B1Qgc08C023809 Trn: 3385012117Es | -23,000.00 | 1,982.20 |
| 04/27 | Online Domestic Wire Fee | -25.00 | 1,957.20 |
| 04/28 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14212465481 Info:  Iid: 20220428021000021P1Brjpm00000017216 Recd: 10:30:10 Trn: 9212465481Rfx | 25,000.00 | 26,957.20 |
| 04/28 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14212926317 Info:  Iid: 20220428021000021P1Brjpm00020034446 Recd: 11:32:44 Trn: 9212926317Rfx | 11,000.00 | 37,957.20 |
| 04/28 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-14212888744 Info:  Iid: 20220428021000021P1Brjpm00020032034 Recd: 11:27:43 Trn: 9212888744Rfx | 5,000.00 | 42,957.20 |
| 04/28 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-14216956550 Info:  Iid: 20220428021000021P1Brjpm00520070043 Recd: 21:18:51 Trn: 9216956550Rfx | 5,000.00 | 47,957.20 |
| 04/28 | 04/28 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0428B1Qgc05C007525 Trn: 3009962115Es | -5,000.00 | 42,957.20 |



Page 4 of 6

SB1478499-F1



April 09, 2022 through May 09, 2022
Account Number: **000000815402372**

## TRANSACTION DETAIL *(continued)*



| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| 04/28 | 04/28 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0428B1Qgc06C010203 Trn: 3269162118Es | -12,000.00 | 30,957.20 |
| 04/28 | 04/28 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Aba/121042882 Concord CA US Ben: Heidi King Rancho Santa Fe CA 92067 US Ref:/Time/11:40 Imad: 0428B1Qgc08C020499 Trn: 3272132118Es | -10,000.00 | 20,957.20 |
| 04/28 | Zelle Payment To Bf Jpm999Ba06T2 | -1,300.00 | 19,657.20 |
| 04/28 | Non-Chase ATM Withdraw  04/28 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 19,150.21 |
| 04/28 | Online Domestic Wire Fee | -25.00 | 19,125.21 |
| 04/28 | Online Domestic Wire Fee | -25.00 | 19,100.21 |
| 04/28 | Online Domestic Wire Fee | -25.00 | 19,075.21 |
| 04/28 | Non-Chase ATM Fee-With | -2.50 | 19,072.71 |
| 04/29 | Recurring Card Purchase 04/28 Apple.Com/Bill 866-712-7753 CA Card 0934 | -11.99 | 19,060.72 |
| 04/29 | Card Purchase          04/28 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -14,560.00 | 4,500.72 |
| 04/29 | Zelle Payment To Bf Jpm999Ba9459 | -700.00 | 3,800.72 |
| 05/02 | Recurring Card Purchase 04/30 Adobe Acropro Subs 408-536-6000 CA Card 0934 | -14.99 | 3,785.73 |
| 05/02 | Card Purchase          04/30 Instacart Httpsinstacar CA Card 0934 | -113.14 | 3,672.59 |
| 05/02 | Recurring Card Purchase 05/02 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.99 | 3,665.60 |
| 05/02 | Zelle Payment To Bf Jpm999Bg748N | -2,000.00 | 1,665.60 |
| 05/02 | Non-Chase ATM Withdraw  05/02 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -506.99 | 1,158.61 |
| 05/02 | Non-Chase ATM Fee-With | -2.50 | 1,156.11 |
| 05/03 | Card Purchase          05/03 Amzn Mktp US*1345686 Amzn.Com/Bill WA Card 0934 | -146.24 | 1,009.87 |
| 05/03 | Zelle Payment To Bf Jpm999Bh3Nny | -1,000.00 | 9.87 |
| 05/04 | Card Purchase          05/04 Amzn Mktp US*1Q5Re12 Amzn.Com/Bill WA Card 0934 | -24.89 | -15.02 |
| 05/05 | Real Time Transfer Recd From Aba/021000021 From: King Family Lending LLC Ref: Mms-14271729515 Info:  Iid: 20220505021000021P1Brjpm00560013485 Recd: 06:50:20 Trn: 9271729515Rx | 25,000.00 | 24,984.98 |
| 05/05 | Real Time Transfer Recd From Aba/021000021 From: Hrh Property Holdings LLC Ref: Mms-14274829919 Info:  Iid: 20220505021000021P1Brjpm00000036381 Recd: 13:53:28 Trn: 9274829919Rx | 15,000.00 | 39,984.98 |
| 05/05 | Recurring Card Purchase 05/04 Apple.Com/Bill 866-712-7753 CA Card 0934 | -4.99 | 39,979.99 |
| 05/05 | Recurring Card Purchase 05/04 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 39,977.00 |
| 05/05 | 05/05 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0505B1Qgc06C001320 Trn: 3135912125Es | -24,000.00 | 15,977.00 |
| 05/05 | Zelle Payment To Bf Jpm999Bjikrg | -2,000.00 | 13,977.00 |
| 05/05 | 05/05 Online Domestic Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Sara King Newport Beach CA 92660 US Imad: 0505B1Qgc08C023452 Trn: 3382702125Es | -1,000.00 | 12,977.00 |
| 05/05 | Online Domestic Wire Fee | -25.00 | 12,952.00 |
| 05/05 | Online Domestic Wire Fee | -25.00 | 12,927.00 |
| 05/06 | Card Purchase          05/05 Evi* Wynn Las Vegas 702-8553000 NV Card 0934 | -2,629.99 | 10,297.01 |
| 05/06 | Zelle Payment To Danny Weis Jpm999Blbeis | -1,500.00 | 8,797.01 |
| 05/09 | Card Purchase          05/07 Amazon Prime*1L8722Z Amzn.Com/Bill WA Card 0934 | -16.15 | 8,780.86 |
| 05/09 | Zelle Payment To Bf Jpm999Bltxes | -500.00 | 8,280.86 |



Page 5 of 6



April 09, 2022 through May 09, 2022
Account Number:     **000000815402372**

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 05/09 | Recurring Card Purchase 05/07 Apple.Com/Bill 866-712-7753 CA Card 0934 | -9.99 | 8,270.87 |
| 05/09 | Zelle Payment To Bf Jpm999Bmz63R | -2,000.00 | 6,270.87 |
| 05/09 | Zelle Payment To Bf Jpm999Bnelab | -2,000.00 | 4,270.87 |
| 05/09 | 05/08 Online Realtime Transfer To Perfbus Chk  2308 Transaction#: 14296589324 Reference#: 9296589324Rx | -4,000.00 | 270.87 |
| 05/09 | Recurring Card Purchase 05/09 Apple.Com/Bill 866-712-7753 CA Card 0934 | -2.99 | 267.88 |
| 05/09 | Recurring Card Purchase 05/09 Apple.Com/Bill 866-712-7753 CA Card 0934 | -6.99 | 260.89 |
| 05/09 | Recurring Card Purchase 05/09 Newlife Vitamin Shop Www.Newlifevi OR Card 0934 | -113.04 | 147.85 |
| 05/09 | Non-Chase ATM Withdraw  05/09 3131 Las Vegas Blvd So Las Vegas NV Card 0934 | -106.99 | 40.86 |
| 05/09 | Non-Chase ATM Fee-With | -2.50 | 38.36 |
| | **Ending Balance** | | **$38.36** |

A Monthly Service Fee was **not** charged to your Chase Total Checking account.  Here are the three ways you can avoid this fee during any statement period.

- **Have electronic deposits made into this account totaling $500.00 or more, such as payments from payroll providers or government benefit providers, by using (i) the ACH network, (ii) the Real Time Payment network, or (iii) third party services that facilitate payments to your debit card using the Visa or Mastercard network.**
(Your total electronic deposits this period were $257,980.00. Note: some deposits may be listed on your previous statement)

- **OR, keep a balance at the beginning of each day of $1,500.00 or more in this account.**
(Your balance at the beginning of each day was -$15.02)

- **OR, keep an average beginning day balance of $5,000.00 or more in qualifying linked deposits and investments.**
(Your average beginning day balance of qualifying linked deposits and investments was $7,596.91)

---

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC.

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 6 of 6

**SB1478499-F1** 53

## CHASE ⬡

### DEPOSIT/DEPÓSITO

CHECKING/CHEQUES ☐
SAVINGS/AHORROS ☐
CHASE LIQUID ☐

R/T 500001020

**DEPOSIT/DEPÓSITO**

Today's Date/Fecha
4·9·22

Customer Name *(Please Print)*/Nombre del cliente *(en letra de molde)*
SARA KING

**Sign Here** *(If cash is received from this deposit)*/
**Firme aquí** *(si recibe efectivo de este depósito)*
X

N13062-CH (Rev 07/12)   90304570   10/19

Start your account number here/
▼ Empiece su número de cuenta aquí

815402372

CASH/
EFECTIVO ▶

CHECK/
CHEQUE ▶

TOTAL FROM
OTHER SIDE /
TOTAL DEL REVERSO ▶

SUBTOTAL ▶

LESS CASH/
MENOS EFECTIVO
RECIBIDO ▶

TOTAL **$**

4000.—

⑈1083339815⑈ ⑆50000 10 20⑈

JPMorganChaseBank 041110 208245 961310020025

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing a Cash In ticket.  The image you requested is not available.**

**Posting Date 11-Apr-22**

**Sequence number 009590271379**

**Amount 4000.00**

**Account Number 2372**

**CHASE ◑**                     **DEPOSIT/DEPÓSITO**

CHECKING/CHEQUES ☐
SAVINGS/AHORROS ☐
CHASE LIQUID ☐

R/T 500001020

Today's Date/Fecha
7/22/22

Customer Name (Please Print)/ Nombre del cliente (en letra de molde)

Sarah King

CASH/
EFECTIVO ▶          5000. —

CHECK/
CHEQUE ▶                  .

Sign Here (If cash is received from this deposit)/
Firme aquí (si recibe efectivo de este depósito) - - - - - - - - -
X

TOTAL FROM
OTHER SIDE /
TOTAL DEL REVERSO ▶

SUBTOTAL ▶                 .

N13052-CH (Rev 07/12)   10164265   08/21

Start your account number here/
▼ Empiece su número de cuenta aquí

LESS CASH/
MENOS EFECTIVO
RECIBIDO ▶

815402372          TOTAL  $    5000. —

⑈⑈159944156⑈  ⑈500001020⑈

JPMorganChase Bank  042204  134770  957140045330

**21-Aug-23**

**Reference Case Number: 21Aug23-1104**

**This is a substitute document representing a Cash In ticket.  The image you requested is not available.**

**Posting Date 22-Apr-22**

**Sequence number 001070655004**

**Amount 5000.00**

**Account Number 2372**